## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JAVIER HERRERA,<br><br>*Plaintiff,*<br><br>v.<br><br>KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity County Board of Commissioners President, KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney, THOMAS J. DART, in his official capacity as Sheriff of Cook County, CITY OF CHICAGO, a body politic and corporate, DAVID O'NEAL BROWN, in his official capacity as Superintendent of Police for the Chicago Police Department,<br><br>*Defendants.* | Case No. 1:23-cv-00532<br><br>Hon. Mary M. Rowland<br><br><br>**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION**<br><br>**EXPEDITED ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION
## FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. iii

Introduction ......................................................................................................................... 1

Background .......................................................................................................................... 4

    I.      Illinois enacts an outright ban on selling, purchasing, possessing, and carrying common rifles and standard magazines. ........................................... 6

    II.    Cook County and the City of Chicago ban outright selling, purchasing, possessing, and carrying common rifles and standard magazines. ........................... 8

Argument .............................................................................................................................. 9

    I.      Dr. Herrera is likely to succeed on the merits. ................................................ 10

          A.    *Bruen* abrogates pre-*Bruen* decisions and requires Defendants to prove that analogous laws existed at the Founding. ................................... 10

          B.    The outright bans on the sale, purchase, possession, and self-defense use of semiautomatic rifles as common as the AR-15 violate Dr. Herrera's rights under the Second and Fourteenth Amendments. ...................................... 12

          C.    The outright bans on the sale, purchase, and possession of standard magazines, including the standard magazine for the firearm Dr. Herrera keeps in his home, violate Dr. Herrera's rights under the Second and Fourteenth Amendments. ............................................................................ 22

          D.    Illinois's mandatory-registration provision violates Dr. Herrera's Second and Fourteenth Amendment rights. ..................................................... 27

    II.    The balance of the equities and the public interest favor an injunction. ........................... 28

Conclusion ......................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Am. C.L. Union of Illinois v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ................................................................................ 29

*Andrews v. State,*
  50 Tenn. 165, (1871) ................................................................................ 13, 21

*Ass'n of New Jersey Rifle & Pistol Ass'n, Inc. (ANJRPC I) v. Att'y Gen.,*
  910 F.3d 106 (3d Cir. 2018) ................................................................................ 23, 26

*Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey (ANJRPC II),*
  974 F.3d 237 (3d Cir. 2020) ................................................................................ 16

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ................................................................................ 14, 16, 18

*Com. v. Annis,*
  9 Mass. 31 (1812) ................................................................................ 21

*Connection Distrib. Co. v. Reno,*
  154 F.3d 281 (6th Cir. 1998) ................................................................................ 29

*District of Columbia v. Heller,*
  554 U.S. 570, (2008) ................................................................................ passim

*Denius v. Dunlap,*
  330 F.3d 919 (7th Cir. 2003) ................................................................................ 3, 17

*Duncan (I) v. Becerra,*
  970 F.3d 1133, (9th Cir. 2020) ................................................................................ 23, 24, 26

*Duncan (II) v. Bonta,*
  19 F.4th 1087 (9th Cir. 2021) ................................................................................ 23, 24, 25, 26

*Duncan v. Becerra,*
  366 F. Supp. 1131 (S.D. Cal. 2019) ................................................................................ 2, 26

*Elrod v. Burns,*
  427 U.S. 347 (1976) ................................................................................ 28

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ................................................................................ passim

*Friedman v. City of Highland Park,*
  577 U.S. 1039 (2015) ................................................................................ passim

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ................................................................................ 11, 17

*Fyock v. City of Sunnyvale,*
  25 F. Supp. 3d 1267 (N.D. Cal. 2014) ................................................................................ 15

*Fyock v. Sunnyvale,*
  779 F.3d 991 (9th Cir. 2015) ................................................................................ 15, 23

*Hatfield v. Barr,*
    925 F.3d 950 (7th Cir. 2019) ........................................................................... 11

*Heller v. District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011) ............................................................... passim

*Horsley v. Trame,*
    808 F.3d 1126 (7th Cir. 2015) ........................................................................... 11

*Illinois Ass'n of Firearms Retailers (IAFR) v. City of Chicago,*
    961 F. Supp. 928 (N.D. Ill. 2014) ........................................................ 13, 14, 20

*Joelner v. Vill. of Washington Park,*
    378 F.3d 613 (7th Cir. 2004) ............................................................................ 29

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ...................................................................... 10, 11

*Kareem v. Haspel,*
    986 F.3d 859 (D.C. Cir. 2021) .......................................................................... 16

*Kolbe v. Hogan,*
    813 F.3d 160 (4th Cir. 2016) ..................................................................... passim

*Kole v. Vill. of Norridge,*
    2017 WL 5128989 (N.D. Ill. Nov. 6, 2017) .............................................. 13, 20

*Luis v. United States,*
    578 U.S. 5 (2016) ...................................................................................... 13, 22

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ..................................................................................... 1, 15

*Midwest Title Loans, Inc. v. Ripley,*
    616 F. Supp. 2d 897 (S.D. Ind. 2009) ............................................................. 29

*Miller v. Bonta,*
    542 F. Supp. 3d 1009 (2021) ............................................................................ 17

*Mills v. District of Columbia,*
    571 F.3d 1304 (D.C. Cir. 2009) ....................................................................... 28

*Mobility Workx, LLC v. United Pats., LLC,*
    15 F.4th 1146 (Fed. Cir. 2021) ........................................................................ 16

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) .............................................................................. 3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ............................................................................. passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) .................................................................. 14, 16, 18

*O'Neill v. Neronha,*
    594 F. Supp. 3d 463 (D.R.I. 2022) .................................................................. 14

*Planned Parenthood Arizona, Inc. v. Humble,*
  753 F.3d 905 (9th Cir. 2014) ............................................................................... 28

*Preston v. Thompson,*
  589 F.2d 300, (7th Cir. 1978) .............................................................................. 29

*Rodriguez v. Robbins,*
  715 F.3d 1127 (9th Cir. 2013) ............................................................................. 29

*Staples v. United States,*
  511 U.S. 600 (1994) ...................................................................................... 15, 20

*Teixeira v. Cnty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ......................................................................... 13, 23

*Thomas v. Collins,*
  323 U.S. 516 (1945) ............................................................................................ 27

*United States ex rel. Winkelman v. CVS Caremark Corp.,*
  827 F.3d 201 (1st Cir. 2016) ............................................................................... 16

*United States v. Gonzalez,*
  2022 WL 4376074 (7th Cir. Sept. 22, 2022) ...................................................... 12

*United States v. Seiwert,*
  2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) .................................................... 12

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ............................................................................... 11

*USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.,*
  402 F. Supp. 3d 427 (N.D. Ill. 2019) .................................................................... 9

*Villasenor v. Indus. Wire & Cable, Inc.,*
  929 F. Supp. 310 (N.D. Ill. 1996) ................................................................. 10, 12

*White v. Illinois State Police,*
  15 F.4th 801, 805 (7th Cir. 2021) ....................................................................... 11

*Wilson v. Cook County,*
  937 F.3d 1028 (7th Cir. 2019) ....................................................................... 11, 12

**Statutes**

44 U.S.C. §1507 ......................................................................................................... 17

720 Ill. Comp. Stat. Ann. 5/24-1 ................................................................... 6, 12, 19

720 Ill. Comp. Stat. Ann. 5/24-1.10 ................................................................. passim

720 Ill. Comp. Stat. Ann. 5/24-1.9 ................................................................... passim

Chi. Mun. Code §8-20-010 ............................................................................ 8, 19, 22

Chi. Mun. Code §8-20-075 ........................................................................ 1, 8, 12, 19

Chi. Mun. Code §8-20-085 ............................................................................ 1, 8, 22

Chi. Mun. Code §8-20-250 ................................................................................. 8, 19

Chi. Mun. Code §8-20-300.................................................................................1, 8, 19, 22

Cook Co. Code of Ord. §§54-211....................................................................................passim

Cook Co. Code of Ord. §54-212.....................................................................................passim

Cook Co. Code of Ord. §54-214........................................................................1, 8, 19, 22

Ill. Pub. Act 102-1116 (H.B. 5471) ..........................................................................1, 6

Militia Act, 1 Stat. 271, §1 (May 8, 1792) .............................................................. 21, 26

**Other Authorities**

2 William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia* (1823)........20

Congressional Research Service, House-Reported Assault Weapons Ban of 2022 (H.R. 1808)
(July 21, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12174 ................................... 16

David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*,
127 Harv. L. Rev. F. 230 (2014) ..................................................................................... 20

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,
78 Alb. L. Rev. 849 (2015)........................................................................................... 16, 25

Herbert L. Osgood, *The American Colonies in the Seventeenth Century* (1904)............................26

Letter from Thomas Jefferson to George Hammond (May 15, 1793),
*in* 6 *The Writings of Thomas Jefferson* 252-53 (P. Ford, ed. 1895) ............................................21

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*,
Georgetown McDonough School of Business Research Paper No. 4109494 (May 18, 2022) .......17

**Treatises**

11A Charles Alan Wright et al., Federal Practice & Procedure §2948.1 (2d ed. 1995) ........................26

**Regulations**

87 Fed. Reg. 24652, 24655 (Apr. 26, 2022) .................................................................................15

## INTRODUCTION

The Second and Fourteenth Amendments protect an individual right to keep and bear arms. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022); *D.C. v. Heller*, 554 U.S. 570, 635 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). That right "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156. It is not subject to "freestanding 'interest-balancing'" such that courts ask "whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. The government may not "simply posit that [gun] regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126. The government must instead "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government cannot do that when it bans arms commonly kept by law-abiding citizens for lawful purposes. *See Heller*, 554 U.S. at 625, 629; *Bruen*, 142 S. Ct. at 2128, 2156. Such laws violate "the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36 50 n.10 (1961)).

Those constitutional guarantees apply in Illinois, no less than every other State. *See McDonald*, 561 U.S. at 791. But on the heels of the Supreme Court's decision in *Bruen*, Illinois enacted an outright ban on selling, purchasing, possessing, and using the most commonly owned semiautomatic rifle in the country as well as standard magazines commonly owned for lawful purposes. *See* Ill. Pub. Act 102-1116 (H.B. 5471). Illinois is not alone. Cook County and the City of Chicago likewise prohibit Dr. Javier Herrera and millions of other Chicagoans from keeping that commonly owned semiautomatic rifle and standard magazines for equally common handguns in their homes, in addition to other prohibitions. *See* Cook Co. Code of Ord. §§54-211, 54-212, 54-214; Chi. Mun. Code §§8-20-010, 8-20-075, 8-20-085, 8-20-300. These bans flout the Second Amendment. All unconstitutionally infringe the right to keep and bear arms. All should be enjoined to prevent further irreparable injury to Dr. Herrera.

*First*, outright bans on commonly owned semiautomatic rifles are unconstitutional. While States may regulate "dangerous *and* unusual weapons," those "in common use" are beyond the State's power to ban. *Heller*, 554 U.S. at 627 (emphasis added). For that reason, the Supreme Court held that people have an individual right to keep operable handguns for self-defense. *Id.* at 635. What mattered in *Heller* was that "the American people have considered the handgun to be the quintessential self-defense weapon," *id.* at 629, not that handguns might also be "the overwhelmingly favorite weapon of armed criminals," *id.* at 682 (Breyer, J., dissenting). By the same logic, there is an individual right to keep common semiautomatic rifles for self-defense. There is "no basis … for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles." *Heller v. D.C.*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). Especially so after *Bruen. See Bruen*, 142 S. Ct. at 2153-55, 2127. The Second Amendment precludes the unprecedented State and local bans on the country's most commonly owned semiautomatic rifles.

*Second*, outright bans on the sale, purchase, and possession of standard magazines are unconstitutional. Illinois, Cook County, and the City of Chicago now ban rifle magazines that can hold more than 10 rounds of ammunition and handgun magazines that can hold more than 15 rounds. 720 Ill. Comp. Stat. Ann. 5/24-1.10; Cook Co. Code of Ord. §§54-211, 54-212; Chi. Mun. Code §§8-20-010, 8-20-085. The effect of that is to ban standard magazines for some of the most common rifles and handguns, including both standard magazines for Dr. Herrera's AR-15 and Glock 45. Americans own millions of them for lawful purposes. *See Heller*, 670 F.3d at 1261 ("[M]agazines holding more than ten rounds are indeed in 'common use.'"). These bans are ahistorical, creatures of the last century. *See Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1149 (S.D. Cal. 2019). Defendants will not be able to satisfy their burden to affirmatively prove that there is an early tradition of banning such magazines. *Bruen*, 142 S. Ct. at 2153-55, 2127.

**Finally**, Illinois will unconstitutionally require Dr. Herrera to register his semiautomatic rifles, including the make and serial number, with the state police. *See* §24-1.9(d). The "fundamental problem with [the] gun registration law is that registration of lawfully possessed guns is not 'longstanding.'" *Heller*, 670 F.3d at 1291 (Kavanaugh, J., dissenting). Such registration can be a prelude to confiscation and, as with any registry of personal information, the target of data breaches. The State's mandatory registration provision is ahistorical and unconstitutional. *See Bruen*, 142 S. Ct. at 2129-30. And to what end? Even if he were to register, the Illinois Act would limit the locations where such rifles could be kept and does not expressly say whether they could actually be used for self-defense. And local laws would still ban Dr. Herrera from keeping his rifles and standard magazines in his Chicago home.

These issues are issues of law. There should not be any meaningful dispute over material facts. Any factual issues would concern "legislative facts" or otherwise judicially noticeable facts of which this Court can take account now. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (explaining that the Court determines "'legislative facts,'" or "facts that bear on the justification for legislation, as distinct from facts concerning the conduct of parties in a particular case," without a trial). As such, the constitutionality of the challenged provision should "not present factual questions for determination in a trial." *Id.* And injecting immaterial or irrelevant factual disputes would "simply cause[] additional judicial work by contesting a factual issue that, according to information readily available in the public domain, cannot be reasonably disputed." *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003). These are legal issues, ready for a decision now.

For the reasons detailed below, Dr. Herrera seeks immediate relief by February 27, 2023. *See* Exhibit 1, Herrera Dec. ¶15. Immediate relief is necessary and warranted given the ongoing violation of his constitutional rights. *E.g.*, *id.* ¶¶6-10, 12, 15. Dr. Herrera seeks a temporary restraining order only to the extent that his request for a preliminary injunction cannot be decided within that time.

## BACKGROUND

Dr. Javier Herrera is a law-abiding gun owner. Compl. ¶5; Exhibit 1, Herrera Dec. ¶3. He resides in Chicago, one of the most dangerous cities in the country today. Compl. ¶¶5, 16-17; Herrera Dec. ¶2. As an emergency medicine doctor at a Chicago area public hospital, he has firsthand knowledge of those dangers. Compl. ¶¶16, 18; Herrera Dec. ¶¶2, 11. He teaches tactical medicine at a public university. Compl. ¶5; Herrera Dec. ¶2. And for five years, he has served as a medic on a Chicagoland SWAT team that conducts high-risk missions in some of the Chicago area's most dangerous neighborhoods. Compl. ¶¶26-28; Herrera Dec. ¶8. The team's operators carry AR-15 rifles on these missions, responding to hostage and active shooter situations or executing high-risk search warrants. Compl. ¶27; Herrera Dec. ¶8. Dr. Herrera does not carry a rifle on missions, but he must train regularly to ensure he could handle one if the need arises—for instance, to quickly secure an injured operator's rifle for the safety of the team and bystanders. Compl. ¶25-30; Herrera Dec. ¶8. He has attended SWAT school and today trains monthly to maximize his safety in the field, team members' safety, and any bystanders' safety. Compl. ¶¶29-31; Herrera Dec. ¶9.

Detailed below, firearms and magazine bans in Illinois, Cook County, and the City of Chicago unconstitutionally dictate where and how Dr. Herrera may exercise his fundamental right to self-defense, as though it is up to Defendants to decide "whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. Defendants do not tell Dr. Herrera he may speak freely by speaking only certain words or practice his religion by attending the Presbyterian Church but not the Catholic Church. Compare that to here, where local laws prohibit Dr. Herrera from even *keeping* the most common semiautomatic rifle in the country today, the AR-15, inside his home. Compl. ¶¶24, 32; Herrera Dec. ¶¶6-7, 11. The State tells Dr. Herrera that, if he wishes to keep the semiautomatic rifles that he currently owns, he must register them by disclosing sensitive information to the Illinois State Police. Herrera Dec. ¶14; Compl. ¶103. Both state and local laws prohibit Dr. Herrera from *using* that most

4

common semiautomatic rifle for lawful purposes including self-defense. Compl. ¶¶24, 32-35, 37-38; Herrera Dec. ¶¶6-7, 11-13. And while—at least as of today—local law permits Dr. Herrera to keep a common handgun inside his home, a Glock 45, both state and local laws prohibit Dr. Herrera from keeping, using, or replacing the standard magazine for that handgun. Compl. ¶¶20-22, 101, 114; Herrera Dec. ¶¶5. As a result, he keeps his Glock 45 inoperable. Herrera Dec. ¶5; Compl. ¶¶20, 22 ("Because of the ban on the 17-round standard magazine for the Glock 45, Dr. Herrera keeps his Glock 45 inoperable in his home."). He cannot use his Glock 45 handgun for self-defense, whether inside or outside the home. *Id.*

These laws affect Dr. Herrera's life in myriad ways. He owns AR-15 rifles, for example, but he cannot keep them in his Chicago home. Herrera Dec. ¶6. He must store it more than an hour away. Compl. ¶24; Herrera Dec. ¶7. On top of that, state and local laws ban him from purchasing new equipment to maintain or improve or use his AR-15 rifles, including standard magazines that wear over time. Compl. ¶101; Herrera Dec. ¶¶5-6. State and local law thus ban Dr. Herrera from using an AR-15 for self-defense in his home. Herrera Dec. ¶¶5-7, 11 Outside his home, Dr. Herrera cannot take part in the SWAT team's monthly training drills with his AR-15—shooting drills that he would otherwise participate in to ensure he remains able to quickly disable and secure any injured operator's or perpetrator's firearm. Compl. ¶99; Herrera Dec. ¶¶7-10, 12. Participating in training with his AR-15 would entail driving hours to retrieve his AR-15 from beyond county lines for training and then return it after training. Compl. ¶¶24, 32-35; Herrera Dec. ¶¶7, 12. Dr. Herrera, unsurprisingly, does not have hours to retrieve and return his AR-15 given his medical and teaching obligations. State and local laws make it a practical impossibility to participate in that training. Compl. ¶¶32-35; Herrera Dec. ¶¶6-7, 12. Those laws also impede Dr. Herrera's ability to use his firearms for other lawful purposes, such as hunting and sport shooting. Herrera Dec. ¶13; Compl. ¶¶37-38, 100.

I.      **Illinois enacts an outright ban on selling, purchasing, possessing, and carrying common rifles and standard magazines.**

On January 10, 2023, Governor Pritzker signed into law the "Protect Illinois Communities Act." *See* Ill. Pub. Act 102-1116, §1 (H.B. 5471). The Act largely took effect on January 10, 2023. *Id.* §99. According to the Governor, the Act "immediately bans the sale and distribution of assault weapons" and "high-capacity magazines." Compl. ¶54. The Governor promised that the Illinois State Police will immediately enforce the Act. Compl. ¶¶53-55.

The Act creates two new sections to the Illinois Compiled Statutes: 720 Ill. Comp. Stat. Ann. 5/24-1.9 (the rifle ban) and 720 Ill. Comp. Stat. Ann. 5/24-1.10 (the magazine ban). H.B. 5471, §25. It also amends section 24-1 of the Criminal Code of 2012. *Id.* The Act makes it a crime to "knowingly … [c]arr[y] or possess[] any assault weapon," 720 Ill. Comp. Stat. Ann. 5/24-1(a)(15), or "knowingly … purchases any assault weapon … in violation of Section 24-1.9," *id.* §24-1(a)(16).

There is no pre-existing category of "assault weapons." The Act defines "assault weapon" to include, *inter alia*, "[a] semiautomatic rifle that has the capacity to accept a detachable magazine … if the firearm has … a pistol grip." 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(1)(A)(i). The Act expressly names "[a]ll AR types, including" the "AR-15." *Id.* §24-1.9(a)(1)(J)(ii)(II). Section 24-1.9 then declares that selling, purchasing, possessing, or using so-called "assault weapons" is unlawful. *Id.* §24-1.9(b) (prohibiting selling or purchasing), (c) (prohibiting possessing); *see also* 720 Ill. Comp. Stat. Ann. 5/24-1(a)(15) (criminalizing knowingly carrying or possessing). In short, possessing a semiautomatic rifle such as the AR-15 is now a criminal offense, and purchasing one is now a felony in Illinois. *See* 720 Ill. Comp. Stat. Ann. 5/24-1(b).

Section 24-1.9 contains a grandfather provision requiring registration. It applies only to those who possessed an "assault weapon" before January 10, 2023, or "inherited" one from someone who did. *Id.* §24-1.9(d). To be eligible, the grandfather provision requires the detailed registration of such

firearms with the Illinois State Police, including "the make, model, caliber, and serial number of the … assault weapon." *Id.*

Section 24-1.9 will soon stop even those grandfathered from freely possessing America's most common rifle or using it for self-defense. In fewer than 90 days, those grandfathered may possess the banned arms in only specified places and circumstances. A person may *possess* the rifles only on his own "private property"; on "private property that is not open to the public with the express permission of the person who owns or immediately controls such property;" on "the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair;" "while engaged in the legal use of the assault weapon … at a properly licensed firing range or sport shooting competition venue;" or "while traveling to or from these locations, provided that the assault weapon … is unloaded and the assault weapon … is enclosed in a case … or other container." *Id.* Other than the reference to shooting ranges, the Act does not indicate that those grandfathered may *use*—that is, "bear"—these common rifles for self-defense purposes, even on their own property.

Separately, the Act bans standard magazines. The Act prohibits "'[l]arge capacity ammunition feeding device[s],'" defined as magazines of "more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns." 720 Ill. Comp. Stat. Ann. 5/24-1.10(a)(1); *see id.* §24-1.10(b) (banning purchase), (c) (banning possession). As defined, that bans standard magazines for the AR-15 and the Glock 45—both owned by Dr. Herrera and millions of other Americans. Compl. ¶¶68-87; Herrera Dec. ¶¶5-6.

The magazine ban contains a similar grandfathering provision—but only for those magazines lawfully possessed *before* the Act's effective date. 720 Ill. Comp. Stat. Ann. 5/24-1.10(d). That means someone like Dr. Herrera could not purchase new magazines to replace old ones, subject to wear-and-tear, for his standard firearms after the Act's effective date. Herrera Dec. ¶¶5-6; 720 Ill. Comp. Stat. Ann. 5/24-1.10(g). The grandfathering provision also limits the places and circumstances where a

person may possess any grandfathered magazines and does not indicate that they may be used for self-defense. *Id.* §24-1.10(d)(1)-(5).

## II. Cook County and the City of Chicago ban outright selling, purchasing, possessing, and carrying common rifles and standard magazines.

Cook County similarly bans both rifles and magazines, without any applicable grandfathering provisions. Cook Co. Code of Ord. §54-212(a) ("unlawful…to…acquire, carry or possess"), (b) (unlawful if "possessed, carried, sold, or transferred"), (c) (prior owners must "remove the assault weapon or large capacity magazine from" the County, or "render it permanently inoperable," or "surrender" them "to the Sheriff"); §54-214(a) (penalties including imprisonment). The County ordinance defines "assault weapon" to include all "AR-15" rifles and similar rifles. *Id.* §54-211(1), (7)(A)(iii). It defines "*[l]arge-capacity magazine*" as those exceeding "more than ten rounds." *Id.* §54-211.

The City likewise contains an outright ban on semiautomatic rifles and magazines. The Municipal Code of Chicago defines an "assault weapon" to mean "[a] semiautomatic rifle that has the ability to accept a detachable magazine and has … a handgun grip," and expressly includes the "AR-15" rifle and rifles like it. Chi. Mun. Code §8-20-010; *see id.* §8-20-075(a) (unlawful "to import, sell, manufacture, transfer, or possess"), (d) (declaring such weapons "contraband" that "shall be seized by and forfeited to the city"); §8-20-300(a) (penalties including incarceration). The Code states that the "superintendent has the authority to seize any … assault weapon … carried or possessed in violation of this chapter" and that such "items are declared contraband" that "shall be destroyed at the direction of the superintendent." *Id.* §8-20-250.

The Code also bans so-called "high capacity magazines." *See id.* §8-20-085(a) (unlawful to "carry, possess, sell, offer or display for sale, or otherwise transfer"), (b) (large-capacity magazines "contraband and shall be forfeited to the city"); §8-20-300 (penalties including imprisonment). The Code defines "high capacity magazines" as those with "an overall capacity of more than 15 rounds of ammunition." *Id.* §8-20-010.

* * *

Together, these bans infringe Dr. Herrera's fundamental right to defend himself. The County and City bans prohibit Dr. Herrera from keeping his AR-15 in his home for self-defense. That infringes his right in the home, but also out of the home—because of travel times, Dr. Herrera cannot attend regular SWAT team training with his AR-15. Compl. ¶99; Herrera Dec. ¶¶7, 12. That compounds the infringement of his right of self-defense. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use."). As for the handgun he lawfully owns and could keep in his home for self-defense, the County and City also prohibit Dr. Herrera from keeping the standard magazine for that handgun, which exceeds 15 rounds. Compl. ¶98 ("The County and City ordinances mean that Dr. Herrera cannot keep his Glock 45 operable at home for self-defense, because the Glock 45 comes standard with 17-round magazines."); Herrera Dec. ¶5. Finally, the bans prohibit Dr. Herrera from acquiring semiautomatic rifles and standard magazines, which but for the bans Dr. Herrera would purchase. Compl. ¶¶101-02; Herrera Dec. ¶6. Accordingly, all bans directly infringe Dr. Herrera's right to self-defense, including where it is "most acute" in "the home." *Heller*, 554 U.S. at 628.

## ARGUMENT

This Court should grant Dr. Herrera's emergency motion for a temporary restraining order and preliminary injunction. For a temporary restraining order and a preliminary injunction,[1] Dr. Herrera must show (1) that he has "some likelihood of success on the merits" and (2) that he has "no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied." *Ezell*, 651 F.3d at 694. "If the moving party meets these threshold requirements, the district court weighs

---

[1] "The standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 & n.5 (N.D. Ill. 2019).

the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.* Here, binding precedent establishes Dr. Herrera's likelihood of success on the merits of his claims that the state and local laws at issue are unconstitutional. The ongoing deprivation of his constitutional self-defense right is irreparable harm. No countervailing factors outweigh that ongoing harm, and the public interest favors a stay.

**I.    Dr. Herrera is likely to succeed on the merits.**

**A.    *Bruen* abrogates pre-*Bruen* decisions and requires Defendants to prove that analogous laws existed at the Founding.**

*Bruen*'s governing framework is simple. The Government must justify regulations of firearms "'in common use'" as consistent with historical regulations. *See Bruen*, 142 S. Ct. at 2134-26. The government "may not simply posit that the regulation promotes an important interest." *Id.* at 2126. "Only if a firearm regulation is consistent with this Nation's historical tradition [of firearms regulation] may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*; *see also id.* at 2135. The government cannot make that showing when it bans arms commonly kept by law-abiding citizens for lawful purposes. *See Heller*, 554 U.S. at 625, 629; *Bruen*, 142 S. Ct. at 2128, 2156. Such laws violate "the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2126.

That test from *Bruen* abrogates pre-*Bruen* Seventh Circuit precedent. *See Villasenor v. Indus. Wire & Cable, Inc.*, 929 F. Supp. 310, 313 (N.D. Ill. 1996) (Courts "are bound by Seventh Circuit precedent unless and until a subsequent decision by … the Supreme Court undermines its holding."). Before *Bruen*, the Seventh Circuit and other courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125. *Bruen* categorically rejects that two-step framework including, expressly, Seventh Circuit cases employing it. *See id.* at 2125-27 & n.4 (citing *Kanter v. Barr*, 919 F.3d 437, 442 (7th Cir. 2019), *abrogated*

10

*by Bruen*, 142 S. Ct. 2111)); *see also, e.g.*, *White v. Illinois State Police*, 15 F.4th 801, 805, 811-12 (7th Cir. 2021) (collecting Seventh Circuit decisions that applied "intermediate scrutiny"); *Hatfield v. Barr*, 925 F.3d 950, 953 (7th Cir. 2019); *Kanter*, 919 F.3d at 442; *Horsley v. Trame*, 808 F.3d 1126, 1131 (7th Cir. 2015); *United States v. Skoien*, 614 F.3d 638, 640-42 (7th Cir. 2010). Courts in the Seventh Circuit may no longer "apply[] means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127. "Instead, the government must *affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* (emphasis added).

Most relevant here, *Bruen* abrogates pre-*Bruen* decisions upholding semiautomatic-rifle bans, which employed the sort of constitutional analysis that *Bruen* rejects. *See Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015); *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019). Before *Bruen*, the *Friedman* panel "adopted a new test," *see Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari), by asking whether banned rifles have "'some reasonable relationship to the preservation or efficiency of a well regulated militia, and whether law-abiding citizens retain adequate means of self-defense.'" *Friedman*, 784 F.3d at 410. *Friedman* expressly rejected the historical test that *Bruen* now mandates, *compare id.* at 408-09 (rejecting argument "that there is no 'historical tradition' of banning possession of semi-automatic guns and large-capacity magazines" and rejecting reliance "on how common a weapon is at the time of litigation"), *with Bruen*, 142 S. Ct. at 2135, 2143 (explaining that the question is whether weapons are "in common use *today*" and restricting the analysis to whether the regulation "is consistent with this Nation's historical tradition of firearm regulation" (emphasis added)). *Friedman*'s "reasonable relationship" test was the "freestanding interest-balancing approach" that both *Heller* and *Bruen* forbid. *See Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari) (cleaned up); *Bruen*, 142 S. Ct. at 2176. *Wilson* likewise upheld Cook County's ban based on the government's "'substantial' interests," 937 F.3d at

11

1036—again the sort of interest-balancing that *Heller* and *Bruen* forbid. *Bruen* confirms that these decisions "flout[ed]" Supreme Court precedent. *See Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari).

After *Bruen*, a panel of the Seventh Circuit has acknowledged that "the question is *only* whether the restriction is consistent with 'the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *United States v. Gonzalez*, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (emphasis added). The district courts have acknowledged the same. *See, e.g.*, *United States v. Seiwert*, 2022 WL 4534605, at *1-2 (N.D. Ill. Sept. 28, 2022) (explaining that the Supreme Court "rejected" the Seventh Circuit's approach). Applying *Bruen*'s framework, and not those abrogated decisions, the question here is whether Defendants can satisfy their burden to "affirmatively prove that [their] firearms regulation[s] [are] part of the historical tradition" of regulations. *Bruen*, 142 S. Ct. at 2134; *see Villasenor*, 929 F. Supp. at 313. They cannot.

**B.    The outright bans on the sale, purchase, possession, and self-defense use of semiautomatic rifles as common as the AR-15 violate Dr. Herrera's rights under the Second and Fourteenth Amendments.**

Dr. Herrera challenges outright bans on the sale, purchase, possession, and self-defense use of semiautomatic rifles such as the AR-15 by state, county, and city law. The State ban immediately prohibits the sale and purchase of semiautomatic rifles including the AR-15. *See* 720 ILCS 5/24-1(a)(15)-(16); *id.* §24-1.9(a). Cook County declares that it is unlawful for Dr. Herrera "acquire, carry or possess" his AR-15 in his home. Cook Co. Code of Ord. §54-212(a). And Chicago likewise bans Dr. Herrera from keeping his AR-15 in his home. *See* Chi. Mun. Code §8-20-075(a). These bans are facially unconstitutional because they prohibit the purchase and possession of arms in common use by law-abiding citizens. They are also unconstitutional applied to Dr. Herrera: because of the bans, he cannot keep his own AR-15 in his own home, even though he would prefer it for self-defense, nor can he train with that firearm in furtherance of his safety in the field as a SWAT medic. *Cf. Ezell*, 651 F.3d at

704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use."); Herrera Dec. ¶¶6-12. Nor can he purchase an AR-15 or AR-15 components, which he would otherwise do but for the bans. Herrera Dec. ¶6; Compl. ¶102. Defendants should be enjoined from enforcing their unconstitutional bans.

Dr. Herrera is likely to succeed on the merits of his claims because Defendants cannot meet their burden. Just as Defendants cannot contest that Dr. Herrera—a "law-abiding, adult citizen[]—[is] part of 'the people' whom the Second Amendment protects," Defendants cannot contest that the plain text of the Second Amendment protects his right to armed self-defense inside and outside his home. *Bruen*, 142 S. Ct. at 2134-35; *id.* at 2134 (The Second Amendment protects "the individual right to possess … weapons in case of confrontation.'" (quoting *Heller*, 554 U.S. at 592)). That right presumptively "'extends … to *all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding,'" *id.* at 2132 (emphasis added) (quoting *Heller*, 554 U.S. at 582), including "rifle[s] of *all* descriptions," *Andrews v. State*, 50 Tenn. 165, 179 (1871). And the right to keep and bear arms "protect[s] those closely related acts necessary to their exercise," *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring), including the ability to *purchase* and ultimately *use* "modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2129-30, 2132. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to *acquire* arms." (emphasis added) (quoting *Ezell*, 651 F.3d at 704)); *Andrews*, 50 Tenn. at 178 ("[T]he right of keeping arms … necessarily involves the right to *purchase* and *use* them in such a way as is usual." (emphases added)).[2]

---

[2] Courts in this district have already held that the Second Amendment protects a right to acquire and purchase covered arms. *See Illinois Ass'n of Firearms Retailers (IAFR) v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) (holding that an outright ban on sale and purchase violates the Second Amendment); *Kole v. Vill. of Norridge*, 2017 WL 5128989, at *9 (N.D. Ill. Nov. 6, 2017) ("[T]he Second Amendment right to keep and bear arms for self-defense necessarily includes the right to

Defendants therefore must "affirmatively prove" that their laws—changing the terms by which Dr. Herrera can exercise his presumptively protected conduct by completely banning Dr. Herrera's possession or self-defense use of an AR-15 inside his home—are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126-27; *see also IAFR*, 961 F. Supp. 2d at 934 (quoting *Ezell*, 651 F.3d at 702-03) (describing government's burden "to 'establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment'"). But here, Defendants cannot satisfy their burden to show either (1) that their bans concern weapons not in common use[3] or—another way at getting at that question—(2) that their bans are consistent with this Nation's historical tradition of firearm regulation. Accordingly, each of the challenged provisions are unconstitutional.

### 1. Semiautomatic rifles are in common use for lawful purposes.

Defendants cannot plausibly argue that the banned weapons, semiautomatic rifles as ubiquitous as the AR-15, are not "weapons 'in common use' today for" lawful purposes. *Bruen*, 142 S. Ct. at 2134; *see also Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (rejecting "equating 'unusual' with 'in common use at the time of the Second Amendment's enactment'"). For this inquiry, "*all that is needed* for citizens to have a right under the Second Amendment to keep" semiautomatic rifles is that the "overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including

---

acquire a firearm, and … this right is implicated by local laws directly or functionally banning firearm sales" and purchase.).

[3] *Bruen* makes clear that "'[g]overnment[s] bear[] the burden of proving the constitutionality of [their] actions,'" 142 S. Ct. at 2130, and even pre-*Bruen* courts recognized that they have the burden to show that the regulated arms are uncommon, *see, e.g., Ezell*, 651 F.3d at 702-03; *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015) (holding that the State bears the burden to show that the "'bearable arms'" are "unusual" to rebut the "presumption in favor of Second Amendment protection (citing *Ezell*, 651 F.3d at 702-03)); *Kolbe v. Hogan*, 813 F.3d 160, 176 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017) (same (citing *Ezell*, 651 F.3d at 702-03)); *O'Neill v. Neronha*, 594 F. Supp. 3d 463, 470-74 (D.R.I. 2022) (collecting cases and imposing burden on government defendants).

self-defense and target shooting." *See Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari) (emphasis added).[4] Defendants cannot satisfy their burden to prove that semiautomatic rifles such as the AR-15 are within the historical tradition of restricting "'dangerous *and* unusual'" arms. *See Heller*, 554 U.S. at 627 (emphasis added); *Bruen*, 142 S. Ct. at 2143.

    ***Common use.*** Semiautomatic rifles are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.[5] Defendants cannot liken an AR-15 to "short-barreled shotguns" or other arms "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. In *Staples v. United States*, the Supreme Court expressly distinguished semiautomatic rifles such as the AR-15 from uncommon arms like "machineguns, sawed-off shotguns, and artillery pieces." 511 U.S. 600, 603, 611-12 (1994); *accord Heller*, 670 F.3d 1261 ("semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use'"). As *Staples* confirmed, "semi-automatic rifles [including] … the AR-15 [are] in common use by law-abiding citizens and ha[ve] traditionally been lawful to possess." *Heller*, 670 F.3d at 1288 (Kavanaugh, J., dissenting).

---

[4] It is legally irrelevant whether the arms at issue are often *used* in self-defense encounters or are *effective* when so used. *See McDonald*, 561 U.S. at 767-68 (explaining that what matters is whether the people commonly "prefer[]" a weapon and "consider[]" it to be worthy of ownership for a lawful purpose (cleaned up)); *accord id.* at 890 n.33 (Stevens, J., dissenting) ("The Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose."); *Kolbe*, 813 F.3d at 174 (explaining that "Second Amendment rights do not depend on how often the semi-automatic rifles or regulated magazines are actually used to repel an intruder" or "whether the magazines are often actually employed in self-defense incidents"); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014) (explaining that "the standard is whether the prohibited [arms] are 'typically *possessed* by law-abiding citizens for lawful purposes,' not whether they are often *used* for self-defense" (quoting *Heller*, 554 U.S. at 625)), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).

[5] Semiautomatic rifles like the AR-15 are not a machine guns. "A semi-automatic gun 'fires only one shot with each pull of the trigger' and 'requires no manual manipulation by the operator to place another round in the chamber after each round is fired.'" *Heller*, 670 F.3d at 1285 (Kavanaugh, J., dissenting) (*quoting Staples v. United States*, 511 U.S. 600, 602 n.1 (1994)). "That is in contrast to an automatic gun—also known as a machine gun—which 'fires repeatedly with a single pull of the trigger.'" *Id.*

With good reason. "Even accepting the most conservative estimates," so-called "assault weapons … are 'in common use' as the term was used in *Heller*" because "Americans own *millions* of the firearms that the challenged legislation prohibits." *Cuomo*, 804 F.3d at 255-56 (emphasis added); *compare Caetano*, 577 U.S. at 420 (Alito, J., concurring) (explaining that stun guns are in common use for lawful purposes notwithstanding that they are "less popular than handguns" because "'approximately 200,000 civilians owned stun guns' as of 2009"). As then-Judge Kavanaugh explained, "about 40 percent of rifles sold in 2010 were semi-automatic," *Heller*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and "the AR-15 semiautomatic rifle … has become '[t]he most popular rifle in American history.'" *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey (ANJRPC II)*, 974 F.3d 237, 256 (3d Cir. 2020) (Matey, J., dissenting), *cert. granted, judgment vac'd sub nom.* 142 S. Ct. 2894 (2022) (quoting David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859-60 (2015)). Courts have consistently found that semiautomatic rifles such as the AR-15 are commonly owned. *See, e.g.*, *Kolbe*, 813 F.3d at 174 (collecting cases and stating that "it is beyond dispute" that "law-abiding citizens commonly possess semi-automatic rifles such as the AR-15").

The most recent data confirms what courts have consistently concluded. A recent report of the Congressional Research Service identified that "from 1990 through 2020, nearly 24.5 million AR- and AK-type rifles were introduced into the U.S. civilian gun stock," and "2.8 million AR-or AK-type rifles" "were introduced into the U.S. civilian gun stock" in 2020 alone.[6] Another report states that "30.2% of gun owners—about 24.6 million individuals—have owned an AR-15 or similarly styled rifle

---

[6] *See* Congressional Research Service, House-Reported Assault Weapons Ban of 2022 (H.R. 1808), at 2 (July 21, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12174. Public documents like CRS reports are subject to judicial notice. *See, e.g.*, *Kareem v. Haspel*, 986 F.3d 859, 867 n.7 (D.C. Cir. 2021); *Mobility Workx, LLC v. United Pats., LLC*, 15 F.4th 1146, 1151 & n.1 (Fed. Cir. 2021); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 207-08 (1st Cir. 2016).

(up to 44 million such rifles in total)."[7] As the ATF acknowledges, "the AR-15-type rifle" is "one of the most popular firearms in the United States," including "for civilian use." 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022).[8] Indeed, semiautomatic rifles such as the AR-15 are more common than Ford F-150 trucks, "the most commonly sold vehicle in the United States." *Kolbe*, 813 F.3d at 174. "Twice as many [semiautomatic] rifles were sold" in 2018 as the "909,330 Ford F-150s" that were sold that year. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (2021), *vac'd and rem.*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). "[E]very time one passes a new Ford pickup truck, it is a reminder that two new modern rifles have been purchased. That is a lot of modern rifles owned by Americans." *Id.*

These commonly owned rifles, moreover, are commonly owned for lawful purposes. *See Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari); *Friedman*, 784 F.3d at 416 & n.3 (Manion, J., dissenting) (explaining that "a statistically significant amount of gun owners … use semiautomatic weapons and high-capacity magazines for lawful purposes"); *Heller*, 670 F.3d at 1287-88 (Kavanaugh, J., dissenting) ("Semi-automatic rifles are commonly used for self-defense in the home, hunting, target shooting and competitions."). In 2018, whereas "only 5% of traditional rifles were bought for personal protection," about "34% of buyers purchased" a semiautomatic rifle "for personal protection, while 36% purchased for target practice or informal shooting, and 29% purchased for hunting." *Bonta*, 542 F. Supp. 3d at 1022 (noting more than 18 million people participated nationally in target and sport shooting with modern rifles). So the "overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting." *See*

---

[7] William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 2, 20 (May 18, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

[8] "The contents of the Federal Register shall be judicially noticed." 44 U.S.C. §1507; *see also Denius*, 330 F.3d at 926-27 (explaining that a "court is required to take judicial notice of information contained in agency regulations").

*Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari). And "that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Id.*

**Dangerousness**. Defendants cannot carry their burden by arguing about the dangerousness of semiautomatic rifles in the hands of some. The test is *conjunctive*: Defendants may restrict arms that are both unusual *and* dangerous. *See Caetano*, 577 U.S. at 412; *see also id.* at 417 (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual."). Because these semiautomatic rifles are *not* unusual, the Court need not "consider the … conclusion that they are also 'dangerous.'" *Id.* at 417 (Alito, J., concurring). The Court can instead conclude that "broadly prohibitory laws restricting … possession even in the home … are categorically unconstitutional." *Ezell*, 651 F.3d at 703.

In any event, Defendants cannot establish dangerousness as would be required for their firearms bans.[9] Even if the "relative dangerousness of a weapon were relevant"—it is not, *see Caetano*, 577 U.S. at 418 (Alito, J., concurring)—"semi-automatic handguns are more dangerous as a class than semi-automatic rifles because handguns can be concealed." *Heller*, 670 F.3d at 1286 (Kavanaugh, J., dissenting). Semiautomatic handguns "are the overwhelmingly favorite weapon of armed criminals." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). Federal government statistics show that between 2015 and 2019, about 1,600 people were killed in the United States with a rifle of any kind, as compared to about 33,000 with handguns.[10] Handguns "account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes." *Cuomo*, 804 F.3d at 255-56. Yet they remain protected as the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. It necessarily follows that semiautomatic rifles, which are statistically less "dangerous," qualify

---

[9] "Dangerous" cannot mean merely objects "designed and constructed to produce death or great bodily harm and for the purpose of bodily assault or defense." *See Caetano*, 577 U.S. at 417-18 (Alito, J., concurring). Otherwise, "virtually every covered arm would qualify as dangerous." *Id.* at 418.

[10] FBI, "2019 Crime in the United States: Murder Victims by Weapon, 2015-2019," https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls.

too. *Heller*, 670 F.3d at 1286 (Kavanaugh, J., dissenting). "Put simply, it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles." *Id.* at 1286-87.

> **2. There is no other historical tradition in this Nation that would justify broadly prohibiting the purchase or possession of commonly owned rifles.**

Each of the challenged laws ban conduct that the Constitution "presumptively protects." *Bruen*, 142 S. Ct. at 2126. First, the State now bans semiautomatic rifles as common as the AR-15. *See* 720 Ill. Comp. Stat. Ann. 5/24-1(a)(15)-(16); *id.* §24-1.9. And while there is a narrow grandfathering provision, it does not contemplate the self-defense use of the common weapons, *supra*. Nor would it do Dr. Herrera any good. The County and City laws impose outright bans on possessing his AR-15 in his home. *See* Cook Co. Code of Ord. §§54-211, 54-212, 54-214; Chi. Mun. Code §§8-20-010, 8-20-075, 8-20-250, 8-20-300.

Defendants bear a heavy burden to justify those bans. They must "demonstrate a tradition of *broadly* prohibiting the" purchase and possession of "commonly used firearms for self-defense" by identifying analogous prohibitions that existed "when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137-38 (emphasis added).

No such historical traditions existed. *Bruen* already decided that, as a general rule, there was no historical tradition of outright bans on arms in common use—and that was *outside* the home. 142 S. Ct. at 2147, 2156. Indeed, long guns were historically treated *more* favorably than handguns. *See id.* at 2144 (noting that one restriction of pistols "did not prohibit planters from carrying long guns for self-defense—including the popular musket and carbine"); *id.* at 2154 (noting that two jurisdictions "prohibited the carry of pistols in towns, cities, and villages, but seemingly permitted the carry of rifles and other long guns *everywhere*" and that another "prohibited public carry of pistols *everywhere*, but allowed the carry of 'shot-guns or rifles' for certain purposes"). It necessarily follows that there is no historical tradition of broadly prohibiting their use *inside* the home for self-defense and other lawful purposes.

*See Heller*, 554 U.S. at 624-25, 627 (concluding that there was no tradition of completely banning arms in common use and explaining that in "'in the colonial and revolutionary war era, small-arms weapons used by militiamen and weapons used in defense of person and home were one and the same'" (alteration adopted)).

Semiautomatic rifles are no exception to the historical tradition of protecting possession of long guns. There is no "evidence that prohibitions on either semiautomatic rifles or large-capacity magazines are longstanding." *See Heller*, 670 F.3d at 1260 (Kavanaugh, J., dissenting). Detailed above, semiautomatic rifles such as the AR-15 "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612; *Heller*, 670 F.3d at 1288 (Kavanaugh, J., dissenting) (explaining that "most of the country does not" ban semiautomatic rifles even today). Historically, the earliest examples that courts have found come from the last century: two bans passed in 1927 and 1932. *See id.* at 1260 n.*. But those twentieth century bans are not indicative of acceptable restrictions at the time of the founding. *See Bruen*, 142 S. Ct. at 2237-38, 2153-54.

Nor is there a longstanding tradition of banning the purchase of "'popular and common arms,'" *see IAFR*, 961 F. Supp. at 937, as the State now seeks to do for Dr. Herrera and everyone else. On the contrary, there appears to be an *opposite* tradition, spanning before, during, and after the Revolution. *See Kole*, 2017 WL 5128989, at *10. A Virginia statute enacted in 1676-77 declared that "all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." 2 William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia* 403 (1823). In response to King George III imposing a firearms embargo, persons were recommended "'to provide themselves immediately, with at least twelve and a half rounds of powder, with a proportionate quantity of bullets.'" *See* David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 234 (2014). One early commentator suggested that no law forbade "'the veriest pauper'" from raising "'a sum sufficient for the purchase of … his Gun.'" *Heller*, 554 U.S.

at 583 n.7. The Militia Act 1792 declared that all "able-bodied white male citizen[s]" above "the age of eighteen years and under the age of forty-five years … shall … provide himself with a good musket or firelock" and adequate ammunition.[11] *See* Militia Act, 1 Stat. 271, §1 (May 8, 1792). And later courts acknowledged that the right to keep arms "necessarily involves the right to *purchase* and use them in such a way as is usual, or to keep them for the ordinary purposes to which they are adapted." *See Andrews*, 50 Tenn. at 178. In short, "[o]ur citizens have *always* been free to make, vend, and export arms." Letter from Thomas Jefferson to George Hammond (May 15, 1793), *in* 6 *The Writings of Thomas Jefferson* 252-53 (P. Ford, ed. 1895) (emphasis added).

To summarize, there "is no meaningful or persuasive constitutional distinction between semi-automatic handguns"—unquestionably protected by the Second Amendment as the Supreme Court has held and held again—"and semi-automatic rifles." *Heller*, 670 F.3d at 1269 (Kavanaugh, J., dissenting); *see also id.* at 1286. "Semi-automatic rifles, like semi-automatic handguns, have not traditionally been banned and are in common use today by law-abiding citizens for self-defense in the home, hunting, and other lawful purposes." *Id.* at 1269. It follows that semiautomatic rifles are protected by the Second Amendment. *Id.* at 1286-87. So, Dr. Herrera is likely to succeed on the merits of his claim.

---

[11] States likewise mandated that able-bodied men acquire arms suitable for militia service, implying no tradition of prohibiting the sale or purchase of arms. For example, one statute declared that an able-bodied man "shall constantly keep himself furnished and provided with the arms and equipments required by the laws of the United States" and "made the duty of parents and guardians to furnish minors, enrolled in the militia, while under their care respectively, with the arms and equipments required." *See Com. v. Annis*, 9 Mass. 31, 32 (1812). Accordingly, the existence of statutes requiring ordinary civilians to acquire arms at their own expense implies that there was no general prohibition of the sale, purchase, or acquisition of arms at the Founding.

**C.    The outright bans on the sale, purchase, and possession of standard magazines, including the standard magazine for the firearm Dr. Herrera keeps in his home, violate Dr. Herrera's rights under the Second and Fourteenth Amendments.**

Also unconstitutional are the outright bans on the sale, purchase, and possession of so-called "large-capacity magazines" that are standard for some of the most commonly owned rifles and handguns, including AR-15 rifles and Glock 45 handguns. The State, County, and City all ban the acquisition or self-defense use of rifle and handgun magazines with capacities of greater than 10 and 15 rounds, respectively. *See* 720 Ill. Comp. Stat. Ann. 5/24-1.10; Cook Co. Code of Ord. §§54-211, 212, 214; Chi. Mun. Code §§8-20-010, 8-20-085, 8-20-300.

Each of these bans are facially unconstitutional and unconstitutional as applied to Dr. Herrera. They categorically prohibit, on their face, the purchase and possession of commonly owned arms protected by the Second Amendment. They are particularly egregious as applied to Dr. Herrera. As a result of Defendants' bans, Dr. Herrera cannot keep his standard-issue 17-round Glock 45 magazine in his home for self-defense, where the right is "most acute," *Heller*, 554 U.S. at 628. *See* Herrera Dec. ¶5; Compl. ¶98. Including because of its standard magazine, he cannot keep his AR-15 in his home for self-defense or train with it. ¶¶6-7, 11-12. And he cannot purchase new magazines, which he would do but for the bans. Herrera Dec. ¶¶5-6; Compl. ¶101.

Dr. Herrera is likely to succeed on the merits of his claims. Magazines—like all components of arms necessary for their functionality—are inherent in the meaning of "Arms." *See Luis*, 578 U.S. at 26 (Thomas, J., concurring) (explaining that the Second Amendment protects "closely related acts necessary" to exercise the right to keep and bear arms, including implicit rights related to ammunition). Because magazines are "modern instruments that facilitate armed self-defense," *Bruen*, 142 S. Ct. at 2135, the text of the Second Amendment covers them. "Magazines enjoy Second Amendment protection for a simple reason: Without a magazine, many weapons would be useless, including 'quintessential' self-defense weapons like the handgun." *Duncan (I) v. Becerra*, 970 F.3d 1133, 1146 (9th Cir.

2020);[12] *accord Heller*, 554 U.S. at 630 (invalidating regulation that "ma[de] it impossible for citizens to use" firearms "for the core lawful purpose of self defense"); *Fyock*, 779 F.3d at 998 (concluding that, if a firearm is "commonly possessed by law-abiding citizens for lawful purposes, … there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable."); *Kolbe*, 813 F.3d at 174 (similar based on "strong historical support"). "Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of New Jersey Rifle & Pistol Ass'n, Inc. (ANJRPC I) v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated in part by Bruen*, 142 S. Ct. 2111 (2022). "Put simply, a regulation cannot permissibly ban a protected firearm's components critical to its operation." *Duncan I*, 970 F.3d at 1146.

Accordingly, the Second Amendment "presumptively protects" acquiring and possessing rifle and handgun magazines. *Bruen*, 142 S. Ct. at 2129-30, 2132; *see also, e.g.*, *Teixeira*, 873 F.3d at 677. Defendants therefore "must demonstrate that the[ir] regulation[s are] consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Defendants cannot show that there is "a tradition of broadly prohibiting the" acquisition and possession of magazines or ammunition. *Id.* at 2138.

### 1. The banned magazines are in common use for lawful purposes.

"[M]agazines holding more than ten rounds are indeed in 'common use.'" *Heller*, 670 F.3d at 1261. "Millions of Americans across the country own" large-capacity magazines and "nearly half of all magazines in the United States today hold more than ten rounds of ammunition." *Duncan I*, 970

---

[12] This decision was vacated by the *en banc* court, but then the Supreme Court vacated the *en banc* decision. *See Duncan (II) v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated* 142 S. Ct. 2895 (2022).

F.3d at 1142.[13] There are "nearly 115 million … in circulation in America today" for lawful purposes, *id.* at 1149 n.8, and they "are a standard component on many of the nation's most popular firearms, such as the Glock pistol, which comes with a magazine that holds 15 to 17 rounds," *Duncan II,* 19 F.4th at 1155 (Bumatay, J., dissenting); *accord Kolbe*, 813 F.3d at 174 (collecting cases). Those common magazines include the 17-round magazines that are standard for Herrera's Glock 45 handgun. And "all that is needed for citizens to have a right" to possess magazines is that the "overwhelming majority of citizens who own and use" them "do so for lawful purposes, including self-defense and target shooting." *Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari). So the magazines that Defendants ban are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

### 2. There is no other historical tradition that would justify broadly prohibiting the purchase or possession of commonly owned rifle and handgun magazines.

Each of the challenged laws ban conduct that the Constitution "presumptively protects." *Bruen*, 142 S. Ct. at 2129-30, 2132. First, because of the bans, Dr. Herrera cannot purchase new magazines that come standard issue for both his rifle and his handgun. Second, Dr. Herrera cannot possess the magazines he owns for his rifle and his handgun in his home, where his right to self-defense is "most acute." *Heller*, 554 U.S. at 628. For two reasons, Defendants cannot "affirmatively prove" that there is "a tradition of broadly prohibiting the" acquisition and possession of magazines. *Bruen*, 142 S. Ct. at 2126-27, 2138.

---

[13] In *Duncan II*, the en banc court acknowledged that "'[m]ost pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds.'" 19 F.4th at 1097. It also considered "that approximately half of all privately owned magazines in the United States have a capacity greater than ten rounds." *Id.*; *accord id.* at 1155 (Bumatay, J., dissenting). Dr. Herrera's rifle and handgun magazines exceed the capacity allowed by all the regulations at issue here. Herrera Dec. ¶¶5-6.

*First*, so-called large-capacity magazines existed before the Founding and the Fourteenth Amendment, as Judge Bumatay catalogued:

- The first known firearm capable of firing more than ten rounds without reloading was a 16-shooter invented in 1580.
- The earliest record of a repeating firearm in America noted that it fired more than ten rounds.
- At the Founding, the state-of-the-art firearm was the Girandoni air rifle with a 22-shot magazine capacity.
- In 1777, Joseph Belton demonstrated a 16-shot repeating rifle before the Continental Congress.
- By the 1830s, 'Pepperbox' pistols had been introduced to the American public and became commercially successful. Depending on the model, the Pepperbox could fire 5, 6, 12, 18, or 24 rounds without reloading.
- It took several years for Samuel Colt's revolvers (also invented in the 1830s) to surpass the Pepperbox pistol in the marketplace.
- From the 1830s to the 1850s, several more rifles were invented with large ammunition capacities, ranging from 12- to 38-shot magazines.
- By 1855, Daniel Wesson (of Smith and Wesson fame) and Oliver Winchester collaborated to introduce the lever action rifle, which contained a 30-round magazine that could be emptied in less than one minute. A later iteration of this rifle, the 16-round Henry lever action rifle, became commercially successful, selling about 14,000 from 1860 to 1866.
- By 1866, the first Winchester rifle, the Model 1866, could hold 17 rounds in the magazine and one in the chamber, all of which could be fired in nine seconds. All told, Winchester made over 170,000 copies … from 1866 to 1898.
- A few years later, Winchester produced the M1873, capable of holding 10 to 11 rounds, of which over 720,000 copies were made from 1873 to 1919.

*Duncan II*, 19 F.4th at 1154-55 (Bumatay, J., dissenting). "From this history, the clear picture emerges that firearms with large-capacity capabilities were widely possessed by law-abiding citizens by the time of the Second Amendment's incorporation." *Id.* at 1155; *see also* Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, *supra*, at 851 ("In terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified.").

*Second*, despite the early existence of large-capacity magazines, magazine regulations are relatively recent phenomena. Even before *Bruen*, the Courts of Appeals recognized that magazine bans are not longstanding and lack historical pedigree. *See, e.g.*, *Heller*, 670 F.3d at 1260 ("We are not aware

of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity."); *ANJRPC I*, 910 F.3d at 116-17 ("[T]here is no longstanding history of LCM regulation."); *id.* at 117 n.18 ("LCMs were not regulated until the 1920s, but most of those laws were invalidated by the 1970s."). At the founding, "no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years." *Duncan I*, 970 F.3d at 1150. The "earliest analogues only show up in the early twentieth century." *Duncan II*, 19 F.4th at 1156-57 (Bumatay, J., dissenting). The magazines banned here are *detachable* ones and yet "[t]he oldest statute limiting the permissible size of a detachable firearm magazine" was introduced in 1990 by New Jersey. *See Duncan*, 366 F. Supp. at 1149. Even if the analogy is broadened to capacity generally, "laws restricting ammunition capacity emerged in 1927 and all but one [were later] repealed." *Duncan I*, 970 F.3d at 1150-51. None of the regulations from the first half of the 20th century limited that capacity to 10 rounds. *Duncan*, 366 F. Supp. at 1152-53 ("No regulation on 'firing-capacity' set a limit as low as California's 10-round limit."). And such "short lived" and "passing regulatory efforts" cannot demonstrate "an enduring American tradition of state regulation."[14] *Bruen*, 142 S. Ct. at 2155; *id.* at 2153-54 (rejecting government's appeal to regulations from "the late-19th century" because "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence").

In short, Defendants cannot "affirmatively prove" that their bans are "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. The magazine bans are "therefore unconstitutional." *Id.* at 2138.

---

[14] "Ironically, the closest Founding-era analogues to ammunition regulations appear to be laws requiring that citizens arm themselves with particular arms and a specific *minimum* amount of ammunition." *Duncan II*, 19 F.4th at 1159 (Bumatay, J., dissenting) (emphasis added) (citing 1784 Mass. Acts 142; 1786 N.Y. Laws 228; 1785 Va. Statutes at Large 12 (12 Hening c. 1); 1 Stat. 271; Herbert L. Osgood, *The American Colonies in the Seventeenth Century* 499-500 (1904)).

**D.    Illinois's mandatory-registration provision violates Dr. Herrera's Second and Fourteenth Amendment rights.**

Dr. Herrera is also likely to succeed on the merits of his claim that Illinois's mandatory-registration provision is ahistorical and unconstitutional. Herrera Dec. ¶14; Compl. ¶¶46, 103, 127-35. Dr. Herrera proposes to possess his current AR-15 rifle, but he cannot do so unless there is an injunction of the County and City bans. Even if enjoined, he still faces another hurdle. To continue possessing his lawfully owned AR-15 rifle, he must register with the Illinois State Police by revealing the rifle's "make, model, caliber, and serial number." *See* 720 Ill. Comp. Stat. Ann. 5/24-1.9(d). Because this regulation burdens the right to keep arms, Illinois must "justify" its registration requirement by establishing that it is longstanding. *Bruen*, 142 S. Ct. at 2129-30. But the "fundamental problem with [the] gun registration law is that registration of lawfully possessed guns is not 'longstanding.'"[15] *Heller*, 670 F.3d at 1291 (Kavanaugh, J., dissenting). "Because the vast majority of states have not traditionally required and even now do not require registration of lawfully possessed guns, [Illinois]'s registration law … does not satisfy the history- and tradition-based test." *Id.* at 1293 (Kavanaugh, J., dissenting). The registration requirement is "therefore unconstitutional." *Bruen*, 142 S. Ct. at 2128; *cf. Thomas v. Collins*, 323 U.S. 516, 540 (1945) ("[A] requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment."). It is ahistorical, *id.*, and, in other countries, has been the first step on the way to confiscation of such weapons. *See* Smilde, *Citizen Security Reform, part 5: Gun Control*, Venezuelan Politics and Human Rights (Aug. 5, 2013) (describing Venezuela's gun registration law

---

[15] The majority of the D.C. Circuit in *Heller* acknowledged that registration requirements for *long guns* are not longstanding, but then went on to apply intermediate scrutiny, which *Bruen* now forecloses. *Heller*, 670 F.3d at 1255-56 ("The requirements that are not longstanding, which include … *all* the requirements as applied to long guns."). Illinois acknowledges that the AR-15 is a long gun, *see, e.g.*, 720 Ill. Comp. Stat. Ann. 5/24-1.10(a), so the regulation as applied to the AR-15 and Dr. Herrera is not longstanding.

in advance of private gun confiscation), *available at* venezuelablog.org/citizen-security-reform-part-5-gun-control; *see also* Kopel, *In the Wake of a Gun Ban, Venezuela Sees Rising Homicide Rate*, The Hill (Apr. 19, 2018), *available at* thehill.com/opinion/campaign/383968-in-the-wake-of-a-gun-ban-venezuela-sees-rising-homicide-rate.

## II.     The balance of the equities and the public interest favor an injunction.

Dr. Herrera is suffering irreparable harm for which there is no adequate remedy at law and therefore seeks relief by February 27, 2023, when he will next attend SWAT team training, or earlier. *See* Herrera Dec. ¶15. Dr. Herrera seeks a temporary restraining order, but if the preliminary injunction can be decided within that time, then he would forgo the request for a temporary restraining order.

The harm to Dr. Herrera is irreparable. *See* Compl. ¶¶97-104. The "loss of constitutional freedom, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)); *see also, e.g.*, *Ezell*, 651 F.3d at 698. Irreparable harm is thus presumed for constitutional violations including those perpetuated here. *See Ezell*, 651 F.3d at 699-700 (citing 11A Charles Alan Wright et al., Federal Practice & Procedure §2948.1 (2d ed. 1995)); *see also Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014) ("[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury."). "Infringements of [the Second Amendment] cannot be compensated by damages." *Ezell*, 651 F.3d at 699.[16] No amount of money damages can compensate Dr. Herrera for the lost training opportunities, to the detriment of his safety, or the other unconstitutional compromises that state and local law require of him for self-defense inside and outside his home. *See*

---

[16] The Seventh Circuit analogized infringements of Second Amendment rights with infringements of First Amendment rights for purposes of irreparable harm and other preliminary-injunction factors. *See Ezell*, 651 F.3d at 699. As *Bruen* reaffirmed, the right to keep and bear arms "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156.

Herrera Dec. ¶¶5-14 The "ban[s] w[ere] unconstitutional when enacted and violate[] [Dr. Herrera's] Second Amendment rights every day [the bans] remain[] on the books." *Id.* at 698. That "kind of constitutional harm" is irreparable. *See id.* at 698-99.

In light of that irreparable harm, the balance of harms favors Dr. Herrera. *See Ezell*, 14 F.3d at 314. That balance of "harm to the parties and considering the public interest 'largely overlap' when a Plaintiff sues a government entity to enjoin enforcement of a statute." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd*, 593 F.3d 660 (7th Cir. 2010). Applied here, "there can be no irreparable harm to a [government]"—nor is it in the public interest—when the government "is prevented from enforcing an unconstitutional statute." *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). Although "the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in" doing so through unconstitutional means. *Ripley*, 616 F. Supp. 2d at 908; *accord Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (explaining that governments "cannot suffer harm from an injunction that merely ends an unlawful practice"). On the other side, Dr. Herrera is suffering and will continue to suffer irreparable harm "every day" the bans remain "on the books." *Ezell*, 651 F.3d at 698-99. In short, "the balance of harms … favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest."); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("'It is always in the public interest to prevent the violation of a party's constitutional rights.'"). Because Dr. Herrera is suffering and will continue to suffer irreparable harm and it is in the public interest to stop the violation of his rights, this Court should enjoin each of the challenged regulations.

## CONCLUSION

For the foregoing reasons, this Court should grant Dr. Herrera's motion for a temporary restraining order and preliminary injunction.

Dated: January 27, 2023

Respectfully submitted,

 /s/ Taylor A.R. Meehan

Gene P. Hamilton*
Reed D. Rubinstein*
Michael Ding (IL ARDC 6312671)
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue SE
Washington, DC 20003
Tel: (202) 964-3721
gene.hamilton@aflegal.org
reed.rubinstein@aflegal.org
michael.ding@aflegal.org

* Pro hac vice applications forthcoming

Thomas R. McCarthy*
Jeffrey M. Harris*
Taylor A.R. Meehan (IL ARDC 6313481)
C'Zar D. Bernstein*
Matthew R. Pociask*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
jeff@consovoymccarthy.com
taylor@consovoymccarthy.com
czar@consovoymccarthy.com
matt@consovoymccarthy.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I filed this motion with the Court via ECF. Because Defendants have not yet entered an appearance, I will attempt to serve the foregoing by process server on Monday, January 30, 2023, or earlier, unless Defendants' counsel agree to service by email. I have also notified counsel who have represented Defendants in other cases in this district of the filing of the underlying complaint and the motion for temporary restraining order and preliminary injunction. I will email a copy of such motion, this memorandum of law, and all attachments to Defendants' counsel in related cases.


Dated: January 27, 2023

*/s/ Taylor A.R. Meehan*

Taylor A.R. Meehan

*Counsel for Plaintiff*

31