**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JAVIER HERRERA,

    Plaintiff,

       vs.

KWAME RAOUL, et al.,

    Defendants.

Case No.  1:23-cv-532

**THE ATTORNEY GENERAL AND ISP DIRECTOR KELLY'S
RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

KWAME RAOUL
*Attorney General of Illinois*

Christopher G. Wells
Kathryn Hunt Muse
Keri Holleb Hotaling
Office of the Illinois Attorney General
100 W. Randolph St.
Chicago, Illinois 60601
*Counsel for Attorney General Raoul and
ISP Director Kelly*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................i

TABLE OF AUTHORITIES .........................................................................................................ii

INTRODUCTION .........................................................................................................................1

BACKGROUND ...........................................................................................................................4

LEGAL STANDARD....................................................................................................................9

ARGUMENT ..............................................................................................................................10

   I.   Plaintiff's claims are unlikely to succeed on the merits................................................10

   A.   The legal framework for Second Amendment claims.................................................11

   B.   Plaintiff cannot show that the Act regulates conduct protected by the text of the Second Amendment. ..........................................................................................................15

      1.   Large capacity magazines are not "arms." ......................................................15

      2.   Neither large capacity magazines nor assault weapons were in common use when the Second and Fourteenth Amendments were ratified. ...........................20

      3.   The Act restricts weapons and accessories not commonly used for self-defense today...........24

         a.   The restricted weapons are for war—not individual self-defense...................25

         b.   Sales and ownership numbers do not show commonality or use.......................33

      4.   The Act's registration process does not implicate the Second Amendment. ...........................37

   C.   Even if Plaintiff meets his textual burden, history and tradition allow regulating these weapons and accessories. ..........................................................................................41

      1.   The Act responds to dramatic technological changes and unprecedented societal concerns. ..43

      2.   There is a historical tradition of regulating dangerous and unusual weapons associated with increased criminality and violence. ...........................45

         a.   From the Founding Era through the 19th century, legislatures enacted categorical restrictions on dangerous and unusual weapons, including specific firearms.....................45

         b.   This tradition continued when 20th century legislatures regulated machine guns and assault weapons.......................................................51

      3.   The Act is relevantly similar to historical regulations.............................................53

         a.   The Act's minimal burden on the right to self-defense is equivalent to, or less than, comparable historical regulations. ...................................53

         b.   The Act's justifications are the same as historical analogues, but even more compelling. ..58

         c.   Plaintiff's attempts to distinguish the Act from the historical tradition of regulating dangerous and unusual weapons will fail............................59

   II.   Plaintiff has not shown he will suffer irreparable harm.................................................63

   III.   An injunction would harm the public interest...............................................................66

   IV.   The balance of equities tips firmly in favor of the State. ..............................................67

CONCLUSION............................................................................................................................68

i

# TABLE OF AUTHORITIES

## Cases

*Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035 .................................................. 9

*Accuracy Firearms, LLC v. Pritzker*, No. 2023-MR-4 (Cir. Ct., 4th Jud. Cir., Effingham County) ........... 9

*Antonyuk v. Bruen*, No. 22-cv-734, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) .................................. 67

*Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020) .................................................................. 67

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) .............. 13, 36, 54

*Baird v. Bonta*, No. 19-cv-617, 2022 WL 17542432 (E.D. Cal. Dec. 8, 2022) ........................................ 12

*Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840 (7th Cir. 2005) ................................................... 37

*Bevis v. City of Naperville*, No. 22-cv-4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ............... passim

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ............................................................. 21, 35

*Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021) ............................................................. 68

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................................... passim

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc) .................................................... 13

*E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700 (7th Cir. 2005) .......... 37

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................... 14, 20, 64, 65

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ......................................... 13, 14, 34, 60

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357 (7th Cir. 2019) ................................... 10, 68

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ................................................................ 20

*Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (D.C. Cir. 2011) ...................... 13, 39, 40, 41

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ................................................................ 13

*Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ............................................ 10

*Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) .................................... 16

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) .......................................................... 13, 54, 66

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ................................................................... 9

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................................................... passim

*Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021) ..................................................... 36

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ..................................... 1

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ............................. 13, 32, 67

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................ 68

*North Carolina v. Huntly*, 25 N.C. 418 (1843) ............................................................... 62

*Nunn v. Georgia*, 1 Ga. 243 (Ga. 1846) ...................................................................... 49

*O'Neill v. Alabama*, 16 Ala. 65 (1849) ...................................................................... 46

*Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) 16

*Oregon Firearms Fed'n, Inc. v. Brown*, No. 22-cv-1815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ...... 19

*Orr v. Shicker*, 953 F.3d 490 (7th Cir. 2020) .................................................................................. 9, 10, 63

*Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949 (N.D. Ill. 2018) ................... 64

*Staples v. United States*, 511 U.S. 600 (1994) ..................................................................................... 62, 63

*United States v. Balint*, 258 U.S. 250 (1922) .............................................................................................. 62

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) .............................................................................. 16

*United States v. Dotterweich*, 320 U.S. 277 (1943) .................................................................................. 61

*United States v. Freed*, 401 U.S. 601 (1971) ............................................................................................. 61

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ............................................................................ 20

*United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) .......................... 16

*United States v. Holton*, No. 21-cr-482, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) ......................... 39

*United States v. Miller*, 307 U.S. 174 (1939)..................................................................................... passim

*United States v. Tita*, No. CR RDB-21-0334, 2022 WL 17850250 (D. Md. Dec. 22, 2022) .............. 38, 40

*Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) .................................................................... passim

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008)..................................................................... 10, 63

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ......................................................................... 13, 34, 54

## Statutes

420 ILCS 66/1.................................................................................................................................................. 65

720 ILCS 5/24-1 .............................................................................................................................................. 65

720 ILCS 5/24-1.10 ................................................................................................................................. passim

720 ILCS 5/24-1.9 ................................................................................................................................... passim

National Firearms Act of 1934, ch. 757, 48 Stat. 1236, Pub. L. 73-474 (1934) ......................................... 52

Pub. L. No. 103-322, § 110102, 108 Stat. 1796........................................................................... 31, 32, 63

## Other Authorities

Chicago Police Department, U04-02-01, Uniform and Property, Department Approved Handguns and
 Ammunition (eff. July 21, 2021), §§ V(A), VI(A), available at
 https://directives.chicagopolice.org/#directive/public/6465. ........................................................... 17, 18

*Joule*, Merriam-Webster.com Dictionary (Merriam-Webster), www.merriam-
 webster.com/dictionary/joule (last visited Feb. 27, 2023) ...................................................................... 28

U.S. Census Bureau, "1860 Fast Facts," https://bit.ly/3Z4TLgL (last visited Feb. 27, 2023)................... 22

U.S. Census Bureau, "1870 Fast Facts," https://bit.ly/41xeP16 (last visited Feb. 27, 2023)..................... 22

**Treatises**

4 W. Blackstone, *Commentaries on the Laws of England* (1769) ........................................................ 41, 45

Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* (1822) .......................... 46

Henry J. Stephen, *Summary of the Criminal Law* (1840) ........................................................................ 46

**Constitutional Provisions**

U.S. Const. amend. II. ................................................................................................................... passim

U.S. Const. amend. XIV ............................................................................................................... passim

## INTRODUCTION

The Framers left us a legacy of self-government through our elected representatives. They did not leave future generations powerless to limit access to the preferred instruments of mass murderers.

The people of Illinois's elected representatives recently passed the Protect Illinois Communities Act, Public Act 102-1116 ("the Act"), which restricts access to assault weapons and large capacity magazines. They did so in response to a horror the Framers never witnessed nor imagined: a single individual, armed with a weapon of war more recent than the hydrogen bomb, fired 83 shots, killed 7 people, and wounded 48 others in less than 60 seconds at a July 4th parade in Highland Park, Illinois. Plaintiff claims the Second Amendment, as interpreted in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), gives him the right to buy this weapon of war and others of equal potency. It doesn't.

*Bruen* reaffirmed that the Second Amendment does not enshrine "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128. In doing so, *Bruen* relied on *District of Columbia v. Heller*, 554 U.S. 570 (2008). Even as *Heller* invalidated a municipal ban on possessing handguns—"the quintessential self-defense weapon"— it simultaneously recognized that "weapons that are most useful in military service—M-16 rifles and the like," can be banned. *Id.* at 627–29. In other words, *Heller* distinguished military-grade weapons, like the M-16, that may be banned, from weapons commonly used by civilians for self-defense, like handguns, that may not.

The Act regulates weapons and accessories like those categorically marked as unprotected in *Heller*. That is why it does not infringe the Second Amendment. The most commercially successful weapons restricted by the Act, AR-15 rifles, are M-16s in every way except one: the ability to toggle between semi-automatic and automatic fire. That distinction is not constitutionally

1

determinative, nor has it stopped mass shooters from using the AR-15 time and again to inflict battle-level casualty numbers in American schools and streets.

Bruen did not overrule Heller, and it does not prevent legislatures from limiting access to weapons of war like the AR-15. It did clarify the two steps courts should use to analyze Second Amendment claims. First, Bruen puts an initial burden on the party bringing a Second Amendment challenge to demonstrate the amendment's "plain text" covers conduct regulated by the law being challenged. Second, if the challenging party carries this initial burden, the government can demonstrate the regulation complies with the Second Amendment because it is "relevantly similar" to analogous historical regulations and is thus "consistent with the Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2131. Plaintiff fails at both steps.

Plaintiff cannot meet his burden of showing assault weapons and large capacity magazines are "arms" protected by the text of the Second Amendment. Large capacity magazines are accessories, not "arms," and they are neither independently capable of nor necessary for self-defense. They augment the lethality of firearms by reducing the frequency of re-loading in battle—or during the episodic massacres that now punctuate modern American life.

The other weapons and accessories regulated by the Act are also not "arms" protected by the Second Amendment because they are not commonly used for self-defense—"'the central component of the [Second Amendment] right itself.'" Bruen, 142 S. Ct. at 2135 (quoting Heller) (emphasis original). In Heller and Bruen, the Supreme Court said the "arms" protected by the Second Amendment are those in common use by law-abiding citizens for self-defense—like a handgun, which both decisions called "the quintessential self-defense weapon." Id. at 2143 (quoting Heller). The assault weapons restricted by the Act are not commonly used for self-defense; by design and in practice, they exist for offensive infliction of mass casualties.

Plaintiff's claims will also fail at *Bruen*'s second step because the Act's restrictions are "consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. *Bruen* made clear that its use of "historical tradition" is not a "regulatory straightjacket," and the government may use "analogical reasoning" to show that a modern firearms regulation is relevantly similar to historical regulations. *Id.* at 2133. A "more nuanced approach" to analogical reasoning is also appropriate where a case implicates "unprecedented societal concerns or dramatic technological changes." *Id.* at 1232. This is exactly such a case: the Act responds to an utterly modern concern borne of dramatic technological change—mass shootings perpetrated by lone individuals armed with assault weapons and large capacity magazines capable of carnage at a level inconceivable to the Framers of either the Second or Fourteenth Amendments.

Although the specific concern targeted by the Act is modern, the Act continues a historical tradition that both *Bruen* and *Heller* recognized: restrictions on "dangerous and unusual" weapons. *Bruen*, 142 S. Ct. at 2128. From the Colonial Era onward, legislatures have regulated specific categories of weapons thought to be particularly "dangerous" or "unusual"—from pocket pistols in the 17th and 18th centuries, to concealable "fighting knives" and revolvers in the 19th century, to machine guns and assault weapons in the 20th century. When specific weapons have generated new threats to public safety, elected representatives have responded. Consistent with this historical tradition, the federal government passed a ten-year ban on assault weapons in 1994 in response to the growing threat of mass shootings. And because of that same escalating threat, Illinois has joined 8 other states, the District of Columbia, and numerous localities in banning their sale now. The Act is consistent with "this Nation's historical tradition of firearm regulation," *id.* at 2126, and Plaintiff's claim will independently fail at *Bruen*'s second step.

Plaintiff seeks an order enjoining enforcement of the Act. His request must be denied. Plaintiff is unlikely to succeed on his Second Amendment claims. Plaintiff also has not met his burden on the other elements for injunctive relief: he is unlikely to suffer irreparable harm without an injunction; an injunction would not be in the public interest; and the balance of equities tips away from invalidating a critical public safety measure.

## BACKGROUND

**Mass shootings with assault weapons and large capacity magazines have skyrocketed nationally, especially in the last two decades**. Since the 9/11 terrorist attacks, the deadliest individual acts of intentional criminal violence in the United States have all been mass shootings. Ex. 4, Klarevas Dec. ¶ 11. While the U.S. population grew 20% during this time period, the number of people killed in high-fatality mass shootings increased 260%. *Id*. The large and growing proportion of these massacres committed with assault weapons and large capacity magazines reflects a clear preference among the perpetrators for these weapons. *Id*. ¶¶ 12–13. Meanwhile, the ease with which these weapons and magazines can be operated by novices "transforms terrorists, criminals, deranged people, or disconnected teens with poor coping skills and intent to kill into killing machines." Ex. 5, Andrew Dec. ¶ 42.[1] Assault weapons and large capacity magazines have come to present an "immitigable public safety threat" for communities and law enforcement. *Id*. ¶ 41. They enable scores of bullets to be fired in seconds, but the impact of those rounds devastates communities for years afterward.

---

[1] For example, the shooter in Uvalde, Texas who massacred elementary school children and staff in May 2022 "bought two AR-15 weapons less than a week before he committed a mass shooting. Without any training, and after owning the weapon only one week, he fatally shot 19 students and 2 teachers, and wounded 17 others." Ex. 5, Andrew Decl. ¶ 42.

**On July 4, 2022, a single shooter equipped with an assault weapon and large capacity magazines rained gunfire down on an Independence Day parade in Highland Park, Illinois— killing 7 people and wounding 48 more**. The rapid rate of fire enabled by his assault weapon and the volume of rounds enabled by his large capacity magazines meant the shooter was able to fire approximately 83 rounds in less than 60 seconds. Ex. 2, Morgan Decl. ¶¶ 19–20. Concealed on a rooftop where he could take aim and utilize the weapon's extended range, the shooter was able to evade apprehension on site. When his minute-long rampage was done, he left the scene. *Id.* ¶ 21.

Alarm quickly spread across Illinois while the shooter remained at large. *See* Ex. 1-A.[2] Morton Grove, Skokie, Glenview, Lincolnshire, Glencoe, and Mount Prospect canceled their July 4th parades. Ex. 1-B. Northbrook, Winnetka, Waukegan, Vernon Hills, Buffalo Grove, Libertyville, St. Charles, and Huntley canceled fireworks. *Id.*; Ex. 1-D. Evanston and Lake Forest closed beaches. Ex. 1-B. Arlington Heights, Elgin, Deerfield, Downers Grove, Wilmette, Lombard, Oak Park, Elk Grove, Itasca, Rolling Meadows, Long Grove, Niles, Northfield, and Palatine also cancelled holiday events. Ex. 1-A; Ex. 1-C. While civilians sheltered in their homes, massive numbers of local, state, and federal law enforcement officers mobilized to find the shooter. Ex. 1-D. Dozens of medical workers manned the emergency room late in the day in case the killer shot more people. Ex. 1-E. In all, because a single person was on the loose with an assault weapon, dozens of law enforcement officers and medical workers were deployed, communities all over northern Illinois cancelled holiday celebrations, and thousands of Illinois residents could not leave their homes.

When the suspect was apprehended after approximately 8 hours, Ex. 2, Morgan Decl. ¶ 21, attention returned to the horror that had been inflicted that morning. Seven people lay dead. *Id.*

---

[2] Exhibit 1 is a compilation of newspaper articles cited in this memorandum of law.

¶ 19. A bloodstained toddler, found underneath the body of a dying man, had been orphaned. Ex. 1-F. Forty-eight people had been injured. Ex. 2, Morgan Decl. ¶ 19. A mother who had been shot in the foot and leg had to have two surgeries before she could be reunited with her 8-year-old son—who lay in critical condition with a gunshot wound. Ex. 1-H. Dozens more had been traumatized and "will never forget the bloodshed, carnage, and chaos" they witnessed that day. Ex. 2, Morgan Decl. ¶ 12. The parade was supposed to have been a procession of Cub Scouts, musicians, day campers, and "emissaries from every other kind of group that makes a community feel close-knit and secure"—in a town where there had not been a single murder from 2000 to 2020. Ex. 1-J. Instead, hospitals were flooded with patients from 8 to 85 years old. Ex. 1-K.

Attention next turned to solutions. Highland Park had banned sales of assault weapons and large capacity magazines since 2013, Ex. 2, Morgan Decl. ¶ 26, but the shooter's assault weapons had been purchased elsewhere in Illinois, *id*. ¶ 22. Eight other states restricted access to assault weapons, large capacity magazines, or both, but not Illinois. *Id*. ¶ 28. The shooting brought renewed urgency to enact legislation in Illinois when the General Assembly reconvened. On December 1, 2022, the representative whose district includes Highland Park and surrounding communities introduced House Bill 5855, which built on elements from another pending bill, House Bill 5522. *Id.* ¶ 30. Later that month, the legislature convened three public hearings to hear testimony about the proposed assault weapon and large capacity magazine restrictions reflected in the proposed bills. *Id.* ¶¶ 31–32; *see also* Ex. 1-L. In one hearing, legislators heard an audio recording from the parade "that began with a high-pitched cry from a child with not enough air to take a breath," followed by a child "scream[ing] in exasperation and fear" because of the chaos of the shooting. Ex. 1-M. A mother who attended the parade with her 6-year-old testified that the trauma of witnessing the events that day had caused her son to wet the bed for months after. *Id.* In

addition to "gut-wrenching testimony" from survivors of the Highland Park massacre, the House Committee heard testimony from community members across Illinois who supported—and opposed—the proposed restrictions. Ex. 2, Morgan Decl. ¶¶ 31–32. Following the public hearings, in January 2023, the Illinois General Assembly passed the law at issue in this case as House Bill 5471. *Id.* ¶ 33.

**On January 10, 2023, the Governor signed the Protect Illinois Communities Act into law.** The Act prohibits the sale, purchase, manufacture, delivery, or importation of "assault weapon[s]" and "large capacity ammunition feeding device[s]" (*i.e.*, large capacity magazines)[3] in Illinois subject to certain exceptions for law enforcement, members of the military, and other professionals with similar firearms training and experience. *See generally* 720 ILCS 5/24-1.9 (new) & 1.10 (new).[4] Individuals who lawfully possessed assault weapons and large capacity magazines covered by the Act as of the effective date can continue to possess them. *Id.* §§ 1.9(c)-(d) & 1.10(c)-(d). By January 1, 2024, to continue lawfully possessing an assault weapon, an individual must submit to the Illinois State Police ("ISP") an endorsement affidavit stating: (1) their Firearm Owner's Identification Card number; (2) an affirmation that they possessed the assault weapon(s) prior to January 10, 2023; and (3) the make, model, caliber, and serial number of the assault weapon(s) that they possess. *Id.* This registration requirement does not extend to large capacity magazines; individuals who lawfully possessed large capacity magazines (over 15

---

[3] The Act uses the defined term "large capacity ammunition feeding devices" to refer to large capacity magazines. In this filing, "large capacity magazines" is used to refer to magazines that fall within the definition of "large capacity ammunition feeding devices" under the Act. *See* 720 ILCS 5/24-10(a) (new).

[4] In the attachments to Exhibit 3, the Illinois State Police provides compilations of images of firearms and magazines regulated by the Act.

7

rounds for handgun magazines or over 10 rounds for rifle magazines, *id.* § 1.10(a)) as of the Act's effective date can continue to possess them without registering these items. *Id.* § 1.10(d).

Beginning April 10, 2023, the Act delineates specific locations where lawful owners of assault weapons and large capacity magazines may continue to possess them: (1) on private property they own or control (e.g., at home); (2) on private property not open to the public and with the owner's permission; (3) while on the premises of a licensed firearms dealer or gunsmith for the purpose of repair; (4) while at a licensed firing range or sport shooting competition; or (5) while traveling to or from these locations. *Id.* § 1.9(d).

**Shortly after the Act took effect, Plaintiff sued**. On January 27, 2023, Plaintiff filed this action challenging various state, county, and municipal regulations of assault weapons and large capacity magazines. Dr. Herrera is a Chicago resident, a doctor, and owner of assault weapons and large capacity magazines. ECF 1 ¶ 5 ("Compl."). Herrera alleges that he serves as a medic on a "SWAT team" in the Chicago area, which he believes requires him to obtain proficiency with AR-15 semiautomatic rifles. ECF 5-1 ¶ 8 ("Herrera Decl."). He sues two state officials—Attorney General Kwame Raoul and ISP Director Brendan Kelly—claiming his Second Amendment rights have been violated because the Act restricts new purchases of large capacity magazines (Count I), restricts new purchases of assault weapons (Count II), and requires registration by current assault weapon owners that wish to continue to possess them (Count III). On the same day Plaintiff filed his complaint, he moved for a temporary restraining order and preliminary injunction halting enforcement of all of the challenged regulations. ECF 4 ("Mot."); ECF 5 (supporting memorandum of law) (hereinafter "Br.").

The Act has also been challenged in state court, though none of the state court actions alleges violations of the U.S. Constitution. Most allege state constitutional claims based on the

legislative process, as well as an equal protection claim under the Illinois Constitution based on the Act's exceptions for members of law enforcement, the military, and other specially trained professionals. In *Accuracy Firearms, LLC v. Pritzker*, No. 2023-MR-4 (Cir. Ct., 4th Jud. Cir., Effingham County), the circuit court initially entered a temporary restraining order, but the Fifth District Appellate Court later reversed that order on all but the equal protection count, on which it affirmed. 2023 IL App (5th) 230035. The State has filed a petition for leave to appeal that ruling in the Illinois Supreme Court. Other plaintiffs in state court actions have since obtained temporary restraining orders, limited to themselves, based on the Fifth District's currently binding ruling in *Accuracy Firearms*.

The only court to have considered whether the Act infringes the Second Amendment has ruled that it does not. On February 17, 2023, a judge in this district denied a motion for a temporary restraining order and preliminary injunction against the Act. *Bevis v. City of Naperville*, No. 22-cv-4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) (Kendall, J.). Applying *Bruen*, the court found that the Act is "constitutionally sound," and the plaintiffs were unlikely to succeed on the merits of their Second Amendment challenge. *Id.* at *18–30.[5]

## LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). For this reason, a "preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020).

---

[5] The State was not sued and was not a party when the court ruled, and therefore the State's views on the constitutionality of the law were not considered by the court. The *Bevis* plaintiffs have filed a notice of appeal of the Court's Feb. 17 ruling under 28 U.S.C. § 1292.

To obtain a preliminary injunction, Plaintiff must make a clear showing that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the injunction is in the public interest; and (4) the balance of equities tips in Plaintiff's favor. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24.

The movant "bears a significant burden" of making a "strong showing" that they are likely to succeed on the merits; neither a "better than negligible" chance of success nor a "possibility of success" is sufficient. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). In addition to showing a high likelihood of success on the merits, Plaintiff must show that he will "*likely* suffer irreparable harm" absent injunctive relief, which requires "more than a mere possibility of harm." *Orr*, 953 F.3d at 502. Plaintiffs who are less likely to win on the merits must make a stronger showing on the balancing of harms. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

## ARGUMENT

### I. Plaintiff's claims are unlikely to succeed on the merits.

Plaintiff is unlikely to succeed on his claims, which all derive from the Second Amendment. *See* Compl. ¶¶ 89–135. Plaintiff is not likely to succeed on Counts I and II because he cannot show that the "the Second Amendment's plain text covers" the weapons and accessories Plaintiff seeks to purchase and sell. *Bruen*, 142 S. Ct. at 2129–30. Plaintiff will fail on Count III because the Act's registration requirement does not burden his right to keep and bear arms. Plaintiff

is also unlikely to succeed on the merits on all of his claims because all of the Act "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

### A. The legal framework for Second Amendment claims.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In 2008, the Supreme Court held for the first time that this text protects "an individual right" that is "unconnected to militia service." *Heller*, 554 U.S. at 599, 608. *Heller* has been followed by two other decisions that discuss this right—*McDonald v. City of Chicago* in 2010 and *Bruen* in 2022. In all three cases, the Supreme Court emphasized that "individual self-defense" is "the '*central component*' of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. 742, 767, quoting *Heller*, 554 U.S. at 599).

When the *Heller* court recognized this right, it made clear that the right is "not unlimited." 554 U.S. at 626. The Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The right "extends only to certain types of weapons." *Id.* at 623. For example, "weapons that are most useful in military service—M-16 rifles and the like—may be banned[.]" *Id.* at 627. That is because the amendment protects only "instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. States may prohibit "the carrying of 'dangerous and unusual weapons[.]'" *Id.* at 2128.

In *Bruen*, the Supreme Court also clarified the text-and-history framework appropriate for analyzing whether the right recognized in *Heller* has been violated. Before *Bruen*, many federal appellate courts applied a two-step framework for evaluating challenges to firearms regulations. First, courts considered text and history, evaluating whether "the challenged law regulates activity falling outside the scope of the right as originally understood." *Id.* at 2126 (cleaned up). Second,

courts applied means-end scrutiny, applying intermediate or strict scrutiny depending upon the severity of the law's burden upon the core Second Amendment right of self-defense. *Id.*

Bruen eliminated the means-end scrutiny framework and clarified that the appropriate legal standard is rooted in text and history. 142 S. Ct. at 2129–30. Specifically, the Court set forth a different two-step inquiry:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* In other words, Plaintiff bears the burden to show that "the Second Amendment's plain text covers [his proposed] conduct" and thus "presumptively protects that conduct." *Id.*; *see also id.* at 2141 n.11 ("*[B]ecause* the Second Amendment's bare text covers petitioners' public carry, *the respondents here shoulder the burden* of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope.") (emphasis added); *Baird v. Bonta*, No. 19-cv-617, 2022 WL 17542432, at *6 (E.D. Cal. Dec. 8, 2022) (analyzing which party bears the burden of proof and concluding plaintiffs initially "must show they are likely to prove 'the Second Amendment's plain text covers' conduct regulated by" the law challenged before the state must justify its regulation). If the plaintiff meets his burden, the government must then show that the challenged regulation aligns with historical tradition, *Bruen*, 142 S. Ct. at 2129–30, either by identifying historical regulations that are "distinctly similar" to the challenged regulation, *id.* at 2131, or by demonstrating that the challenged regulation is analogous to historical regulations, *id.* 2132.

Contrary to Plaintiff's assertions, *Bruen* did not wipe out every appellate court and district court ruling on the Second Amendment. Courts have not always relied on means-end analysis to reject claims, and those decisions remain relevant. For example, in *Hollis v. Lynch*, 827 F.3d 436,

446–47 (5th Cir. 2016), the Fifth Circuit found machine guns are not covered by the text of the Second Amendment. Similarly, in *Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017), the Fourth Circuit upheld a ban on assault weapons by applying *Heller* to conclude that the prohibited weapons were among those arms not protected by the text of the Second Amendment.[6] The result in *Kolbe* was not an outlier. Before *Bruen*, at least seven federal appellate courts upheld restrictions on assault weapons and/or large capacity magazines. *Kolbe*, 849 F.3d at 130, 140; *Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc); *Worman v. Healey*, 922 F.3d 26, 30, 40 (1st Cir. 2019); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 122 (3d Cir. 2018) ("*ANJRPC*"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 263–64 (2d Cir. 2015); *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1264 (D.C. Cir. 2011); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015); *Wilson v. Cook County*, 937 F.3d 1028, 1032–33 (7th Cir. 2019). Many of these decisions used a means-end scrutiny later criticized in *Bruen*, while the Seventh Circuit used a different framework.

Twice—in 2015 and again in 2019—the Seventh Circuit upheld local ordinances in Illinois that banned the sale and possession of assault weapons and large capacity magazines.[7] *Friedman*, 784 F.3d 406; *Wilson*, 937 F.3d 1028. *Friedman* discussed three factors: (i) history—"whether a regulation bans weapons that were common at the time of ratification," 784 F.3d at 410; (ii) militia

---

[6] Although the Supreme Court in *Bruen* abrogated the portion of *Kolbe* that applied intermediate scrutiny, the *Kolbe* court's decision also rested on the entirely independent ground that assault weapons and large capacity magazines are excluded from the text of the Second Amendment. *Kolbe*, 829 F.3d at 121 (explaining that the court merely found it "prudent" to also conduct intermediate scrutiny analysis). The independently dispositive text-based ruling in *Kolbe* is consistent with *Bruen*'s first step and remains good law.

[7] Similar to the Act, the ordinances challenged in *Friedman* and *Wilson* adopted a two-fold definition of assault weapons: identifying specific weapons by name (e.g., AR-15 and AK-47 rifles) and also listing features that, individually or in combination, made specific firearms "assault weapons" within the meaning of the ordinances. *See Friedman*, 784 F.3d at 407 (describing ordinance); *Wilson*, 937 F.3d at 1029 (same). The ordinances in *Friedman* and *Wilson* defined large capacity magazines as those that can accept more than 10 rounds. *Friedman*, 784 F.3d at 407 (describing ordinance); *Wilson*, 937 F.3d at 1029 (same).

use—whether a regulation bans "those [weapons] that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,'" *id.* (quoting *Heller*, 554 U.S. at 622–25; *United States v. Miller*, 307 U.S. 174, 178–79 (1939)); and (iii) burden on self-defense—"whether law-abiding citizens retain adequate means of self-defense." *Id.* After finding "no definitive constitutional rule" invalidating the regulation at issue, *Friedman* concluded "the political process" was the appropriate forum for "evaluat[ing] the relation among assault weapons, crime, and self-defense," because "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment[.]" *Id.* at 412. In *Wilson*, plaintiffs asked the Seventh Circuit to overrule *Friedman* in favor of "a test that tracks more closely the language" in *Heller* and a 2011 Seventh Circuit decision, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). *Wilson*, 937 F.3d at 1031, 1034. The *Wilson* court refused and again rejected a Second Amendment challenge to a ban on the sale or possession of assault weapons and large capacity magazines. *Id.* at 1036.

In sum, after *Heller* recognized an individual right to keep and bear arms, seven federal appellate courts upheld assault weapons and/or large capacity magazine restrictions when faced with Second Amendment challenges. The Seventh Circuit has rejected challenges to these types of laws *twice* in the past decade. While *Bruen* clarified the analytical framework courts should be using, it did not say the ultimate conclusions of those courts were wrong. They were not. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("[N]othing . . . should be taken to cast doubt on . . . the historical tradition of prohibiting the carrying of dangerous and unusual weapons."). *Bruen* permits assault weapons and large capacity magazine restrictions like those in the Act because they regulate weapons and accessories not commonly used for individual self-defense. Under *Bruen*'s "history and tradition" step, regulations like the Act are also consistent with our Nation's tradition of regulating "dangerous and unusual" weapons.

**B. Plaintiff cannot show that the Act regulates conduct protected by the text of the Second Amendment.**

To succeed on his Second Amendment claims, Plaintiff must demonstrate the Act regulates conduct protected by the amendment's text. Plaintiff cannot meet this burden in three primary respects. First, the "arms" protected by the Second Amendment do not include non-essential accessories like large capacity magazines. Firearms are fully capable of providing self-defense with the 15- and 10-round magazines permitted by the Act. Second, assault weapons restricted by the Act are not protected "arms" because "arms" do not include "weapons that are most useful in military service—M-16 rifles and the like," *Heller*, 554 U.S. at 627. The Second Amendment's text protects only arms in common use at the time the Second or Fourteenth Amendments were ratified, or those commonly used for individual self-defense today. *Id.*; *McDonald*, 561 U.S. at 750. Plaintiff cannot show the Act violates the Second Amendment because it regulates weapons designed for war, not self-defense. Third, the Act's registration process does not implicate any Second Amendment rights.

**1. Large capacity magazines are not "arms."**

The "object" of an individual's Second Amendment right is "arms." *Heller*, 554 U.S. at 581. To satisfy *Bruen*'s first step, Plaintiff must prove both that the regulated instrument, device, or weapon fits within the category of "bearable arms," *Bruen*, 142 S. Ct. at 2132, and that it is "commonly used" for self-defense purposes, *id*. at 2138. Because large capacity magazines are accessories, not arms, they fall outside the text of the Second Amendment. Plaintiff's challenge to the Act's 15-round cap on handgun magazines and 10-round cap on rifle magazines will fail at *Bruen*'s first step.

The term "arms" refers to weapons and excludes related accessories like ammunition magazines. *See Heller*, 554 U.S. at 581 (citing 1 Dictionary of the English Language 106 (4th ed.)

15

(1773 edition of dictionary defining "arms" as "[w]eapons of offence, or armour of defence")). Although large capacity magazines can be used alongside weapons, they are not themselves weapons with offensive or defensive uses. Ex. 6, Busse Decl. ¶ 22 ("Magazines are containers which hold ammunition in spring-loaded preparation for feeding into the receiver of a firearm."); Ex. 7, Baron Decl. ¶ 57. *See Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *11 (D.R.I. Dec. 14, 2022) ("LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another.'") (quoting *Heller*).

This distinction was understood at the time the Bill of Rights was ratified, as demonstrated by the common phrase "arms and accoutrements," which clearly distinguished weapons, on the one hand, from items like cartridge cases, boxes, scabbards, and flints on the other. Ex. 7, Baron Decl. ¶¶ 11–12. Such accessories are not protected by the text of the Second Amendment. *See, e.g.*, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that a silencer is unprotected because it is "a firearm accessory [and] not a weapon in itself" and thus "can't be a 'bearable arm' protected by the Second Amendment"); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).

Although some courts have held that accessories may be protected in certain circumstances, this ancillary right has been extended only to accessories *necessary* to operate firearms for self-defense. *See, e.g.*, *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[T]he right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them.") (cleaned up); *Cox*, 906 F.3d at 1196 (Hartz, J., concurring) (noting that the Tenth Circuit's holding that silencers are not protected arms did not extend to "items that are not themselves bearable arms but are necessary to the operation of a firearm (think ammunition)").

Even under other courts' more expansive construction, the Second Amendment's text excludes large capacity magazines because they are not necessary to operate firearms for any purpose, including self-defense. All firearms that can accept a detachable large capacity magazine can also accept a magazine that holds fewer rounds and work just as well. Ex. 6, Busse Decl. ¶ 25. In any event, handguns, the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629, are widely sold with magazines of 15 or fewer rounds (the threshold permitted by the Act), not the 30-round magazines for AR-15s that Plaintiff wants to re-brand as "standard." Compl. ¶ 24. *See* 720 ILCS 5/24-1.10(a)(new).

Plaintiff's contention that large capacity magazines are critical for self-defense is irreconcilable with the many highly effective handguns that have magazines compliant with the Act's 15-round threshold. The Beretta M9 semi-automatic pistol, which continues to be a sidearm commonly issued by the U.S. military for self-defense, typically has a 15-round magazine. Ex. 9, Schreiber Decl. ¶ 19. Many of the law enforcement officers patrolling neighborhoods with the most gun violence in Illinois carry standard-duty firearms with magazines at or below the Act's 15-round threshold. For example, handguns in the Beretta 92 series, which accept a 15-round magazine, are approved for use as standard-duty weapons by the Chicago Police Department.[8] For officers who have joined the department since 2015, "[t]he only authorized prescribed firearm, alternate prescribed firearm, and auxiliary firearm . . . for on-duty or off-duty use will be a striker-fired semiautomatic pistol chambered in 9mm Luger (Parabellum)."[9] These pistols are available with standard magazines of 15, 10, or even 7 rounds—all below the Act's threshold for handgun

---

[8] Chicago Police Department, U04-02-01, Uniform and Property, *Department Approved Handguns and Ammunition* (eff. July 21, 2021), §§ V(A), VI(A), available at https://directives.chicagopolice.org/#directive/public/6465.

[9] *Id.* § II(c).

magazines. Ex. 8, Yurgealitis Decl. ¶ 92. Plaintiff cannot seriously contend that Chicago police officers have been left without adequate means of self-defense because they are not equipped with magazines holding more than 15 rounds.[10] *Cf.* Ex. 5, Andrew Decl. ¶ 61.

Many handguns popular with civilians also have magazines below the 15-round threshold. The Model 1911, which was the accepted defensive sidearm of the U.S. military for decades and is still one of the most widely owned self-defense guns in the country, is built to accept a magazine of 8 rounds or less. Ex. 6, Busse Decl. ¶ 25. The Sig P938, which is fully functional with a 7- or 8-round magazine, is a widely popular handgun preferred by consumers and acclaimed by industry experts as one of the most effective concealed carry/self-defense firearms on the market. *Id.* The Sig P938's shorter magazine is not just sufficient, but advantageous, because it makes the firearm easier to carry, including in public in accordance with concealed carry laws. *Id.*; *see also* Ex. 8, Yurgealitis Decl. ¶ 108. The popularity of these handguns for self-defense belies Plaintiff's claim that capping magazine capacity at 15 rounds offends the Second Amendment right to self-defense.

The 10-round threshold for rifle magazines is equally permissible. Rifles with 10-round magazines are fully functional for self-defense and other lawful purposes. Modern semi-automatic rifles that are designed, manufactured, and marketed as "hunting rifles" traditionally have an internal magazine capacity of fewer than 10 rounds depending on the caliber. Ex. 8, Yurgealitis Decl. ¶ 91. Even for the AR- and AK-platform rifles that are often sold with a 30-round magazine, the manufacturers also offer an option to purchase 10-round and lower capacity magazines (sometimes called "compliant" magazines, referring to compliance with magazine capacity limits in other jurisdictions). Ex. 6, Busse Decl. ¶¶ 25-26; *see also* Ex. 8, Yurgealitis Decl. ¶ 93. A rifle

---

[10] Notably, the Chicago Police Department *prohibits* officers from carrying extended magazines. *Id.* § II(L).

does not need a magazine holding more than 10 rounds to be used for self-defense. Ex. 6, Busse Decl. ¶ 26.

The increased popularity of semi-automatic rifles with magazines greater than 10 rounds is also a recent phenomenon, and this emerging trend has little to do with lawful self-defense. In 1990, there were only 43,000 "modern sporting rifles" (a gun industry euphemism for AR-15s and similar assault rifles that are frequently sold with 30-round magazines, Ex. 4, Klarevas Decl. ¶ 13) produced for the U.S. domestic market. Ex. 6, Busse Decl. ¶ 39 & Table, Estimated Modern Sporting Rifles in the United States 1990-2020. In other words, despite the continued legality of the AR-15 and other rifles sold with 30-round magazines in most states, American firearms consumers were choosing other options for self-defense. A decade later, in 2000, the domestic production figure was 86,000. *Id.* It only began to steadily increase in the years after the expiration of the federal assault weapons ban in 2004. *Id.* Then, between 2011 and 2013—during which the horrific 2012 elementary school massacre in Newtown, Connecticut was perpetrated with an AR-15 equipped with a 30-round magazine—sales tripled, increasing from 653,000 in 2011, to 1,308,000 in 2012, to 1,882,000 in 2013. *Id.* ¶¶ 11, 39, & Table. But a market spike driven by anticipation of a potential ban—a fear justified by the infamy assault weapons and large capacity magazines earned from Newtown and other mass shootings—is not evidence that either assault weapons or the 30-round magazines they come with were suddenly needed or used for self-defense. They were not.

In light of these facts, it is unsurprising that federal courts that have considered whether large capacity magazines fall within the text of the Second Amendment since *Bruen* have found that they do not. *See Oregon Firearms Fed'n, Inc. v. Brown*, No. 22-cv-1815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) (refusing to enjoin large capacity magazine ban); *Ocean State Tactical*, 2022

19

WL 17721175 (same). Because the large capacity magazines regulated by the Act are not "arms" within the original meaning of the Second Amendment, Plaintiff's challenge to those regulations will fail.

> **2.   Neither large capacity magazines nor assault weapons were in common use when the Second and Fourteenth Amendments were ratified.**

The Second Amendment protects "the sorts of weapons . . . 'in common use at the time'" the Bill of Rights was ratified in 1791. *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179). In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held the Second Amendment is applicable to the states through the Fourteenth Amendment. U.S. Const. amend. XIV. As a result, how the right was understood in 1868, when the Fourteenth Amendment was ratified, is also relevant. *Ezell*, 651 F.3d at 702 ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."). *See also United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."). *Cf. Bruen*, 142 S. Ct. at 2138 (declining to decide whether 1791 or 1868 is more useful to consider because the understanding of the right in both years was "the same with respect to public carry").

Plaintiff has not provided evidence that the assault weapons and large capacity magazines restricted by the Act were in common use in either 1791 or 1868—they were not. Reliable multi-shot firearms did not appear in any appreciable numbers until after 1868. Even those weapons, the Colt revolver and the Winchester repeating rifle, could not come remotely close to the rate of fire and rapid reloadability of modern assault weapons paired with large capacity magazines.

20

The firearms owned in the Founding Era generally could shoot one shot before reloading. Approximately 50% to 60% of households in the Colonial and Founding Eras owned a working firearm, usually a musket or a fowling piece. Ex. 10, Roth Decl. ¶ 15. Both were muzzle-loading. *Id*. Muskets were larger, single-shot firearms used for militia service. *Id.* Loading a musket required the musket ball to be manually inserted into the open end of the gun barrel and ramrodded into position. Fowling pieces were made to hunt birds and control vermin, using shot as ammunition instead of a ball. *Id.* With the exception of a few double-barreled pistols, neither muskets nor fowling pieces could fire multiple shots without reloading. *Id.* ¶ 16. Reloading was a time-consuming process that typically required at least half a minute. *Id*. Most owners stored guns empty, because the black powder used in a musket or fowling piece absorbed moisture and could corrode the barrel or firing mechanism or make the gun vulnerable to misfire. *Id.*

Single-shot, muzzle-loading firearms remained the standard infantry weapon up to and including the Civil War. Ex. 11, Spitzer Decl. ¶ 44. Even as firearms technology advanced to improve the reliability of multi-shot weapons, adoption of these weapons was slow. The first practical firearm that could shoot more than one bullet without reloading was a handgun designed by Samuel Colt in the 1830s with a revolving cylinder carrying multiple rounds (a "revolver"). *Id.* ¶ 45. But Colt struggled to find a market for his revolver, either from the government or the public. *Id*. The U.S. government repeatedly rejected the weapon after tests in 1836, 1837, 1840, and 1850, driving Colt to bankruptcy at one point. *Id*. The official sidearm of the U.S. Army in the Civil War remained a single-shot pistol. *Id*. It was only after the Civil War that the Colt-type revolver began to broadly proliferate in American society. *Id*; *accord Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) ("Revolvers were virtually unknown well into the 19th century, and semiautomatic pistols were not invented until near the end of that century.") (Alito, J., concurring). Even so, the

vast majority of revolvers produced in the 19th century held 7 or fewer rounds. Ex. 12, Delay Decl. ¶ 53. Reloading a revolver (then and now) required the cylinder to be unlocked from the gun frame and swung out so the user could remove expended cartridge casings and insert unfired rounds. *Id.* ¶ 54; Ex. 8, Yurgealitis Decl. ¶ 9.

Reliable rifles capable of firing more than one round did not appear in significant numbers until after the Civil War, and even then there were significant limitations compared to modern assault weapons. Benjamin Henry patented a rifle that could fire multiple rounds without reloading (through the use of a lever action) in 1860. Ex. 11, Spitzer Decl. ¶ 46. The Winchester Arms Company built on this design to introduce a repeating rifle in 1866 that could fire up to 16 rounds (1 in the chamber plus 15 in an attached, tubular magazine) without reloading. Ex. 12, Delay Decl. ¶ 58. It was not, however, a semiautomatic rifle; the shooter had to manipulate a lever in a forward-and-back motion before each shot. Ex. 11, Spitzer Decl. ¶ 46. Reloading a lever-action Winchester rifle was also significantly slower than changing the magazine on a modern firearm. The user had to manually reload the rifle one round at a time. *Id.*; Ex. 12, Delay Decl. ¶ 64. Although undoubtedly an innovation, the Winchester repeating rifle is a gun "whose legendary status wildly outdistanced its actual production and impact." Ex. 11, Spitzer Decl. ¶ 46. In reality, between 1861 and 1871—the decade spanning the Civil War and the ratification of the Fourteenth Amendment— there were 31 to 38 million Americans but only 74,000 repeating rifles produced in the aggregate by the Henry and Winchester companies.[11] *Id.*; Ex. 12, Delay Decl. ¶ 59.

---

[11] Just before the introduction of these Winchesters, the population of the United States was 31,443,321. U.S. Census Bureau, "1860 Fast Facts," https://bit.ly/3Z4TLgL (last visited Feb. 27, 2023). By 1871, the population had risen to 38,558,371. U.S. Census Bureau, "1870 Fast Facts," https://bit.ly/41xeP16 (last visited Feb. 27, 2023).

Practically speaking, these were the only firearms in circulation at the time the Fourteenth Amendment was ratified in 1868 that could fire more than 10 rounds without reloading.[12] Ex. 12, Delay Decl. ¶ 58. And there were not many of them compared to other types of firearms. As one prominent historian put it: "Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction." Ex. 11, Spitzer Decl. ¶ 46 (quoting historian Michael Vorenberg). One estimate puts this figure at 0.002% of all firearms in the United States by 1872. Ex. 12, Delay Decl. ¶ 60. In other words, firearms with magazines or magazine capacities like those restricted by the Act were not in "common use" in either 1791 or 1868. *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179).

Plaintiff elides this fact and offers misleading references to "large-capacity magazines" that he contends "existed before the Founding." Br. 25. None of Plaintiff's allegations show there were multi-shot firearms or magazines commonly owned (and certainly not in "common use" for self-defense) at any point before 1791. The "16-shooter invented in 1580" Plaintiff references belongs to a category of "superposed" firearms that used "roman-candle style bursts of fire" that had "limited utility on the battlefield and no utility off it," and that were "notoriously perilous to the shooter[.]" *Compare* Br. 25 *with* Ex. 12, Delay Decl. ¶¶ 14–15. The "Girandoni [*sic*] rifle" Plaintiff references—actually called a Girardoni rifle, Ex. 12, Delay Decl. ¶ 23 n.16—was an air rifle that had to be pumped 1500 times to fully pressurize a single reservoir and, when pressurized, was liable to explode. *Id.* ¶ 25. It was a "show piece" that was far more likely to draw curious observers to a museum than to actually be used as a weapon. *Id.* ¶¶ 27–29. The same is true for the "16-shot repeating rifle" that Joseph Belton demonstrated for the Continental Congress, which

---

[12] Lever-action repeating rifles like the Winchester 1873 are not restricted by the Act. The Act defines "assault weapon" to exclude a "firearm that is manually operated by bolt, pump, lever or slide action, unless the firearm is a shotgun with a revolving cylinder." 720 ILCS 5/24-1.9(a)(2)(C) (new).

Plaintiff also references. Br. 25. Demonstration is not adoption and certainly not "common use."[13] The Continental Congress ordered a total of 100 of Belton's weapons, only to cancel the order days later and never revisit it. *See* Ex. 12, Delay Decl. ¶¶ 21–22.

For each of Plaintiff's pre-1791 examples, limited or experimental use is not "common use," and the former is all Plaintiff can allege. As one of Defendants' experts, Professor Brian Delay, a historian from the University of California-Berkeley, lays out in detail in his declaration, the multi-shot weapons Plaintiff references:

> were flawed, experimental curiosities prior to the founding of the United States. They were both dangerous (to the shooter, as well as to the target) and highly unusual. Most of these weapons never advanced beyond proof of concept. Only a small minority of large-capacity firearm inventions ever moved past the design or prototype stage, and none achieved commercial success or military relevance prior to 1791.

Ex. 12, Delay Decl. ¶ 8. That is why Plaintiff can point to no evidence of these weapons—which would have been game-changing battlefield innovations in the frequently fought-over regions of 18th and 19th century Europe and North America if they were actually reliable—achieving widespread adoption in either a military or civilian setting. *Id.* ¶¶ 8–10. If George Washington, Napoleon Bonaparte, or Ulysses S. Grant never found use for these "exotic curios" amid their bloody conflicts, then it is hard—indeed, impossible—to conclude they were in "common use" among civilians before 1791 or even 1868. *See id.* ¶ 31.

### 3. The Act restricts weapons and accessories not commonly used for self-defense today.

The Act restricts weapons and accessories that are not commonly used by Americans for self-defense today. As explained *supra*, large capacity magazines provide a round-capacity in

---

[13] Multi-shot firearms were no more in common use at the Founding than personal jetpacks are today. Although jetpacks have long piqued the interest of militaries and private consumers—a design was even patented in 1919—they remain an "expensive and experimental curiosity to this day." Ex. 12, Delay Decl. ¶ 46. The same could have been said about multi-shot firearms in 1791. *See id.* ¶ 45.

excess of what is necessary for self-defense. Assault weapons similarly enable a degree of lethality appropriate for the battlefield, but unnecessary for individual self-defense. Because assault weapons are not commonly used for the purpose of self-defense, they are not "arms" protected by the Second Amendment. *McDonald*, 561 U.S. at 749–50; *Bruen*, 142 S. Ct. at 2134.

In *Heller*, the Supreme Court made clear that the Second Amendment should be interpreted to extend beyond weapons in common use in the past to protect arms commonly used today for "self-defense in the home." *Heller*, 554 U.S. at 636. The Supreme Court has reaffirmed in cases since that the individual right to bear arms protects arms commonly used today for the purpose of self-defense. *See Bruen*, 142 S. Ct. at 2143 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today.") (citation omitted); *McDonald*, 561 U.S. at 749–50 ("the Second Amendment protects the right to keep and bear arms for the purpose of self-defense").

Meanwhile, the Supreme Court's decisions have consistently recognized that individuals' self-defense rights can coexist with prohibitions on specific types of weapons. For example, in *Heller*, the court observed that the National Firearms Act of 1934 permissibly restricted machine guns because at the time they were not commonly being used by civilians for self-defense. 554 U.S. at 624–25. And the Court emphasized that today "weapons that are most useful in military service—M-16 rifles and the like—may be banned[.]" *Id*. at 627.

The assault weapons restricted by the Act are not protected by the Second Amendment because, like M-16 rifles, they are "most useful in military service," not civilian self-defense. *Id.*

### a. The restricted weapons are for war—not individual self-defense.

According to Plaintiff, the largest number of firearms impacted by the Act are likely AR-15 rifles. In an effort to meet his burden under *Bruen*'s first step, Plaintiff cites various statistics about ownership of AR-15s, which he claims show "common use" for self-defense. Compl. ¶¶ 73–

25

77. Plaintiff also alleges that he personally owns two AR-15s. *Id.* ¶ 24. Like the other assault weapons covered by the Act,[14] AR-15 rifles were designed and built for soldiers on the battlefield; they have no place in American communities.

The AR-15 models in circulation today trace their origin to a rifle designed by the ArmaLite (the "A" in "AR") Corporation in 1956.[15] Ex. 8, Yurgealitis Decl. ¶¶ 58–60; Ex. 5, Andrew Decl. ¶ 25; Ex. 10, Roth Decl. ¶ 49 n. 112. Responding to the capabilities of the Soviet-designed Kalashnikov rifle that first appeared in 1947, the AK-47, ArmaLite's design closely followed what was emerging as standard assault rifle design in the post-World War II era: light-weight construction using aluminum where possible in lieu of machined steel; separate pistol grip and shoulder stock; a foregrip and/or barrel shroud; a detachable magazine; and flash hider or muzzle brake variations. Ex. 10, Roth Decl. ¶ 49; Ex. 8, Yurgealitis Decl. ¶¶ 52–53, 58–60; *compare* 720 ILCS 5/24-1.9(a)(1)(A)(new). In 1961, the U.S. Department of Defense purchased 1,000 AR-15 rifles. Ex. 8, Yurgealitis Decl. ¶¶ 59-60; Ex. 5, Andrew Decl. ¶ 25; Ex. 10, Roth Decl. ¶ 49 n.112. The U.S. Army subsequently shipped them to Vietnam that same year for testing during live combat. Ex. 5, Andrew Decl. ¶ 25; Ex. 8, Yurgealitis Decl. ¶ 59.

A declassified field test report prepared by the Department of Defense in 1962 detailed just how lethally potent the AR-15 proved as a weapon of war. Ex. 5, Andrew Decl., Ex. B. Describing the wounds to 5 dead Viet Cong soldiers shot by AR-15 rounds, the report noted in grisly detail:

---

[14] Like the AR-15, the other specific models of assault weapons in the Act are also generally of military origin. Many were designed to mimic and build upon features from the German StG 44, considered the first "assault weapon" or "assault rifle," which appeared in production late in World War II. Ex. 8, Yurgealitis Decl. ¶¶ 40-60.

[15] As a reference point, the U.S. military tested the first hydrogen bomb, the thermonuclear warhead that would loom large over much of the Cold War era, in 1952—four years before the AR-15 first appeared. Ex. 10, Roth Decl. ¶ 49 n.112.

- One sustained a "[b]ack wound, which caused the thoracic cavity to explode";

- Another sustained a "[s]tomach wound, which caused the thoracic cavity to explode";

- A third sustained a "[b]uttock wound, which destroyed all tissue of both buttocks";

- A fourth sustained a "[c]hest wound" that "destroyed the thoracic cavity";

- The fifth sustained a "[h]eel wound" in which "the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip."

*Id.* ¶ 27 (quoting Ex. B). All of the deaths "were instantaneous except the buttock wound. He lived approximately five minutes." *Id.*; *see also id.* ¶¶ 28–32. The "phenomenal lethality" of the AR-15 described in the field report led the U.S. Army to adopt it as a combat rifle in December 1963. *Id.* ¶ 32; Ex. 8, Yurgealitis Decl. ¶ 60. As part of its adoption, the Army gave the AR-15 a new name: the M-16—the weapon name-checked by the *Heller* court as the type of weapon that can be banned for civilian use, notwithstanding the Second Amendment. Yurgealitis Decl. ¶ 59; *Heller*, 554 U.S. at 627.

The features that made the AR-15 phenomenally lethal in the jungles of Vietnam make it equally lethal in in our Nation's classrooms and communities. The killing capacity of a firearm is primarily determined by the kinetic energy imparted by the bullet, its effective range, and the rate at which the weapon fires projectiles. Ex. 9, Schreiber Decl. ¶ 20; Ex. 13, Hargarten Decl. ¶ 13. The amount of energy a bullet transfers into a victim is a function of the bullet's velocity and mass. Ex. 13, Hargarten Decl. ¶ 13; *accord* Ex. 9, Schreiber Decl. ¶ 20. The muzzle velocity of an AR-15 with standard ammunition, when first adopted by the U.S. military and now, is approximately 3200 feet per second—nearly three times the speed of sound. Ex. 8, Yurgealitis Decl. ¶ 61; Ex. 9, Schreiber Decl. ¶ 21; Ex. 13, Hargarten Decl. ¶¶ 13–15, 32; Ex. 5, Andrew Decl. ¶ 34. By contrast, a 9-millimeter Beretta (like those commonly carried by law enforcement officers) has a muzzle velocity of around 1100 to 1200 feet per second. Ex. 9, Schreiber Decl. ¶ 21; Ex. 8, Yurgealitis

Decl. ¶ 60; *see also* Ex. 13, Hargarten Decl., Ex. B (using gelatin tests to assess energy transfer and impact of AR-15 rounds compared to .25, .32, and .40 caliber handgun rounds). This nearly three-fold difference in velocity means that the kinetic energy generated by the impact of an AR-15 round is 1303 foot pounds, compared to 400 foot pounds for a 9-millimeter Beretta. Ex. 9, Schreiber Decl. ¶ 22.

The massive amount of energy delivered by each AR-15 round is what caused the "thoracic cavit[ies]" of multiple Viet Cong soldiers "to explode" as described in the U.S. military's 1962 field report. Ex. 5, Andrew Decl. ¶¶ 27, 30; Ex. 9, Schreiber Decl. ¶¶ 22, 35 ("Inside a human body, one assault weapon round can destroy organs in a way that looks like an explosion has happened."). The AR-15's immense capacity to inflict catastrophic injury is equally evident today in combat hospitals, emergency rooms, and laboratory settings. Ex. 9, Schreiber Decl. ¶ 33 ("The assault weapon wounds that I have seen in a civilian context are virtually identical in nature to the wounds that I saw in combat.") A bullet entering the human body creates a temporary and, eventually, permanent cavity; holding all else equal, the larger the cavity, the more severe the injury. *Id.* ¶ 23. Because of their mass, velocity, and resulting kinetic energy, AR-15 rounds produce larger cavities in the human body, with devastating effects to tissue and surrounding organs. *Id.* ¶ 24; Ex. 13, Hargarten Decl. ¶¶ 23–30 & Ex. B. Laboratory tests confirm that a common 5.56-millimeter AR-15 round inflicts temporary cavities in simulated human tissue that are "significantly larger than the cavity sizes caused by handguns, [the] Thompson Machine, and [a] musket." Ex. 13, Hargarten Decl. ¶ 27. Testing also shows that the energy released by an AR-15 5.56-millimeter round—1,055.05 joules—dwarfs that of: handguns (54.13 joules[16] for a .25

---

[16] A joule is "a unit of work or energy equal to the work done by a force of one newton acting through a distance of one meter." *Joule*, Merriam-Webster.com Dictionary (Merriam-Webster), www.merriam-webster.com/dictionary/joule (last visited Feb. 27, 2023).

caliber round, 108.73 joules for a .32 caliber round, and 265.99 joules for a .40 caliber round); a .45 caliber Thompson machine gun (301.81 joules); and a musket ball (111.27 joules). *Id.* ¶ 26.

Assault weapon rounds also are more likely to injure multiple organs and kill children. Assault weapon rounds tend to cause victims to suffer multiple organ injuries, increasing their lethality compared to handgun rounds. Ex. 9, Schreiber Decl. ¶¶ 35–41. As one leading trauma surgeon and retired Navy captain put it in describing AR-15 wounds: "[I]t's as if you shot somebody with a Coke can." Ex. 5, Andrew Decl. ¶ 34 (quoting Dr. Pete Rhee). The impact is especially catastrophic for children: the relative proximity of vital organs to each other in children's smaller bodies increases the likelihood of serious injury or death. Ex. 13, Hargarten Decl. ¶¶ 32, 34–35. The grim reality of school shootings bears this out. At Sandy Hook Elementary School in 2012, twenty children between the age of six and seven years old were shot with an AR-15. None of them survived. *Id.* ¶ 35.

In addition to the catastrophic impact of each individual round from an assault weapon, the rate of fire enabled by assault weapons makes them lethal weapons of war, especially when used with large capacity magazines. For example, a semi-automatic AR-15 equipped with a 30-round magazine is capable of firing substantially more rounds per minute than a bolt-action Remington hunting rifle with a magazine of three to five rounds. *Id.* ¶ 28. Even though laboratory tests indicate that the energy delivered by a single Remington round comes close to what a single AR-15 round imparts, the rapid rate of fire enabled by the AR-15's semi-automatic reloading means that the AR-15 releases significantly more energy on a per-minute basis than the hunting rifle. *Id.* The magazine size—30 rounds versus 3 to 5—also drastically reduces the frequency of reloading needed for the AR-15 compared to the hunting rifle. *Id.* Because of its rate of fire, an AR-15 style weapon is capable of causing massive destruction at a speed not possible with a hunting rifle. *Id.*

¶ 29. This vastly differential killing capability is why Remington's hunting rifles are permitted under the Act, but AR-15s and similar assault weapons are not.

Plaintiff downplays the capabilities of assault weapons subject to the Act by differentiating between semi-automatic and automatic fire. Compl. ¶ 68. These allegations are misleading and beside the point. *See* Ex. 6, Busse Decl. ¶ 34. While it is true that automatic firearms generally have a higher rate of fire than semi-automatic firearms, the carnage a firearm inflicts depends on the number of rounds that hit intended targets. Assault weapons combine a high rate of fire *and* continued accuracy—that combination is what makes them so lethal. *See id.* ¶¶ 23, 34; Ex. 13, Hargarten Decl. ¶ 14 n.5 (noting that assault weapons enable rounds to be fired at "high velocity," "a high rate of delivery," and "a high degree of accuracy at long range"); *accord* Ex. 5, Andrew Decl. ¶ 20 n.4. The U.S. Army understands this fact. The Army's 2008 Field Manual for the M-16—which, unlike its civilian AR-15 counterparts, enables both automatic and semi-automatic fire—stressed that semi-automatic fire is the "most important firing technique during fast-moving, modern combat," and further noted that "[i]t is surprising how devastatingly accurate rapid semi-automatic fire can be." Ex. 5, Andrew Decl. ¶ 33. This is why U.S. Special Forces trainers also teach that semi-automatic fire is the preferred and most lethal setting in most wartime scenarios. Ex. 6, Busse. Decl. ¶ 34.

The nexus between rate of fire and lethal accuracy is why the Act, in defining "assault weapon[s]" subject to its restrictions, zeroes in on firearm features enabling a shooter to maintain lethal accuracy while discharging a high number of rounds in a short time. *See* 720 ILCS 5/24-1.9(a)(1)(A)-(C). The Act defines assault weapons in relevant part as semiautomatic rifles or pistols with one or more features like: "a protruding grip," "a flash suppressor," a "pistol grip or thumbhole stock," a "folding" or "telescoping" stock, or a "shroud" on the barrel that allows the

"bearer to hold the firearm with the non-trigger hand without being burned," *id.* §§ 1.9(a)(1)(A)(i)-(iv), (vi) & 1.9(a)(1)(B)(ii)-(iv). *See also* Ex. 3, Demuth Decl., Ex. A (providing examples). These features all facilitate greater sustained accuracy when shooting multiple rounds in quick succession:

- Thumbhole stocks and pistol grips allow a shooter to control and aim a rifle during periods of rapid fire. Ex. 6, Busse Decl. ¶¶ 13, 14.

- A protruding or second grip is also designed to keep a firearm stable during rapid firing. Ex. 6, Busse Decl. ¶ 15; Ex. 8, Yurgealitis Decl. ¶ 81. This additional grip allows shooters to better control the muzzle during firing and can help keep the rifle stable during magazine changes, which can reduce reloading time. Ex. 6, Busse ¶ 15. Forward grips first gained prominence among special operations and other military units. *Id.*

- Flash suppressors are devices added to the end of a firearm to direct the gas produced from firing in directions that result in reduced recoil and muzzle rise, allowing the shooter to stay on target in extended rapid-fire situations. Ex. 6, Busse Decl. ¶ 17. By reducing muzzle flash, flash suppressors help conceal a shooter's location (e.g., from enemies in war, or from law enforcement in domestic use), and allow a shooter to more easily acquire additional targets in low light conditions without having to wait for their vision to adjust to a brighter muzzle flash. Ex. 8, Yurgealitis Decl. ¶ 84.

- A barrel shroud enables a shooter to stabilize a rifle with the non-trigger hand without getting burned by the barrel heat generated during rapid fire. Ex. 6, Busse Decl. ¶ 19.

In short, the design objective of each of the restricted features is to enable a shooter to stay on target—to be more lethal—while firing large amounts of ammunition in quick succession.

The Act's two-fold approach to defining assault weapons—identifying features and listing specific models—is not novel. The federal assault weapons law in effect from 1994 through 2004 adopted a similar features-based definition, which it also combined, like the Act, with a list of specifically covered models. *See* Pub. L. No. 103-322, § 110102, 108 Stat. 1796 (amending 18 U.S.C. § 921(a)).[17] For both the expired federal law and the Act, the features covered are not

---

[17] The federal features-based definition for "semiautomatic assault rifle[s]" was based on the combination of two or more of the following features: "(i) a folding or telescoping stock; (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon; (iii) a bayonet mount; (iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (v) a grenade launcher." Pub. L. No. 103-322,

necessary "for the purpose of self-defense." *McDonald*, 561 U.S. at 750. Instead, their purpose is primarily to facilitate lethal accuracy during rapid fire. While these features are "useful in military service," they are unnecessary for civilian self-defense. *Heller*, 554 U.S. at 627. On the other hand, because of the accuracy-enhancing features in modern assault weapons, mass shooters who use them do not require a high level of firearms training or practice to inflict mass death and injury at both close and extended ranges. Ex. 5, Andrew Decl. ¶¶ 41–42. Faced with this reality, the Illinois General Assembly had ample reason to restrict access to these weapons of war.[18]

Finally, even Plaintiff admits that a reason he wants access to AR-15 rifles is that they are special weapons used by highly trained law enforcement teams in special operations. Compl. ¶ 27.[19] Specifically, in his role as a volunteer medic for a SWAT team, he sees law enforcement

---

§ 110102, 108 Stat. 1796 (amending 18 U.S.C. § 921(a)). The features listed for "semiautomatic assault pistols" were (i) an ammunition magazine that attaches to the pistol outside of the pistol grip; (ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; (iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned; (iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and (v) a semiautomatic version of an automatic firearm[.]" *Id.*

[18] Plaintiff cites crime statistics to allege that assault weapons are less dangerous than handguns. Compl. ¶¶ 90–93. These allegations are misleading because they falsely equate the dangerousness of a weapon with the frequency of its use in certain crimes. Even the case Plaintiff cites for statistics about handgun use, *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), expressly *rejected* reliance on overall crime data: "Looking solely at a weapon's association with crime . . . is insufficient. We must also consider more broadly whether the weapon is 'dangerous and unusual' in the hands of law-abiding civilians." *Id.* at 256. It is unsurprising that handguns are used in more violent crimes than assault weapons, given that handguns are far more prevalent. *See* Ex. 4, Klaveras Decl. ¶¶ 28–29. The special danger of assault weapons is reflected not in their use in violent crimes in general, but rather their effectiveness for perpetrating a specific type of crime: high-fatality mass shootings. *See id.* ¶ 12 & Figs. 3–5; Ex. 5, Andrew Decl. ¶ 23 ("The use of assault weapons and large-capacity magazines dramatically and disproportionately increases killings and injuries in mass-casualty events."). Individuals who wish to kill as many people as possible (such as domestic terrorists, extremists, and private militias with hateful ideologies) increasingly turn to assault weapons like AR-15s because of their extreme lethality. Ex. 5, Andrew Decl. ¶¶ 38–39. The fact that many murders are also committed with pistols, knives, and blunt objects does not undermine the reality that assault weapons are objectively more dangerous.

[19] Plaintiff wants to use his own AR-15 as a volunteer as a medic for a Chicagoland SWAT team. *See* Compl. ¶¶ 25–36. It is unclear if Plaintiff is arguing that the Second Amendment requires that he be permitted to train with his own AR-15 where SWAT team operators train with regulated weapons, *see* Br. 12. If so, that claim also fails at the first *Bruen* text step: The Second Amendment protects an individual

officers on the team carrying AR-15 rifles. *Id.* "SWAT" is a common acronym for Special Weapons and Tactics. Ex. 15, Chiappini Decl. ¶ 1. SWAT operators are permitted to use special weapons (like AR-15 rifles) only because they have received special training on how to fire these weapons, as well as on protocols governing the use of deadly force. *Id.* ¶ 9. That law enforcement agencies limit the carrying of assault weapons to only specialized law enforcement teams and operations only further demonstrates the restricted weapons are not in common use for self-defense.

### b. Sales and ownership numbers do not show commonality or use.

In support of his motion, Plaintiff offers no evidence establishing the restricted weapons are commonly used for self-defense.[20] Plaintiff instead alleges that millions of Americans "have owned" AR-15 riles at some point, and some own them for self-defense. *See* Compl. ¶¶ 77, 81. Neither allegation is sufficient to show "common use" for self-defense and, by extension, coverage by the Second Amendment. *See McDonald*, 561 U.S. at 749–50; *Bruen*, 142 S. Ct. at 2134.

*Heller* held and *McDonald* reaffirmed that "that the Second Amendment protects the right to keep and bear arms *for the purpose of self-defense.*" *McDonald*, 561 U.S. at 749–50 (emphasis added). Ownership statistics prove nothing about whether AR-15s and the like are commonly used *for self-defense*. It would be circular for courts to determine the constitutionality of a restriction on weapons sales by whether the market had been flooded with them yet. *See Friedman*, 784 F.3d at

---

right to armed self-defense, not to serve as an auxiliary volunteer for law enforcement.

[20] Indeed, Plaintiff appears to think the court need not consider any facts at all. Plaintiff audaciously states that his complaint presents only "legal issues, ready for a decision now." Br. 3. Before *Bruen*, this Court may have found expedited judgment *in Defendants' favor* appropriate because controlling Seventh Circuit precedent affirmed the constitutionality of assault weapon and large capacity restrictions like the Act. *See Wilson*, 937 F.3d 1028 (finding judgment against the plaintiffs without factual development appropriate in light of *Friedman*). But there is no such controlling precedent, pre- or post-*Bruen*, for judgment in a plaintiff's favor. To the contrary: the only court in the Seventh Circuit to consider how assault weapon and large capacity magazine restrictions fare post-*Bruen* found them "constitutionally sound." *Bevis*, 2023 WL 2077392, at *9.

409 ("It would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned."); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical"). *Heller* confirms that the question is how the regulated weapons are being used. In discussing the machineguns and sawed-off shotguns regulated by the National Firearms Act of 1934, *Heller* took it as a given that these were not the "types of weapons" protected by the Second Amendment. 554 U.S. at 623. Regardless of their prevalence in the 1920s and 1930s, which *Heller* did not bother to assess, they could be banned because they were not weapons "typically possessed by law-abiding citizens *for lawful purposes*." *Id.* at 624–25 (citing *Miller*, 307 U.S. 174).[21]

Plaintiff has not shown the assault weapons covered by the Act are commonly owned, let alone used, for self-defense. Two categories of weapons already recognized by the Supreme Court as weapons commonly used for self-defense, modern handguns and Colonial Era muskets, provide a useful threshold for comparison. Handguns, the "quintessential self-defense weapon" in modern America, *Heller*, 554 U.S. at 629, are vastly more common than the AR-15 rifles Plaintiff seeks. According to data from the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), handguns represent 50% of all firearms in civilian circulation in the United States. Ex. 4, Klarevas Decl. ¶ 28 & Fig. 14. By contrast, according to Plaintiff's own figures, AR-15s make

---

[21] The need to show both commonality and use for lawful self-defense is why Plaintiff misses the mark with his reference to there being more AR-15s in circulation than there are Ford F-series trucks on the road. *See* Compl. ¶ 76. A Ford F-series truck has never been used to murder dozens of children in an American classroom. *See* Ex. 4, Klarevas Decl., Table 2 (AR-15 used in six of seven deadliest mass shootings since 9/11, including in Uvalde, Texas and Newtown, Connecticut). Most people are also content to own one Ford F-series truck, whereas Plaintiff apparently wants to stock up on multiple AR-15s. *See* Herrera Decl. ¶ 6 (stating that he owns "two AR-15 rifles" and planned to purchase "another AR-15 rifle this year"). Plaintiff is part of a niche group of Americans who own AR-15s: A survey by the National Shooting Sports Foundation, found that owners of "modern sporting rifles" tend to own 3.8 such rifles on average, with only 24% of owners owning a single such rifle. Ex. 4, Klarevas Decl. ¶ 27.

up only 5.3% of the firearms in civilian circulation in the United States. *Id.* ¶ 27. Plaintiff touts that there have been "about 24.5 million modern semiautomatic rifles like the AR-15 . . . in circulation in the United States since 1990," Compl. ¶ 76—but there are an estimated 461.9 million firearms in circulation in American society, Ex. 4, Klarevas Decl. ¶ 27. This means there are more than 18 firearms that are not AR-15s for every single AR-15 in civilian circulation.

Even the vast majority of gun-owners in the United States do not own an AR-15. Out of the 81 million Americans who own at least one personal firearm, only 6.4 million (or 8%) own "modern sporting rifles"—the term the firearms industry uses to euphemize assault weapons. Ex. 4, Klarevas Decl. ¶¶ 13, 27. All told, only 2% of Americans own a "modern sporting rifle" based on the current U.S. population of 333 million people. *Id.* ¶ 27. This 2% figure is dwarfed by the 50% to 60% of colonial Americans who, according to historians, owned a musket, fowling piece, or other firearm. Ex. 10, Roth Decl. ¶ 15. Whether modern or historical reference points are considered, Plaintiff's allegations that AR-15s and other assault weapons are in "common use" do not hold up to scrutiny.[22]

Plaintiff does not cite any evidence for the claim assault weapons and large capacity magazines are commonly used for self-defense. In fact, he alleges the opposite: he cites a statistic showing that a large majority of semiautomatic rifles are purchased for reasons *other than* self-

---

[22] Plaintiff cites a concurrence by Justice Alito in *Caetano*, 577 U.S. at 420 (Alito, J., concurring), noting that, in his view, the fact that stun guns were owned by "approximately 200,000 civilians" as of 2009 meant they met the threshold for common use for self-defense. Br. at 16. The *per curiam* opinion in *Caetano* did not address any numerical threshold. In any event, as discussed *infra*, there were likely over 200,000 pistols, Bowie knives, revolvers, and machine guns in circulation in the United States at various points throughout history. *How* those weapons were being used matters just as much for Second Amendment analysis as their raw numerical prevalence. Because they were being used for purposes other than self-defense, they were regulated. And, despite the growing numerosity of these weapons in the 19th century and, in the case of machine guns, in the early 20th century, they were still considered "dangerous and unusual" weapons because they created novel public safety threats. Plaintiff's attempt to focus on the raw numerosity of particular weapons to the exclusion of how those weapons are being *used* is contrary to *Heller* and its progeny.

defense. Compl. ¶ 70 (citing *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal. 2021), *vacated and remanded*, No. 21-55608, 2022 WL 3095986 (9th Cir. Aug. 1, 2022), to allege that only 34% of buyers purchased semiautomatic rifles for personal protection, compared to 65% for target shooting and hunting). The case Plaintiff cites for the defensive use of large capacity magazines is equally unavailing, as the court found that such magazines "are typically possessed by law-abiding citizens for hunting [and] pest-control," but only "*occasionally* for self-defense." Compl. ¶ 81 (quoting *ANJRPC*, 910 F.3d at 116) (emphasis added).

In sum, the Act does not deprive Illinois residents of weapons in common use for self-defense. Rather, it limits access to a category of weapons designed to inflict "phenomenal lethality" on the battlefield, because those weapons are turning our streets, schools, and offices into combat zones. Ex. 5, Andrew Decl. ¶ 32. From 1991 to 2022, there have been 93 mass shootings in our country where 6 or more victims died. Ex. 4, Klarevas Decl., Ex. C. Out of the high-fatality mass shootings (6 or more victim deaths) occurring in the last 8 years, half—50%—have been perpetrated with assault weapons; and 76%, involved large capacity magazines. Ex. 4, Klarevas Decl. ¶ 12, Figs. 3 & 4. On the other hand, the Federal Bureau of Investigation ("FBI") has documented 406 active shooter incidents around the country since 2000; in all those tragedies, there has only been a single instance—one—where a civilian used an assault rifle defensively to stop an active shooter. Ex. 4, Klarevas Decl. ¶ 25. To put it bluntly, assault weapons in civilian hands are killing us, not protecting us.

The Act restricts weapons and accessories not in common use "for the purpose of self-defense." Assault weapons and large capacity magazines are not "arms" protected by the Second Amendment. *McDonald*, 561 U.S. at 750.

### 4. The Act's registration process does not implicate the Second Amendment.

In addition to Plaintiff's arguments that the Act's restrictions on purchases violate his Second Amendment rights (Count I and II), Plaintiff argues that the affidavit procedures for owners of grandfathered assault weapons violate the Second Amendment because they require owners to register these weapons (Count III). Compl. ¶¶ 46, 127–135. Under 720 ILCS 5/24-1.9(d), individuals who lawfully owned assault weapons as of January 10, 2023 may continue to possess them so long as they submit an "endorsement affidavit" providing basic information to the Illinois State Police by January 1, 2024. Plaintiff's challenge to the affidavit requirement will fail on the merits. The affidavit procedures do not interfere with a Second Amendment right and in *Bruen* the Supreme Court expressly found similar licensing requirements constitutional.

At the outset, this claim is not ripe for adjudication in Plaintiff's preliminary injunction motion because the restrictions on individual possession of AR-15s (like those Plaintiff admits he owns), along with the registration requirement, do not go into effect until 2024. *See* 720 ILCS 5/24-1.9(c) ("[B]eginning on January 1, 2024, it is unlawful for any person within this State to knowingly possess an assault weapon."); *id.* § 24-1.9(d) (setting a January 1, 2024 deadline to submit endorsement affidavits). Because regulations that will become effective ten months from now necessarily do not pose any risk of imminent harm, they cannot support preliminary relief at this stage. *See Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 844 (7th Cir. 2005) (noting that plaintiffs have "standing to seek a preliminary injunction" only when "irreparable harm is *imminent*" (emphasis added)).[23]

---

[23] Plaintiff's unsubstantiated and conspiratorial allegation that the registration requirement is a prelude to the mass "confiscation" of guns, a la Venezuela's authoritarian socialist dictatorship, Compl. ¶ 46, should likewise be disregarded. Wild speculation about theorized future government enforcement actions cannot support preliminary injunctive relief. *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("[S]peculative injuries do not justify this extraordinary remedy.").

Even if the Court considers this claim, it will fail on the merits because the endorsement affidavit procedure will not affect Plaintiff's right to self-defense under the Second Amendment. On the contrary, the procedure will offer Plaintiff the ability to lawfully possess and use his current AR-15s and large capacity magazines as set forth in 725 ILCS 5/24-1.9(d) and 24-1.10(d). By simply listing his Firearm Owner's Identification (FOID) Card number, providing the make, model, and serial number of the assault weapons (ownership of which he freely admits in this lawsuit), and attesting that he lawfully owned the weapons on January 10, 2023, Plaintiff will be automatically entitled to keep those weapons. Thus, even if assault weapons were protected under the Second Amendment, which they are not, nothing about the endorsement affidavit process will impair Plaintiff's right to self-defense. *Cf. United States v. Tita*, No. CR RDB-21-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) (applying *Bruen* to hold that the federal law requiring guns to have serial numbers "does not impede on one's ability to appropriately use a gun for self-defense").

*Bruen* itself confirms that Plaintiff's challenge lacks merit because firearms licensing and registration requirements that do not burden the right to bear arms for self-defense are constitutional. The Supreme Court took pains to clarify that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of gun licensing regulations in most states (including Illinois), which have "shall-issue" licensing laws. *Bruen*, 142 S. Ct. at 2138 n.9. Such laws are constitutional under *Bruen* because they do not depend on "appraisal of facts, the exercise of judgment, and the formation of an opinion" on the part of licensing officials. *Id*; *see also id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible."). Like the shall-issue licensing laws that *Bruen* condones, the Act's endorsement affidavit process does "not require applicants to show an atypical need for armed self-defense,"

38

but instead provides "narrow, objective, and definite standards" for lawful ownership of assault weapons. *Id.* at 2138 n.9. Indeed, the endorsement affidavit process works in conjunction with Illinois's shall-issue licensing laws by requesting the applicant's FOID number, in order "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.*

Plaintiff does not argue that the endorsement affidavit process will impair his ability to defend himself, nor does he explain how a straightforward registration requirement will burden his Second Amendment rights in light of *Bruen*'s holding that most licensing requirements do not implicate Second Amendment rights whatsoever. In fact, the shall-issue programs that *Bruen* found constitutional are more intrusive than the Act's simple endorsement affidavit procedure: typical shall-issue regimes "require applicants to undergo a background check or pass a firearms safety course." *Id. Bruen* held that even these more burdensome requirements are constitutional because they do not "necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* Because the Act's endorsement affidavit process will not burden his right to self-defense, Plaintiff cannot succeed on his claim.

Plaintiff's sole argument questions the existence of analogous historical regulations, and he cites a dissenting opinion by then-Judge Kavanaugh in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), to argue that registration requirements are not longstanding. Br. 27. However, this argument improperly skips the first step now clearly required under *Bruen*: determining whether the "Second Amendment's plain text" covers the conduct at issue. *Bruen*, 142 S. Ct. at 2129–30. But even courts that have looked at history have found numerous historical regulations analogous to modern registration requirements. *See United States v. Holton*, No. 21-cr-482, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022) (citing, inter alia, the heavy control of colonial governments over the firearms trade and specific laws requiring recording and

registration of firearms); *Tita*, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) ("[S]cholars have noted that many of the colonies enacted laws regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms.").[24]

The *Heller II* dissent is also inapposite because the Act's procedures for registering grandfathered weapons are far narrower and less burdensome than the ones at issue in that case. The District of Columbia's registration ordinance was "onerous," requiring, "among other things, that a gun owner submit every pistol for a 'ballistics identification procedure,' appear in person to register a gun, register only one pistol every 30 days, and renew each registration certificate every three years." *Heller II*, 670 F.3d at 1295 n.19 (Kavanaugh, J., dissenting). The Act's endorsement affidavit process, by comparison, requires owners to submit only basic information once by filling out a standard form. *See* 720 ILCS 5/24-1.9(d). And far from mandating registration of "all lawfully possessed guns," as in the D.C. ordinance, *see Heller II*, 670 F.3d at 1293, the Act is limited to an enumerated set of dangerous and unusual weapons that are "outside the protection of the Second Amendment," *id.* at 1294. As then-Judge Kavanaugh conceded, the Supreme Court's

---

[24] Firearms registration requirements trace to the earliest days of the Colonial Era. By 1631 in Virginia, just two decades after the founding of Jamestown, the colony had a "muster" law requiring an annual accounting of "arms and munition" held by its inhabitants. Ex. 14, Table 5 (1631 Va. Acts 174, Acts of Feb. 24, 1631, Act LVI). Later, state legislatures imposed taxes on specific firearms, the collection of which necessarily required the firearms to be identified and disclosed to the government. For example, in 1856, North Carolina imposed a tax on "every pistol, except as used exclusively for mustering," that "at some time within the year" been "used, worn or carried about the person of the owner[.]" Ex. 14, Table 5 (1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled 'Revenue,' ch. 34, § 23, pt. 4). Likewise, in 1867, Alabama imposed a tax "[o]n [a]ll pistols or revolvers in the possession of private persons not regular dealers holding them for sale," and on bowie knives. Ex. 14, Table 5 (Revised Code of Alabama p. 169, Image 185 (1867)). In 1918, Montana required "every person" within the state, "who owns or has in his possession any fire arms or weapons"—defined as "any revolver, pistol, shot gun, rifle, dirk, dagger, or sword"—to "make a full, true, and complete verified report" to the local sheriff of all such weapons he or she "owned," "possessed," or "control[ed]". Ex. 14, Table 5 (1918 Mont. Laws 6-7, 9, ch. 2, §§ 1, 3, 8). And, as noted in *Miller*, the National Firearms Act of 1934 imposed registration requirements for regulated firearms. *See* 307 U.S. at 175 n.1 (quoting, *inter alia*, § 5 of the National Firearms Act of 1934 (requiring owners of grandfathered weapons to register their weapons within 60 days by providing "the number or other mark identifying such firearm, together with [the owner's] name, address, place where such firearm is usually kept, and place of business or employment")).

1939 decision in *Miller*, 307 U.S. 174, which upheld a conviction for possession of an unregistered sawed-off shotgun, recognized the validity of a registration requirement for firearms that are not the "type of weapon" commonly used for self-defense. *Heller II*, 670 F.3d at 1293 (quoting *Heller*, 554 U.S. at 622). Even under the standard from the *Heller II* dissent, Plaintiff's challenge to the registration requirement is thus functionally inseparable from his underlying challenge to the other parts of the Act, and will fail for the same reasons.

### C. Even if Plaintiff meets his textual burden, history and tradition allow regulating these weapons and accessories.

The Act not only does not burden conduct covered by the plain text of the Second Amendment, but it also fits well within the long-standing historical tradition of regulating "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2129–30. As a result, Plaintiff's claims are independently likely to fail at *Bruen*'s second step if the Court reaches it.

*Bruen*'s second step allows regulations of conduct covered by the Second Amendment when the government can show those regulations are "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. The Supreme Court has already recognized our country's "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'"— a tradition derived from English law pre-dating the Founding and subsequently incorporated into American law. *Heller*, 554 U.S. at 627 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 148–49 (1769)). *Bruen* confirmed this tradition. 142 S. Ct. at 2132; *see also id.* at 2162 (Kavanaugh, J., concurring) ("[N]othing . . . should be taken to cast doubt on . . . the historical tradition of prohibiting the carrying of dangerous and unusual weapons."). To demonstrate that the Act is consistent with this historical tradition, the State may use "analogical reasoning" to identify historical regulations that are "relevantly similar" to the Act. *Id.* at 2133. The State's burden is to

identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* The Act need not be "a dead ringer for historical precursors" to "pass constitutional muster." *Id.*

To determine whether the historical regulations identified are relevantly similar to the Act, this Court must consider "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. These "how and why" considerations look to "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. In some cases, the historical inquiry is "fairly straightforward," such as when a challenged regulation addresses a "general societal problem that has persisted since the 18th century." *Id.* at 2131. But other cases require "a more nuanced approach," particularly cases "implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 2132.

The Act adheres to the tradition of regulating dangerous and unusual weapons. Its restrictions on acquiring assault weapons and large capacity magazines share common purpose with historical regulations targeting weapons especially disruptive and harmful to public order and safety. *See Bruen*, 142 S. Ct. at 2133 (considering "why" historically analogous regulations were enacted). The Act does so in a manner that imposes no more burden than comparable historical regulations. *See id.* (considering "how" historically analogous regulations burdened "a law abiding-citizen's right to self-defense"). Americans in prior eras subject to comparable regulations maintained the right to keep and carry muskets or rifles for self-defense, even as laws in several states restricted weapons associated with public violence and criminality—concealable pistols, Bowie knives, clubs, and, later, machine guns and semi-automatic weapons. The same is true here. Law-abiding Illinois residents retain access to many firearms for self-defense, including handguns with 15-round magazines, rifles with 10-round magazines, and shotguns. Because the Act regulates

"dangerous and unusual weapons" for a purpose and in a manner relevantly similar to comparable historical regulations, it does not violate the Second Amendment. *Id.* at 2129–30. Plaintiff's claims are equally unlikely to succeed under *Bruen*'s second step.

### 1. The Act responds to dramatic technological changes and unprecedented societal concerns.

*Bruen*'s "more nuanced approach" to "analogical reasoning" is appropriate in assessing whether the Act accords with historical tradition. 142 S. Ct. at 2132. The Act responds to "dramatic technological changes"—the emergence of modern assault weapons in the Cold War era—that have generated "unprecedented societal concerns"—mass-casualty shootings perpetrated by lone gunmen empowered by these weapons.

Assault weapons represent "dramatic technological changes" compared to the weapons that existed in either 1791 or 1868. As discussed *supra*, compared to the single-shot, muzzle-loading muskets of 1791, or the Colt revolvers or Winchester repeating rifles of 1868, the assault weapons and large capacity magazines regulated by the Act are different in kind across multiple dimensions: rate of fire, ease of reloading, power, range, sustained accuracy, and, ultimately, lethality. A musket, Colt revolver, or Winchester repeating rifle from 1868 or before simply had nowhere close to the accelerated re-loading capability that large capacity magazines and assault weapons enable. The near-instantaneous swapping of a modern 30-round magazine is materially different than manually re-filling each chamber of a Colt revolver, individually inserting rounds into a Winchester repeating rifle, or loading a single musket ball in half a minute. This difference has lethal implications: the Highland Park shooter could not have inflicted the same carnage in a minute with a musket, a Colt revolver, or a Winchester repeating rifle as he did with his AR-15 and 30-round magazines. The Act responds to "dramatic technological changes." *Bruen*, 142 S. Ct. at 2132.

43

These "dramatic technological changes" have wrought an "unprecedented societal concern": the ability of a single individual equipped with an assault weapon and large capacity magazines to murder dozens of people in a matter of minutes, if not seconds. *Id.* The sharply increasing frequency and severity of mass shootings in this country confirms this is a new phenomenon. Before 1948, there were no mass shootings perpetrated by a single individual that resulted in double-digit fatalities. Ex. 4, Klarevas Decl. ¶ 18. The first known mass shooting resulting in 10 or more deaths occurred in 1949. *Id.* It took 17 years for another comparably lethal shooting to occur in 1966; 9 years passed before a third such shooting in 1975; and 7 years passed before a fourth occurred in 1983. *Id.* ¶ 19. But in recent years—and especially since the expiration of the federal assault weapons ban in 2004—the frequency and cumulative lethality of mass shootings has increased dramatically. The following graph plots high-fatality mass shootings by year (1776 to the present) and number of fatalities, with the large cluster on the right (i.e., more recent) side showing just how modern this phenomenon is:



*Id.*, Fig. 12. This trend demonstrates that mass shootings are a recent and "unprecedented societal concern" made possible by "dramatic technological changes" in modern weaponry. *Bruen*

therefore requires a "more nuanced approach" in drawing comparisons between the Act and historical regulations. 142 S. Ct. at 2132.

### 2. There is a historical tradition of regulating dangerous and unusual weapons associated with increased criminality and violence.

As the Supreme Court recognized in *Heller* and *Bruen*, the United States has a long historical tradition of regulating dangerous and unusual weapons. *See Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at 627. Plaintiff acknowledges there is such a tradition, but disagrees the Act is consistent with it. Compl. ¶ 4. Plaintiff is wrong as a matter of history and law. There is an uninterrupted through line running from regulations of pistols and "fighting knives" in the 18th and 19th centuries, to revolvers in the latter half of the 19th century, to machine guns in the early 20th century, to assault weapons in the late 20th and early 21st centuries. In each historical era, our ancestors regulated these specific categories of weapons when their proliferation coincided with escalating or novel forms of violence. Unsurprisingly, the scope of the regulation increased commensurate with the increasing danger posed by new weapons technology—moving from concealed-carry prohibitions on single-shot pistols to outright possession bans on machine guns by the early 20th century. The purchase-and-sale and possession limitations Plaintiff challenges in the Act are entirely consistent with this tradition.

### a. From the Founding Era through the 19th century, legislatures enacted categorical restrictions on dangerous and unusual weapons, including specific firearms.

The historical tradition of regulating dangerous and unusual weapons pre-dates the Founding. For example, Blackstone's *Commentaries on the Laws of England* noted that "riding or going armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land[.]"[25] 4 William Blackstone, *Commentaries* 148–49 (1769); *see Bruen*

---

[25] Plaintiff misinterprets the phrase "dangerous and unusual" in *Heller* to argue that firearms can be

142 S. Ct. at 2128 (citing Blackstone). Colonial lawmakers were explicit about specific categories of weapons they understood to be dangerous or unusual. For example, a 1686 New Jersey law restricted concealed carrying of "any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons." Ex. 14, Excerpts from Historical Regulations Cited, Table 1 (quoting The Grants, Concessions, and Original Constitutions of The Province of New Jersey 289–90 (1686) (*An Act against wearing Swords, Etc.*, Ch. IX (1686)). Categorical restrictions on specific dangerous or unusual weapons continued to emerge in the 18th century. Between 1750 and 1799, six states (or soon-to-be states) passed laws restricting the carrying of blunt weapons like clubs. Ex. 11, Spitzer Decl. ¶ 76 (citing Exhibit C). These laws were a response to the growing use of the regulated weapons by criminals and as fighting instruments. *Id.* ¶ 79. Over time, legislatures added new categories to these "dangerous or unusual" weapons statutes.

The tradition of categorical regulation of specific dangerous or unusual weapons carried over into the early American Republic. New forms of violence triggered by new weaponry drove legislatures to respond. Prior to the American Revolution, homicide rates among colonists were low; that began to change in the first half of the 19th century, especially in southern slave states and frontier regions. Ex. 10, Roth Decl. ¶ 13. Homicide rates in southern and frontier states soared in the antebellum period, driven in large part by the increased ownership of concealable percussion cap pistols and fighting knives. *Id.*

---

prohibited only if they are both dangerous *and* unusual. Compl. ¶ 88. *See Heller*, 554 U.S. at 627. The Court's use of the phrase derives from Blackstone's commentary, quoted above, which describes "dangerous *or* unusual weapons" (emphasis added). Other historical sources cited in *Heller* use the same disjunction. *See* Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822) ("Riding or going armed with dangerous or unusual weapons, is a crime against the public peace . . . ."); Henry J. Stephen, *Summary of the Criminal Law* 85 (1840) (listing among "offences against the public peace" the crime of "[r]iding or going armed with dangerous or unusual Weapons"); *O'Neill v. Alabama*, 16 Ala. 65, 67 (1849) (noting that criminal liability could be imposed for wielding "deadly or unusual weapons"). To the extent *Heller*'s animating principle is fidelity to historical tradition, "or," not "and," is more historically accurate, and the disjunctive was clearly not at issue in *Heller*.

The emergence of the Bowie knife and the widespread regulatory response to it illustrate how legislatures enacted categorical restrictions to attempt to tamp down on weapons-driven violence. The Bowie knife was invented in the 1820s and gained notoriety in the 1830s. Ex. 11, Spitzer Decl. ¶¶ 62–63. Although variations existed, the Bowie knife was typically a large, single-edged knife with a cross guard and a blade with a clipped point. *Id.* ¶ 63. These characteristics made them particularly effective "fighting knives," and they were widely used in fights and duels, especially at a time when single-shot pistols were unreliable and often inaccurate. *Id.*; Ex. 10, Roth Decl. ¶¶ 25, 30.

Bowie knives and similar "fighting knives" could also be carried concealed. Ex. 10, Roth Decl. ¶ 24. Their concealability contributed to their criminal misuse: They were used to ambush, bully, and intimidate law-abiding citizens, and to seize the advantage in fist fights. *Id.* An 1834 plea by a grand jury in Jasper County, Georgia to the state's legislature summarizes the social harm these weapons caused:

> The practice which is common amongst us with the young[,] the middle[,] aged[,] and the aged[,] to arm themselves with Pistols, dirk[,] knives[,] sticks[,] & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol[,] dirk[,] or club is immediately resorted to, hence we so often hear of the stabbing[,] shooting & murdering [of] so many of our citizens.

*Id.* These concerns were not unique to Georgia. The proliferation of fighting knives and other concealed weapons drove criminal violence in many parts of the country to previously unknown levels. *Id.* ¶ 27.

Legislatures in the 19th century responded to this burgeoning violence with categorical restrictions on the Bowie knife and other "fighting knives." Over the course of the 19th century, at least 38 states (or soon-to-be states) and the District of Columbia enacted restrictions on Bowie knives, often in conjunction with other categories of "dangerous or unusual" weapons associated

with violence (e.g., clubs, bludgeons, "slung shots"). Ex. 14, Table 2. This regulatory trend began in the 1830s when 6 states enacted laws barring carriage of the Bowie knife. *Id.* ¶ 70. Other legislatures also targeted the Bowie knife, adopting different regulatory approaches as they saw fit: 15 states banned both open and concealed carry; 29 barred concealed carry; 4 taxed their commercial sale; 3 taxed ownership; 10 barred their sale to specific groups; and 4 punished brandishing them. Ex. 11, Spitzer Decl. ¶ 71 & Ex. H. Apparently, none of these 39 legislatures understood the Second Amendment to prohibit categorical restrictions on weapons that were driving new forms of violence.

The categorical regulation of Bowie knives parallels the regulatory response to another emergent weapon: concealable, percussion cap pistols. As early as the 17th century, pistols were categorically regulated. The 1686 New Jersey law referenced above expressly prohibited concealed carry of "pocket pistol[s]." Ex. 14, Table 1. Concern about the concealability of "pocket" pistols foreshadowed regulatory concerns in later eras. Firearms that could be concealed created new societal concerns. For much of the Colonial and Founding Eras, the predominant firearms owned by Americans, muskets and fowling pieces, were infrequently associated with criminal violence. Ex. 10, Roth Decl. ¶ 15. They were liable to misfire, slow to reload, and infrequently stored ready to fire, reducing the likelihood of impulsive use. *Id.* ¶ 16. Likely for these reasons, only 10% to 15% of family, intimate, and partner homicides in the Colonial and Founding Eras were committed with guns. *Id.* ¶ 15. But advances in firearm technology in the first half of the 19th century made guns a much more frequent murder weapon than before, increasing to a third or two-fifths of homicides. *Id.* ¶ 23.

The emergence of percussion cap pistols propelled the upward trend in gun homicides and homicides generally. *Id.* ¶ 13. Percussion cap pistols, unlike the flint-lock pistols they had replaced

48

by the mid-1820s, could be kept loaded and carried around for longer periods without risk of corrosion. *Id.* ¶ 25. As with Bowie knives, this new form of weaponry contributed to rising crime rates. *Id.* ¶ 27.

Legislatures responded by passing laws regulating pistols. Between 1813 and 1838, at least six states—Kentucky, Louisiana, Indiana, Arkansas, Georgia,[26] and Virginia—enacted prohibitions on carrying certain concealable weapons, including pistols. *Id.* ¶ 26; Ex. 14, Table 1. A seventh state, Tennessee, prohibited pistol carrying in 1870. Ex. 14, Table 3. At least three of these states also prohibited selling pistols.[27] Some of the early laws prohibiting concealed carry of pistols included exceptions for "horseman's pistols"—which were large, difficult to conceal, and favored by travelers—or "army or navy pistols"—which were also large and carried by members of the military. *Id.* ¶¶ 26, 36. These exceptions reflect the societal concern of the era: concealable weapons associated with criminal violence.

Prohibitions restricting the concealed carry of firearms, as well as other weapons, proliferated throughout the remainder of the 19th century. This regulatory proliferation also arose in response to another advance in firearms technology: the emergence of the first reliable multi-shot handguns in the Civil War and Reconstruction Era, especially the Colt revolver. *See supra* Section I.B.2; Ex. 11, Spitzer Decl. ¶ 48. As with prior advancements in firearms technology, its growing adoption coincided with escalating violence. Ex. 11, Spitzer Decl. ¶ 48. Once again, legislatures responded. Beginning around 1870, legislatures began adding "revolver[s]" to the

---

[26] In 1846, the Georgia Supreme Court upheld the state's restriction on concealed carry of pistols—consistent with the widespread concern of the time about the particular danger caused by concealed weapons—while also ruling that open carry could not be constitutionally prohibited. *See Nunn v. Georgia*, 1 Ga. 243 (Ga. 1846).

[27] Ex. 10, Roth Decl. ¶ 36 (1881 Ark. Acts 191; 1879 Tenn. Pub. Act 135-36); Ex. 11, Spitzer Decl., Ex. E at 21 (1837 Ga. Acts. 90).

same "dangerous and unusual weapons" statutes that, throughout the 19th century, had prohibited carrying—usually, but not always,[28] concealed—Bowie knives, clubs and other blunt fighting weapons. An 1872 Wisconsin law exemplified this trend in making it unlawful for "any person" to "go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slungshot, brass knuckles, or other offensive and dangerous weapon[.]"[29] By the turn of the century, at least 12 states and territories had enacted laws including revolvers on the list of weapons subject to concealed carry prohibitions; at least another five had followed suit by 1917.[30] While many legislatures, but not all, expressly regulated revolvers, there was near unanimity among the states by the turn of the century in prohibiting or severely restricting concealable firearms and other weapons. Ex. 11, Spitzer Decl. ¶ 48 & Ex. B.

In all, this shows a pattern preceding the Founding and continuing into the 19th century: When new weapon technology emerged, proliferated among civilians, and contributed to increased violence, legislatures imposed categorical weapon regulations. Legislatures did so to reduce homicides, violence, and disruptions to public order. At the same time, Americans retained the ability to own and carry other weapons for lawful self-defense.

---

[28] An 1891 West Virginia statute prohibited any person from "carry[ing] about his person any revolver or other pistol . . . or any other dangerous or deadly weapon of like kind or character[.]" Ex. 14, Table 1 (1891 W. Va. Code 915, *Of Offenses Against the Peace*, ch. 148, § 7).

[29] Ex. 14, Table 1 (Wisc. Sess. Law 17, Ch. 7, § 1, An Act to Prohibit and Prevent the Carrying of Concealed Weapons).

[30] The following states expressly regulated revolvers: Georgia in 1870 (revolver "or any kind of deadly weapon"); Wisconsin in 1872 ("revolver"); Colorado in 1881 ("any firearms, as defined by law," including revolvers); West Virginia in 1882 (revolver); Oregon in 1885 (revolver "or other fire-arm"); Montana in 1883; Oklahoma in 1890 (revolver); Michigan in 1891 (revolver—state enactment applicable to city of Saginaw); Alaska in 1896 (revolver "or other firearm") (revolver "or other deadly weapon"); Washington in 1897 (revolver or "other fire-arms"); Iowa in 1897 (revolver); New Jersey in 1905 (revolver or "other deadly, offensive or dangerous weapon or firearm"); Massachusetts in 1906 ("loaded" revolver); Idaho in 1909 (revolver, "gun or any other deadly or dangerous weapon"); North Dakota in 1915 (revolver, "gun . . . or any other dangerous fire arm loaded or unloaded"); Oregon in 1917 (revolver "or other firearm"). Ex. 14, Table 3.

**b. This tradition continued when 20th century legislatures regulated machine guns and assault weapons.**

The historical tradition of regulating "dangerous and unusual" weapons, including specific types of firearms, continued into the 20th century. During and after World War I, firearms technology began to most closely resemble the assault weapons and large-capacity magazines covered by the Act, and the form of the regulatory response looked increasingly like—and even more severe than—the Act. Hand-held semi-automatic and automatic weapons comparable to assault weapons did not emerge until World War I. Ex. 11, Spitzer Decl. ¶¶ 14–15. When they did, they began to impact civilian life through criminal violence, and legislatures continued their practice of responding with categorical weapons regulations. Commensurate with the increasing danger these new weapons posed, the regulations moved beyond carry-related restrictions to outright possession bans.

For example, the proliferation of the Thompson submachine gun (the "Thompson") and the Browning Automatic Rifle—both built for the battlefield, like assault weapons—triggered a widespread regulatory response when they started being used to perpetrate high-profile crimes. Ex. 11, Spitzer Decl. ¶¶ 15–16. The Thompson in particular became an object of public concern in part because it was used in the infamous St. Valentine's Day Massacre of 1929—in Chicago, Illinois. *Id.* ¶ 15. News reports detailed lurid accounts of Prohibition-era gangsters using the Thompson to inflict criminal violence. *Id.* ¶ 22. Demands for legislative action followed.

As in prior eras, legislatures responded: between 1925 and 1933, at least 29 states enacted anti-machine gun laws. *Id.* at Exs. B, D. But many laws went further than concealed-carry restrictions by banning possession of a machine gun with limited exceptions. *Id.* ¶ 23 & Ex. E.[31]

---

[31] Examples of states that banned possession of machine guns, concealed or otherwise, included: Massachusetts (1927); Michigan (1927); Illinois (1931); South Carolina (1934); Missouri (1929); Texas (1933); Minnesota (1933); Washington (1933); Pennsylvania (1929); New York (1933); California (1927);

Congress followed suit. In 1932, it banned machine guns for the District of Columbia, and notably defined a machine gun as "any firearm which shoots automatically *or semiautomatically* more than twelve shots without reloading." *Id.* ¶ 24 (quoting 47 Stat. 650, ch. 465, §§ 1, 14 (1932) (emphasis added). Congress was not alone in characterizing both automatic and semiautomatic firearms as machine guns: 7 states also enacted laws restricting possession of semi-automatic weapons. *Id.* ¶ 28.

With the National Firearms Act of 1934, Congress further responded to the dangers posed by both automatic weapons, like the Thompson, and other firearms associated with criminal violence, like concealable short-barreled shotguns and rifles. *Id.* ¶¶ 25-28. *See* National Firearms Act of 1934, ch. 757, Sec. (a)-(b), 48 Stat. 1236, Pub. L. 73-474 (1934).[32] And, in 1939, the Supreme Court held in *Miller* in reference to short-barreled shotguns in particular that the Second Amendment does not guarantee "the right to keep and bear such an instrument." 307 U.S. at 178. *Cf. Heller*, 554 U.S. at 627 (citing *Miller*); *Bruen*, 142 S. Ct. at 2128 (same).

These early 20th century laws illustrate a continuing historical tradition of regulating dangerous and unusual weapons—particularly when those weapons embodied technological advances and became associated with prominent public violence. This tradition runs throughout the 20th century and to the present: through the federal assault weapons ban of 1994, to the laws of 8 states and numerous localities that have regulated these weapons, and, ultimately, to the Act challenged here.

---

Kansas (1933); Louisiana (1932); Wisconsin (1933). The text of these laws is in Ex. 14, Table 4.

[32] Specifically, the National Firearms Act of 1934 severely taxed their transfer (at $200 per transfer, which is over $4,300 in today's dollars), *id.* at § 3(a); required existing owners to register these weapons with the federal government, *id.* at § 5(a); subjected purchasers to background checks, fingerprinting, and documentation requirements, *id.* at § 4(a); and prohibited possession of covered firearms that had been transferred in violation of these requirements, *id.* at § (6).

### 3. The Act is relevantly similar to historical regulations.

The regulations comprising the historical tradition of regulating "dangerous and unusual weapons" are relevantly similar to the Act in terms of the metrics identified in *Bruen*: how and why they burden a law-abiding citizen's right to armed self-defense. 142 S. Ct. at 2133. The Act imposes minimal burden, if any, on the right to self-defense. Neither assault weapons nor large capacity magazines are necessary for self-defense, and the Act leaves Illinois residents free to purchase, keep, and carry firearms that are commonly used for self-defense, including handguns, shotguns, and many types of rifles. Whatever minimal burden may exist is justified by the same overriding interest that motivated prior generations to enact similar regulations: the need to protect the public from unusually lethal weapons associated with increased criminal violence.

### a. The Act's minimal burden on the right to self-defense is equivalent to, or less than, comparable historical regulations.

At most, the Act minimally burdens Plaintiff's Second Amendment right to possess firearms for self-defense because he can continue to lawfully buy, sell, and keep many commonly used firearms for self-defense: semi-automatic handguns, shotguns, and many types of rifles. The Act's minimal burden is relevantly similar to historical regulations that restricted specific categories of firearms and other "dangerous and unusual" weapons, without affecting more common weapons like muskets. None of these categorical regulations, then or now, meaningfully impair the right to self-defense.

The Act does not ban "an entire class of 'arms'" commonly used for self-defense, like the prohibition on handgun possession struck down in *Heller*. 554 U.S. at 628. The definition of "assault weapon" in the Act does not reach all rifles, all handguns, or all shotguns. 720 ILCS 5/24-1.9(a)-(b). There are numerous firearms within each of these broad classes that can still be legally bought, sold, and possessed in Illinois. Because Plaintiff retains access to these weapons, all of

53

which are effective means of self-defense, the Act imposes a *de minimis* burden on Plaintiff's Second Amendment rights. *Bruen*, 142 S. Ct. at 2135 (self-defense is the "*central component*" of the Second Amendment right).

Plaintiff attempts to misleadingly characterize the Act as a ban on semi-automatic rifles as a whole. *See* Br. 14–15. But the Act does not even come close to prohibiting *all* semi-automatic handguns, rifles, or shotguns. Multiple courts have likewise concluded that prohibitions on "assault weapons" are not class-wide bans under *Heller*. *See Worman*, 922 F.3d at 37 (upholding an assault weapons ban because it "proscribe[d] only a set of specifically enumerated semi-automatic assault weapons"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Kolbe*, 849 F.3d at 138 (rejecting attempt to frame the AR-15 and other prohibited assault weapons as "a class of weapons" under *Heller*), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. A ban on large capacity magazines is also not the type of class-wide ban *Heller* disfavored. *See Ass'n of N.J. Rifle and Pistol Clubs v. Att'y Gen. of N.J.*, 910 F.3d 106, 117–18 (3d Cir. 2018) ("*ANJRPC*") (concluding a large capacity magazine ban was not a class-wide ban under *Heller*), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.[33] Even after *Bruen*, the district court for the Northern District of Illinois concluded that the Act's restrictions on assault weapons and large capacity magazines are "constitutionally sound" and not the same as the "severe" handgun ban in *Heller*. *Bevis v. City of Naperville*, No. 22-cv-4775, 2023 WL 2077392, at *9, 16 (N.D. Ill. Feb. 17, 2023).

The Act is also not a ban of any kind as applied to Plaintiff. Plaintiff alleges that he already owns assault weapons and large capacity magazines covered by the Act. Compl. ¶ 24 (Plaintiff "owns two AR-15 rifles" as well as "standard" magazines for those rifles). The Act does not

---

[33] *Bruen* abrogated *Worman*, *Kolbe*, and *ANJRPC* because of their use of means-end scrutiny. *See Bruen*, 142 S. Ct. at 2126. The cited portions remain relevant to the question of how, if at all, the restrictions in the Act burden the right to self-defense.

deprive him of these weapons or accessories; as long as Plaintiff lawfully owned these weapons and accessories at the time the Act took effect, he can continue to lawfully own and possess them. 720 ILCS 5/24-1.9(d). The Act also permits him to travel with these items to designated locations to maintain proficiency. *Id.*

The Act prevents Plaintiff from buying *more* assault weapons and *more* large capacity magazines than he already owns. That is not a significant burden on Plaintiff's right to self-defense. Plaintiff may keep buying any number of handguns, shotguns, and rifles, just not assault weapons that meet the Act's criteria. The same is true for magazines. Plaintiff can purchase as many 15-round handgun magazines or 10-round rifle magazines as he wants without violating the Act. He can continue to use those magazines with his lawful firearms for self-defense. The Act has not deprived Plaintiff of the means to defend himself.[34] Having slightly fewer options at the gun store is not a meaningful Second Amendment burden when the remaining options provide ample means for self-defense.

Because the Act preserves access to many firearms for self-defense, while focusing on a subset of "highly dangerous" weapons and accessories particularly susceptible to criminal misuse, it is relevantly similar to historical regulations of "dangerous and unusual weapons." *Heller*, 554 U.S. at 627; *Bevis*, 2023 WL 2077392, at *16. The Act is similar to the restrictions on pistols and, later, revolvers that legislatures enacted in the 17th, 18th, and 19th centuries. *See generally Bevis*,

---

[34] Plaintiff's allegations about his role as a medic for a SWAT team do not identify *any* burden on his right to self-defense. Plaintiff admits that he does not carry any firearm on SWAT missions, Compl. ¶ 28, and provides no reason to think he would be doing so if the Act were enjoined. This is likely because SWAT teams protect their unarmed medics. Medics are purposefully kept out of the "hot zone," where firearm discharges may occur. Herrera Decl. ¶ 8. If an individual is injured, SWAT team members bring the injured out of the hot zone for treatment. Ex. 15, Chiappini Decl. ¶ 8. If it becomes necessary to render medical aid in a hot zone, SWAT operators defend the medic. *Id.* If Plaintiff is concerned that his team's protocols are putting him at risk, then he should direct those concerns to the SWAT team and its supervising law enforcement agency. What Plaintiff can or cannot lawfully do on SWAT team missions is a function of the policies and regulations his team is bound by—it has nothing to do with the Second Amendment.

2023 WL 2077392, at *10–14 (detailing the historical tradition of regulating "dangerous or unusual" weapons and concluding that "assault weapons and large-capacity magazines fall under this category"). Legislatures from prior eras enacted regulations that kept these "dangerous or unusual" weapons out of public spaces because of their propensity to cause criminal violence. Ex. 11, Spitzer Decl. ¶ 82; Ex. 10, Roth Decl. ¶ 26–28, 35–40; Ex. 12, Delay Decl. ¶ 65. Bowie knives, other "fighting knives," clubs, and popular melee weapons ("slung shots," bludgeons, billy clubs) were also subject to regulation as "dangerous or unusual weapons," often in the very same statutes. Ex. 11, Spitzer Decl. ¶¶ 70–81, Exs. B, C, H; *see also Bevis*, 2023 WL 2077392, at *10–13 (discussing historical regulations on these weapons).

These historical regulations frequently took the form of bans on concealed carry, and sometimes prohibitions on any form of public carry, concealed or otherwise. Ex. 11, Spitzer Decl., Exs. B, C, E; *Bevis*, 2023 WL 2077392, at *13. Beginning as early as 1837, multiple legislatures in the 19th century also enacted prohibitions on the sale of specific "dangerous or unusual weapons," including pistols.[35]

Later, following World War I, legislatures similarly responded to the machine guns and high-capacity semi-automatic weapons that had migrated from 20th century battlefields into American communities. Ex. 11, Spitzer Decl. ¶¶ 14–29. Given that the danger posed by these firearms went well beyond their concealable nature, numerous legislatures tailored their response by enacting bans on civilian possession of these weapons. *Id.* ¶ 31, Ex. D (collecting machine gun laws). Many early 20th century legislatures also expressly banned the sale of machine guns.[36] They

---

[35] Ex. 10, Roth Decl. ¶ 36 (1881 Ark. Acts 191; 1879 Tenn. Pub. Act 135-36); Ex. 11, Spitzer Decl., Ex. E at 21 (1837 Ga. Acts. 90).

[36] *See* Ex. 11 Spitzer Decl., Ex. D; Ex. 14, Table 4: South Carolina (1934); Missouri (1929); Minnesota (1933); North Dakota (1931); Illinois (1931); Texas (1933); Pennsylvania (1929); Washington (1933); New York (1933); California (1933); Louisiana (1932); Nebraska (1929); Wisconsin (1931–1933); New Jersey

also regulated based on ammunition capacity, including for semi-automatic weapons.[37] Between 1917 and 1934, "[t]wenty-three states imposed some limitation on ammunition magazine capacity, restricting the number of rounds from anywhere between one (Massachusetts and Minnesota) and eighteen (Ohio)." *Bevis*, 2023 WL 2077392, at *12 n.39 (collecting statutes).

The Act operates in ways comparable to these historical regulations. *See Bruen*, 142 S. Ct. at 2133 (considering "how" historical analogues and modern regulations burden Second Amendment rights). Like regulations from the 18th, 19th, and early 20th centuries, the Act permits law-abiding citizens to keep, carry, and acquire firearms commonly used for self-defense, but restricts assault weapons and large capacity magazines because they are particularly dangerous, unusual, and prone to criminal misuse. *See Bevis*, 2023 WL 2077392, at *15 (noting that "assault weapons are used disproportionately in mass shootings, police killings, and gang activity"). Of course, regulations of "dangerous and unusual" weapons from prior eras differ somewhat both among themselves as a group and compared to the Act. But *Bruen* does not require "historical *twins*," only "historical *analogues*." *See Bruen*, 142 S. Ct. at 2133. As another judge in the Northern District of Illinois has already ruled, the Act satisfies *Bruen*'s requirements because it fits well within the Nation's historical tradition of regulating dangerous and unusual weapons. *See Bevis*, 2023 WL 2077392, at *10–16.

In sum, the Act imposes no burden on the "*central component*" of the Second Amendment, the right to self-defense, because many, many semi-automatic handguns, rifles, and shotguns remain available to Plaintiff to buy, sell, and possess. *Bruen*, 142 S. Ct. at 2135 (quoting *Heller*).

---

(1927).

[37] *See, e.g.*, 1927 R.I. Pub. Laws 256–57, ch. 1052 §§ 1, 4 (prohibiting the manufacture, sale, purchase, and possession of "any weapon which shoots more than twelve shots semi-automatically without reloading"); 1927 Mich. Pub. Acts 888-89 § 3 (regulating guns that could fire "more than sixteen times without reloading").

The Act is no more burdensome than other categorical restrictions on particular types of weapons that cases like *Heller* and *Miller* have said are permissible. *See Heller*, 554 U.S. at 622–23 (discussing *Miller*, 307 U.S. 174); *accord Bevis*, 2023 WL 2077392, at *16 (noting "other effective weapons for self-defense" remained available). The Act follows the well-established historical tradition of regulating dangerous and unusual weapons.

### b. The Act's justifications are the same as historical analogues, but even more compelling.

Whatever minimal burden the Act imposes is equally justified compared to regulations of "dangerous and unusual" weapons from prior eras. Throughout American history, when lawmakers have confronted new or escalating forms of societal violence, they have frequently responded by regulating the instruments of that violence in an effort to reduce it. This is what the Act does too. In response to an unprecedented phenomenon—mass shootings perpetrated by lone individuals resulting in previously inconceivable casualty numbers—Illinois lawmakers sought to limit access to the military-grade weaponry that makes this carnage possible.

As discussed above, the categorical weapons restrictions enacted by past legislatures responded to increases in societal violence. Near-ubiquitous Bowie knife restrictions proliferated at a time when interpersonal conflicts and homicides were rapidly increasing, driven in substantial part the availability and use of these knives. Ex. 11, Spitzer Decl. ¶ 63. Restrictions on concealable pistols similarly followed the increased use of these guns in homicides. Ex. 10, Roth Decl. ¶ 24. And later, as the spread of multi-shot revolvers coincided with an upward trend in gun violence, regulations began to specifically target this new category of weapons. When automatic and semi-automatic firearms began to inflict high-profile carnage in the civilian world, like Chicago's St. Valentine's Day Massacre, legislatures responded by banning their possession and sale.

The impetus for the Act is relevantly similar and even more compelling. Before the current era, no single person armed with a single firearm could kill as many people in so little time. Since the 9/11 attacks, the deadliest individual acts of intentional criminal violence in the country have been mass shootings. Ex. 4, Klarevas Decl. ¶ 11 & Table 1. The frequency of high-fatality mass shootings (involving 10 or more victim deaths) has also increased—especially after the expiration of the federal assault weapons ban in 2004. *Id.*, Figs. 1 & 2. A majority of these shootings in recent years have involved assault weapons, large capacity magazines, or both. *Id.*, Figs. 3–5.

The Illinois General Assembly passed the Act not long after the Nation's grim tide of mass shootings reached Highland Park, Illinois—where a lone gunman used an AR-15 and large capacity magazines to fire 83 rounds in less than a minute, killing 7 people and wounding 48 more at a July 4th parade. In doing so, the General Assembly followed the example of numerous legislatures from prior eras who sought to prevent heinous acts of violence by limiting access to the weapons that made them possible. In *Bruen*'s language, the "why" behind the Act is indistinguishable from the motivations that drove our ancestors to regulate the "dangerous and unusual" weapons of their times. 142 S. Ct. at 2133. Plaintiff's Second Amendment challenge to the Act is unlikely to succeed.

### c. Plaintiff's attempts to distinguish the Act from the historical tradition of regulating dangerous and unusual weapons will fail.

Plaintiff is likely to try to discount the extensive historical tradition supporting the Act in two ways: by ignoring the 20th century, and by portraying 19th century and earlier regulations as nothing more than concealed-carry limitations. But both tactics disregard the Supreme Court's instruction that "analogical reasoning" does not impose a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133.

Plaintiff wants this Court to avoid consideration of the 20th century because laws prohibiting the sale and possession of machine guns from the 1920s and 1930s eviscerate his claims. *See, e.g.*, Compl. ¶ 84 (dismissing all historical evidence from "the last century"). Plaintiff's willful blindness regarding the 20th century is at odds with *Heller* and *Bruen*. *Heller* specifically examined the interplay between 20th century firearms technology—machine guns— and a significant milestone in the regulatory response they generated—the National Firearms Act of 1934. 554 U.S. at 625; *accord Friedman*, 784 F.3d at 408 (noting *Heller*'s conclusion that bans on possessing machine guns were "obviously valid" even though such laws did not arise until 1927). The *Heller* majority was "startl[ed]" at the possibility, which it took as a logical implication of the dissent's reasoning, "that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional[.]"554 U.S. at 624; *accord Friedman*, 784 F.3d at 408 (observing that "*Heller* deemed a ban on private possession of machine guns to be obviously valid," even though "states didn't begin to regulate private use of machine guns until 1927").

*Heller* likewise considered a 1939 case, *United States v. Miller*, 307 U.S. 174, upholding indictments under the National Firearms Act against defendants caught transporting short-barreled shotguns, another weapon type the statute regulated. *Heller* read *Miller* as standing for the proposition that "*the type of weapon at issue* was not eligible for Second Amendment protection," and that "the Second Amendment right, whatever its nature, extends only to certain types of weapons." 554 U.S. at 622–23. The *Heller* majority accepted this proposition as in line with "the historical understanding of the scope of the right" they articulated. *Id.* at 625. In other words, *Heller* considered 20th century regulations of 20th century weapons and understood those regulations as in line with earlier history.

In keeping with *Heller*, *Bruen* did not foreclose consideration of 20th century evidence. To the contrary: by acknowledging that "dramatic technological changes" or "unprecedented societal concerns" would necessitate a "more nuanced approach," *Bruen* left the door open. 142 S. Ct. at 2132. It would be impossible to account for "technological changes" without looking at the time period in which those changes arose. *Id.* The same is true for "societal concerns" with no precedent before the 20th century (or the 21st, for that matter). *Id.* In short, both *Heller* and *Bruen* permit consideration of 20th century evidence—especially in a case like this one involving both "dramatic technological changes" and "unprecedented societal concerns." *Id.*

Nor does the evolution of the regulatory method of "dangerous and unusual" weapons laws—moving from carry-related regulations to sale and possession bans—interrupt the through line of this historical tradition or sever 20th century laws from it. The move to possession-based bans in "dangerous and unusual" weapons laws was not unique, but instead reflected a broader trend toward strict liability for certain "activities affecting the public health, safety, and welfare." *United States v. Freed*, 401 U.S. 601, 607 (1971) (upholding an indictment under the National Firearms Act, as amended in 1968, for possessing a hand grenade); *accord United States v. Dotterweich*, 320 U.S. 277, 281–82 (1943) ("[The Food and Drugs Act of 1906, as amended in 1938,] is based on a now familiar type of legislation whereby penalties serve as effective means of regulation . . . In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger."); *United States v. Balint*, 258 U.S. 250, 252 (1922) (upholding an indictment for selling derivatives of opium and coca leaves under the Narcotic Act of 1914, and noting "[m]any instances" of "police power" regulations "where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of *mala in se*").

When 19th century legislatures focused on *concealed* carry of pistols, revolvers, and the like, they did so because concealment was evidence of a "'wicked purpose.'"[38] *Bruen*, 142 S. Ct. at 2145 (quoting *North Carolina v. Huntly*, 25 N.C. 418, 422–23 (1843)). Consistent with presumptions from the common law, criminal intent was understood at that time to be an essential element for any criminal conviction. *Balint*, 258 U.S. at 251 (noting the "general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime"). That understanding changed with the emergence of "public health, safety, and welfare" regulations around the advent of the 20th century. *Freed*, 401 U.S. at 607; *accord Balint*, 258 U.S. at 252 (noting that "there has been a modification of th[e] view" that "scienter" was a "necessary element" of every crime). Machine gun laws from the early 20th century reflected this underlying shift in regulatory approach that manifested in multiple types of laws seeking to protect the public from particularly dangerous items. *See Staples v. United States*, 511 U.S. 600, 611–12 (1994) (discussing *Balint* and *Freed* and characterizing "machineguns, sawed-off shotguns, and artillery pieces" as "items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades in *Freed*").[39]

---

[38] *See also* Ex. 10, Roth Decl. ¶ 24 (quoting the Louisiana Supreme Court's commentary on "unmanly" men carrying concealed weapons to gain "secret advantages" over their adversaries), ¶ 34 (discussing Colt revolvers), ¶ 37 (concealed weapons leading to homicides), ¶ 39 (discussing affirmative defense under Ohio concealed-carry law if accused could show circumstances that would "justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family").

[39] Plaintiff repeatedly cites *Staples* because there Justice Thomas distinguished between "certain categories of guns—no doubt including the machine guns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation," and other "guns falling outside those categories" that "traditionally have been widely accepted as lawful possessions." 511 U.S. at 611–12. *See* Compl. ¶¶ 69, 72. But *Staples* was not a Second Amendment case and, unlike *Heller*, did not analyze the kinds of weapons that are "arms" protected by that right. Instead, it dealt with whether a criminal defendant charged with possessing a "machinegun" in violation of federal law had to know the gun in question, an AR-15, could be fired automatically because it had been modified to do so. *Staples*, 511 U.S. at 602–03. Justice Thomas did not state or consider whether AR-15s in particular were "widely accepted as lawful possessions," but referred more generally to the lawful ownership of firearms. *Id.* at 611–12; *cf. id.* at 613–14 (noting that "roughly" 50% of American households owned "at least one firearm *of some sort*," without further specification) (emphasis added). The

The purchase and sale limitations in the Act, as well as the conditions on possession, follow in this trend. If anything, the Act is less onerous because all of its restrictions retain a *mens rea* requirement—only those who "knowingly" sell, purchase, or possess assault weapons or large capacity magazines in a manner prohibited by the Act are liable for violating it. 720 ILCS 5/24-1.9(b)-(c), 1.10(b)-(c). *Cf. Staples*, 511 U.S. 600 (requiring "knowledge" for a criminal conviction for possession of a fully automatic AR-15). Plaintiff's attempt to distinguish the Act and its early 20th century antecedents from prior 19th and 18th century laws will fail.

## II.  Plaintiff has not shown he will suffer irreparable harm.

Plaintiff has not shown he will "*likely* suffer irreparable harm" absent injunctive relief, *Orr*, 953 F.3d at 502, because he has not provided any evidence that the Act impairs his ability to bear arms for self-defense. Plaintiff carries the burden to establish irreparable harm by making a "clear showing" that he is entitled to relief. *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). Plaintiff has not made such a showing, and his motion can be independently denied on this basis.

Plaintiff's allegations of irreparable harm are impossible to square with the fact that he has been prohibited by a separate City and County ordinances from possessing assault weapons and large capacity magazines since 2006. *See Wilson*, 937 F.3d at 1029. Plaintiff completed his medical training in Chicago and has presumably lived there for at least several years, *see* Compl. ¶ 16, but he did not move for a preliminary injunction until January 27, 2023. This years-long delay in seeking preliminary injunctive relief "precludes a finding of irreparable harm." *See Redbox Automated Retail, LLC v. Xpress Retail LLC,* 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018).

---

other two branches of government—a bipartisan Congress and then-President Clinton—did specifically address the relative danger posed by AR-15s just three months later, when they enacted the federal assault weapons law banning AR-15s, whether semi-automatic or otherwise. *See* Pub. L. No. 103-322, § 110102, 108 Stat. 1796 (amending 18 U.S.C. § 921(a)) (passed Aug. 25, 1994; signed Sept. 13, 1994).

Plaintiff's argument relies solely on *Ezell v. City of Chicago*, where the Seventh Circuit held that irreparable harm may sometimes be presumed for Second Amendment violations. 651 F.3d 684, 699 (7th Cir. 2011). The Seventh Circuit has since cautioned that *Ezell* was decided "at a time when 'Second Amendment litigation [wa]s new,'" and the decision attempted to identify threshold inquiries that would govern in "'*some* Second Amendment cases.'" *Wilson*, 937 F.3d at 1036 (quoting and adding emphasis to *Ezell*, 651 F.3d at 700–01). But even assuming such a presumption of harm applies, it only applies where a regulation burdens the "central component" of the Second Amendment: "the right to possess firearms *for protection*." *Ezell*, 651 F.3d at 699 (emphasis added); *see also id.* at 708 (distinguishing an earlier case by noting that it did not "involve the central self-defense component of the right").

The *Ezell* presumption does not apply here. As explained above, the Act does not regulate arms commonly used for self-defense, and the restricted firearms and accessories are designed for offensive military use rather than individual protection. The Act allows individuals to purchase and wield handguns, "the quintessential self-defense weapon[s]," shotguns, and many types of rifles. *Heller*, 554 U.S. at 629.

Factual differences between this case and *Ezell* further undermine Plaintiff's claim of irreparable harm. In *Ezell*, the challenged ordinance effectively banned firing ranges, while at the same time another ordinance mandated training at firing ranges "as a condition of lawful firearm possession." *Ezell*, 651 F.3d at 704–05. The court also noted that "the core right" to possess firearms "implies a corresponding right to acquire and maintain proficiency in their use." *Id.* at 704. The ordinances at issue in *Ezell* therefore undermined *all* lawful gun ownership for self-

defense, thus "implicat[ing] the core of the Second Amendment right." *See id.* at 708.[40] The Act has no comparable effect on the right to self-defense.

Plaintiff both fails to show that the restricted assault weapons and large capacity magazines are important for individual self-defense generally, and he also fails to show the restrictions harm him in particular. Plaintiff acknowledges that he already owns firearms, including two AR-15 rifles and large capacity magazines, and does not explain why the firearms he possesses are insufficient for self-defense.[41] *See* 720 ILCS 5/24-1.9(d) (grandfathering already-owned assault weapons); 720 ILCS 5/24-1.10(d) (grandfathering already-owned large capacity magazines). Nor does Plaintiff cite a single instance in which he was unable to defend himself over the many years he has been subject to the County and City regulations. Plaintiff further admits he carries a Glock 43x handgun, which comes standard with a 10-round magazine, "for self-defense outside the home," Compl. ¶ 23, and provides no reason to doubt the sufficiency of this weapon and magazine for self-defense.[42]

---

[40] In addition, the court in *Ezell* found that the regulation required individuals to travel to another jurisdiction to exercise their constitutional rights and found it "unimaginable" that imposing a travel burden was consistent with constitutional safeguards. *Ezell*, 651 F.3d at 697–98. In this case, the Act imposes no such geographical burden: Plaintiff can carry handguns anywhere he could have before the Act took effect in accordance with concealed-carry requirements.

[41] Plaintiff objects that, as of April 10, 2023, the Act designates specific locations where he can possess his "grandfathered" assault weapons. Compl. ¶ 47. But Illinois's public carry laws, which are not at issue here, already restrict what weapons can be carried in public and where. Illinois's concealed-carry laws permit public carry only of "handgun[s]. *See* 720 ILCS 5/24-1(a)(4) (prohibiting carrying or possessing any firearm in public except in accordance with the Firearm Concealed Carry Act, 420 ILCS 66/1 *et seq.*); 430 ILCS 66/5, 10(a) (defining "concealed firearm" as a "handgun"); 720 ILCS 5/24-1(4) (delineating where and how non-concealed-carry firearms can be possessed and carried). Plaintiff makes no attempt to identify the locations where he could lawfully carry assault weapons in public *before the Act* where he can no longer carry them *because of the Act*.

[42] Plaintiff alleges that he would prefer to carry his Glock 45, which he says he keeps "inoperable in his home." Compl. ¶¶ 22–23. But the Glock 45, like almost all modern handguns, is fully compatible with smaller magazines sizes that are lawful under the Act. *See* Ex. 6, Busse Decl. ¶¶ 92–93; Ex. 8, Yurgealitis Decl. ¶ 24 ("[E]ven if large capacity magazines are available or sold with firearms today, all firearms companies offer lower capacity options."). And despite Plaintiff's speculation to the contrary, *see* Compl. ¶ 21, using a 10-round magazine has no effect on the safe or effective operation of the pistol. Ex. 6, Busse

Finally, Plaintiff's allegations regarding his volunteer role as a SWAT team medic do not demonstrate irreparable harm. He admits he does not carry any firearm during missions, but seeks to bring his personal AR-15 to "shooting drills" with a SWAT team. Herrera Decl. ¶ 12. As a legal matter, there is no right to practice shooting with SWAT teams. As a factual matter, Plaintiff has not provided the Court with evidence from which it may infer that participation in this volunteer effort requires him to access or use weapons in ways prohibited by the Act. Plaintiff's threadbare allegations about trainings that are of unclear relevance to the role *he personally* plays on SWAT team missions do not establish any harm, let alone irreparable harm, attributable to the Act. The Act also allows current owners to continue to own restricted items and to bring them to certain locations, like firing ranges, to train. *Id.* § 1.9(d)(4); *see also id.* § 1.9(d)(5) (permitting travel to and from permitted locations with regulated items); *id.* § 1.10(d). Plaintiff offers no explanation for why the training he wishes to attend falls outside what the Act allows. Plaintiff remains free to practice securing and unloading special weapons, like the AR-15, as he believes could be useful in a future mission, in training scenarios that do not involve shooting. Ex. 15, Chiappini Decl. ¶ 11. Plaintiff's desire to handle AR-15s during SWAT trainings is not a basis for irreparable harm.

## III.    An injunction would harm the public interest.

The public has a fundamental interest in limiting the death, injury, and suffering wrought by mass shootings. Courts have repeatedly held that similar regulations of assault weapons and large capacity magazines promote a "compelling interest in protecting the public" by reducing risk of death and injury from guns. *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017); *see also New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015).[43] In a similar context,

---

Decl. ¶ 90; Ex. 8, Yurgealitis Decl. ¶¶ 25–26.

[43] Although these cases applied a form of means-end scrutiny that has since been foreclosed by *Bruen*, their discussion of the public interest remains directly relevant to the preliminary injunction factors. *See*

the Tenth Circuit affirmed a district court's decision not to enjoin a rule restricting bump stocks (which modify semi-automatic weapons to replicate automatic fire), finding that "the public has a strong interest in banning the possession and transfer of machine guns" and that "[t]he ban supports the safety of the public in general . . . and the safety of law enforcement officers and first responders." *Aposhian v. Barr*, 958 F.3d 969, 991 (10th Cir. 2020).

Empirical evidence shows that an injunction would undermine this vital public interest because assault weapons and large capacity magazines pose an imminent threat to health and safety. Widespread availability of assault weapons and large capacity magazines causes more frequent and more lethal mass shootings. Ex. 4, Klarevas Decl. ¶ 11. While assault weapons are rarely used for self-defense, they are increasingly the weapons of choice for mass shooters. *Id.* ¶¶ 12–13. Bullets fired from assault weapons inflict more harm compared to other kinds of guns due to their velocity and rate of fire, shattering bones and shredding organ tissue beyond the ability of ordinary weapons. Ex. 9, Schreiber Dec. ¶¶ 24, 33–40; Ex. 13, Hargarten Dec. ¶¶ 31–35. At the same time, large capacity magazines make shootings more deadly by increasing the number of rounds that can be fired during a short time. Ex. 6, Busse Dec. ¶ 23; Ex. 4, Klarevas Dec. Fig. 10; Ex. 13, Hargarten Dec. ¶¶ 28, 30; Ex. 8, Yurgealitis Dec. ¶ 95. The public's interest in restricting the availability of assault weapons and large capacity magazines "could not be more undeniably compelling." *Ocean State Tactical*, 2022 WL 17721175, at *19.[44]

## IV. The balance of equities tips firmly in favor of the State.

The threat that assault weapons and large capacity magazines pose to public safety tips the

---

*Antonyuk v. Bruen*, No. 22-cv-734, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022).

[44] Plaintiff fails to even acknowledge these vital public safety objectives, instead making a cursory argument that "the public has no cognizable interest" in enforcing statutes that allegedly violate constitutional rights. Br. 29. As explained above, the Act does not violate a constitutional right.

balance of harms heavily against a preliminary injunction. The public's interest in limiting the catastrophic effects of mass shootings[45] far exceeds any speculative injury to Plaintiff. And because Plaintiff is unlikely to prevail on the merits of his claims as explained in Section I, he faces a heightened burden to show that the balance of equities warrants injunctive relief. *See GEFT Outdoors*, 922 F.3d at 364. Plaintiff cannot meet this stringent standard.

Enjoining the Act would allow future potential perpetrators of mass shootings ready access to potent tools for mass murder. Compared with the risk of profound and irreparable damage to Illinois residents posed by continued access to these weapons, Plaintiff's speculative allegations of harm cannot justify a preliminary injunction. Plaintiff retains ample means for self-defense, including the assault weapons and large capacity magazines he lawfully possessed before the Act took effect.

A district court deciding whether to issue the extraordinary relief of a preliminary injunction must "seek[] at all times to minimize the costs of being mistaken." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). In this case, the costs of mistakenly enjoining the challenged provisions of the Act are dire. The motion for a preliminary injunction should be denied.

## CONCLUSION

For the foregoing reasons, the Attorney General and Director Kelly request that Plaintiff's motion for a temporary restraining order and preliminary injunction be denied.

---

[45] Where, as here, the proposed injunction would prevent the enforcement of a public-safety statute, the interests of the public and the interests of the government are one and the same. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

68

Dated: March 3, 2023

Respectfully submitted,

KWAME RAOUL
*Attorney General of Illinois*

/s/ Christopher G. Wells                           /s/ Kathryn Hunt Muse
Christopher G. Wells, No. 6304265          Kathryn Hunt Muse, No. 6302614
Chief, Public Interest Division                  Deputy Chief, Public Interest Division
Office of the Attorney General                   Office of the Attorney General
100 W. Randolph Street, 12th Floor          100 W. Randolph Street, 12th Floor
Chicago, IL 60601                                     Chicago, IL 60601
(312) 814-3000                                         (312) 814-3000
Christopher.Wells@ilag.gov                     Kathryn.Muse@ilag.gov

*Counsel for Attorney General Raoul and*      *Counsel for Attorney General Raoul and*
*ISP Director Kelly*                                        *ISP Director Kelly*


Exhibits to follow:

1. Newspaper Articles Cited
2. Declaration of Robert Morgan
3. Declaration of William E. Demuth II
4. Declaration of Louis Klarevas
5. Declaration of Phil Andrew
6. Declaration of Ryan Busse
7. Declaration of Dennis Baron
8. Declaration of James E. Yurgealitis
9. Declaration of Martin A. Schreiber
10. Declaration of Randolph Roth
11. Declaration of Robert Spitzer
12. Declaration of Brian Delay
13. Declaration of Stephen Hargarten
14. Excerpts from Historical Regulations Cited
15. Declaration of Dominic Chiappini