**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JAVIER HERRERA | |
| Plaintiff, | Case No. 1:23-cv-00532 |
| v. | Assigned Judge: Lindsay C. Jenkins |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity as County Board of Commissioners President, KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney, THOMAS J. DART, in his official capacity as Sheriff of Cook County, CITY OF CHICAGO, a body politic and corporate, DAVID O'NEAL BROWN, in his official capacity as Superintendent of Police for the Chicago Police Department, | |
| Defendants. | |

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... i

TABLE OF AUTHORITIES ............................................................................. ii

LEGAL STANDARD...........................................................................................2

ARGUMENT ........................................................................................................3

I.   **Plaintiff is Not Likely to Succeed on the Merits**...............................3

  A. Shifting Burdens Under *Bruen*...........................................................3

  B. *Bruen Step 1*: The Weapons Regulated by the Ordinance Do Not Fall Within the Plain Text of the Second Amendment……………………………………………….5

      1. The Weapons Regulated by the Ordinance Are Not "Arms" as Defined by the Second Amendment ...........................................................................5

          a.  The Regulated Weapons Share Performance Characteristics   with Weapons Developed for Military Offensives ................................6

          b.  Marketing Military Grade Weapons to Civilians ....................................10

          c.  Assault Weapons are Frequently Used to Propagate Domestic Terror ...............................................................................11

          d.  The Performance Capabilities of the Assault Weapon Render it Practically and Legally Unsuitable for Use in Self-Defense Under Illinois Law ...................................................................14

          e.  Assault Weapons Deploy More Force Than is Necessary and Therefore Their Use Falls Outside of the Legal Parameters of Self-Defense Under Illinois Law .................................................................16

      2. The Weapons Regulated by the Ordinance Are So Dangerous and Unusual That They Fall Outside of the Scope of the Second Amendment's Protection ..................................................................21

          a.  Legal Interpretation of "Dangerous and Unusual"....................................23

          b.  The Assault Weapons Regulated by the Ordinance are Unreasonably Dangerous .........................................................................24

c.  Weapons Not in Common use for a Lawful Purpose are "Unusual" and May be Regulated ....................................................................24

i.  The Regulated Weapons are Not Commonly Used for a Lawful Purpose ........................................................................25

ii. Practical Considerations Rendering Assault Weapons Dangerously Unusual ......................................................27

1. The Psychological Influence on Potential Mass Shooters ...........27

2. Assault Weapons Cause Unusual Wounds to the Human Body ...27

3. The Unusually Broad Harmful Societal Impact of Mass Shootings Involving Assault Weapons .........................................30

4. The Use of Assault Weapons Creates Unusual Crises Impacting Law Enforcement .......................................................31

5. The Threat of Assault Weapons Has a Chilling Effect on Other Constitutionally Protected Activities ................................33

C.  *Bruen Step 2*: The Ordinance Is Consistent With the Nation's Historical Tradition of Firearm Regulation ............................................................34

1.  Historical Tradition of Regulating Dangerous and Unusual Weapons ...........38

a.  The English Law of Affray Prohibited Conduct that Terrorized the People .................................................................................39

b.  The Government Historically Regulated Weapons More Likely to Be Used for Unlawful Purposes People .........................................43

2.  The Public Concern Justifications Are Similar to Historical Analogues People .................................................................................45

3.  In Addressing An Unprecedented Problem, the Ordinance's Burden on the Right to Self-Defense is Still Equivalent to or Less Than Historical Analogues People ................................................................47

D.  This Case Is Controlled by the Seventh Circuit's Decisions in *Wilson* and *Friedman* ...........................................................................................50

II.  **Plaintiff Cannot Show He is Likely to Suffer Irreparable Harm** ...............................52

III. **The Balancing of Equities Weighs in Defendants' Favor** ............................................55

**IV.     A Preliminary Injunction Would Not Be in the Public Interest**...................................57

CONCLUSION  ............................................................................................................................60

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                    <u>Pages</u>

*Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)..............58

*ACLU v. Alvarez,* 679 F.3d 583 (7th Cir. 2012) ....................................................58

*Alden v. Maine*, 527 U.S. 706 (1999) .................................................................38

*Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592 (1982) .......................................46

*Andrews v. State*, 1871 Tenn. LEXIS 83 (1871)....................................................43

*Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 31, 2022).........................57

*Aymette v. State*, 1840 Tenn. LEXIS 54 (1840)..................................................43, 46

*Association of New Jersey Rifle & Pistol Clubs v. AG New Jersey*, 910 F.3d 106
    (3d Cir. 2018) ....................................................................................15

*Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018).............................................2, 3, 56

*Bevis v. City of Naperville*, No. 22 C 4775, 2023 U.S. Dist. LEXIS 27308
    (N.D. Ill. Feb. 17, 2023)..................................................................37, n. 25, 57

*Bidi Vapor, LLC v. Vaperz LLC*, 543 F. Supp.3d 619, 625 (N.D. Ill. 2021) .................................3

*Bogan v. City of Chicago*, 644 F.3d 563 (7th Cir. 2011) ...............................................4

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ..........................................2, 6, 22, 23

*Cassel v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) ................................................57

*CF Entertainment, Inc. v. Nielsen Co. (US), LLC*, 2020 U.S. Dist. LEXIS 121402, (N.D. Ill.
    July 10, 2020)......................................................................................2

*Cheatham v. Shearon*, 1851 Tenn. LEXIS 50 (1851).............................................42, 43

*Chune v. Piott*, 80 Eng. Rep. 1161; 1 Ro. R. 237 (K.B. 1614)......................................44

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)......................................58

*Davenport & Morris v. Richmond City*, 1886 Va. LEXIS 130 (1886)..........................43

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................................ 9, passim

*English v. State*, 1872 Tex. LEXIS 91 (1872) ...............................................47

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .................................... 52, passim

*Fife v. State*, 1876 Ark. LEXIS 69 (1876) ...................................................43

*Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554 (N.D. Ill. Mar. 19, 1993) .......16

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ................................ 22, passim

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ...........................................23

*Hawaii v. Standard Oil Co.,* 405 U.S. 251 (1972)............................................46

*Heller v. District of Columbia*, 670 F.3d 1244 (2011) ...................................... 9, passim

*Hill v. State*, 1874 Ga. LEXIS 509 (1874).............................................46, 47

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ...........................................23

*Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 939 (N.D. Ill., Jan. 6, 2014) (Chang, J.) ...........................................53

*Ill. Republic Party v. Prizker,* 973 F.3d 760, 762 (7th Cir. 2020) ...................................3

*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ...................................41

*Joelner v. Vill. of Washington Park*, 378 F.3d 613 (7th Cir. 2004)..............................................58

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ...................................8, 9, 22, 25, 51, 57

*Late Corp. of Church of Jesus Christ v. United States*, 136 U.S. 1 (1890) .................................46

*Louisville v. Babb*, 75 F.2d 162 (7th Cir. 1935) ...........................................4

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)...........................................2

*McBride v. Grice*, 576 F.3d 703 (7th Cir. 2009) ...........................................4

*McDonald v. Chicago*, 561 U.S. 742 (2010) ...........................................14

*New York State Rifle & Pistol Ass'n v. Bruen*, ___U.S.___, 142 S. Ct. 2111 (2022) ....... 3, passim

*O'Neill v. State*, 16 Ala. 65 (1849) ...........................................40

*Oregon Firearms Federation, Inc. v. Brown,* No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391 (D. Or. Dec. 6, 2022) ...............................................................4

*People v. Brown*, 227 Cal. App. 4th 451, 173 Cal. Rptr. 3d 812 (2014) ......................................9

*People v. Horton*, 2021 IL App (1st) 180551, 455 Ill. Dec. 881, 192 N.E.3d 710 ......................16

*People v. James*, 174 Cal. App. 4th 662, 94 Cal. Rptr. 3d 576 (2009) .........................................9

*People v. Jeffries*, 164 Ill. 2d 104, 646 N.E.2d 587, 207 Ill. Dec. 21 (Ill. 1995) ....................16,17

*People v. Morgan*, 187 Ill. 2d 500, 719 N.E.2d 681, 241 Ill. Dec. 552 (Ill. 1999) ................16,17

*People v. Murillo* 225 Ill. App. 3d 286 (1st Dist. 1992) .....................................................17,19,20

*People v. Nunn*, 184 Ill. App. 3d 253, 133 Ill. Dec. 345, 541 N.E.2d 182, 1989 Ill. App. LEXIS 235 (Ill. App. Ct. 1st Dist. 1989), cert. denied, 497 U.S. 1027, 110 S. Ct. 3277, 111 L. Ed. 2d 787, 1990 U.S. LEXIS 3490 (U.S. 1990) ................................................................17

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) ........................52

*Rogers v. Grewal*, 140 S. Ct. 1865 (2020).................................................................39,40,48,49

*Simpson v. Justice*, 1851 N.C. LEXIS 202 43 N.C. 115, 117 (1851)...........................................43

*Simpson v. State*, 1833 Tenn. LEXIS 186 (1833) .................................................................48-49

*Sir John Knight's Case*, 87 Eng. Rep. 75 K.B. 1686.................................................................39

*State v. Duke*, 1874 Tex. LEXIS 352 (1874) ............................................................................48

*State v. Huntly*, 25 N.C. 418 (1843)........................................................................................40

*State v. Kessler*, 614 P.2d 94 (1980).......................................................................................22

*State v. Langford*, 10 N.C. 381 (1824)....................................................................................40

*State v. Lanier*, 71 N.C. 288 (1874).........................................................................................40

*University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)........................................................2

*U.S. ex rel. Guirsch v. Battaglia*, No. 05 C 2696, 2007 U.S. Dist. LEXIS 93838 (N.D. Ill. Dec. 20, 2007) ...............................................................................................16

*U.S. v. Henry*, 688 F.3d 637 (9th Cir. 2012) ............................................................................23

*U.S. v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) .........................................................23

*U.S. v. Miller*, 307 U.S. 174 (1939) ...........................................................22,23

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ..............................51

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) ...52,56

*Wilson v. Cook Cty.*, 937 F.3d 1028 (7th Cir. 2019)...........................................22,51,52

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)....................................2

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021)..............................................40

<u>Statutes and Ordinances</u>

720 ILCS 5/47-5(7)....................................................................42

720 ILCS 5/7-1 .......................................................................17

720 ILCS 5/7-2 .......................................................................17

720 ILCS 5/24-1-1.5 ..................................................................20

720 ILCS 5/24-1.2 ....................................................................20

<u>Other Sources</u>

Barlow, Theodore, THE JUSTICE OF PEACE: A TREATISE CONTAINING THE POWER & DUTY OF THAT MAGISTRATE 12 (1745)x Blackstone, William, *Commentaries On The Laws Of England* 148 (1769)..............................................................................39

Blackstone, William, *Commentaries On The Laws Of England*, 148 (1769) .........................38,46

Cornell, Saul & DeDino, Nathaniel, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 510–12 (2004) .................................42

Chitty, J., PREROGATIVES OF THE CROWN 155 (1820) ..................................................46

Hawkins, William, 1 PLEAS OF THE CROWN 136 (1716) ..............................................39

Keble, Joseph, *An Assistance to the Justices of the Peace, for the Easier Performance of their Duty* 147 (1689)..............................................................................39

Lambarde, William, *Eirenarcha* 134 (1579) ...............................................39

National Firearms in Commerce and Trafficking Assessment (NFCTA), Vol. 2,

Part VII, *Recommendations and Future Enhancements* ..................................................44

Nourse, V.F., *Self-Defense & Subjectivity*, 68 U. CHI. L. REV. 1235 (2001)................................48

WEBSTER'S II NEW COLLEGE DICTIONARY 226 (2001) ................................................................24

Defendants, The County of Cook, a body politic and corporate, Toni Preckwinkle, in her official capacity as County Board President and Chief Executive Officer of Cook County, Kimberly M. Foxx, in her official capacity as State's Attorney, and Thomas Dart, in his official capacity as Sheriff (collectively the "Defendants"), by their attorney, Kimberly M. Foxx, State's Attorney of Cook County, hereby submit this Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, stating:

## INTRODUCTION

On May 24, 2022, Roy Guerrero, M.D., an Uvalde-area pediatrician, reported to his office for a routine day. Exhibit 1[1]. By 12:30 p.m., Dr. Guerrero found himself racing to the hospital only to find the parents of his patients sobbing and shouting their children's names, desperately begging for news of their survival. *Id.* Dr. Guerrero made his way to the surgical area, searching for information about one of his patients. *Id.* What he found "was something no prayer will ever relieve: two children whose bodies had been pulverized by bullets fired at them, decapitated, whose flesh had been ripped apart, that the only clue as to their identities was blood-spattered cartoon clothes still clinging to them []." *Id.* As he waited with his fellow Uvalde doctors, nurses and first responders for children that could be saved, "they never arrived. All that remained was the bodies of 17 more children and the two teachers who cared for them." *Id.*

On that fateful day, children and educators were attacked in an elementary school, murdered in an act of domestic terror by an assailant carrying an AR-15 rifle, a type of weapon regulated by the Cook County Blair Holt Assault Weapon Ordinance ("the Ordinance"). Exhibit

---

[1] *The Urgent Need to Address the Gun Violence Epidemic: Hearing Before the H. Comm. on Oversight and Reform*, 117th Cong. 8-10 (2022) (statement of Dr. Roy Guerrero, Pediatrician, Uvalde, Tex.) attached hereto as Exhibit 1 ("Exh. 1").

2[2]; Exhibit 3[3] at Table 4; Exhibit 4[4] at ¶ 61. "A State's most basic responsibility is to keep its people safe." *Caetano v. Massachusetts*, 577 U.S. 411, 421 (2016) (Alito, J., concurring). The purpose of the Ordinance is to protect Cook County residents by regulating weapons of war – which are not "arms" as that term is defined by the Second Amendment and Supreme Court precedent interpreting it. The record is clear: i) weapons regulated by the Ordinance ("Assault Weapons" or "Assault Rifles" or "regulated weapons")[5] are not those that facilitate armed self-defense; ii) weapons regulated by the Ordinance are so dangerous and unusual that they fall outside of the scope of the Second Amendment's protection; and iii) the Ordinance is consistent with the nation's historical tradition of firearm regulation.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as a matter of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018), *quoting Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A preliminary injunction is "intended to preserve the status quo until the merits of a case may be resolved." *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *CF Entertainment, Inc. v. Nielsen Co. (US), LLC*, 2020 U.S. Dist. LEXIS 121402, *18 (N.D. Ill. July 10, 2020). The moving party must, by a clear showing, carry the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

A party seeking a preliminary injunction must first demonstrate (1) some likelihood of success on the merits; (2) that it will suffer irreparable harm in the absence of a preliminary

---

[2] Cook County Blair Holt Assault Weapon Ordinance attached hereto as Exhibit 2 ("Exh. 2").
[3] Expert Declaration of Louis Klarevas, attached hereto as Exhibit 3 ("Exh. 3").
[4] Expert Report of John J. Donohue attached hereto as Exhibit 4 ("Exh. 4").
[5] For the purposes of this brief, these terms are used to reference the semiautomatic rifles regulated by the Ordinance.

injunction; (3) the injunction is in the public interest; and (4) the balancing of equities tips in its favor. *Benisek*, 138 S. Ct. 1942 at 1943-1944. In conducting its balancing analysis, the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if it were granted. *Bidi Vapor, LLC v. Vaperz LLC*, 543 F. Supp.3d 619, 625 (N.D. Ill. 2021). In the Seventh Circuit, the balancing test employs a sliding scale approach, meaning the less likely the plaintiff is to win on the merits, the more the balance of harms needs to weigh in his favor and vice versa. *Id*. at 633.

## ARGUMENT

### I.  Plaintiff is Not Likely To Succeed on the Merits.

The Seventh Circuit has clarified that a plaintiff seeking a preliminary injunction must make a "strong showing" of a likelihood of success on the merits, and that a "possibility" or "better than negligible chance" is not enough. *Ill. Republic Party v. Prizker*, 973 F.3d 760, 762 (7th Cir. 2020).

Because Assault Weapons and large capacity magazines ("LCMs" or "Magazines") are not arms in common use for self-defense and because the County's Ordinance fits within the nation's historical tradition of firearms regulation, Plaintiff is not likely to succeed on the merits.

### A.  Shifting Burdens Under *Bruen.*

In *Bruen*, the Supreme Court held that the appropriate legal standard for Second Amendment claims is rooted in text and history. *New York State Rifle & Pistol Ass'n v. Bruen*, ___U.S.___, 142 S. Ct. 2111, 2129–30 (2022). Specifically, the Court cemented a two-step inquiry: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation

by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Id*.

Plaintiff bears the initial burden to show that "the Second Amendment's plain text covers [their proposed] conduct" and thus "presumptively protects that conduct." *See id*. (If the "plain text covers an individual's conduct…[t]he government must then justify its regulation"); *id*. at 2141 n.11 ("[B]ecause the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope."); *Oregon Firearms Federation, Inc. v. Brown,* No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391, at *22–23, 31 (D. Or. Dec. 6, 2022) (restating the *Bruen* test and concluding plaintiffs bear the threshold burden of showing they are likely to prove the Second Amendment's plain text covers the conduct regulated before the government must justify its regulation). And as the Seventh Circuit has long recognized, the plaintiff challenging the constitutionality of government conduct always bears the initial burden of proof. *E.g.*, *Louisville v. Babb*, 75 F.2d 162, 165 (7th Cir. 1935); *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009) (per curiam) (collecting cases); *Bogan v. City of Chicago*, 644 F.3d 563, 570 n.4 (7th Cir. 2011).

If the challenged regulation falls outside the text of the Second Amendment, the regulation passes scrutiny, and the inquiry ends there.  If the conduct is covered by the text, the Second Amendment "presumptively protects that conduct" and the government "must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 142 S. Ct.  at 2129–30 (quotation marks omitted).

4

The government must then show that the challenged regulation aligns with historical tradition, by identifying historical regulations that are "distinctly similar," to the challenged regulation, *id.* at 2131, or by demonstrating that the challenged regulation is analogous to historical regulations, *id.* at 2132.

Defendants should prevail under both step one and step two of the *Bruen* standard.

**B.** ***Bruen Step 1:*** **The Weapons Regulated by the Ordinance Do Not Fall Within the Plain Text of the Second Amendment.**

This Court need not go beyond the plain text of the Second Amendment to find that the Ordinance passes constitutional muster. When evaluating the constitutionality of a firearms regulation, the court must first determine whether the regulation falls within the Second Amendment's text. *Bruen*, 142 S. Ct. at 2126. The Ordinance survives constitutional scrutiny under step one of the *Bruen* analysis for two distinct reasons. First, Plaintiff cannot demonstrate that these weapons facilitate armed self-defense so as to meet the definition of "arms" under the Second Amendment. *See Bruen*, 142 S. Ct. at 2132. Next, even if Plaintiff could credibly argue that the regulated weapons and LCMs facilitate self-defense, the record is replete with evidence demonstrating that the regulated weapons are so dangerous and unusual that they fall outside of the ambit of the Second Amendment's protection. We address each of these points in turn.

**1.** **The Weapons and Magazines Regulated by the Ordinance Are Not "Arms."[6]**

Assault Weapons and large capacity magazines are not "arms" as that term has been defined by the Supreme Court as they do not "facilitate armed self-defense." *Bruen*, 142 S. Ct. at6

---

[6] Defendants adopt and incorporate the arguments set forth in section I(B) of Defendant State of Illinois' response to Plaintiff's motion for preliminary injunction regarding large capacity magazines. See ECF No. 52.

2132 ("Thus, even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense."); *Cf. Caetano v. Massachusetts*, 577 U. S. 411, 411–412, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016) (per curiam). There is nothing "defensive" whatsoever about the weaponry regulated by the Ordinance. And while the Plaintiff claims that he *desires* to possess the regulated Assault Weapons and LCMs in pursuit of self-defense, Exhibit 7[7] at ¶5, 18, 37, 81, 123, 151, 170; the evidence in the record clearly shows that: i) these weapons were developed for use in military offensives; ii) these weapons are the ones most frequently used in armed offensive attacks resulting in mass casualties; and iii) these weapons are practically and legally unsuitable for use in self-defense under Illinois law.

### a. The Regulated Weaponry Shares Performance Characteristics with Weapons Developed for Military Offensives.

The performance capacity of the Assault Weapons and LCMs regulated by the Ordinance ensure that they do not fall within the ambit of the Second Amendment's protection. James Yurgealitis is a consultant and technical advisor in the field of firearms forensics and offered opinion testimony on behalf of Defendants. Exhibit 5[8] at p.1. Mr. Yurgealitis served as an ATF Special Agent and Program Manager for Forensic Services ATF National Laboratory Center, as an FBI Special Agent, and in various other high profile law enforcement roles with the Department of State. *Id.* Jon Donahue, a Professor of Law at Stanford University focused his opinion testimony on the efficacy of historical gun regulations on public safety. Exh. 4 at ¶¶ 3-5.

---

[7] Complaint, attached hereto as Exhibit 7 ("Exh. 7").
[8] Expert Report of James Yurgealitis, attached hereto as Exhibit 5 ("Exh. 5") at p. 16.

It was not until the mid-20th century that semiautomatic rifles became widely available. In 1957, the United States Army invited Armalite, a firearms manufacturer, to produce a lightweight, high-velocity rifle that could operate in both semiautomatic and fully automatic modes with firepower capable of penetrating a steel helmet or standard body armor at 500 yards. Exh. 4 at ¶¶ 44, 103. Eugene Stoner of Armalite devised the AR-15 to meet these specifications. *Id.* ¶ 103. In December of 1963 the Army adopted the AR-15 and rebranded it the "M-16" *Id.* at ¶ 106; Exh. 5 at p.13-14. The semiautomatic AR-15 rifle currently available to civilians retains the same performance characteristics in terms of muzzle velocity, range, and type of ammunition as does the M-16 and its variants. Exh. 5 at p. 13-16, 21; Exh. 12 at p. 2, 3; Exh. 4 at ¶ 107.

Mr. Yurgealitis testified concerning the historical development of semiautomatic Assault Rifles and the weapons' respective performance capacity as compared to military equipment and other handguns. Put simply, the weapons regulated under the Ordinance carry the same destructive capacity as those developed for use in war-time offensives by the United States Military. Exh. 5 at p. 11–15, 19, 21, 29. As illustrated by the table below, there is not a meaningful difference between the military-grade M-16 and the civilian AR-15.

| Weapon | Ammunition | Muzzle Velocity[9] | Effective Range[10] | Maximum Range[11] |
|--------|-----------|-------------------|--------------------|--------------------|
| M 16 | 5.56 mm/.223 caliber | 3,200 ft/sec | 550 M individual targets/800 M area targets | 3,000 M |
| AR 15 | 5.56 mm/.223 caliber | 3,200 ft/sec | 550 M individual targets/800 M area targets | 3,000 M |

The M-16 performing in semi-automatic mode (i.e., substantially identical to the AR-15) fires at a rate of 45-65 rounds per minute. Exh. 4 at ¶ 99; Exh. 5 at p.13,14, 30. The M-16 performing in automatic mode fires at a rate of 150-200 rounds per minute. Exh. 5 at p.30. A civilian AR-15 can be, and often is, easily converted into a fully automatic weapon with the acquisition of a conversion kit, giving it the same capabilities as the M-16. Exh. 4 at ¶ 107; Exh. 6; Exh. 8 at ¶ 12.

Broadly speaking, the Assault Weapons prohibited by the Ordinance are identical to military firearms except for the ability to fire on a fully automatic mode. Exh. 5 at p. 21. Of course, this shortcoming is easily remedied by converting a semiautomatic rifle such as a "civilian" AR-15 into a fully automatic weapon through bump stocks. Exh. 4 at ¶ 100. *See Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017) (semiautomatic rifles and large capacity magazines are sufficiently

---

[10] Exh. 5 at p. 30;
https://www.tecom.marines.mil/portals/120/docs/student%20materials/fmst%20manual/m16.doc
[11] Exh. 5 at p. 30;
https://www.tecom.marines.mil/portals/120/docs/student%20materials/fmst%20manual/m16.doc

analogous to fully automatic rifles that are most useful in military service and therefore do not receive Second Amendment protection); *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011) (*Heller II*) ("[I]t is difficult to draw meaningful distinctions between the AR-15 and the M-16.").

The Assault Weapons as defined by the Ordinance were developed for use in war or are direct descendants of weapons developed for use in wartime offensives. Exh. 5 at p. 11–15, 19, 29. As is more fully fleshed out in section I(B)(1), *infra*, this fact alone is significant enough for this Court to rely upon in upholding the regulation. *See District of Columbia v. Heller,* 554 U.S. 570, 627 (2008) (citing "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" such as "weapons that are most useful in military service--M-16 rifles and the like"); *Kolbe*, 849 F.3d at 136 n.10 ("We deem it prudent and appropriate to simply rely on the [Supreme] Court's clear pronouncement that there is no constitutional protection for weapons that are "like" "M-16 rifles" and "most useful in military service," without needlessly endeavoring to define the parameters of 'dangerous and unusual weapons.'") (citing *Heller,* 554 U.S. at 627); *see also People v. James*, 174 Cal. App. 4th 662, 676, 94 Cal. Rptr. 3d 576, 586 (2009) (semiautomatic rifles are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense, but rather are weapons of war; handguns are a class of arms that is overwhelmingly chosen by American society for the lawful purpose of self-defense); *People v. Brown*, 227 Cal. App. 4th 451, 173 Cal. Rptr. 3d 812 (2014). The military performance capability of the regulated Assault Weapons — which cannot be challenged by Plaintiff — is enough to determine that the Ordinance passes constitutional muster under *Heller* and *Bruen. See Heller,* 554 U.S. at 627; *Bruen,* 142 S. Ct. at 2126.

### b. Marketing Military Grade Weapons to Civilians.

After Armalite's patent on the AR-15 in the late 1970s, new competition in the semiautomatic rifle marketplace emerged and semiautomatic rifles became the subject of aggressive marketing. Exh. 5 at p.14,15. In the 1980s, gun manufacturers began branding military-style firearms with the label "assault" weapons to make them more marketable to civilians. Exh. 5 at p. 18–19; Exh. 3 at 8; Exh. 4 at ¶ 96. In the early 2000s, gun manufacturer immunity allowed a torrent of consumer advertising designed to highlight the battlefield appeal of modern Assault Weapons. Exh. 4 at ¶ 90. Gunmakers developed a set of marketing strategies linking these products to their origins in the military. Exhibit 14[12] at p. 22. The gun industry marketed Assault Weapons with depictions of combat and phrases like, "[t]he closest you can get without having to enlist," and "[f]orces of opposition, bow down." Exh. 4 at ¶ 91, 93.

These marketing efforts have fostered an environment of encouragement for those with violent tendencies. Shooters embrace these weapons to intimidate and "look cool." Exhibit 9[13] at p.4; *see also* Exh. 4 at ¶ 64. Mass shooters frequently express the view that Assault Weapons will make others realize they are powerful. Exh. 4 at ¶ 64. The marketing of these weapons as similar to those used in war appeals to the "military or police wannabe." Exh. 9 at p.4; *see also* Exh. 4 at ¶ 64. The mere presence of weapons increases aggressive thoughts and aggression in a phenomenon called "the weapons effect." Exhibit 16[14] at p. 12–13.

---

[12] Expert Declaration of Saul Cornell, attached hereto as Exhibit 14 ("Exh. 14").
[13] Expert Declaration of Phil Andrew, attached hereto as Exhibit 9 ("Exh. 9").
[14] Florida Department of Law Enforcement Investigative Summary, Case Number OR-27-0258, attached hereto as Exhibit 16 ("Exh. 16").

### c. Assault Weapons and LCMs Are Frequently Used for Domestic Terrorism.

The "purpose and best use" of Assault Weapons like those regulated by the Ordinance "is to kill with extreme speed and efficiency." Exhibit 8[15] at ¶ 18. This testimony was offered by Larry Snelling, Chief of the Bureau of Counter-Terrorism in the Chicago Police Department. Chief Snelling further opined that shooters using assault weapons do not need a high level of proficiency or training to inflict mass death and injury.  Exh. 8 at ¶ 12; Exh. 9 at ¶ 41.

Given the aggressive language used in the marketing of these weapons, it should come as no surprise then that the weapons and magazines regulated by Cook County are frequently used in faux-military-style ambushes and offensives by disgruntled American civilians against an unwitting and defenseless populace. "An [A]ssault [W]eapon transforms terrorists, criminals, deranged people, or disconnected teens with poor coping skills and an intent to kill into killing machines." Exh. 9 at ¶42. These weapons enabled American civilians to declare war on and terrorize their "opposition" (otherwise known as their neighbors), based upon hate related ideologies.  Exh. 4 at ¶¶ 83, 64, 91, 93, 100, 116; Exh. 9 at ¶¶ 37-39, ; Exh. 8 at ¶ 14–15, 17. Some shooters are less focused on the perceived wrongs of their targets, and are rather more obsessed with demonstrating their own power over others – causing American society as a whole to "bow down" to their indiscriminate rage as they slaughter innocent men, women and children with Assault Weapons (*inter alia,* Parkland, Florida, Aurora, Colorado; Columbine, Colorado; Newtown, Massachusetts, and Uvalde, Texas).  Exh. 4 at ¶¶ 83, 64, 91, 93, 100, 116; Exh. 14 at p.23; Exh. 9 at ¶¶ 37-40; Exh. 8 at ¶ 14–15, 17.

---

[15] Declaration of Chicago Police Department Chief Larry Snelling attached hereto as Exhibit 8 ("Exh. 8").

11

Assault Weapons like the AR-15 design are the weapon of choice in 85 percent of the deadliest mass shootings in the United States according to retired FBI Special Agent and public safety and crisis management specialist Phil Andrew, Exh. 9 at ¶ 37, and weapons equipped with LCMs are used disproportionately in mass shootings. Exh. 4 at ¶ 122. Over the past eight years, 97% of high-fatality mass shootings involved LCMs. Exh. 3 at 8-9. Over the past four years, 100% of high-fatality mass shootings in America involved the use of LCMs. *Id.*

Mr. Andrew opined that "[f]rom a public safety perspective, once an attack begins with an [A]ssault [W]eapon, it is already worst-case scenario." Exh. 9 at p. ¶ 24. "Death and severe injury is [*sic*] not avoidable." *Id.* "Law enforcement response, armed security, and concerned citizen response have proven to be slow for the few minutes that Assault Weapon attacks transpire and have low effectiveness in preventing death and injury in confrontations involving assault weapons." *Id.* at ¶ 53. "Attacks with [A]ssault [W]eapons result in death and injury even with on-duty and off-duty law enforcement, armed security, and lawfully armed citizens present or in immediate vicinity or response" *Id*. The danger and lethality of these attacks are only increased by the use of LCMs. *Id.* at ¶ 40. Since 1991, when LCMs are used in a high-fatality mass shooting but not in conjunction with an assault rifle, the average death toll is 9.2 fatalities. Exh. 3 at 14. When used in conjunction with an Assault Rifle, the average death toll increases to 14.0 fatalities. *Id.* LCMs are "force multipliers" and the increase in death toll from high-fatality mass shootings is in part due to the use of LCMs. *Id.* at 14, 19. However, Between September 1, 1990 and December 31, 2022, states that regulate Assault Rifles and LCMs experienced a 56% decrease in high-fatality mass shootings, a 62% decrease in high-fatality mass shootings involving the use of

an Assault Rifle and/or LCMs, and a 72% decrease in the rate of deaths from high-fatality mass shootings perpetrated with Assault Rifles and/or LCMs. Exh. 3 at 32.

The testimony of Defendants' law-enforcement experts is tragically illustrated by too many recent mass shootings to count. These include, but are by no means limited to, Las Vegas, 59 killed; Pulse Nightclub, 49 killed; Sandy Hook Elementary, 26 killed; Colorado movie theater, 12 killed; Buffalo, New York supermarket 10 killed; Uvalde, Texas elementary school, 21 killed; Sutherland Springs Baptist Church, 26 killed. Exh. 4 at ¶ 83, 116. Mr. Yurgealitis cited the foregoing mass shootings to support the opinion that "the Assault Weapons (in conjunction with high-capacity magazines) as defined under the Ordinance are capable of inflicting significant carnage upon civilians in a short period of time." Exh. 5 at 31-32.

The record overwhelmingly supports the conclusion that the use of the regulated weapons in the United States is not for self-defense. Dr. Christopher Colwell, Chief of Emergency Medicine at Zuckerberg San Francisco General Hospital and Trauma Center with over 30 years' experience in treating gunshot wounds, agrees. Exhibit 10[16] at 1, 3. Dr. Colwell's experience includes providing treatment for the victims of the Columbine HS mass shooting, the Aurora, Colorado Theater mass shooting, and San Francisco, California UPS mass shootings. Dr. Colwell testified that "[n]ot one of the injuries from [A]ssault [W]eapons that [he has] managed has come in the setting of self-defense." *Id.* at 3.

---

[16] Expert Declaration of Christopher Colwell, M.D., attached hereto as Exhibit 10 ("Exh. 10").

### d.  The Performance Capabilities of Assault Weapons Render Them Practically and Legally Unsuitable for Use in Self-Defense.

The Supreme Court has long held that handguns are the quintessential weapon to promote self-defense and that these arms fall squarely within the scope of protection afforded by the Second Amendment. *Bruen*, 142 S. Ct. at 2122 ("In [*Heller*, 554 U.S. 570 (2008)] and *McDonald v. Chicago*, [561 U.S. 742 (2010)], we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."). There is a strong foundation in law and fact to support this legal proposition. Although there are over 300 million firearms in the United States, victims of violent crimes do not defend themselves with any kind of firearm in 99.2% of attacks. Exh. 4 at ¶ 150. To the extent a victim of a potential crime wishes to defend themselves with a weapon, other firearms are more suitable. Exh. 5 at 28-29; Exh. 9 at ¶¶ 24-24. A pump action shotgun or an eight-shot revolver have stopping power, a low probability of over penetration, and greater ease of use. Exh. 5 at 28.

In contrast, the uniform testimony in this case establishes that Assault Weapons are an inferior weapon for self-defense. The experts have asserted both that Assault Weapons are more dangerous than handguns and that they do not offer an advantage for self-defense over handguns. Assault Weapons, whether rifles or handguns, are a poor choice for home defense or personal protection. Ex. 5 at 28. They were "not designed for" nor are they "particularly suitable for, home defense in short range close quarter situations." *Id.* at 29.

These witnesses offered several reasons that the comparative performance capacity of Assault Weapons renders them unsuitable for use in self-defense situations: (1) Assault Weapons and LCMs "facilitate excessive discharge of ammunition with a resultant risk to uninvolved individuals," Exh. 5 at 28; (2) "In a home defense capacity, AK and AR type rifles present a

14

problem of overpenetration of common household materials," *Id.*; (3) Home defense and/or retail robbery situations are rarely, if ever, lengthy shootouts with extensive exchanges of gunfire that would demand use of an LCM, *Id.*; (4) Most confrontations involve gunfire at close range, and most law enforcement agencies emphasize a 3–10-yard line of fire during their firearm training qualifications, Exh. 9 at ¶ 59; (5) The range of Assault Weapon fire renders it unsuitable for close range situations, Exh. 5 at 29; (6) LCMs increase kill potential because they allow a shooter to fire more bullets, at a higher rate, and inflict more injuries in a shorter period of time. Exh. 3 at 27.

Further, according to Chief Snelling, high capacity magazines are not needed for self-protection, as smaller magazines still contain enough bullets for a firearm to be used effectively for personal self-defense. Exh. 8, ¶ 8. All told, this means the rate at which bullets can be rapidly sprayed from the regulated Assault Weapons at a high velocity for an extensive range creates an unreasonable risk of harm to uninvolved and unintended third parties, including persons within the purported shooter's own household. *See Association of New Jersey Rifle & Pistol Clubs v. AG New Jersey*, 910 F.3d 106, 112 (3d Cir. 2018) (*overruled in part by Bruen*, 142 S. Ct. 2111) (explaining that large capacity magazines "are not necessary or appropriate for self-defense" and that their use in self-defense can result in "indiscriminate firing" and "severe adverse consequences for innocent bystanders"). In fact, LCMs make it more difficult for victims or bystanders to defend themselves and reduce the opportunities they may have to disarm a gunman, escape, or call for help. Exh. 4 at ¶ 139-141. In many major mass shootings victims have tackled or subdued the shooter while he is reloading, including the 2011 shooting in Tucson, Arizona that targeted Congresswoman Gabby Giffords, the 2018 Waffle House shooting where a customer hid behind a

swinging door and burst out at the moment of opportunity, and at Sandy Hook Elementary where 9 children were able to escape while the shooter reloaded a 30-round LCM. *Id*.

> ### e. Assault Weapons Deploy More Force Than is Necessary and Therefore Their Use Falls Outside of the Legal Parameters of Self-Defense Under Illinois Law.

Plaintiff conflates a factual desire to possess a specific weapon for self-defense with a legal determination that the same weapon facilitates armed self-defense. See., e.g., ECF No. 5 at 9. Regardless of Plaintiff's desire, there is significant evidence that the weapons sought cannot be safely or effectively viable for use in that context, and their use for self-defense in Illinois is likely to be unlawful.

Illinois case law does not readily accept a claim of self-defense when the defendant "provokes the incident, *uses force greater than necessary to ward off the imminent danger*, or uses force when he could have avoided the situation." *Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554, at *34 (N.D. Ill. Mar. 19, 1993) (Pallmeyer, J.) (emphasis added). A [person] may raise a claim of self-defense to a criminal charge only when he or she presents evidence: "(1) that force had been threatened against his or her person; (2) that the individual asserting self-defense was not the aggressor; (3) that the danger of harm was imminent; (4) that the force threatened was unlawful; (5) that the individual actually believed that a danger existed, that the use of force was necessary to avert the danger, ***and that the kind and amount of force actually used was necessary***; and (6) that the individual claiming self-defense beliefs were reasonable." *People v. Morgan*, 187 Ill. 2d 500, 719 N.E.2d 681, 700, 241 Ill. Dec. 552 (Ill. 1999), *citing People v. Jeffries*, 164 Ill. 2d 104, 646 N.E.2d 587, 598, 207 Ill. Dec. 21 (Ill. 1995) (emphasis added); *see also United States ex rel. Guirsch v. Battaglia*, No. 05 C 2696, 2007 U.S. Dist. LEXIS 93838, at *17 (N.D. Ill. Dec. 20, 2007); *People v. Horton*, 2021 IL App (1st) 180551, ¶ 46, 455 Ill. Dec.

881, 890, 192 N.E.3d 710, 719. These standards apply to claims of self-defense under both statutory sections which address the use of force in self-defense. *See* 720 ILCS 5/7-1[17]; 720 ILCS 5/7-2.[18]

Given the performance capacity of the regulated Assault Weapons, Plaintiff here cannot make a showing that the kind and amount of force discharged by an Assault Weapon would qualify as self-defense under Illinois law. *See Morgan*, 187 Ill. 2d 500, (Ill. 1999), *citing Jeffries*, 164 Ill. 2d 104 (Ill. 1995). If a person responds with such excessive force that he or she is no longer acting in self-defense but in retaliation, that person may no longer claim self-defense; a non-aggressor has a duty not to become the aggressor. *People v. Nunn*, 184 Ill. App. 3d 253, 133 Ill. Dec. 345, 541 N.E.2d 182, 1989 Ill. App. LEXIS 235 (Ill. App. Ct. 1st Dist. 1989), cert. denied, 497 U.S. 1027, 110 S. Ct. 3277, 111 L. Ed. 2d 787, 1990 U.S. LEXIS 3490 (U.S. 1990). *People v. Murillo* 225 Ill. App. 3d 286, 293 (Excessive force is no longer self-defense under Illinois law.)

A comparison[19] of the performance capacity of a semiautomatic handgun to an Assault Weapon regulated by the Ordinance illustrates that the firepower associated with the Assault Weapon is far greater than a semi-automatic handgun, (the generally accepted gold standard of self-defensive firearms):

---

[17] Force likely to cause death or great bodily harm, in particular, may be justified "only if [the person] reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony." 720 ILCS 5/7-2.

[18] Deadly force may be used to defend a dwelling when entry is made or attempted in a violent, riotous, or tumultuous manner, and a person reasonably believes that the force is necessary to prevent an assault upon himself or another then in the dwelling or the commission of a felony in the dwelling. See 720 ILCS 5/7-2.

[19] Table reproduced from Exh. 5 at Exh. D.

| Weapon | Ammunition | Kinetic Energy | Muzzle Velocity | Effective Range | Semiautomatic Cyclic Rate |
|---|---|---|---|---|---|
| M-16 / AR-15 Rifle | .223 / 5.56mm | 1220-1350 foot pounds | 2800-3100 feet per second | 602-875 yards | 300 rounds per minute |
| AK-47 / AK 74 Rifle | 7.62x39mm | 1450-1650 foot pounds | 2300-2600 feet per second | 550-800 yards | 300 rounds per minute |
| FN-FAL Rifle | 7.62x51mm | 2350-2550 foot pounds | 2800-3000 feet per second | 575-800 yards | 300 rounds per minute |
| Glock Model 17 Pistol | 9x19mm | 355-500 foot pounds | 1100-1300 feet per second | 50 yards maximum | 300-400 rounds per minute |
| Colt M1911 Pistol | .45 ACP | 350-375 foot pounds | 775-850 feet per second | 50 yards maximum | 300-400 rounds per minute |
| Walther PPK Pistol | .380/ 9mm Kurz | 300-500 foot pounds | 900-1100 feet per second | 50 yards maximum | 300-400 rounds per minute |

Dr. Martin Schreiber is a Colonel in the U.S. Army Reserve and the Chief of the Division of Trauma, Critical Care, & Acute Care Surgery, a Professor of Surgery, and the trauma medical director at Oregon Health & Science University. Exhibit 12[20] at 1. He served two tours of duty in Afghanistan and one in Iraq caring for combat injuries. *Id.* As Dr. Schreiber explains, the killing capacity of a weapon is primarily determined by the kinetic energy imparted by the bullet, its effective range, and the rate at which the weapon fires projectiles. *Id*. at 2–3. The critical area of focus for the purposes of this discussion is muzzle velocity as well as the effective range.

---

[20] Expert Declaration of Martin A. Schreiber, M.D., attached hereto as Exhibit 12 ("Exh." 12).

18

The residents of Cook County are concentrated at a population density of 5,583 people per square mile. *United States Census Bureau, QuickFacts Chicago city, Illinois*, https://www.census.gov/quickfacts/fact/table/chicagocityillinois,US/PST045221. (last visited March 3, 2023). In the City of Chicago, the largest metropolitan area in Cook County, the population density is even greater at 12,059.8 people per square mile. *Id*. Given the muzzle velocity and effective range of the regulated Assault Weapons, ammunition fired from them travels easily through objects, such as most bullet proof vests, walls, vehicles, and the human body. Exh. 8 at ¶¶13–15, 21; Exh. 5 at 17; Exhibit 11[21] at ¶ 10; Exh. 12 at 3; Exh. 4 at ¶ 83. The muzzle velocity coupled with the population density creates an incredibly dangerous situation within Cook County. "Because [A]ssault [W]eapons allow a shooter to hit within a larger area and at a higher velocity, many victims of [A]ssault [W]eapons are not the intended targets but innocent bystanders" "shot…through barriers such as cars or building walls." Exh. 8 at ¶¶14–15. Victims, intended and unintended, can be killed by shots fired through solid barriers. *Id.* To wit: John Donohue testified about the details of a 2017 shooting at the Sutherland Springs Baptist Church noting that a lone gunman killed 26 people by standing *outside of the church* and shooting an AR-15 254 times *through the walls and into the building*. Exh. 4 at ¶ 83. (emphasis added).

Reduced to a fine point, firing a weapon that has the capacity to pierce body armor at 500 yards, *see* Exh. 4 at ¶¶ 103, 108, 44, within densely populated Cook County, *see United States Census Bureau, QuickFacts Chicago city, Illinois*, https://www.census.gov/quickfacts/fact/table/chicagocityillinois,US/PST045221 (last visited March 3, 2023), is excessive force, and not self-defense. *See, e.g., Murillo* 225 Ill. App. 3d at 293.

---

[21] Declaration of Stephen W. Hargarten, M.D., attached hereto as Exhibit 11 ("Exh. 11").

This is particularly true when there is an alternative kind of force available in the form of a handgun, Exh. 12 at 2, with one-tenth of the range of an Assault Weapon, Exh. 5 at 30. *Cf. Murillo* 225 Ill. App. 3d at 293. The force involved when an assault weapon is used is only made more excessive when more shots can be fired due to the use of an LCM. When most self-defense shootings occur with 3 yards, the firing of more than 10 rounds is likely to be unnecessary. Exh. 4 at 63.

Discharging a firearm and endangering a third party not only removes the availability of a claim of self-defense, but it also gives rise to a separate criminal charge under Illinois law. *See, e.g.,* 720 ILCS 5/24-1-1.5 Reckless Discharge of a Firearm. "A person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." *Id.* Similarly, a person can be charged with aggravated discharge of a firearm when he or she "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." 720 ILCS 5/24-1.2

Law enforcement agencies therefore emphasize with their training a 3–10-yard line of fire, or 9 to 30 feet, for the safe defensive discharge of a gun. Exh. 9 at ¶ 59. This range ensures that the weapon is discharged in a manner to avoid unintended casualties downrange. Given the effective range of the Assault Weapons when compared to the population density of Cook County, there are few, if any, places where one could safely discharge an Assault Weapon without knowingly or unknowingly endangering the bodily safety of a third party.

Considering the foregoing, the Assault Weapons regulated by Cook County plainly fall outside of the plain text of the Second Amendment under *Bruen*, and Plaintiff cannot meet his

20

burden to show otherwise. Therefore, the Ordinance withstands constitutional scrutiny and should be upheld.

      **2.**    **The Weapons Regulated by the Ordinance Are So Dangerous and Unusual That They Fall Outside of the Scope of the Second Amendment's Protection.**

*Heller* drew a distinction between arms that are protected under the Second Amendment because they are in common use for a lawful purpose, and weapons that are subject to regulation because they are dangerous and unusual.  And because, as we explain above, Plaintiff bears the burden of proof to show that a regulated weapon is an "arm" subject to constitutional protection, he bears the burden of demonstrating that the weapon is not considered dangerous and unusual. *See Bruen*, 142 S. Ct. at 2129–2130.  Here, once again, he will not be able to meet that burden, and will not be able to produce sufficient evidence that these weapons and magazines are not dangerous and unusual. Absent such evidence, his claims fail as a matter of law because the weapons and accessories he desires to purchase are not "arms" protected by the Second Amendment.  Even were the burden of proof reversed, the result would be the same because the County has and can muster overwhelming evidence that Assault Weapons are properly considered dangerous and unusual.

Far from being commonly used for lawful purposes, Assault Weapons fall outside the protection of the Second Amendment. The rights protected by the Second Amendment "are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–635.  But *Heller* also makes clear that the Second Amendment was not meant to protect a right to keep and carry any weapon whatsoever. *Id.* at 627; *accord id.* at 622–623 ("[T]he Second Amendment right, whatever its nature, extends only to certain types of weapons."); *U.S.*

*v. Miller*, 307 U.S. 174, 179 (1939). Rather, the only arms protected under the Second Amendment are weapons "'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624-625; *accord id.* at 627 (quoting *Miller*, 307 U.S. at 179); *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015); *Wilson v. Cook County*, 937 F.3d 1028, 1030 (7th Cir. 2019); *Heller II* , 670 F.3d at 1260 (*Heller* "recognized yet another limitation on the right to keep and carry arms, namely that the sorts of weapons protected are those in common use at the time for lawful purposes like self-defense") (cleaned up); *Kolbe*, 849 F.3d at 136–137.

This understanding of the term "arms" comports with the Founding-era conception of the militia as a "body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Heller*, 554 U.S. at 624; *accord Miller*, 307 U.S. at 179; *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring); *Friedman*, 784 F.3d at 408. The types of weapons a citizen was understood to possess at home at the time of the founding did not include weapons specifically developed for military use, such as those regulated by the Ordinance. *Heller*, 554 U.S. at 624–625 (quoting *State v. Kessler*, 614 P.2d 94, 98 (1980)).

As *Heller* makes clear, the preliminary inquiry whether a weapon is an "arm" for purposes of the Second Amendment — whether it is commonly used for a lawful purpose — bears a direct relation to the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. In *Heller*'s view, the "historical tradition" of regulating dangerous and unusual weapons supported the notion that the Second Amendment's protections are limited to weapons in common use for lawful purposes *Id*. In other words, if a weapon is dangerous and unusual it cannot be considered in common use for lawful purposes and vice versa. *See Caetan*o,

22

577 U.S at 418 (Alito, J. concurring) (*Heller* "contrast[ed] 'dangerous and unusual weapons' that may be banned with protected 'weapons…in common use at the time'"); *see also Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016).

### a. Legal Interpretation of "Dangerous and Unusual."

The *Heller* Court did not attempt to define "dangerous and unusual." A weapon is not unusual simply because it is modern. *Caetano*, 577 U.S. at 411. A weapon does not elude categorization as dangerous and unusual simply because it is used in the military. *See Heller*, 554 U.S at 624 (concluding that it would be a "startling" reading of *Miller* to say all weapons useful in warfare are protected, because that would mean machine guns could be protected); *Caetano*, 577 U.S. at 418 (Alito, J. concurring). To determine whether a weapon is dangerous and unusual, the court should consider factors like whether the weapons have features that make them particularly deadly or harmful compared to other firearms, whether the weapons have an unusually apt application to illegal activity, and whether the weapons pose a unique threat. *See Friedman,* 784 F.3d at 409–410 (comparing the ammunition and shot pattern of handguns and Assault Weapons*); Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (the court considers whether a weapon has "uniquely dangerous propensities"); *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010) (a weapon may be dangerous and unusual because its features "foster its use in illicit activity" or lend it a "heightened capability to cause damage"); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (considering a machine gun's ability to kill dozens of people within a matter of seconds). Here, while the development of Assault Weapons for tactical military purposes is enough to establish that they are dangerous and unusual, their dangerous and unusual nature is further established by (1) their regular use in mass shootings; (2) the unusual patterns of mimicry

23

tied to mass shootings utilizing assault weapons; (3) their unusual lethality; (4) the unusual injuries caused by the projectiles fired at such a high velocity; (5) their psychological effect on society at large; (6) the unusual risk posed to law enforcement by these weapons and the crises caused by efforts to police them; and (7) their profound chilling effects on other constitutional rights. The record will provide ample evidence to illustrate how each of these qualities classify Assault Weapons and LCMs as dangerous and unusual.

### b.  The Assault Weapons Regulated by the Ordinance are Unreasonably Dangerous.

Cook County hereby adopts the arguments raised in Section IA1(a)-(e), *supra*, as if fully set forth herein concerning the dangerous lethality of Assault Weapons.

### c.  Weapons Not in Common Use for a Lawful Purpose are "Unusual" and May Be Regulated.

The phrase "commonly used for a lawful purpose" requires unpacking. Neither the Supreme Court nor the Seventh Circuit have defined "common" in this context. *Friedman*, 784 F.3d at 409 ("what line separates common from uncommon ownership is something [*Heller*] did not say."). Something is ordinarily understood to be "common" if it is "widespread" or "prevalent," "occur[s] frequently or habitually," or is "most widely known." WEBSTER'S II NEW COLLEGE DICTIONARY 226 (2001) (internal capitalization omitted).

Moreover, *Heller*'s express focus on "use" demonstrates that mere commonness of *ownership* of a particular weapon is not a relevant inquiry, only the regularity with which that weapon is *commonly used* for a lawful purpose. *Heller*, 554 U.S. at 624. And while all lawful uses of a particular weapon may be considered when assessing the commonness of its lawful use, the commonness of a weapon's use for self-defense bears the most weight in the analysis, because the

24

right to self-defense is the core lawful purpose protected by the Second Amendment. *See Heller*, 554 U.S. at 630; *see also Friedman*, 784 F.3d at 411 (unlike handgun ban in *Heller*, Highland Park's Assault Weapon regulation leaves residents with many self-defense options).

At the other end of the spectrum, receiving little if any weight at all, is the commonness of a weapon's purely military use – this is demonstrated by *Heller* itself, which recognized that bans on fully automatic machine guns are presumptively constitutional, 554 U.S. at 624-625; *Oregon Firearms Federation*, 2022 U.S. Dist. LEXIS 219391 at *27, n. 13, despite the fact that such weapons are commonly used by the military, *Friedman*, 784 F.3d at 408; *see Kolbe*, 849 F.3d at 136 (recognizing that "weapons most useful for military service" are "outside the ambit of the Second Amendment"). Also at this end of the spectrum are uses of a weapon relating solely to proficiency with that weapon, such as target practice or sport shooting. While both of these training activities are undoubtedly lawful pursuits, and literal "uses" of a gun, they are properly understood as subsidiary to whatever lawful purpose they seek to advance – to say otherwise would have the absurd implication that the mere act of training how to fire a weapon used solely or overwhelmingly for unlawful purposes (such as sawed-off shotguns or silenced weapons) makes it harder for the government to regulate that weapon.

> i. The Regulated Weapons are Not Commonly Used for a Lawful Purpose.[22]

Under the above analytical framework, plaintiff will fail to show that Assault Weapons and LCMs are commonly used for lawful purposes such as self-defense. Despite bearing the burden

---

[22] Defendants adopt and incorporate the arguments set forth in section I(B) of Defendant State of Illinois' response to Plaintiff's motion for preliminary injunction regarding large capacity magazines. See ECF No. 52.

of proof on this preliminary issue, Plaintiff has identified no evidence indicating that he can show owners of Assault Weapons commonly use them for lawful purposes such as self-defense or hunting. This lack of evidence is unsurprising. Ownership of Assault Weapons is far from common – the vast majority of Americans do not own a firearm at all, let alone an Assault Weapon. Exh. 14 at 21. Of those who do own a firearm, many do not possess weapons equipped with an LCM. Exh. 4 at ¶ 28. Assault rifles made up approximately 5.3% of all firearms in circulation in American society, apparently including assault rifles owned by law enforcement agencies in the United States and not by private citizens. Exh. 3 at 11. No reasonable person would say that an entire category of weapons comprising such a negligible percentage of all guns is "common," and even that small number likely overrepresents the number of *people* who own Assault Weapons, which are not distributed evenly among the population or even among gun owners. Exh. 4 at ¶ 92.

While the commonness of possession of Assault Weapons is constitutionally irrelevant because the inquiry focuses on use rather than ownership, the rarity of Assault Weapons is reflective of the infrequency of their use for self-defense. Although there are over 300 million firearms in the United States, victims of violent crimes do not use *any* firearms to defend themselves 99.2% of the time. Exh. 4 at ¶ 150. And as to the remaining 0.8% of incidents in which a firearm *is* used for self-defense, the likelihood that the victim used an Assault Rifle to defend himself is vanishingly small because, again, only 5.3% of all firearms in this country are Assault Weapons. And, in all likelihood, even those few individuals who own Assault Weapons are unlikely to use those weapons for self-defense for the simple reason that other weapons, such as handguns, are more suitable for personal defense. Exh. 9 at ¶ 59; Exh. 5 at 28–29.

26

ii.  Practical Considerations Rendering Assault Weapons
Dangerously Unusual.

There exists an abundance of evidence in the record upon which this court may conclude

that the regulated Assault Weapons are unusual as compared to other protected forms of self-

defense.

1.  The Psychological Influence on Potential Mass Shooters.

First, these weapons have a negative demonstrated psychological effect on potential mass

shooters.  The mere presence of an Assault Weapon can make an individual more violent. Exhibit

13[23] at 12–13.  In the context of mass shootings, researchers have documented a pattern of mimicry

– many mass shooters conform to expectations of what mass shooters do – including attacking the

unsuspecting while using semiautomatic rifles. *Id*. at 13.

2.  Assault Weapons Cause Unusual Wounds to the Body.

Assault Weapons also prove to be unusual when looking at their effect on the human body.

In determining whether a weapon is dangerous and unusual and therefore outside the protection of

the Second Amendment, the relevant question is how deadly a single weapon of one kind is

compared with a single weapon of a different kind. To answer this question, one need only refer

to the successful military commission of semiautomatic rifles and the experiences of those who

treat people shot with semiautomatic rifles.

Dr. Christopher Colwell has treated over 1,000 gunshot wounds in his career, including

those of victims of several mass shootings. He testified that injuries caused by Assault Weapons

and events in which such weapons are used are consistently more serious than those caused by

non-Assault Weapons and that victims of Assault Weapons are at greater risk for immediate and

---

[23] Declaration of Jillian Peterson, attached hereto as Exhibit 13 ("Exh. 13").

long-term complications from both damages caused by the velocity of the bullets and the number of wounds involved. Exh. 10 at 2, 3. This is due to the unique characteristics of Assault Weapons, particularly the velocity of the projectile fired and the outlay of energy. Exh. 12 at 2, 3; Exh. 5 at 16; Exh. 11 at ¶¶ 11–13.

The ammunition often used in civilian AR-15s, the 5.56mm/.223 caliber cartridge, was adopted by the U.S. military for use in its Assault Weapons specifically because of its light weight and ability to deliver reliable lethality. Exh. 5 at 15. The extra-lethal characteristics of this type of ammunition were immediately evident. Indeed, the temporary cavity created in the human body by the 5.56mm caliber cartridge is over three times the size of the temporary cavity created by the .45 caliber bullet from the Thompson Machine gun. Exh. 11 at ¶¶ 11,12. The LCMs often used with Assault Weapons cause victims of shootings to have more of these horrendous wounds, reducing the victims' capacity to defend themselves, and cause more victims being shot overall. Exh. 4 at ¶ 67.

Dr. Stephen Hargarten, an emergency medical specialist who has practiced for over 35 years, researched wound ballistics with the Wisconsin Crime Lab, shooting AR-15 style rifles, a hunting rifle, a Thompson Machine gun, and a pistol at a gelatin standardized muscle tissue simulator. Exh. 11 at at ¶¶ 1, 8–12. When a bullet hits a human body, a permanent cavity is created by the mass of the bullet crushing and tearing through tissue; a temporary cavity is created by the dispersion of kinetic energy radially from the permanent cavity path. *Id*. at 10; Exh. 12 at 2. Dr. Hargarten and the researchers found that the energy release of the 5.56mm/.223 caliber bullet, and the temporary cavity created, are both over three times the size of the .45 caliber bullet's temporary cavity from the fully automatic Thompson Machine gun. Exh. 11 at ¶¶ 11, 12. In addition, the

5.56mm/.223 caliber ammunition used in semiautomatic rifles experiences "yaw" when it hits human tissue, meaning it begins to revolve, creating a larger temporary cavity, whereas handgun bullets do not typically experience yaw. Exh. 5 at 16–17. The yaw effect of Assault Rifle ammunition can also cause the bullet to fragment upon striking human bone, which contributes to additional tissue damage beyond the original path of the bullet. Exh. 5 at 16.

The significant difference in energy transfer and temporary cavity has direct implications for injury and death. Exh. 11 at ¶ 13. Assault Weapons lead to higher fatalities and more serious injuries than handguns. Exh. 10 at 1. Handgun injuries produce less harm to the human body and are generally survivable unless the bullet penetrates a critical organ or major blood vessel. Exh. 12 at 2.

Dr. Martin Schreiber, (Col.), testified that he cared for countless casualties during his tours of military service. In his experience, if a handgun injury requires surgery, typically only one surgery is needed. *Id*. Conversely, patients with Assault Rifle injuries frequently have multiple organs injured as well as major blood vessels. *Id*. They often require massive blood transfusions due to tremendous blood loss and require a series of operations. *Id*. When patients with Assault Rifle injuries survive, they require prolonged hospitalizations and follow-up treatment and suffer much greater disability for the rest of their shortened lives. *Id*.

In addition to the extreme damage caused to tissue, Dr. Hargarten testified that bullets from semiautomatic AR-15 style rifles are more likely to fracture bones simply due to their higher energy release. Exh. 11 at ¶ 14. Assault Rifle blasts to the extremities frequently result in amputations, even where an injury to the same body part caused by a handgun would be treatable. Exh. 10 at 3. Assault Weapon injuries are particularly dangerous in children given their smaller

29

torso and lower blood reserve when compared to teenagers or adults, leading to extremely high mortality rates for young patients. Exh. 11 at ¶ 15. The physical impact of ammunition shot from an Assault Weapon on human tissue is vastly different than the impact from a handgun and leads to greater fatality and injury. Exh. 5 at 16, 17; Exh. 11 at ¶¶ 14–15; Exh. 12 at 2; Exh. 10 at 3. As a result, semiautomatic rifles pose a greater danger to the general public as the injuries caused are far more severe, require complex care, and are less likely to be successfully treated. Assault Weapons also have a unique ability to quickly overwhelm and overburden social institutions, as demonstrated by the manner in which those institutions address incidents involving such weapons. A mass shooting can easily inundate area hospitals diverting resources and personnel away from other patients in need. Exh. 10 at 2–3; Exh. 12 at 3.

3. The Unusually Broad Harmful Social Impact of Mass Shootings Involving Assault Weapons.

Beyond the physical dangers, Assault Weapons also pose greater risk of psychological damage to victims, bystanders, and society as a whole. Exh. 4 at ¶¶ 50, 58–60, 62, 63, 64, 44; Exh. 13 at 14–15; Exh. 5 at 32; Exh. 9 at ¶¶ 22, 43-45; Exh. 16 at 13, 24; Exhibit 15[24] at 8–13; Exh. 8 at ¶¶ 12, 14–15, 17–28. Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety. Exh. 4 at ℙ 61. The events lead to significant increases in rates of post-traumatic stress disorder amongst both witnesses and community members who did not witness the event first-hand. *Id.* at ℙℙ 61-62. One study found that as many as 95% of mass shooting survivors develop PTSD in its aftermath. *Id.* at ¶ 61. The possibility of being involved in a mass shooting has become a source of stress and fear in many

---

[24] Declaration of Diana Palmer, attached hereto as Exhibit 15 ("Exh. 15").

adults and young people. Exh. 13 at 15. This generalized fear is particular to Assault Weapons, and not handguns, as Assault Weapons are used in nearly all the highly publicized mass shootings in recent years, including Sandy Hook Elementary; Aurora, Colorado; Orlando, Florida; Las Vegas, Nevada; Sutherland Springs, Texas; Parkland, Florida; Buffalo, New York; and Uvalde, Texas. Exh. 4 at ¶ 58.

### 4. The Use of Assault Weapons Creates Unusual Crises Impacting Law Enforcement.

Chief Snelling testified that Assault Weapons add complexities for law enforcement. He is responsible for over twenty units, including the Intelligence Section, Special Weapons and Tactics (SWAT), Firearms Investigation Team, Canine Unit, Public Transportation Unit, Airport Operations, Marine Operations Unit, Mounted Unit, Gang Investigations Unit, and Bomb Squad of CPD. Exh. 8 at ¶¶ 1-3, 6. There are more than 1,000 sworn staff under his supervision, and he serves as the Incident Commander for all major events in Chicago, including protests, festivals, concerts, etc. *Id.* at ¶ 6. While his duties are myriad, they include ensuring that CPD assists the FBI and other law enforcement agencies in defending against international and domestic terrorism. *Id.* at ¶ 8. He testified that he has decades of professional experience with firearms, including Assault Weapons. *Id.*

Over the past several years, Chief Snelling testified that he witnessed a significant increase in the use of Assault Weapons, particularly by those involved in organized crime. Exh. 8 at ¶¶ 11, 17. Assault Weapons are brandished and used by these groups to intimidate others and inflict events of mass casualty. *Id.* at ¶¶ 17, 24. According to Chief Snelling, "Assault [Weapons] are the weapon of choice for mass shootings in public spaces. Designed as killing machines, they allow a person to kill or injure as many people as possible in a short time." *Id.* at ¶ 24. "CPD has thus

adjusted its large event and domestic terrorism preparations to address assault weapons and mass shootings." *Id.* These adjustments require extensive time and resources in an effort to "secure public events" and ensure "the general safety of the public." *Id.* at ¶ 25. Chief Snelling expects that if Chicago's ordinances were enjoined, even temporarily, the number of assault weapons and high capacity magazines in the City would significantly increase, particularly among persons who would use them to commit crimes. *Id.* at ¶ 31. And as Chief Snelling noted, '[n]o matter how prepared or well-equipped CPD is, it is virtually impossible to guarantee a mass shooting with an assault weapon(s) will be stopped." *Id.* at ¶ 28.

Assault Weapon attacks not only are powerful enough to kill scores of people, but they also inflict destruction on the areas around them and require police to do the same. Phil Andrew testified that in order to counteract Assault Weapon attacks, law enforcement increasingly requires tactics such as charging structures with armored vehicles, use of explosives, robots, and drones with explosives. Exh. 9 at ¶ 54. During the mass shooting at Pulse Nightclub in Orlando, for example, officers had to use an armed personnel carrier (BearCat) to breach the wall after learning the solitary shooter had an Assault Rifle. Exh. 16 at 13, 24. This was the response needed to address a single shooter armed with an Assault Rifle. *Id.*

In addition to the threats posed to the general public, Assault Weapons pose a significant threat to law enforcement officers themselves. Standard police protective equipment has minimal effects on ammunition fired by an Assault Weapon. Exh. 8 at ¶¶ 13-14, 20-21. Assault Weapons are capable of discharging ammunition at such a velocity that it will pierce all standard issue body armor approved for use by officers in the Chicago Police Department. *Id.* at ¶¶ 13-14, 21. While there is more highly protective equipment available for special use, it is too expensive, bulky, and

32

heavy to be worn for everyday policing. *Id.* at ¶¶ 22-23. Chief Snelling testified that wearing highly protective equipment may make officers appear more like members of an occupying military preparing for war rather than persons who wish to protect and serve, thus hindering their ability to de-escalate situations. *Id.* at ¶23. Even if an officer is wearing highly protective equipment, a shot from an Assault Weapon can still inflict significant trauma due to the velocity of the ammunition. *Id.* at ¶ 22. Most CPD officers are not equipped with an Assault Weapon themselves; therefore, CPD officers first responding to an active shooter incident involving an assault weapon will have weaker firepower than the suspected assailant(s). *Id.* at ¶ 20. Moreover, according to Chief Snelling, the increased prevalence of Assault Weapons only furthers the perception that being a police officer is less safe today than in earlier years which hurts CPD's recruiting ability. *Id.* at ¶28.

Police departments must allocate significant time and resources to plan for Assault Weapons and mass shootings in connection with domestic terrorism as well as large events. Exh. 8 at ¶¶ 24-27. The use of specialized equipment and widespread action plans is simply not required to counter handgun violence. Assault Weapons pose a greater danger to a community as a whole and to the social institutions most often involved.

5. The Threat of Assault Weapons Has a Chilling Effect on Other Constitutionally Protected Activities.

Finally, the threat of Assault Weapons and mass shootings also has a unique chilling effect on how people live their lives and express themselves. Beyond the impact on mental health and the generalized fear and anxiety caused by Assault Weapons, people are increasingly afraid to exercise their right to free speech and protest. Exh. 15 at 8-13. According to research, the prospect of individuals carrying firearms at a protest makes other individuals less likely to vocalize their

33

views than they would if no firearms were present. *Id.* Similarly, instructors on campus have described armed students as having a chilling effect on speech based on the instructors' perceived threat of aggression. *Id.* at 9. This chilling effect on free speech and protest activity is a direct result of the mass shooting-plagued era we inhabit, of which Assault Weapons are the main driver. Exh. 3, at 8-10; Exh. 13 at 8, 11.

Furthermore, everyday citizens are asked to voluntarily forgo constitutionally protected activities such as free association to aid the overburdened Chicago Police Department when managing large scale events. Exh. 8 at ⁋ 26. It is sobering to consider that Chicago requests (and Chicago citizens agree) to keep all rooftop decks clear and empty during large public gatherings downtown. And the alarming reason for this invitation and courtesy – so that CPD can assume that anyone occupying the rooftop is a potential shooter and more quickly address the threat. *Id.* at ⁋⁋ 26-27. If assault weapons became even more prevalent in the population, CPD would have to engage in efforts like this, which require a great deal of planning, much more often, thus depleting the resources available for other activities including routine policing in neighborhoods. *Id.* at ⁋ 25.

There is overwhelming evidence that these weapons are used in mass shootings, do not facilitate self-defense, and are so dangerous and unusual that there is simply no protection afforded to them under a plain reading of the text of the Second Amendment. For each of the forgoing reasons, Cook County asks this court to enter judgment in its favor and against the Plaintiff.

**C.** ***Bruen Step 2:*** **The Ordinance is consistent with the Nation's historical tradition of firearm regulation.**

Even assuming for sake of argument that the Ordinance regulates weapons that fall within the text of the Second Amendment, it still survives constitutional scrutiny under *Bruen*'s second step because it is clearly consistent with this nation's historical tradition of firearm regulation.

*Bruen* does not impose "a regulatory straightjacket" requiring the government to identify a "historical *twin*" to the regulation in question. *Bruen*, 142 S. Ct. at 2133. Rather, *Bruen* suggests "a more nuanced approach" when regulations "implicat[e] unprecedented societal concern or dramatic technological changes." *Id.* at 2132.

Given the stark technological divide between modern rapid-fire Assault Weapons and the muzzle-loading, single-shot weapons that existed at the time of the founding, there are simply no historical firearms that posed a public threat anywhere near to that of modern Assault Weapons and LCMs – namely, the epidemic of lone gunmen using those weapons to inflict mass casualties in a short period of time. At the time of the founding, the guns most Americans owned were single-shot muzzle-loading weapons most useful for hunting and farming, and such weapons were not effective tools of interpersonal violence. Exh. 14 at 8. They could not even be kept loaded because the gunpowder available was corrosive and attracted moisture. *Id.* As a result, there was no substantial gun homicide problem at the time of the founding. *Id.* at 7. Levels of gun violence were low amongst the population, both because small and homogenous rural communities did not lend themselves to gun violence, and because of the practical limitations of types of weapons in common use. *Id.* at 7-8. Gun violence did not begin to emerge as a problem in America until the early 1900s, decades after the Fourteenth Amendment's ratification in 1868. *Id.* at 19.

Modern Assault Rifles, by contrast, do not require manual reloading – they automatically load the next cartridge, and may also feature a detachable and/or extended magazine (i.e., LCMs). Exh. 5 at 8-10, 22, 24-25. Together these features increase the lethality of modern Assault Rifles by allowing the shooter to fire more shots, faster and farther than their predecessors. *Id.* at 16, 22-26; Exh. 10 at 2-3; Exh. 12 at 2-3. These weapons and accessories also increase the killing efficacy

35

of amateur shooters at both close and long ranges because they fire rapidly and accurately, and the ammunition fired by modern Assault Rifles is uniquely lethal. Exh. 5 at 15-16; Exh. 8 at ⁋ 12; Exh. 9 at ¶ 33. The smaller size and yaw of a 5.56/.223 cartridge (commonly marketed for civilian use) leaves a horrendous wound channel inside a human body. Exh. 5 at 16, 30-21. The cartridge creates both a permanent cavity the size of the bullet, and a temporary cavity of up to 11-12.5 times larger than the diameter of the cartridge, as well as additional tissue damage due to bone splintering outside the cavity itself. *Id.* at 16-17; Exh. 11 at ⁋ 10; Exh. 12 at 2.

Lou Klarevas has studied the effect of laws such as the Ordinance on the prevalence of mass shooting incidents and has found that jurisdictions "that restrict both [A]ssault [W]eapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita" than those that do not restrict Assault Weapons and LCMs. Exh. 3 at p.5. Today, Assault Weapons have been used in most high fatality mass shootings and 57% of all mass public shootings since 2019. Exh. 3, at 8; Exh. 13 at 11. The Las Vegas concert mass shooting, which left 59 people dead, and injured many hundreds more, demonstrates how dangerous a lone, previously law-abiding, individual can be with an Assault Rifle. Exh. 4 at ⁋ 116; Exh. 9 at ¶ 56. The same is true for the massacres at: the Pulse Nightclub (49 lives lost); Sandy Hook Elementary (26 lives lost); the Aurora movie theater (12 lives lost); Robb elementary school in Uvalde, Texas (21 lives lost); and the Highland Park July 4th parade (7 lives lost).  Exh, 4 at ⁋ 116.

Indeed, the idea that an ordinary citizen would possess a single weapon and enough ammunition with such killing capacity would have been inconceivable to the founding generation and their English ancestors, who would have believed that only weapons used exclusively in military settings and not commonly owned or used by civilians, such as cannons, could so quickly

inflict a comparable loss of life. As a result of these advances in lethality, Assault Weapons and LCMs are being used to inflict disproportionate casualties on a scale the Framers – who did not have similar experiences with mass gun violence because the guns and ammunition of their time were uniquely ill-suited for that purpose – could never have contemplated.

Invoking an unprecedented societal concern and dramatic technological changes, the Ordinance implicates *Bruen's* "more nuanced approach." *Bruen*, 142 S. Ct. at 2132. The Ordinance clearly passes constitutional muster under this "nuanced approach." First, there is historical precedent for strict regulation analogous to the unprecedented threat currently posed by Assault Weapons and LCMs – i.e., the potential for rapid, mass loss of human life at the hands of a single individual.[25] Second, considerations historically taken into account when enacting firearm regulations are present here and easily weigh in favor of the Ordinance. *Id.* at 2133 ("courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."). Third, the Ordinance imposes no more a burden on the right to self-defense than comparable historical regulations. *See Id.* at 2132-2133 ("While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment… *Heller* and point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").

---

[25]  Indeed, this court has already recognized that a regulation of assault weapons is consistent with this nation's historical tradition of prohibiting especially dangerous weapons.  *Bevis v. City of Naperville*, No. 22 C 4775, 2023 U.S. Dist. LEXIS 27308 (N.D. Ill. Feb. 17, 2023).

### 1. Historical Tradition of Regulating Dangerous and Unusual Weapons.

Our nation has long practiced a historical tradition of regulating weapons deemed to be dangerous and unusual. The starting point for any historical analysis regarding firearm regulation is, as usual, William Blackstone, whose writings "constituted the preeminent authority on English law for the founding generation." *Alden v. Maine*, 527 U.S. 706, 715 (1999); *see Heller*, 554 U.S. at 582, 593–95, 597, 605–09, 626–27 (extensively discussing Blackstone's writings). And Blackstone explains that the right to bear arms under English law contained an important limitation—namely, that "going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." *William Blackstone, Commentaries On The Laws Of England* 148 (1769). Blackstone immediately thereafter notes that such a law was analogous to "the laws of Solon [in which] every Athenian was finable who walked about the city in armour." *Id.* at 148–49. Blackstone was not alone in this understanding of the right to bear arms: a host of legal authorities from the founding era acknowledged the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (collecting authority). Thus, the right to bear arms protected by the Second Amendment does not extend to such weapons. *See, supra,* discussion at Section IB2.

Because *Heller* does not explore what, exactly, historically constituted a "dangerous" or "unusual" weapon for purposes of the Second Amendment, it is necessary to return to the historical sources for guidance. Those sources reveal two English legal doctrines of particular importance to the dangerous and unusual analysis: (1) the common law crime of affray, which formed the basis of essentially all English regulations of the right to bear arms; (2) the common-law right to self-defense, which demarcated the boundary between the uses of force private individuals were

authorized to employ and the uses of force reserved solely to the government.  We address them in turn.

### a. The English Law of Affray Prohibited Conduct that Terrorized the People.

The historical prohibition against dangerous and unusual weapons originated from the English common law crime of affray. The crime of affray has long been recognized as a threat to the peace, existing at least as far back as its codification in the Statute of Northampton of 1328, which sought to "punish people who go armed to terrify the King's subjects." S*ir John Knight's Case*, 87 Eng. Rep. 75 K.B. 1686. The word affray meant "to terrifie or bring feare," and the crime could be committed "without word, or blowe, given: as if a man shall shewe him selfe furnished with armour or weapon, which is not usually worne and borne, it will strike a feare into others that be not armed as he is." William Lambarde, Eirenarcha 134 (1579); *see* Joseph Keble, An Assistance to the Justices of the Peace, for the Easier Performance of their Duty 147 (1689) ("[I]f a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed"). Given that underlying purpose of the prohibition against affray, it was widely understood that "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People" and that, therefore, "wearing common Weapons" did not violate the law. William Hawkins, 1 PLEAS OF THE CROWN 136 (1716); *accord, e.g.*, Theodore Barlow, THE JUSTICE OF PEACE: A TREATISE CONTAINING THE POWER & DUTY OF THAT MAGISTRATE 12 (1745)  "People of Rank and Distinction do not offend by wearing common weapons") see also *Rogers v. Grewal*, 140 S. Ct. 1865, 1870–71 (2020) (Thomas, J., dissenting from denial of

certiorari) (discussing above authorities); *accord Chune v. Piott*, 80 Eng. Rep. 1161; 1 Ro. R. 237 (K.B. 1614).

The English law of affray traveled to the colonies at the time of this nation's founding, as the "colonists brought with them the English acquiescence to firearm limitations outlined in the Statute of Northampton." *Young v. Hawaii*, 992 F.3d 765, 796 (9th Cir. 2021); *see id.* at 797-98 (noting that North Carolina adopted the Statute of Northampton verbatim, including "the references to the King"). This is because, the courts explained, the common law of affray actually predated, and was merely codified in, the Statute of Northampton. *State v. Huntly*, 25 N.C. 418, 420–421 (1843). It thus continued to control even after the American Revolution. *Id*. In fact, "James Wilson, a prominent Framer and one of the six original Justices of the Supreme Court, understood founding era law to prohibit only the carrying of 'dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people.'" *Rogers*, 140 S. Ct. at 1871 (Thomas, J., dissenting). This view of the law was shared by a number of states, even well after the founding. *E.g., State v. Lanier*, 71 N.C. 288, 289 (1874) ("The elementary writers say that the offence of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same to be the common law . . . ."); *O'Neill v. State*, 16 Ala. 65, 67 (1849) ("[I[f persons arm themselves with deadly or unusual weapons for the purpose of an affray, and in such manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows."); *State v. Langford*, 10 N.C. 381, 383–84 (1824) ("[I]t seems certain there may be an affray when there is no actual violence: as when a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause

a terror to the people; which is said always to have been an offence at common law, and is strictly prohibited by statute.").

There were no dangerous and unusual weapons at the time of the founding that are similar enough to the Assault Weapons and LCMs of today to provide a direct regulatory analogy. Given all the differences between the firearms that existed at the time of the founding and Assault Weapons that exist today, historical firearms lacked the range, capacity, and power that could fairly be considered as comparably destructive to human life as modern Assault Weapons and LCMs. However, the Second Amendment covers firearms and items "necessary to use" those firearms. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless."); *see* also *Bruen*, 142 S. Ct. at 2132 (noting that the Second Amendment "covers modern instruments that facilitate self-defense"). Therefore, if the analogical net is cast to include materials "necessary to use" a firearm, and rightly should when discussing the LCM regulations at issue here, an analogy can be drawn to regulations regarding something with comparable mass destructive power: gunpowder. Unlike cannons or similar weapons of mass destruction that existed at the time of the founding, gunpowder could be acquired and stored by average citizens, who could theoretically stockpile large amounts of gunpowder in their homes or places of business. See *Accidental Explosions: Gunpowder in Tudor & Stuart London,* available at https://www.historyextra.com/period/tudor/accidental-explosions-gunpowder-in-tudor-and-stuart-london/. Gunpowder gave an average citizen the ability to kill many people quickly, as Assault Weapons and LCMs do today. That lethal potential was often realized – in London alone, a gunpowder explosion at Tower Hill in 1552 killed seven, an explosion at Crooked Lane in 1560 killed eleven, another at Fetter Lane in 1583 killed three,

41

another at Tower Street in 1650 killed 67 and destroyed fifteen houses, and in 1715 over a hundred houses on Thames Street were destroyed in a fire caused by a gunpowder explosion that leveled a house. *Id.* Particularly following the famed Gunpowder Plot of 1605, in which Guy Fawkes and his coconspirators amassed 36 barrels of gunpowder to level the House of Lords, *See generally,* Alan Haynes, *The Gunpowder Plot* (History Press 1994), the Founders would have been well aware of gunpowder's destructive potential. Exh. 14 at 12-14.

Reflecting this danger, states and localities have extensively regulated gunpowder since pre-colonial England and the earliest days of the American Republic. See, *supra*, Porter; Exh. 14 at 12-14.  In England, the explosion at Crooked Lane led to an outright ban on gunpowder storage in houses, though that ban was later modified to allow storage of two pounds of powder. See, *supra*, Porter. And in the United States, multiple states limited the amount of gunpowder a person could possess, typically in the range of twenty to thirty pounds. Saul Cornell & Nathaniel DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 FORDHAM L. REV. 487, 510–12 (2004) (describing numerous gunpowder storage laws). Other statutes specified how the powder a person could legally keep had to be stored. Ex. 14 at 12-14. Such regulations persist to this day, despite the advent of cartridges making it generally unnecessary for the average person to possess freestanding gunpowder. *E.g.*, 720 ILCS 5/47-5(7) (forbidding powder magazines near incorporated towns in Illinois).

The rationale behind the regulations was self-apparent – as the courts have explained, a "deposit of a large quantity of gunpowder in the midst of a populous city" could lead to an explosion, "and such would be the terrible and wide-spread destruction from it that the whole population would live in dread of some horrible catastrophe." *Cheatham v. Shearon,* 1851 Tenn.

LEXIS 50, *5 (1851); *see* also *Simpson v. Justice*, 1851 N.C. LEXIS 202, *6 (1851); *Davenport & Morris v. Richmond City*, 1886 Va. LEXIS 130, *10 (1886). This fear supported legislation because "the dangers would be real, and all men of reflection and prudence would feel them to be so, and therefore their apprehensions would be well founded." *Cheatham*, 1851 Tenn. LEXIS at *6. And, notably, regulations on gunpowder storage were not limited to individuals with a past history of unsafe practices regarding the storage of gunpowder – rather, they applied to all citizens equally, law-abiders and lawbreakers alike. Because the Ordinance regulates Assault Weapons and LCMs at least as dangerous for mass murder as stockpiles of gunpowder, it is analogous to historical regulations on gunpowder, is wholly consistent with this nation's historical traditions regarding firearms and accessories and is thus constitutional.

### b. The Government Historically Regulated Weapons More Likely to Be Used for Unlawful Purposes.

Early Americans lawmakers often regulated weapons that, while theoretically useful in self-defense, were more likely than others to be used for unlawful purposes. *See Fife v. State*, 1876 Ark. LEXIS 69, *10 (1876) (explaining that right to bear arms did not extend to weapons such as "the dirk, butcher or Bowie knife, the sword or spear in a cane, brass or metal knucks, and the razor," which are normally "used in private quarrels and brawls"); *Andrews v. State*, 1871 Tenn. LEXIS 83, *29 (1871) (finding law constitutional "so far as it prohibits the citizen 'either publicly or privately to carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol'"). No constitutional right entitled citizens to "the use of weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." *Aymette v. State*, 1840 Tenn. LEXIS 54, *9 (1840).

43

At the beginning of the 20th century, changes in technology, consumer behavior, and society in the early decades of the 1900s created a novel gun-violence problem. Exh. 14 at 19. Fully automatic and semiautomatic weapons exacerbated urban crime. *Id.* As semiautomatic and fully automatic weapons proliferated and undermined public safety, new laws were crafted to mitigate their harm. *Id.* This continues the established historical trend, in which restrictions on weaponry typically follow growing criminal abuse and social harm, rather than be enacted at the time these weapons were first introduced. *Id.*; Exh. 4 at ¶ 136.

For example, fully automatic weapons like the Tommy gun became available for civilian purchase after World War I but were not immediately perceived to present a sufficient public safety concern to prompt regulation. Exh. 14 at 19-20. It was not until the mid-to-late 1920s, when fully automatic weapons became the preferred weapons for gangsters, that states moved to restrict them. *Id.* By the early 1930s, more than half the states had passed some type of prohibition on fully automatic or semiautomatic weapons. *Id.* Multiple states embraced the view that both fully automatic and semiautomatic weapons should be classified as "machine guns" for legal purposes. *Id.*

While fully automatic weapons have historically been strongly regulsupated, the current legality of semiautomatic rifles creates a loophole for would-be machine gun owners: they can buy a semiautomatic rifle and convert it to a fully automatic weapon. This tactic is growing in popularity. The recently released ATF report (the "National Firearms in Commerce and Trafficking Assessment (NFCTA), Vol. 2", Part VII, <u>Recommendations and Future Enhancements</u>, Table FER-01) reveals that the combined total of "Machine-Gun Conversion Parts" recovered by ATF increased by 570% between the 2012 to 2016 period and the 2017 to

2021 period. Exh. 6. Today, it appears that "law abiding citizens" – in other words, those to whom the Second Amendment presumptively applies – are surreptitiously turning what Plaintiff here strenuously contends is not a "dangerous and unusual" weapon, namely, the semiautomatic rifle, into something that the United States Supreme Court in *Heller* has essentially conceded *is* a "dangerous and unusual" weapon, namely, the fully automatic rifle. *See Heller*, 554 U.S. at 627 ("weapons that are most useful in military service – M-16 rifles and the like – may be banned.").

### 2. The Public Concern Justifications Are Similar to Historical Analogues.

The historical regulations on gunpowder provide a key analogy to the Ordinance when one considers "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. The reason "why" the County has strictly regulated Assault Weapons and LCMs is patently obvious: like the strict historical regulations of gunpowder, the Ordinance strictly regulates the possession of Assault Weapons and LCMs in response to multiple mass casualty events involving the use of such weapons. Lou Klarevas has studied the effect of laws such as the Ordinance on the prevalence of mass shooting incidents and has found that jurisdictions "that restrict both [A]ssault [W]eapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita" than those that do not restrict Assault Weapons and LCMs. Exh. 3 at p.5. The gunpowder regulations and the Ordinance work both to reduce the actual occurrence of mass casualty and death and to alleviate the public apprehension caused by the potential for such massacres while the banned arms remain in circulation. Exh. 3, at 30-31; Exh. 4 at ¶ 80; Exh. 13 at 15 (noting that a large majority of adults report feeling stressed about mass shootings)).

45

The founding generation would have also understood that the government's authority to protect its citizenry was at its peak when the citizens were, for whatever reason, unable to adequately protect themselves from harm. In colonial-era England, the Crown had a "royal prerogative" that "included the right or responsibility to take care of persons who 'are legally unable, on account of mental incapacity, whether it proceed from 1st. nonage: 2. idiocy: or 3. lunacy: to take proper care of themselves and their property.'" *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 600 (1982) (quoting J. Chitty, PREROGATIVES OF THE CROWN 155 (1820)). After the revolution, that power to protect the people transferred to the States "in the form of a legislative prerogative," *id.*, that "is inherent in the supreme power of every State" as "a most beneficent function, and often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves," *Late Corp. of Church of Jesus Christ v. United States*, 136 U.S. 1, 57 (1890); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257 (1972) (quoting 3 William Blackstone, Commentaries 47).

This authority extended to the power to regulate weaponry. The early American cases considering the right to bear arms recognized that the scope of that right was properly understood only in relation to the right of the government to take primary responsibility for defending its citizenry. *See Hill v. State*, 1874 Ga. LEXIS 509, *7-8 (1874) ("The preservation of the public peace, and the protection of the people against violence, are constitutional duties of the legislature, and the guarantee of the right to keep and bear arms is to be understood and construed in connection and in harmony with these constitutional duties."); *Aymette*, 1840 Tenn. LEXIS at *10 (explaining that the right to bear arms "respects the citizens on the one hand and the rulers on the other"). Indeed, the Supreme Court of Georgia found it "absurd" to think the framers of the constitution

46

"ever dreamed, that in their anxiety to secure to the state a well regulated militia, they were sacrificing the dignity of their courts of justice, the sanctity of their houses of worship, and the peacefulness and good order of their other necessary public assemblies." *Hill*, 1874 Ga. LEXIS at *10-11.

This was because, as observed by the Texas Supreme Court in upholding a regulation of certain "deadly" weapons, "in the great social compact under and by which States and communities are bound and held together, each individual has compromised the right to avenge his own wrongs, and must look to the State for redress." *English v. State*, 1872 Tex. LEXIS 91, *6-7 (1872). To do otherwise, the court explained, risked a return to a "state of barbarism in which each claims the right to administer the law in his own case; that law being simply the domination of the strong and the violent over the weak and submissive." *Id.* Given this background, the founding generation would have understood that the government has primary responsibility for protecting its citizenry, most particularly those members of the citizenry unable to protect themselves and would not have expected the Second Amendment to allow rule by those willing and able to arm themselves the most heavily. Such an understanding of the government as a protector of the citizenry would have informed any analysis of a regulation like the Ordinance.

### 3. The Ordinance's Burden on the Right to Self-Defense Is Still Less Than or Equal to Historical Analogues Upheld as Constitutional.

When a court is faced with a firearm regulation that responds to a truly unprecedented societal problem, it must consider how the framers would have balanced the right to armed self-defense against that problem, with the "central" focus continuing to be "how and why" the modern regulation burdens an individual's right to self-defense. *See Bruen*, 142 S. Ct. at 2133. Undertaking

this kind of historical analysis, it is clear that the framers would have balanced those interests in favor of the Ordinance.

At English common law, self-defense was divided into two broad categories: (1) "justified" self-defense, in which "the defendant prevented a felony"; and (2) "excused" self-defense, in which "the defendant was in the midst of a fight." V.F. Nourse, Self-Defense & Subjectivity, 68 U. CHI. L. REV. 1235, 1244 (2001). Consistent with their understanding that the self-defense right was of only limited scope, and that the government had primary responsibility for the protection of its citizenry, the American courts recognized that the right to bear arms extended only to the narrow category of weapons commonly used for lawful self-defense. *See*, *e.g.*, *State v. Duke*, 1874 Tex. LEXIS 352, *6 (1874) (explaining that the "arms which every person is secured the right to keep and bear . . . must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense"). Because "the inherent right of self-defense has been central to the Second Amendment right," *Heller*, 554 U.S. at 628, the historical scope of that right provides important insight as to what weapons the founding generation might have considered "unusual" or "dangerous" for use by a person exercising that right.

Given the firearms of their time and the rights they intended to enshrine, the Framers would have seen modern Assault Weapons and LCMs to be dangerous and unusual weapons of war that not only cause terror and distress to ordinary reasonable people but are so tremendously lethal as to exceed any rational bounds of limited self-defense and encroach on the government's primary responsibility to serve as the protector of its citizenry. Assault Weapons are not "common weapons" that can be used "without causing the least suspicion of an intention to commit any act of violence or disturbance of the peace." *Rogers*, 140 S. Ct. at 1872 (quoting *Simpson v. State*,

1833 Tenn. LEXIS 186, *4-5 (1833)). Exh. 3, at 33; Exh. 5 at 23, 26; See, *supra*, Porter. Assault Weapons and LCMs are so inherently deadly, and so prevalently used in military settings and mass murders, that a reasonable person encountering an individual armed with such a weapon would feel terror and alarm, not an understanding that the bearer was engaged in self-defense.

Such terror and alarm in reaction to Assault Weapons is a particularly natural response following incidents such as the 2017 Las Vegas massacre. That unfortunate event made clear that an individual armed with an assault weapon firing from a distant concealed position has a unique ability to murder massive numbers of people in public with impunity, giving those people effectively no means of defending themselves, even if they are armed with common weapons of their own. Exh. 9 at ¶ 56. A weapon that is so extraordinarily lethal that it can kill 59 people and injure hundreds more from a great distance, Exh. 4 at ℙ 116, is not a common weapon one might use to "prevent a felony" or to defend oneself "in the midst of a fight"; it is an offensive weapon chosen because people cannot defend themselves against it, even with common weapons. Regulating Assault Weapons and LCMs is therefore consistent with the founding era law's prohibition on carrying "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." *Rogers*, 140 S. Ct. at 1871.

Gunpowder regulations and the Ordinance are relevantly similar in "how" they affect law-abiding citizens' right to armed self-defense. Certainly, laws imposing restrictions on the storage of gunpowder imposed some burden on the ability of an individual to engage in armed self-defense, because they "would at the very least have made it difficult to reload the gun to fire a second shot unless the homeowner happened to be in the [location] where the extra gunpowder was required

49

to be kept." *Heller*, 554 U.S. at 685 (Breyer, J. dissenting). But as the *Heller* majority recognized, this burden was minimal, particularly in comparison to "an absolute ban on handguns." *Id*. at 632.

The Ordinance imposes a comparably minimal burden on armed self-defense – like the historic English regulations of gunpowder, which allowed a small amount of gunpowder with significantly lesser destructive power to be stored in homes, the Ordinance allows individuals seeking to engage in armed self-defense to retain possession of a host of weapons and ammunition that are extremely well-suited for that purpose, and merely forbids possession of weapons and LCMs with a proven, unusual potential for mass fatalities. The regulations of gunpowder only prohibited possession of amounts of gunpowder with no practical utility for self-defense – no individual defending himself from a home invader could possibly use thirty pounds of gunpowder in his defense without simply detonating it and risking great harm to innocent bystanders. Similarly, the Ordinance only prohibits the possession of weapons with no discernible additional self-defense utility beyond what is already provided by other, less destructive weapons. Just as the framers deemed it permissible to prevent individuals from possessing large quantities of gunpowder, they would be unconcerned with limiting an individual's ability to fire a large quantity of cartridges in rapid succession, at both close and long ranges, with uniquely lethal ammunition. Exh. 4 at ¶ 83; Exh. 5 at 30-31; Exh. 8 at ¶ 12; Exh. 9 at ¶¶ 31, 33. Thus, not allowing individuals to possess Assault Weapons and LCMs today is no more a burden on self-defense than preventing them from possessing upwards of thirty pounds of gunpowder was at the time of the founding.

### D. This Case is Controlled by the Seventh Circuit's Decisions in *Wilson* and *Friedman*.

A plaintiff succeeds in a facial challenge only by establishing that no set of circumstances exists under which the Act would be valid – in other words, "that the law is unconstitutional in all

of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Here, Plaintiff brings a facial challenge to the Ordinance, and cannot possibly meet the applicable standard, as his claims are foreclosed by the Seventh Circuit's decisions in *Wilson,* 937 F.3d 1028 (7th Cir. 2019), and *Friedman* 784 F.3d 406. R. 1 at 2-3. As the Seventh Circuit recognized in *Wilson*, its decision in *Friedman* held constitutional a Highland Park ordinance that defined Assault Weapons "in virtually identical terms as the County Ordinance does and proscribes the same conduct." *Wilson*, 937 F.3d at 1030. As a result, the Ordinance also survived Second Amendment scrutiny. *Id.* at 1029.

Plaintiff's claim that *Wilson* and *Friedman* were wrongly decided, ECF No. 5, at 11-12, is demonstrably false. The only notable development in governing Second Amendment precedent since those decisions were handed down is the Supreme Court's recent decision in *Bruen*, 142 S. Ct. 2111 (2022), but *Bruen* casts no doubt on the results in *Wilson* and *Friedman*. To the contrary, a critical mass of the Justices in the *Bruen* majority wrote separately to make clear that it (1) did not "decide anything about the kinds of weapons that people may possess," *id.* at 2157 (Alito, J., concurring); and (2) did not undermine the Court's previous statements that the Second Amendment allows the prohibition of "dangerous and unusual weapons," *id.* at 2162 (Kavanaugh, J. & Roberts, C.J., concurring).

And while *Bruen* rejected the two-tiered mode of Second Amendment scrutiny used by most courts when analyzing firearm regulations, *id.* at 2127, *Friedman* specifically declined to adopt or rely on that mode of analysis, 784 F.3d at 410; *accord id.* at 420 (Manion, J., dissenting) (criticizing majority for "wholly disregard[ing]" that two-step inquiry); *Kolbe*, 849 F.3d at 135 (noting that *Friedman* "upheld prohibitions against assault weapons . . . without applying either

51

intermediate or strict scrutiny"). Instead, *Friedman* expressly focused on the considerations identified by *Heller* itself: (1) historical evidence; (2) whether the banned weapon bears a reasonable relationship to the preservation or efficiency of a well-regulated militia; and (3) whether the regulation leaves law-abiding citizens with meaningful opportunities for self-defense. 784 F.3d at 410. *Bruen* casts no doubt on this analysis – it most certainly did not overrule or disavow the considerations identified by *Heller*, and furthermore, made clear that both historical practice and the effect of a regulation on individuals' ability to engage in self-defense were of central importance to the constitutional inquiry. *Bruen*, 142 S. Ct. at 2129-30, 2133.

Regardless, even if this court had grave doubt that *Friedman* and *Wilson* remain good law after *Bruen* – which it should not – they nevertheless continue to control this litigation. Neither case has been expressly overruled by the Supreme Court or the Seventh Circuit, and it is well-settled that lower courts are bound by existing precedent, even when that precedent rests on reasoning that has subsequently been called into doubt. *E.g.*, *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). Because *Friedman* and *Wilson* continue to control here, and foreclose any Second Amendment challenge to the Ordinance, and therefore the motion should be denied.

## II.     Plaintiff Cannot Show He is Likely to Suffer Irreparable Harm.

The court should deny Plaintiff's motion for preliminary injunction because Plaintiff is not likely to succeed on the merits of his claim. But if the court examines the other preliminary injunction factors, it is clear that Plaintiff's motion should be denied because he is also not likely to suffer irreparable harm in its absence. Plaintiff cannot make the required showing that there is "more than a mere possibility of harm" without a preliminary injunction. *Whitaker v. Kenosha*

*Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). Dr. Herrera cites *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) for his contention that irreparable harm is "presumed" in the presence of a violation of his Second Amendment rights. ECF No. 5, p. 27. And while a deprivation of a constitutional right can be an irreparable harm, the Seventh Circuit has not held that any alleged violation of the Second Amendment amounts to an irreparable harm. *Ezell* noted that a First Amendment violation is "frequently," not always, presumed to cause irreparable harm, and from there, analogized the First Amendment interest to the Second Amendment right. *Ezell*, 651 F. 3d 684 at 699. However, the *Ezell* court qualified its finding that the plaintiffs had shown irreparable harm by noting that the finding was made "for reasons related to the form of the claim and the substance of the Second Amendment right." *Id*. at 700. The court did not issue a blanket holding that Second Amendment violations must be presumed to cause irreparable harm.

The claim here differs from *Ezell* in the nature of the alleged impingement of the Second Amendment right. *Ezell* concerned the City of Chicago's ban on firing ranges, while also requiring firing range training as a condition of lawful firearm possession within the City. *Ezell* at 704.The *Ezell* court found that the City's gun range ban, by limiting the right to maintain proficiency in the use of firearms and the ability to satisfy the requirements for firearm ownership, implicated the core right of the Second Amendment. *Id*. ("[T]he core right wouldn't mean much without the training and practice that make it effective.") "In other words, the measure of irreparable harm in Ezell was the weight of the burden the ordinance placed on the core Second Amendment right[.]" *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 939 (N.D. Ill., Jan. 6, 2014) (Chang, J.)

53

Here, the County's Ordinance does not burden the core Second Amendment right, which the Supreme Court has established is self-defense. *Ezell*, 651 F.3d 684 at 699, 700-701, *citing Heller*, 554 U.S. 592-595. The Ordinance does not prohibit weapons that are in common use for self-defense or accessories that are necessary to use firearms for self-defense. *See, supra,* discussion at IB1. Under the County's Ordinance, Plaintiff can legally possess many different kinds of firearms for protection of himself and his home, including shotguns and handguns without LCMs, which are more appropriate for self-defense and defense of the home. Exh. 5 at p. 6. While his AR-15 rifles and Glock 45 with an LCM may be his preferred weaponry, Plaintiff has other firearm options for self-defense and makes no claims that they are, for whatever reason, the only firearms currently available to him. *Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015) (unlike handgun ban in Heller, Highland Park's Assault Weapon ordinance leaves residents with many self-defense options.)

Unlike the ban in *Ezell*, the County's Ordinance does not make it difficult or impossible for Plaintiff to possess firearms at all or undermine Plaintiff's ability to comply with regulations that allow him to lawfully possess a firearm. Indeed, the Ordinance leaves in place Plaintiff's ability to possess handguns, the "quintessential self-defense weapon." *Heller*, 554 U. S. 570 at 629. Nor does it require Plaintiff to travel to another jurisdiction to exercise his right to self-defense. In *Ezell*, the plaintiffs were required as a result of the ordinance to travel outside the City to train at a firing range in order to qualify to possess a firearm within the City. This fact was central to the court's reasoning and led the court to state that it would be a mistaken assumption to assume that "the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction." *Id*. at 697. Defendants make no such claim here. Plaintiff is free

to exercise his right to own a firearm for self-defense in the County. The Ordinance limits only his ability to own a class of dangerous and unusual weapons and accessories that are neither practically nor legally suited for facilitating armed self-defense. Exh. 5 at p. 6; Exh. 9 at ¶ 59.

The thrust of Plaintiff's claim is that it is impractical for him to train to safely use an AR-15 in the SWAT operations in which he volunteers as a medic and during which he may be handed an AR-15. ECF No. 5-1, ¶ 8. Of course, this claim is entirely speculative. Plaintiff does not allege that he has ever been called upon to fire an AR-15 during live action with the SWAT team, and such a scenario would be unlikely given Plaintiff is not a trained law enforcement officer. See ECF No. 52, Exh. 15 Dec. of Chiappini, ¶¶ 8-9. Without a clear showing that his right to self-defense will be violated, Plaintiff cannot show that he will suffer irreparable harm without a preliminary injunction.

### III.   The Balancing of Equities Weighs in Defendants' Favor.

The potential harm to Defendants if a preliminary injunction is granted far outweighs the potential harm to Plaintiff if the injunction is denied. Defendants, and each of them, bear a unique responsibility to regulate dangerous conditions to maintain public safety. If the Court grants Plaintiff's motion, the *status quo* would be upended. The Ordinance has been in place for nearly two decades. Granting Plaintiff preliminary relief would upend the norms and allow Cook County residents to possess dangerous arms that have long been prohibited. If the Ordinance is then ultimately upheld, legal questions may arise as to whether residents have an obligation to relinquish their weapons and as to the legality of possessing weapons that were acquired while the Ordinance was enjoined. Moreover, even if the Ordinance is upheld, the intent will have been temporarily and dangerously subverted. The people of Cook County will be forced to live with the

consequences with no clear path forward as to how or whether authorities can locate or retrieve the assault weapons that came into the County during the pendency of the injunction. Conversely, denying the injunction would retain the *status quo* and leave the Plaintiff in the same position he is in today and will not result in any additional burden or confusion. *See, e.g.*, *Whitaker*, 858 F.3d 1034 at 1054 (balance weighed in favor of maintaining status quo and granting preliminary injunction stopping school from requiring transgender male plaintiff to use girls' bathroom when plaintiff had been using boy's bathroom for six months without incident).

Moreover, Plaintiff presents no reason why an injunction is urgent. "A party requesting a preliminary injunction must generally show reasonable diligence." *Benisek* at 1944 (declining to enjoin use of election map six years after it was adopted). Here, Plaintiff has failed to do so. Plaintiff's claims rest in part on his allegations that he must drive over an hour out of the County to the location where he stores his two AR-15 rifles in order to bring them with him to monthly training for a SWAT team on which he serves as a medic. ECF No. 1, ¶ 28-30; ECF No. 5-1, ¶ 7. Plaintiff has served as a medic on the SWAT team for approximately five years, since 2018. *Id*. Although he has attended trainings with his personal rifle in those five years (ECF No. 1, ¶ 28-30), he has not challenged the Ordinance until now. Furthermore, Plaintiff waited seven months after the Supreme Court issued its decision in *Bruen* before initiating this litigation, while presumably seven SWAT trainings occurred in the interim. Plaintiff has not shown urgency or diligence in challenging the Ordinance, which weighs against the granting of a preliminary injunction. *Benisek* at 1944.

**IV.    A Preliminary Injunction Would Not Be in the Public Interest.**

The court must also consider the harm of a preliminary injunction on the public interest, "which refers to the interests of people and institutions that are not parties to the case." *Cassel v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). It would be difficult to find subject matter that could impact the public interest more than the present litigation. *See Bevis v. City of Naperville*, 2023 U.S. Dist. LEXIS 27308, *39 (N.D. Ill. Feb. 17, 2023 (Kendall, J.) ("The protection of public safety is also unmistakably a 'public interest'" furthered by assault weapons regulations); *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017) (the state had a compelling interest in the protection of its citizenry and public safety effectuated by assault weapons regulations). First, granting the preliminary injunction would harm the public interest because it would undermine public safety and allow dangerous and unusual weapons to proliferate the County. As discussed above, the regulated weapons and LCMs subject to the Ordinance pose a unique threat to the safety of individuals because they are extremely powerful and likely to injure bystanders, are attractive to those who seek to kill or injure many people very quickly and have no utility for self-defense. *See* discussion section I(B), *supra*. Ordinances like the County's have been effective in reducing mass shootings and reducing the lethality of mass shootings. Exh. 3, at 24-27, 31-33.  While a means-end analysis is not necessary for the ultimate disposition of the constitutionality of the Ordinance, it is relevant in making a public interest determination for purposes of a preliminary injunction. *See, e.g. Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874, *99 (N.D.N.Y. Aug. 31, 2022).

Plaintiff does not address any of the clear ramifications of a preliminary injunction and argues only that "'there can be no irreparable harm to a [government]' – nor is it in the public interest – when the government 'is prevented from enforcing an unconstitutional statute.'" ECF

No. 5, p. 35; citing *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). First, Plaintiff neglects to include the full quote from *Joelner*, which reads "[There] can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" *Joelner*, 378 F.3d 613 at 620, quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (emphasis added). Moreover, the court in *Joelner* went on to do exactly what Plaintiff argues cannot be done – the court weighed the harms to the plaintiff's First Amendment rights against the harms to the Village, as well as the public's First Amendment interests and upheld in part the district court's denial of a preliminary injunction, even though the plaintiff was likely to succeed on the merits. *Id*. at 627-629. Similarly, here, the court should weigh the potential harms to all parties and consider that balancing analysis as part of the preliminary injunction analysis as a whole. *See Abbott Laboratories v. Mead Johnson & Co*., 971 F.2d 6, 12 (7th Cir. 1992) (the sliding scale balancing approach is subjective and intuitive).

Plaintiff's argument that the County cannot suffer irreparable harm and that a preliminary injunction must necessarily serve the public interest rests entirely on the presumption that the Ordinance is unconstitutional. Plaintiff cites *ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), for the proposition that "the balance of harms…favors granting preliminary relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." ECF No. 5, p. 35. But the Seventh Circuit in *ACLU v. Alvarez* premised this approach to the balance of harms on the basis that the plaintiffs established a likelihood of success on the merits of their First Amendment claim. *ACLU v. Alvarez*, 679 F.3d 583, 589-590 (7th Cir. 2012) ("Moreover, if the moving party establishes a likelihood of success on the merits, the balance

58

of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.") Plaintiff has not shown that the Ordinance is "probably unconstitutional" or that the balance of harms weighs in his favor.

Denying the preliminary injunction would benefit the public interest because it promotes public safety, preserves the status quo, and would avoid confusion amongst County residents, law enforcement, and visitors to the County who may be less familiar with the County's laws and how to comply with them. In addition, denial avoids the complications, primarily legal and financial, that would result from suspending a long-standing Ordinance and reinstating it months or years later. Residents who purchased Assault Weapons under the assumption that they would be allowed to keep them in their County residences might suffer an economic loss or may expend time and resources navigating how to legally get rid of their weapons. Absent a strong showing that Plaintiff will succeed on the merits, as well as satisfaction of the other requirements of a preliminary injunction, it would be against the public interest to suspend an Ordinance enacted on behalf of the people which has remained in effect for over a decade.

## CONCLUSION

For each of the foregoing reasons, Defendants respectfully request that this Honorable

Court deny the motion for temporary restraining order and preliminary injunction in its entirety.

Dated March 3, 2023

KIMBERLY M. FOXX
*Cook County State's Attorney*
*Counsel for Defendants*

By s/ *Jessica M. Scheller*
_____

JONATHON BYRER
Supervisor, Appeals & Special Projects
DAVID A. ADELMAN
Supervisor, Affirmative & Complex
Litigation Section
JAMES BELIGRATIS
ELIZABETH BROGAN
Assistant State's Attorneys
Civil Actions Bureau
500 W. Richard J. Daley Center Place
Chicago, IL 60602
(312) 603-6934
(312) 603-5463

JESSICA M. SCHELLER
Chief; Advice, Business & Complex
Litigation Division
PRATHIMA YEDDANAPUDI,
Supervisor; Advice, Transactions &
Litigation Section
MEGAN HONINGFORD
SILVIA MERCADO MASTERS
EDWARD M. BRENER
JESSICA L. WASSERMAN
Assistant State's Attorneys
Jessica.Scheller@cookcountyil.gov
Prathima.Yeddanapudi@cookcountyil.gov

## CERTIFICATE OF SERVICE

I, Edward M. Brener, hereby certify that on March 3, 2023, I have caused a true and correct copy of Defendants' Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction be sent via e-filing to all counsel of record in accordance with the rules the service of documents.

/s/ *Edward M. Brener*
Edward M. Brener
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-5971
edward.brener@cookcountyil.gov