**EXHIBIT 4**

## EXPERT REPORT AND AFFIDAVIT OF JOHN J. DONOHUE

I, John J. Donohue, being duly sworn, hereby depose and state as follows, based on my personal knowledge:

1.    I am a citizen of the United States and a Resident of California.

2.     I am over 21 years of age.

## BACKGROUND AND QUALIFICATIONS

3.    I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School.  (A copy of my complete cv is attached as Exhibit A.) After earning a law degree from Harvard and a Ph.D. in economics from Yale, I have been a member of the legal academy since 1986.  I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School.  I have also been a visiting professor at a number of prominent law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), Tel Aviv University, and Renmin University (Beijing).

4.     For a number of years, I have been teaching at Stanford a course on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, and St. Gallen University School of Law in Switzerland. Since gun crime is such an important aspect of American criminal justice, my courses evaluate both the nature of gun regulation in the United States and the impact of gun regulation (or the lack thereof) on crime, which is an important part of my research, about which I have published extensively (as reflected in my c.v.).  I have also consistently taught courses on law and statistics for two decades.

5.     I am a Research Associate of the National Bureau of Economic Research, and an elected member of the American Academy of Arts and Sciences.  I was a Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01 and served as the co-editor (handling empirical articles) of the *American Law and Economics Review* for six years.  I have also served as the President of the American Law and Economics Association and as Co-President of the Society of Empirical Legal Studies.

6.     From October 2011 – December 2018, I served on the Committee on Law and Justice of the National Research Council ("NRC"), which "reviews, synthesizes, and proposes

research related to crime, law enforcement, and the administration of justice, and provides an intellectual resource for federal agencies and private groups." (See http://www7.national-academies.org/claj/ online for more information about the NRC.)

7.     I filed an expert declaration in each of two cases involving a National Rifle Association ("NRA") challenge to city restrictions on the possession of large-capacity magazines: *Fyock v. City of Sunnyvale*, United States District Court (N.D. Cal.), January 2014; *Herrera v. San Francisco*, United States District Court (N.D. Cal.), January 2014.

8.     I also filed an expert declaration in a case involving an NRA challenge to Maryland's restrictions on assault weapons and large-capacity magazines: *Tardy v. O'Malley*, United States District Court (District of Maryland), February 2014.

9.     In all these cases, the relevant gun regulations have (ultimately) been sustained in the relevant federal appellate courts.

10.     I also filed (June 1, 2017) an expert declaration in a case involving a challenge to California's restrictions on carrying of weapons in public in *Flanagan v. Becerra*, United States District Court (C.D. Cal.), Case No. 2:16-cv-06164-JAK-AS and expert declarations on June 4, 2017 and June 16, 2017 in two separate cases challenging California's ban on the possession of large-capacity magazines: *Duncan v. Becerra*, United States District Court (S.D. Cal.), Case No. 17-cv-1017-BEN-JLB and *Weise v. Becerra*, United States District Court (E.D. Cal.), Case No. 2:17-cv-00903-WBS-KJN. I filed a supplemental declaration in Duncan (now *Duncan v. Bonta*) on November 8, 2022.

11.     I filed an expert declaration, and provided expert testimony, in a case involving a challenge to New Jersey's restrictions on large-capacity magazines in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:18–cv–10507–PGS–LHG (D.N.J.)

12.     I filed an expert declaration in *Chambers v. City of Boulder*, Case No. 2018CV30581, in the District Court of Boulder County in September 2020, involving a challenge to the City of Boulder's restrictions on assault weapons.

13.     At the request of the United States Department of Justice, I filed an expert declaration in July 2020 and testified at trial in April 2021 in a case arising out of the Sutherland Springs mass shooting that killed 26 in November 2017: *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.). On December 9, 2020, I submitted an expert report on behalf of the City of San Francisco in a wrongful conviction lawsuit, *Caldwell v. City of San*

*Francisco*, Case No. 12-cv-1892 DMR, United States District Court, Northern District of California, Oakland Division.

14.    I was the main author of the Brief of Amici Curiae Social Scientists and Public Health Researchers in Support of Respondents, which was submitted to the United States Supreme Court on September 21, 2021 in *New York State Rifle & Pistol Association v. Bruen*, Case No. 20-843.

15.    On January 24, 2022, I submitted an expert declaration in *Worth v. Harrington*, a lawsuit in the District of Minnesota (Case No. 21-cv-1348) challenging how Minnesota regulates the concealed carry of firearms by individuals aged 18 to 20.  I was deposed in this case on March 28, 2022.

16.    On May 31, 2022, I submitted an expert declaration in *Meyer v. Raoul*, a lawsuit in the Southern District of Illinois (Case No. 21-cv-518-SMY) challenging how Illinois regulates the concealed carry of firearms by individuals aged 18 to 20.

17.    On September 14, 2022, I submitted an expert declaration in *Viramontes v. The County of Cook*, a lawsuit in the Northern District of Illinois (Case No. 1:21-cv-04595) challenging the Blair Holt Assault Weapons Ban enacted by Cook County, Illinois in 2006.

18.    On October 13, 2022, I submitted an expert declaration in *Miller v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:19-cv-01537-BEN-JLB) challenging how California regulates assault weapons.  This report supplemented my earlier wok in that case which involved submission of an expert declaration on January 23, 2020, followed by testimony on October 23, 2020 during an evidentiary hearing on the Plaintiffs' motion for a preliminary injunction.

19.    On January 6, 2023, I submitted an expert declaration in *Rupp v. Bonta*, a lawsuit in the Central District of California (Case No. 8:17-cv-00746-JLS-JDE) challenging how California regulates assault weapons.

20.    On January 6, 2023, I submitted an expert declaration in *State of Vermont v. Misch*, Criminal Division, Docket No. 173-2-19 Bncr in a case challenging magazine-size restrictions for handguns and long-guns.

21.    On January 26, 2023, I submitted an expert declaration in *NAGR v. Lamont,* a case challenging Connecticut's restrictions on assault weapons and limits on magazine size.

22. On January 26, 2023, I submitted an expert declaration in *NAGR v. Campbell,* Civil Action No. 1:22-cv-11431-FDS, a case challenging Massachusetts restrictions on assault weapons and limits on magazine size in the United States District Court for the District of Massachusetts.

## SUMMARY OF CONCLUSIONS

21.     It is a sound, evidenced-based, and longstanding harm-reducing strategy virtually uniformly embraced throughout the developed world for governments to place constraints on the harm that weapons can inflict.  Restrictions on assault weapons and the size of large-capacity magazines (LCMs) sit comfortably in this appropriate regulatory approach and can be expected to reduce deaths and injury from gun violence.

22.     A ban on assault weapons and LCMs would be expected to have little or no effect on the ability of individuals to possess weapons for self-defense in the home but should have a restraining impact on the effectiveness of those who have the criminal intent to kill as many individuals as possible.  The governmental restrictions imposed by the state of Illinois and its subdivisions that are challenged in this litigation are well-tailored to limit the behavior of criminals engaging in the most dangerous forms of violent criminal behavior, and at the same time are likely to have little or no impact on the defensive capabilities of law-abiding citizens.

23.     The problem of public mass shootings in the United States is a serious and worsening national problem that imposes substantial burdens on the American public far beyond the growing numbers of dead and injured victims that are besieged every year. Since so many of these shootings are committed (or made possible) by previously "law-abiding" citizens with no basis under current law to prevent them from possessing firearms and since such a large proportion of the mass shooters die in the course of their deadly massacres, improved background checks and increased criminal penalties alone cannot adequately address this growing problem.  Moreover, the empirical evidence indicates that another possible policy response – allowing increased gun carrying by the untrained public – rarely generates any benefit

by stopping public mass shootings and is indeed self-defeating since it generates substantial increases in violent crime.[1]

24.    Indeed, gun massacres fell substantially during the ten years of the federal assault weapons ban, which curtailed the proliferation of both assault weapons and high-capacity magazines, and then rose sharply when the ban was lifted in 2004.  FBI data show that the problem of active shooters inflicting mayhem on the public has been rising substantially since the end of the federal ban. State laws restricting assault weapons and high-capacity magazines have also been shown to reduce mass shooting deaths and overall casualties.

25.    The Plaintiff's tenditious Complaint never so much as mentions the words "mass shooting" so its comments are largely irrelevant to the issues it should be addressing. The important point to note is that when the problem of mass shooting began to emerge in the United States, state and federal governments began responding to this growing menace with lawful, appropriate, and effective restrictions on the type of weaponry that both facilitated mass shootings and was attractive to mass shooters. As we learned from the repeal of the federal assault weapons ban, any backsliding on these wise restraints that promote the health, safety, and freedom of Americans would be costly in lives and in devastating firearm injuries.

---

[1] See Donohue, John, Abhay Aneja, and Kyle Weber, 2019, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," *Journal of Empirical Legal Studies*, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.  The amicus brief submitted to the United States Supreme Court on behalf of "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, September 21, 2021, further discusses the evidence that right-to-carry laws increase violent crime, citing 14 studies that have so found in the last five years. Since that brief was submitted, three additional empirical studies have confirmed the conclusion that increased gun carrying leads to higher violent crime: Van Der Wal, W. M. (2022). Marginal Structural Models to Estimate Causal Effects of Right-to-Carry Laws on Crime. *Statistics and Public Policy*, 9(1):163–174.; Doucette, M. L., Ward, J. A., McCourt, A. D., Webster, D., and Crifasi, C. K. (2022). Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020. *Journal of Urban Health*, pages 1–12.; Donohue, J. J., Cai, S. V., Bondy, M. V., and Cook, P. J. (2022). More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities. Working paper no. 30190, National Bureau of Economic Research.

**DISCUSSION**

26.    The Complaint makes reference to the fact that the restricted assault weapons and magazines are "typically possessed by law-abiding citizens" for various lawful purposes. While the comment is either intentionally or unintentionally ambiguous, it is important to clarify that the typical law-abiding citizen does not posess any firearm -- whether an assault weapon or not, and whether it has a high-capacity magazine or not.  The clear majority of Americans do not own any firearm, and this is certainly true for more than 70 percent of Illinois residents.

27.    By a wide margin, most Americans do not own guns, and most Americans who do own guns do not own assault weapons.  Both statements are particularly true for Illinois residents since 43 states have a higher rate of gun prevalence than Illinois.[2]

28.    70 percent of all American adults do not own any firearm according to recent survey data.[3] Moreover, many of the 30 percent of Americans who do own firearms, only possess shotguns, hunting rifles, and revolvers and do not possess assault weapons or firearms equipped with high-capacity magazines of the type covered by the federal assault weapons ban from 1994-2004.

29.    Since assault weapons are only a small fraction of the overall gun supply in the United States, it is clear that only a relatively small minority of Americans owns assault weapons, and most Americans recognize that assault weapons are not important to their self-defense.

30.    The majority of Americans have consistently supported bans on assault weapons for years.  A poll conducted for the *New York Times* from June 17-20, 2016 among a national sample of 1975 registered voters found that 67 percent of Americans favored such a ban.

31.    Less than a year later, a Pew Research Center survey among 3,930 adults (conducted from March 13-27 and April 4-18, 2017) again showed broad opposition to assault weapons.[4]

---

[2] See, Gun Ownership by State 2023, World Population Review, https://worldpopulationreview.com/state-rankings/gun-ownership-by-state
[3] This is the finding of a June 2021 survey of 10,606 adults by the Pew Research Center. https://www.pewresearch.org/fact-tank/2021/08/04/wide-differences-on-most-gun-policies-between-gun-owners-and-non-owners-but-also-some-agreement/.
[4] Ruth Igielnik and Anna Brown, "Key takeaways on Americans' views of guns and gun ownership," Pew Research Center, June 22, 2017, http://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership/.  The authors noted that this poll was conducted *prior* to two of the five deadliest mass

32.     The Pew survey results released on October 18, 2018 again showed that 67 percent of Americans favored bans on assault weapons and on high-capacity magazines.[5]  The same Pew survey based on interviews from September 3 – 15, 2019 showed that 69 percent of Americans supported a ban on assault weapons.[6] A national survey by Pew Research Center, conducted from April 5-11, 2021 among 5,109 adults found that 63 percent of Americans supported a ban on assault weapons.[7]

33.     Importantly, the *New York Times* also polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy" to ask them what measures would be most effective in dealing with America's mass shooting problem, and an assault weapons ban was deemed overall by this panel to have the highest level of effectiveness among the 20 evaluated measures.[8]

34.     Similarly, American adults consistently support bans on such high-capacity magazines, because it is widely recognized that such accoutrements threaten public security and have little utility for personal defense.  A national survey by Pew Research Center, conducted from April 5-11, 2021 among 5,109 adults found that almost two-thirds of Americans -- 64 percent -- supported a ban on magazines with greater than 10 rounds.[9] This is a consistent and persistent finding:  The Pew survey results released on October 18, 2018 similarly found that 67 percent of Americans favored bans on high-capacity magazines.[10]

---

shootings in modern US history, which occurred in October and November of 2017: "a staggering [59] people were killed and more than 500 were hurt when [Steven Paddock] opened fire on a Las Vegas concert and at least 26 people were killed in a Texas church" only five weeks later.

[5] Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support," October 18, 2018, http://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-draw-bipartisan-support/. This survey had 5307 respondents and was conducted from September 24 through October 7, 2018.

[6] Katherine Schaeffer, "Share of Americans who favor stricter gun laws has increased since 2017," https://www.pewresearch.org/fact-tank/2019/10/16/share-of-americans-who-favor-stricter-gun-laws-has-increased-since-2017/ (October 16, 2019).

[7] https://www.pewresearch.org/politics/2021/04/20/amid-a-series-of-mass-shootings-in-the-u-s--gun-policy-remains-deeply-divisive/.

[8] The list of 32 academics included not only me, but also many strong gun-rights supporters, including John Lott, Gary Kleck, David Kopel, Carlisle E. Moody, and Eugene Volokh. See, Margot Sanger-Katz And Quoctrung Bui, "How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws," *New York Times*, October 5, 2017, https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html.

[9] https://www.pewresearch.org/politics/2021/04/20/amid-a-series-of-mass-shootings-in-the-u-s--gun-policy-remains-deeply-divisive/.

[10] Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support," October 18, 2018, http://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-

**The Complaint Reflects a Complete Ignorance of the Problem of Guns and Crime**

35.     The Complaint in this case addresses issues of guns and crime with a breathtaking degree of ignorance.  There is much discussion that the Plaintiff is an upstanding citizen, without any apparent understanding that the Complaint is asking a federal court to make the most lethal weaponry available to alcoholics, people with antisocial personality disorders, anger management problems, serious cognitive disorders, and other socially harmful behavioral traits, not to mention active criminals who have yet to be convicted of a felony and those planning their first crime.

36.   The Complaint starts off by asserting that crime is high in Chicago – true, but as Uniform Crime Reports data indicates there are more than 30 American cities with higher rates of violent crime – but then it fails to appreciate that it is inviting a federal court to *increase* the problem of violent crime by overturning crime-reducing legislation.  The Complaint presumes that allowing citizens to have increasingly more lethal weaponry will somehow improve the crime problem in Chicago, Cook County, and Illinois without realizing the abundant empirical evidence that it will actually produce the opposite effect.

37.   In this sense, the Complaint mimics some of the claims made by those who advocated for Illinois to adopt a right-to-carry (RTC) law, since this would allow law-abiding citizens to thwart or deter crime.  As an abundant empirical literature has confirmed,[11] the increased gun carrying does not achieve these desirable goals but rather produces the precise array of crime problems that the Complaint seemingly decries. The pattern of violent crime since Illinois implemented its RTC law in 2014 has broadly conformed to the predictions of the best empirical literature. As seen in Figure 1, Illinois had enjoyed a decade of substantially declining aggravated assault, which was reversed after the 2014 implementation of the state's RTC law. Over the next five years, the rate of aggravated assault in Illinois rose 19.1 percent (from 213 per 100,000 in 2014 to 254 per 100,000 in 2019).[12] Nor was Illinois unique in this regard.  Figure 1 also shows a broadly similar pattern for the state of Wisconsin: a declining trend in aggravated assault was reversed when Wisconsin's RTC law went into effect in 2011—three years earlier

---

draw-bipartisan-support/. This survey had 5307 respondents and was conducted from September 24 through October 7, 2018.

[11] Donohue, John J. 2023. "The Effect of Permissive Gun Laws on Crime." *The Annals of the American Academy of Political and Social Science*. Forthcoming.

[12] The Illinois increase in aggravated assault over the 2014-2019 period was more than twice the 8.5 percent increase in the rest of the country.

than the Illinois law. By 2019, Wisconsin's rate of aggravated assault was substantially higher than it had been when that state's RTC law was implemented.

## Figure 1



Aggravated Assault per 100,000 People, 2005-2019

38. Figure 2 shows the rates of firearm homicide for the two states, and again we see a pattern consistent with the large body of literature on the impact of RTC laws on violent crime. Specifically, Illinois's rate of firearm homicide had been stable for a decade, but rose sharply following adoption of its RTC law. After 2014, firearm homicide rose by 32.7 percent in Illinois (from 4.6 per 100,000 in 2014 to 6.2 per 100,000 in 2019), which was 5 percentage points higher than 27.7 percent rise in the rest of the country. In addition, Figure 2 reveals that the adverse trend in firearm homicide in Wisconsin began in 2011, the year that it implemented its RTC law. As with Illinois, the rate of firearm homicide in Wisconsin was substantially higher in the years after RTC adoption.

39. A 2021 evaluation of Wisconsin's adoption of right-to-carry concludes that:

an analysis of publicly available data from local agencies, the FBI, and other national databases suggests that [Wisconsin's RTC] law has led to negative consequences for safety in the state. Three categories of violent gun-related crime have increased since its implementation: gun homicides, aggravated assaults that involve a gun, and gun-related

homicides and assaults against law enforcement officers. In addition, gun theft in Wisconsin has increased dramatically. The law is also associated with a significant rise in gun sales, particularly handguns, in the state, suggesting that it may have incentivized more Wisconsin residents to become gun owners.[13]

## Figure 2



Firearm Homicides per 100,000 People, 2005-2019

40. The Complaint seems ignorant of some of the reasons that such a substantial empirical literature has developed showing more gun carrying outside the home will elevate violent crime. First, the evidence is unmistakable and unrefuted that guns carried outside the home are more likely to be stolen. We are not talking about a hundreds or thousands or even tens of thousands of guns being stolen. We are talking about hundreds of thousands of guns stolen each year because of increasing gun carrying. In other words, *the most likely event* to occur each year involving guns and crime in the United States is *the theft of a gun*, essentially putting more guns into the hands of criminals – free of charge. So when the Complaint speaks of wanting to have the Plaintiff moving around town with the most lethal weaponry he can obtain, it is useful to think of how many of

---

[13] Center for American Progress, *Concealed Carry Is Linked to Increased Gun Violence in Wisconsin*, September 1, 2021, https://www.americanprogress.org/issues/guns-crime/reports/2021/09/01/503127/concealed-carry-linked-increased-gun-violence-wisconsin/.

these weapons – if the relief sought is granted enabling anyone to move around with them -- will end up in the hands of criminals. It is not surprising that RAND has evaluated the entire of array of gun scholarship and concludes on the basis of this literature review that more gun carrying leads to pernicious social consequences: specifically, RAND (2023) concludes *at their highest level of evidentiary support* that RTC adoption *increases* total and firearm homicides.[14]

41. The Complaint describes how more lethal weapons will be purchased given the relief it seeks, again without understanding a second major impact of increased gun prevalence. As Donohue et al. (2023) establishes,[15] the array of additional burdens that increased interaction with armed citizens imposes on police leads to numerous adverse consequences. Not least of these, is that there is a roughly 9 percent *drop* in violent crime clearance rates. It is evident that clearly diminishing the success in solving crimes and arresting miscreants that flows from this increased carrying of firearms puts upward pressure on crime rates. Moreover, Nagin (2020)[16] has carefully shown that increased gun prevalence leads to higher levels of police fatally shooting citizens – see Figure 3 which provides a visual confirmation of the findings from his article.

42. Figure 3 highlights that gun prevalence is relatively low in Illinois compared to most other states, and accordingly, as Nagin finds, this partly explains why the state has a lower-than-average rate of police killings of civilians. Increasing gun prevalence – particularly of the most lethal weaponry – can only be expected to increase such killings, thereby exacerbating social strife and degrading police-community relations, with further negative consequences for crime.

43. Since the Complaint at least alludes to the history of weapons since the founding, it is useful to highlight the wisdom of the Founding Fathers as reflected in the very first of the Federalist Papers, which counseled the need to remember that:

> the vigor of government is essential to the security of liberty; that, in the contemplation of a sound and well-informed judgment, their interest can never be separated; and that a dangerous ambition more often lurks behind the specious mask of zeal for the rights of the people than under the forbidden appearance of zeal for the firmness and efficiency of government. History will teach us that the former has

---

[14] RAND. 2023. "Effects of Concealed-Carry Laws on Violent Crime." https://www.rand.org/research/gun-policy/analysis/concealed-carry/violent-crime.html. Accessed on 2023-01-31.
[15] Donohue et al. (2023), "Why Does Right-to-Carry Cause Violent Crime to Increase?"
[16] Daniel Nagin, "Firearm Availability and Fatal Police Shootings," 687(1) *The Annals Am. Acad. Pol. & Soc. Sci*. 49 (2020). Note that Nagin uses the standard, validated proxy for gun prevalence – the percent of suicides that are commited with a firearm.

been found a much more certain road to the introduction of despotism than the latter, and that of those men who have overturned the liberties of republics, the greatest number have begun their career by paying an obsequious court to the people; commencing demagogues, and ending tyrants.

In the course of the preceding observations, I have had an eye, my fellow-citizens, to putting you upon your guard against all attempts, from whatever quarter, to influence your decision in a matter of the utmost moment to your welfare, by any impressions other than those which may result from the evidence of truth.

Federalist No. 1 shows that the Founders had the wisdom to clearly understand in light of the realities of modern America that the security of liberty will be best preserved by the sound and well-informed judgment, based on the best available empirical evidence of truth, that has led to the adoption of the various governmental restrictions being challenged in this litigation.

**Figure 3**

**Fatal Police Shootings of Citizens Rise With Greater Gun Prevalence**



**The Growing Problem of Public Mass Shootings**

35.     Although the long-term (pre-pandemic) secular trend in overall crime over the last 25 years has been benign, the opposite is true for the trend in public mass shootings since the end of the Federal Assault Weapons Ban in 2004. As the Third Circuit stated in upholding New Jersey's restrictions on high-capacity magazines, "plaintiffs attempt to discount the need for [governmental weaponry restrictions] by describing mass shootings as rare incidents" gives insufficient weight "to the significant increase in the frequency and lethality of these incidents." Association Of New Jersey Rifle and Pistol Clubs v. Attorney General of New Jersey (3d Cir., December 5, 2018).

36.     According to a report of the Congressional Research Service, there were an average of 2.7 public mass shootings per year in the 1980s rising to an average of 4.5 events per year from 2010 to 2013.[17] Since then things have only gotten worse.

37.     Writing in May 2018, Louis Klarevas, an Associate Lecturer of Global Affairs at the University of Massachusetts–Boston, noted:

> "Last week's school shooting in Texas marks a new milestone in American history. It's the first time we have ever experienced four gun massacres resulting in double-digit fatalities within a 12-month period. In October 2017, [60] were killed at a concert in Las Vegas. A month later, 26 were killed at a church in Sutherland Springs, Texas. Earlier this year, 17 people lost their lives at a high school in Parkland, Fl. And to this list we can now add the 10 people who lost their lives at a high school in Santa Fe, Texas."[18]

Sadly, the mayhem did not let up in 2019.  In May of that year, 12 were killed in <u>Virginia Beach</u> by a shooter equipped with high-capacity magazines.  In August 2019, a gunman again took advantage of the enhanced lethality of high-capacity magazines to kill <u>23 were killed in El Paso, Texas</u>.  Just 13 hours later, rapid action by police stopped a similarly equipped mass shooter in

---

[17] William J. Krouse & Daniel J. Richardson, Cong. Research Serv., R44126, Mass Murder with Firearms: Incidents and Victims, 1999-2013, at 14-15 (2015), http://fas.org/sgp/crs/misc/R44126.pdf [http://perma.cc/RC4C-SP48]; Mark Follman, "Yes, Mass Shootings Are Occurring More Often," *Mother Jones* (Oct. 21, 2014, 5:05 am), http://www.motherjones.com/politics/2014/10/mass-shootings-rising-harvard.
[18] Louis Klarevas, "After the Santa Fe massacre, bury the 'good guy with a gun' myth: Armed staffers won't deter shooters or keep kids safe," *New York Daily News*, May 22, 2018, http://www.nydailynews.com/opinion/santa-fe-massacre-bury-good-guy-gun-myth-article-1.4003952.

Dayton, Ohio, limiting the body count to <u>nine killed and 27 wounded</u>. That same month, 7 were killed and 25 were wounded – again facilitated by high-capacity magazines – in Odessa, Texas.

38.    In response to the growing list of gun tragedies, President Obama signed into law in 2013 the Investigative Assistance for Violent Crimes Act of 2012, which granted authority to the U.S. Attorney General to assist in the investigation of "violent acts and shootings occurring in a place of public use" and in the investigation of "mass killings and attempted mass killings."[19]

39.    To better understand the nature of these threats, the Federal Bureau of Investigation (FBI) in 2014 initiated a study of "active shooter" incidents designed to identify the prevalence of and trend in these events, how they unfolded, what brought them to an end, and other details that would be of assistance to law enforcement (Id.).[20]

40.    In 2018, the FBI announced that the active shooter problem in the United States was growing ominously, as illustrated in Figure 4 below.[21] At that time, I stressed that this problem would only be getting worse if significant action was not taken to address it. Sadly, my predictions based on the growing lethality of weaponry in the United States have been fulfilled. As bad as the active shooter problem looked in 2018, it is considerably worse today, as seen in the same FBI active shooter data now extended through 2021 in Figure 5. Last year, the 61 active shooter incidents were more than double the previous high of 30 in 2017!

---

[19] Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014, at 4.
[20] Note that if an active shooter bent on inflicting widespread casualties is stopped quickly enough, this incident would not appear in a count of "public mass shootings" that required, say, at least four individuals to be shot and killed, not counting the shooter (which is a standard, although not the only, definition of a mass shooting).
[21] https://www.usatoday.com/story/news/2018/06/20/fbi-most-active-shooters-dont-have-mental-illness-get-guns-legally/718283002/.

**Figure 4**



## Active shooter incidents on the rise, with 2017 topping all years since 2000.

SOURCE FBI data and the FBI's report on active shooter incidents in the United States in 2016 and 2017

41.     The ominous and steep upward trend in the FBI data charting the growth in active shooter incidents is unmistakable.  Not surprisingly, the number of mass shootings clearly is higher following the termination of the federal assault weapons ban in 2004.  In that year, the FBI counted 4 active shooter incidents in which 14 died.  Since then, the mayhem has accelerated so much that in 2021 the FBI counted 61 active shooter incidents killing 103.[22]

---

[22]  FBI, "Active Shooter Incidents in the United States in 2021," https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2021-052422.pdf/view.

**Figure 5**



Active Shooter Incidents, 2000-2021

Source: FBI's Active Shooter Reports

42.     Just in the last two years, the United States has experienced numerous, devastating mass shootings with firearms equipped with high-capacity magazines, including the March 16, 2021 Atlanta spa shootings (8 killed), the March 22, 2021 shooting at King Soopers supermarket in Boulder, Colorado (10 killed); the April 15, 2021 shooting at an Indianapolis FedEx warehouse (8 killed); the May 26, 2021 shooting at a transportation authority facility in San Jose, California (9 killed);[23] the May 14, 2022 supermarket shooting in Buffalo, New York (10 killed); the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children and 2 adults killed); the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed), the November 20, 2022 shooting in a Colorado Springs nightclub in which five people were killed and 17 wounded, and the November 22, 2022 shooting at a Virginia Walmart that left 7 dead. These figures do not reflect the countless people injured, both physically and

---

[23] Woolfolk, John; Salonga, Robert; Savidge, Nico; Baron, Ethan (May 27, 2021). "San Jose shooting: VTA gunman was 'highly disgruntled,' had 32 illegal high-capacity magazines". *East Bay Times*. Walnut Creek, California.

emotionally, and the devastation inflicted on the communities in which they occurred. For example, during the July 4 mass shooting in Highland Park, Illinois, an 8-year-old boy was paralyzed and may never walk again after a bullet severed his spinal cord.[24]

43.    The consequences for the shooter are also severe.  Tellingly, the 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter— a Bushmaster XM-15 semiautomatic rifle—had written, "I am well aware that my actions will effectively ruin my life.  If I'm not killed during the attack, I will go to prison for an inevitable life sentence."[25]

44.    Assault weapons also pose particular dangers and problems to law enforcement. Because of the types of rounds typically fired by assault weapons as well as the muzzle velocities they tend to have, assault weapons are "capable of penetrating the soft body armor customarily worn by law enforcement."[26]  The ability to fire rapidly also allows criminals to more effectively engage with responding police officers, even from a significant distance.[27]  Empirical research by the Violence Policy Center shows that "one in five law enforcement officers slain in the line of duty was killed with an assault weapon," despite the relative rarity of assault weapon use in crime in general.[28]  Christopher S. Koper et al. find that assault weapons, virtually all of which were assault rifles, "accounted for 13.2% of the firearms used in [police murders]" from 2009-2013 (note that this excludes cases involving the officer's own firearm).[29]  Many law enforcement officers and agencies report that the possibility of encountering criminals with assault weapons necessitates that they spend a great deal of time and resources preparing for such encounters.[30] Both the February 2018 mass killing at Parkland High School and the May

---

[24] NBC Chicago, *Cooper Roberts, Boy, 8, Paralyzed in Highland Park Shooting, Continues to Push Forward, Mother Says*, Dec. 19, 2022, https://www.nbcchicago.com/news/local/cooper-roberts-8-year-old-paralyzed-in-highland-park-shooting-continues-to-push-forward-mother-says/3026490/.

[25] Ashley Parker, Tyler Pager, and Colby Itkowitz, "From Sandy Hook to Buffalo and Uvalde: Ten years of failure on gun control," *Washington Post*, May 22, 2022; Jesse McKinley, Jonah E. Bromwich, Andy Newman and Chelsia Rose Marcius, "Buffalo Suspect Planned Attack for Months, Online Posts Reveal," *The New York Times*, May 16, 2022; Craig Whitlock, David Willman, and Alex Horton, "Massacre Suspect Said He Modified Bushmaster Rifle to Hold More Ammunition," *Washington Post*, May 15, 2022.

[26] Brown Decl. ¶ 23, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).
[27] Kyes Decl. ¶ 15-17, *Worman v. Healy*, 293 F. Supp. 3d 251 (D. Mass. 2018).
[28] Violence Policy Center, *Officer Down: Assault Weapons and the War on Law Enforcement*, May 2003, *available at* http://www.vpc.org/studies/officer%20down.pdf (last visited Oct. 12, 2018) at 5.
[29] Christopher S. Koper et al. 2017, Finding at 317.
[30] Brady Center to Prevent Gun Violence 2008 at 4-6.

2022 mass killing in Uvalde, Texas – where police delayed entering the school during a shooting – vividly underscored how police responses to violence are impaired when the officers are confronted by a shooter armed with an assault rifle.

### The Importance of the Instrumentality Effect

45.     Decades of research has shown that there is a considerable variation in the survivability of a gun assault depending on the instrumentality employed.  A seminal 1972 study by UC Berkeley Professor Frank Zimring found "that the outcome of gun assaults had a large random element, and that the power of the firearm was one systematic factor influencing the likelihood that an individual with a gunshot injury would survive."[31]

46.     A meticulous study by Anthony Braga and Phil Cook in 2018 has powerfully confirmed this instrumentality effect.  Braga and Cook examined the files of 511 gunshot victims kept by the Boston Police Department and found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound.  Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased—even though the caliber was not correlated with observable indicators of the intent and determination to kill by the shooter.  The shooter's use of a medium caliber handgun (.38, .380, and 9 mm) more than doubled the odds that the wounded victim would die compared to small caliber handguns (.22, .25, and .32).  Large caliber handguns (.357 magnum, or greater) more than doubled the odds of death compared to medium caliber handguns.

47.     The authors conclude that:

> The results here support the view that the intrinsic power and lethality of the weapon had a direct effect on the likelihood that a victim of a criminal shooting died.  For Boston, in the period studied here, simply replacing larger-caliber guns with small-caliber guns with no change in location or number of wounds would have reduced the gun homicide rate by 39.5 percent.  It is plausible that larger reductions would be associated with replacing all types of guns with knives or clubs (p.8, Braga and Cook 2018).[32]

---

[31] The description of the Zimring study comes from Braga and Cook (2018), infra, note 6.

[32] Anthony A. Braga and Philip J. Cook, "The Association of Firearm Caliber with Likelihood of Death from Gunshot Injury in Criminal Assaults," *JAMA Network Open.* 2018; 1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2688536.

48.     Of course, the conclusion of the Braga and Cook study—that switching to less deadly firearm options could reduce firearm deaths—applies directly to bans on assault weapons and high-capacity magazines.  The greater the lethality of the weapon, the more killed and injured in active shooter incidents.  This was clearly illustrated in a study for the *Journal of the American Medical Association* that examined deaths and injuries documented in the FBI Active Shooter Database from 2000-2017.[33]  The authors found that deaths and injuries were substantially higher for the 61 active shooter incidents using a semiautomatic rifle versus the 187 episodes using some other firearm.  Specifically, in the incidents in which the shooter employed a semi-automatic rifle the average number killed or wounded was 9.72 versus only 5.47 killed or wounded when other firearms were used. (Note that the authors excluded the horrific Las Vegas shooting from the numbers above, since that case was so extreme, with 60 killed and almost 500 wounded—all with semi-automatic rifles.)

49.     Indeed, if one looks at the deadliest acts of intentional mass violence in the United States since 9/11, they all share one feature.  The killer in every case used an assault weapon and/or a firearm equipped with a high-capacity magazine.  Table 1 provides a list of these most deadly mass violence incidents, with the numbers killed ranging from 13 – 60 in these mass shooting spasms of violence aided by the greater lethality afforded by these weapons and accessories formerly banned by the federal government and currently banned under Illinois law. (Eleven incidents are listed because there were two killings tied for tenth with 13 killed.)

---

[33] Elzerie de Jager, et al., "Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States," *JAMA*. 2018;320(10):1034-1035. doi:10.1001/jama.2018.11009, https://jamanetwork.com/journals/jama/fullarticle/2702134.

**Table 1. The 11 Deadliest Acts of Intentional Violence in the U.S. since 9/11**

| Deaths | Date | Location | Used Assault Weapons and/or High-Capacity Magazines |
|---|---|---|---|
| 60 | October 1, 2017 | Las Vegas, NV | ✓ |
| 49 | June 12, 2016 | Orlando, FL | ✓ |
| 32 | April 16, 2007 | Blacksburg, VA | ✓ |
| 27 | December 14, 2012 | Newtown, CT | ✓ |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ |
| 23 | August 3, 2019 | El Paso, TX | ✓ |
| 21 | May 24, 2022 | Uvalde, TX | ✓ |
| 17 | February 14, 2018 | Parkland, FL | ✓ |
| 14 | December 2, 2015 | San Bernardino, CA | ✓ |
| 13 | April 3, 2009 | Binghamton, NY | ✓ |
| 13 | November 5, 2009 | Fort Hood, TX | ✓ |

50.     In addition to the well-documented increase in overall public mass shootings in the United States, there has been an equally dramatic rise of these events in school settings.[34] Indeed, the authors of a study on mass school shootings – written before the May 2022 shooting at Robb Elementary School in Uvalde, Texas left 21 dead – concluded in 2018 that "More people have died or been injured in mass school shootings in the US in the past 18 years than in the entire 20th century."[35]  The impact of the elevated stress experienced by students and parents across the country as the reality of America's tragic mass shooting problem penetrates their consciousness is undeniable. While these horrendous gun massacres are relatively rare compared with the

[34] Antonis Katsiyannis, Denise K. Whitford, Robin Parks Ennis. Historical Examination of United States Intentional Mass School Shootings in the 20th and 21st Centuries: Implications for Students, Schools, and Society. *Journal of Child and Family Studies*, 2018; DOI: 10.1007/s10826-018-1096-2.

[35] Springer, "Rapid rise in mass school shootings in the United States, study shows: Researchers call for action to address worrying increase in the number of mass school shootings in past two decades." *ScienceDaily*, 19 April 2018. <www.sciencedaily.com/releases/2018/04/180419131025.htm>.

totality of gun homicides in the U.S, each one harms tens of millions, if not hundreds of millions, beyond those killed or wounded at the scene.

51.    Indeed, consider the impact of the following student response to a recent mass shooting at a Texas high school:

> "It's been happening everywhere," student Paige Curry said after a gunman's attack at Santa Fe High School … killed [ten and wounded ten]. Asked if there was a moment where she felt as though the shooting could not be real, could not be actually happening at her school, Paige shook her head. "No, there wasn't," she said with a small hitch in her voice.  "I've always kind of felt like eventually it was going to happen here, too," she said. "So, I don't know. I wasn't surprised, I was just scared."[36]

This is the reality of modern America: fear over the prospect of mass shootings for millions of students and their parents throughout the U.S. The harm of mass shooting in the United States is measured in the millions, far beyond the narrow death count the plaintiff seeks to minimize.

52.    The FBI's analysis of active shooters over age 18 found that 65 percent had no adult convictions prior to the active shooting event.[37]  Moreover, the FBI report found that only a tiny fraction would have qualified as "adjudicated mental defectives" that would have been barred from possessing weapons.[38]  In other words, the lack of a basis for prohibiting gun ownership under current law for most active shooters means that tighter background checks would not have likely blocked their homicidal objectives.

53.    The *Wall Street Journal* analyzed data from the 32 school shootings since 1990 with at least three victims dead or injured.[39]  In 25 cases, the shooters were in their teens or younger. Of the 20 cases in which information was available, 17 of the shooters obtained their guns from their home or a relative.  In other words, law-abiding citizens who possess weapons

---

[36] Adam Carlson, "'I've Always Felt Like Eventually It Was Going to Happen Here, Too,' Says Texas Shooting Survivor," People, May 18, 2018, https://www.yahoo.com/entertainment/apos-ve-always-felt-eventually-174424389.html.
[37] Silver, J., Simons, A., & Craun, S. (2018). A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 – 2013. Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 20535.
[38] The Gun Control Act of 1968 prohibits gun possession by felons and adjudicated "mental defectives" (18 U.S.C. §922 (d) (4) 2016).
[39] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," (April 5, 2018), https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600.

equipped with high-capacity magazines can and do unwittingly assist their young children and relatives who take their lethal weaponry to commit mass shootings.

54.    Nor can we hope to limit these horrific crimes by elevating the probability of apprehending mass shooters once their crime is completed since almost all mass killers are either captured, commit suicide, or are killed at the scene.[40] Tellingly, the recent 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter — a Bushmaster XM-15 semiautomatic rifle equipped with high-capacity magazines – had written, "I am well aware that my actions will effectively ruin my life. If I'm not killed during the attack I will go to prison for an inevitable life sentence."

55.    Note the contrast of a school attack in China that occurred only hours before Adam Lanza used an assault weapon armed with 30-round magazines to kill 26:  while 22 children and an adult were injured in the attack in China, no one died – a likely result, at least in part, of the attacker using a knife instead of an assault weapon.[41]

56.    Consider the assassination attempt on the life of Ronald Reagan by John Hinckley on March 30, 1981. Hinckley fired six shots with a six-shot .22 caliber revolver – striking Reagan and three others (White House Press Secretary James Brady in the head, Metropolitan Police Officer Thomas Delahanty in the neck, and Special Agent Tim McCarthy in the abdomen as he turned to shield the president).  Hinckley was tackled after he had emptied his gun, and all four of the wounded victims survived the attack.[42]

57.    A similar attempt today would likely by far more devastating -- as a modern semi-automatic pistol with 15 or more bullets would have enabled the assassin to fire off many more rounds, hitting many more victims and delaying the opportunity to stop his attack.  Moreover, as careful research has demonstrated, a typical 9 mm pistol round would have been far more lethal

---

[40] According to the FBI, in 156 of the 160 episodes, the mass shooter was either captured, committed suicide (64 cases), or was killed (30 cases). Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014.  Of course, those who are captured alive are already punished as severely as the law allows, and the abundant number of mass shootings in Texas and Florida highlights the inefficacy of the death penalty in addressing this problem.

[41] Mallory Ortberg, "Man Arrested in China After Knife Attack on Students," http://gawker.com/5968740/man-arrested-in-china-after-knife-attack-on-students.

[42] U.S Secret Service, Forty Years Since the Assassination Attempt on President Reagan, https://www.secretservice.gov/reagan40thanniversary.

than a .22 caliber round[43] and the likelihood that individual victims would suffer more bullet wounds – which occurs with high-capacity magazines -- would also enhance the risk of death. We need only to look to another attempted assassination – Jared Loughner's 2011 assault on Congresswoman Gabby Giffords to see the greater damage inflicted when a Glock weapon with a high-capacity magazine is used. Loughner was able to empty his 33-round magazine in about 19 seconds, killing six, including a federal judge and a 9-year-old girl, and seriously wounding 13 others, including Ms. Giffords, who was shot in the head at close range.[44] Indeed, the only thing that limited the devastation to this unspeakable level was that an unarmed citizen was able to tackle Loughner when he was trying to reload another high-capacity magazine into his Glock. Of course, with a more limited magazine, the deadly rampage would have been stopped earlier, and fewer lives and families would have been shattered and destroyed.

**The Far-Reaching Costs of Public Mass Shootings**

58.     The large number of overall gun homicides compared with mass shootings should not obscure that major public mass shootings cause profound social damage. This harm of course includes the tragic deaths and extraordinarily devastating injuries, but extends far beyond these mere statistical counts of the fatal and non-fatal casualties. Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety. Horrific mass shootings – such as those perpetrated by Adam Lanza at Sandy Hook School (killing 26), Stephen Paddock in Las Vegas (killing 59 and shooting 422 others), or

---

[43] An inspired study by Anthony Braga and Phil Cook in 2018 that examined the files of 511 gunshot victims kept by the Boston Police Department found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound. Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased – a victim was twice as likely to die from a wound from a 9 mm pistol than from a .22 caliber revolver.

Two studies have found that the fatality rates of those victims hit by more than 1 bullet were more than 60% higher than the fatality rates of gunshot wound victims who were hit by only a single bullet. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. Arch Surg. 1992;127(6): 694–698; Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. J Quant Criminology. 2001; 17(1):81–88.

Not surprisingly, analyses of gunshot wound victims at level I trauma centers suggest that high-capacity magazines are associated with higher rates of multiple bullet wounds per victim. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. J Trauma Acute Care Surg. 2014;76(1):2–9; Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. J Trauma Acute Care Surg. 2017;84(1):58–65.

[44] James Ball, "Loughner faces victims in being sentenced to life in prison without parole," *The Washington Post*, November 8, 2012, https://www.washingtonpost.com/world/national-security/gabrielle-giffords-confronts-shooter-jared-lee-loughner-in-court/2012/11/08/09968fe2-29c7-11e2-b4e0-346287b7e56c_story.html.

by ISIS sympathizers at Inland Regional Center in San Bernardino (killing 14)[45] and at Pulse in Orlando (killing 49)[46] or at various houses of worship in Charleston, South Carolina (killing 9), Sutherland Springs, Texas (killing 26), and Pittsburgh, Pennsylvania (killing 11) – although small in number compared to the total number of homicides, have generated widespread apprehension and increased demand for effective responses from government. It is abundantly clear that the horrors of mass shootings -- such as the killing of 20 students and 6 teachers at Sandy Hook Elementary School in Newtown, Connecticut in December 2012; the killing of 19 elementary school students and two teachers in Uvalde, Texas; and 10 individuals who died in a hate crime in Buffalo, New York, both in May 2022 -- have inflicted psychological distress far beyond the contours of those small communities and indeed caused suffering throughout the entire country (and the world).

59.    A considerable scientific literature has documented the significant emotional and mental health harms that mass shootings inflict on survivors, community members, wounded victims, active responders, and children. The consistent finding of these studies is that mass shootings can lead to increased levels of post-traumatic stress disorder (PTSD), anxiety, and depression.[47] For example, on February 14, 2008, Steven Kazmierczak opened fire in a crowd of Northern Illinois University students, killing 5 people and wounding 17 more before killing himself. This shooting led to dramatic increases in the levels of post-traumatic stress (PTS) symptoms in a sample of Northern Illinois University students.[48]

---

[45] Christine Hauser, San Bernardino Shooting: The Investigation So Far, N.Y. Times (Dec. 4, 2015), http://www.nytimes.com/2015/12/05/us/san-bernardino-shooting-the-investigation-so-far.html (noting fourteen were killed in December 2015).

[46] Gregor Aisch et al., What Happened Inside the Orlando Nightclub, N.Y. Times (June 12, 2016), http://www.nytimes.com/interactive/2016/06/12/us/what-happened-at-the-orlando-nightclub-shooting.html (noting a gunman killed forty-nine in a June 2016 attack).

[47] Shultz, James M., Siri Thoresen, Brian W. Flynn, et al. 2014. "Multiple Vantage Points on the Mental Health Effects of Mass Shootings." *Current Psychiatry Reports.* 16:469. To complete this meta-analysis of the scientific literature from 2010 to early 2014, the authors searched the PUBMED, SCOPUS, PILOTS, PSYCINFO, and CINAHL databases using combinations of terms for mass shooting incidents with MeSH (Medical Subject Heading) vocabulary on mental health.

[48] Bardeen, Joseph R., Mandy J. Jumpula, and Holly K. Orcutt. 2013. "Emotional regulation difficulties as a prospective predictors of posttraumatic stress symptoms following a mass shooting." *Journal of Anxiety Disorders* 27, no.2 (March): 188-196. This longitudinal study assessed the presence of PTS symptoms in a sample of female undergraduates at Northern Illinois University at three time points: T1, the starting period (pre-shooting) (n=1,045), T2, short term post-shooting (17-100 days post-shooting, n=691), and T3, roughly 7-8 months post-shooting (n=588). In the sample of 691 students that were assessed at T1 and T2, clinically significant levels of PTS rose from 20% pre-shooting to almost 50% post-shooting.

60.     Similar findings of the broad social damage from mass shootings were also documented in three studies of the broader harm from the 2011 Norway shooting, when Anders Breivik killed 68 people at a Youth Camp and wounded at least 32. Four to five months following the shooting, survivors were six times more likely to exhibit elevated PTS symptoms compared to an age- and gender-adjusted sample derived from the overall population.[49] But the psychic trauma was not limited to the victims and survivors of mass shootings.  Two additional studies, which focused on the broader harm to the surrounding community following the Breivik shooting in Norway, found measurable increases in stress reactions in the general population, with the effects especially strong for young people with a prior history of trauma.[50] Sadly, we must remember that Breivik wrote in his manifesto that he was grateful that he was able to purchase ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him since these were not available to him in Europe.

61.     More generally, survivors of serious gunshot injuries and multiple victim incidents involving intentionally inflicted harm are at higher risk of experiencing PTS symptoms.[51]

---

[49] Dyb, Grete, Tine K. Jensen, Egil Nygaard, et al. 2014. "Post-traumatic stress reactions in survivors of the 2011 massacre on Utoya Island, Norway." *The British Journal of Psychiatry* 204, no. 5 (May): 361-367. Of the 490 survivors from the Utoya shooting invited to participate in the study, 325 agreed. Semi-structured face-to-face interviews were conducted by health personnel approximately 4-5 months after the shooting.

[50] Thoresen, Siri, Helene Flood Aakvaag, Tore Wentzel-Larsen, et al. 2012. "The day Norway cried: Proximity and distress in Norwegian citizens following, 22nd July 2011 terrorist attacks in Oslo and on Utoya Island." *European Journal of Traumatology* 3, (Nov). The study drew a representative sample from the Norwegian Population Registry. A total of 465 individuals living in Oslo and 716 individuals living in other parts of Norway were interviewed over the phone 4-5 months after the Breivik attacks.

Nordanger, Dag, Kyrre Breivik, Bente Storm Haugland, et al. 2014. "Prior adversities predict posttraumatic stress reactions in adolescents following the Oslo terror events 2011." *European Journal of Traumatology* 5, (May). The study was based on a survey of 10,220 Norwegian high school students that was conducted 7 months after the Oslo and Utoya terrorist attacks. It collected information both on adverse life experiences (e.g. exposure to sexual trauma, violence, etc.) and the exposure and reactions to the Breivik attacks.

[51] Greenspan, Arlene I., and Arthur L. Kellerman. 2002. "Physical and Psychological Outcomes 8 Months After Serious Gunshot Injury." The Journal of Trauma: Injury, Infection and Critical Care 53, no.4 (Oct): 709-716. This study interviewed 60 patients who were admitted to a Level 1 trauma center for firearm-related injuries, first, at the time of their hospitalization, and second, 8 months after they were discharged. Most respondents indicated symptoms of PTS 8-months post-discharge, with 39% reporting severe symptoms of intrusion and 42% reporting severe avoidance behaviors.

Santiago, Patcho N., Robert J. Ursano, Christine L. Gray, et al. 2013. "A Systematic Review of PTSD Prevalence and Trajectories in DSM-5 Defined Trauma Exposed Populations: Intentional and Non-Intentional Traumatic Events." *PLoS One* 8, no. 4 (April). The authors identified 2,537 articles published from January 1, 1998 to December 31, 2010 and covering longitudinal studies of directly exposed trauma populations. Of these articles, they closely surveyed 58 articles that met the DSM-5 definition of having experienced a traumatic event and assessed PTSD symptoms at two or more time points within a 12-month window. The authors found that in the 5 studies with sufficient data, a median of 37.5% of individuals exposed to intentional traumatic events developed PTSD.

62.     Not surprisingly, those who have experienced previous trauma or psychological disorders are especially vulnerable to potential mental health problems after a mass shooting.[52] Moreover, children are more susceptible experiencing PTS symptoms following a mass shooting. For example, a study of 320 students who survived a mass public shooting at a Danish high school found that seven months later 35 percent of students reported PTS symptoms and 7 percent had PTSD.[53]

63.     A recent study of broad scope by Maya Rossin-Slater et al (2019) tries to estimate the impact on mental health of the over 240,000 American students who experienced and survived a school shooting in the last two decades. Using large-scale prescription data from 2006 to 2015, the authors examined the effects of 44 school shootings on youth antidepressant use in a difference-in-difference framework. Their main finding was that local exposure to fatal school shootings increased youth antidepressant use by 21.4 percent in the following two years.[54] Given such evidence, any notion that the problem of public mass shootings in the U.S. is relatively minor is untenable. With only 5 percent of the world's population, the U.S. has roughly one-third of the public mass shootings across 171 countries since the late 1960s.[55]

64.     These troubling findings take on even greater significance and urgency in light of the research on the explosion of children who experience shootings at their schools:

---

[52] See Shultz et al (2014), supra note 47, and Littleton, Heather, Amie E. Grills-Taquechel, Danny Axsom, et al. 2012. "Prior Sexual Trauma and Adjustment Following the Virginia Tech Campus Shooting: Examination of the Mediating Role of Schemas." *Journal of Psychological Trauma* 4, no.6 (Nov): 579-586. This study had interviewed 215 Virginia Tech college women prior to the school's mass shooting and then followed up with them two months and then one year after the shooting. The authors compared the post-shooting PTSD and depression symptoms of women with and without a history of sexual trauma. The authors found that women who had experienced sexual trauma reported significantly higher levels of depression (p=0.006) and shooting-related PTSD symptoms (p=0.04) in the post-shooting interview.

[53] Elklit, Ask, and Sessel Kurdahl. 2013. "The psychological reactions after witnessing a killing in public in a Danish high school." *European Journal of Traumatology* 4, (Jan). Seven months after the mass public shooting, researchers administered the Harvard Trauma Questionnaire to Danish students in the second and third grade of high school (this is roughly equivalent to the final two years of high school in the US system). The questionnaire was also mailed to parents' addresses of students who had graduated in June. Of the 415 students enrolled at the time of the shooting, 320 students returned the questionnaire.

[54] Maya Rossin-Slater, Molly Schnell, Hannes Schwandt, Sam Trejo, Lindsey Uniat, Local Exposure to School Shootings and Youth Antidepressant Use, NBER Working Paper No. 26563 (December 2019), https://www.nber.org/papers/w26563. See also, "My son survived Sandy Hook. It's changed me as a parent," *The Washington Post,* December 13, 2019, https://www.washingtonpost.com/lifestyle/2019/12/13/i-cry-high-school-meets-how-sandy-hook-changed-me-parent/.

[55] Lankford, Adam, "Public Mass Shooters and Firearms: A Cross-National Study of 171 Countries," *Violence and Victims*, Vol 31, Issue 2, DOI: 10.1891/0886-6708.VV-D-15-00093, http://connect.springerpub.com/content/sgrvv/31/2/187.

In the aftermath of the Marjory Stoneman Douglas High massacre on Feb. 14, 2018, [*The Washington Post*] reported for the first time how many children in the United States had endured a shooting at a K-12 school since 1999, and the tally was far higher than what we expected: more than 187,000….

Now, just five years later, and despite a pandemic that closed many campuses for nearly a year, the number has exploded, climbing past 338,000….

By nearly every meaningful measure, 2022 was the worst year of school shootings in history. Across 46 acts of violence during school hours, 34 students and adults died while more than 43,000 children were exposed to gunfire at the places they go to learn and grow….

"This is a clear and pressing public health issue," [according to] Steven Schlozman, a child psychiatrist and associate professor at Dartmouth College…. "We have very good data that children in proximity to frightening circumstances, such as those that trigger school lockdowns, are at risk for lasting symptoms. These include everything from worsening academic and social progression to depression, anxiety, poor sleep, post-traumatic symptomatology and substance abuse."

**Banning Assault Weapons Saves Lives and Reduces Injuries**

64.     The objective of Massachusett's assault weapons ban is to reduce the prevalence of weapons that will be most attractive to mass killers and most effective for committing mass murder or the type of rapid, sustained deadly fire that would be most advantageous for criminal purposes.  In other words, there are two dimensions of assault weapons that are highly problematic in civilian hands: their dangerous symbolic and cosmetic features as well as their capacity to assist in mass killing. The zealous, pro-gun Texas politician Jerry Patterson – author of the 1995 Texas law that first allowed concealed carry of handguns – recognized the importance of the symbolic and cosmetic appeal of these weapons when he acknowledged that the primary value of an AR-15 in civilian life is to be "a look-at-me gun."[56] Unfortunately, no one desires this symbolic feature more than mass shooters, who frequently express the view that assault weapons will finally make others realize they are powerful.  Moreover, as Senator Mark Warner noted in referring to a new proposed federal assault weapons ban, we must "recognize

---

[56] Rachel Monroe, "Are Texas Republicans Budging on Gun Control?" *The New Yorker* (June 16, 2022).

that the features and tactical accessories that define assault weapons under this legislation were designed for a specific purpose — to give soldiers an advantage over the enemy, not to mow down students in school hallways."[57] The ominous and growing problem of mass public shootings since 2013 convinced the Virginia Senator to reverse his prior opposition to an assault weapons ban.

65.     Rifles that incorporate military-style features add to their capacity to enhance the death toll in a public mass shooting event:  pistol grips and thumbhole stocks enable easier spray-firing; a collapsible or folding stock allows the weapon to be shortened and more easily concealed;[58] and barrel shrouds are essential for mass shooters to continuously fire their weapons without suffering discomfort from an overheated barrel.[59] As a consequence, these attributes make these weapons particularly appealing to mass shooters, drug traffickers, and people who may want to exchange fire with law enforcement.[60]

66.     Assault weapons, at least of the long gun variety, tend to have higher muzzle velocities than ordinary handguns.[61] They also tend to utilize .223 rounds designed to fragment and mushroom in a person's body, as illustrated in the 60 Minutes video referenced below at footnote 93.[62] These two factors in conjunction mean that injuries from being shot by assault

---

[57] Mark Warner, "I voted against an assault weapons ban. Here's why I changed my mind," *The Washington Post*, October 1, 2018, https://www.washingtonpost.com/opinions/i-voted-against-an-assault-weapons-ban-heres-why-i-changed-my-mind/2018/10/01/3bfa76a0-c594-11e8-9b1c-a90f1daae309_story.html.

[58] Erica Goodejan, "Even Defining 'Assault Rifles' Is Complicated," *The New York Times* January 16, 2013, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html.

[59] *See* Rovella Aff. ¶¶ 34-38, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); H.R. Rep. No. 103-489 (1994) at 18-19.

[60] *See* H.R. Rep. No. 103-489 (1994) at 14-16; Brady Center to Prevent Gun Violence, *Assault Weapons: Mass Produced Mayhem*, October 7, 2008, *available at* http://www.bradycampaign.org/resources/assault-weapons-mass-produced-mayhem (last visited Oct. 12, 2018) at 3; Batts Decl. ¶¶ 33, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), aff'd in part, vacated in part, remanded sub nom. Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017).

[61] *See* Defts' Stmt. Docket Entry 63 ¶¶ 44–45, 58–59, 61, 64–65, *Worman v. Healey*,1-17-CV-10107, 293 F. Supp. 3d 251 (D. Mass. 2018).

[62] *See* Batts Decl. ¶¶ 44-45, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), aff'd in part, vacated in part, remanded sub nom. Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017); Rovella Aff. ¶¶ 39, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); Duncan Long, *The Complete AR-15/M16 Sourcebook* (2d ed.), 2001 at 50; Colwell Decl. at 2-4, *Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018).

weapons tend to cause more complex damage to the body in ways that make these wounds more dangerous and deadly in both the short and long term.[63]

**Banning High-Capacity Magazines Saves Lives and Reduces Injuries**

67.     Louis Klarevas, the author of Rampage Nation: Securing America from Mass Shootings (Amherst, NY: Prometheus 2016), has become the primary authority on research concerning mass shootings in the United States. Klarevas finds that the use of large-capacity magazines leads to more bullet wounds for victims (thereby substantially increasing the death toll of those who are shot), results in more shots fired (thus increasing the number of individuals who are shot) and reduces the capacity of potential victims to flee to safety or take effective defensive action.

68.     Klarevas was the first to highlight that the ten-year federal ban on assault weapons and high-capacity magazines reduced the toll from mass shootings. Klarevas illustrated that the pattern of the deadliest mass shootings changed over the period from 1984-2014.  Examining gun massacres in which at least six were killed, Klarevas found that these incidents and the number of resulting deaths fell during the decade in which the federal assault weapons ban was in place and then rebounded when the ban was lifted in 2004.

69.     Specifically, Klarevas found that, from 1994-2004, there were only 12 incidents – slightly over one per year – due to assault weapons, resulting in 89 deaths.  In the following decade, when the federal assault weapons ban was no longer in place, there was a dramatic surge in both the number of gun massacres and the total death toll: From 2004-2014, the number of gun massacres rose from 12 to 34 and the number of gun deaths jumped from 89 to 302. Moreover, since overall crime was trending down over this period, the link between the expansion of high-capacity magazines following the lapse in the federal assault weapon ban and the increased number of gun massacres is further buttressed.

---

[63] *See* Colwell Decl. in Supp. of Defs.' Opp. to Mot. for Prelim. Inj. ¶ 8.

**Figure 6**



# Gun massacres fell during the assault weapons ban

Gun massacre (6+ deaths) incidents and fatalities in the decades before, during and after the federal assault weapons ban of 1994

Source: Louis Klarevas
THE WASHINGTON POST

70.     Since the Klarevas data ended in 2014, I conducted my own study both to verify the accuracy of his findings and then to extend the analysis forward to the present.  In implementing his definition of a gun massacre as a mass shooting incident in which 6 or more people died, Klarevas notes in his book that "It doesn't matter if there is one gunman or several gunmen. It doesn't need to occur in public. It can be for any reason whatsoever." In my study, I chose to use the *Mother Jones* database, which does limit the gun crimes to killings occurring in a public place and omits killings related to armed robbery, gang activity, or domestic violence in accord with recent FBI practice.  I augmented the Mother Jones data whenever I found it had missed relevant mass shootings that appeared in other mass shooting databases.

71.    Figure 7 below shows the number of incidents of such gun massacres and the deaths resulting therefrom based on these criteria.[64] The figure illustrates clearly that the number and deadliness of these mass shootings dropped during the ten years of the federal assault weapons ban from September 1994 through 2004 and rose sharply after the federal ban was lifted.[65] Although the number of incidents is too limited to highlight the 25 percent drop in gun massacres, the 40 percent drop in overall fatalities during the period of the federal ban is substantial and noteworthy.

72.    After the federal ban lapsed in 2004, the gun market was flooded with increasingly more powerful weaponry that allowed mass killers to kill ever more quickly with predictable results.  The decade after the ban elapsed saw a 266 percent increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued downward (reflected in the dotted line in Figure 7).  In other words, my independent assessment confirms the pattern first revealed by Louis Klarevas: gun massacres fell during the assault weapons ban and rose sharply when it was removed in 2004.

73.    What has happened since 2014 is even more alarming. In five years, the number of fatalities in these gun massacres has already topped the previous high that occurred during the first decade after the federal assault weapon ban was removed. This murderous leap has occurred at the same time that overall violent crime persisted on a downward trend, as the dotted line in Figure 7 confirms.[66] If we continue at the post-2014 pace until 2024, the last column of Figure 7 shows that we will have an astonishing order of magnitude increase in gun massacre deaths over a 20-year period.[67]

---

[64] Figures 1 and 2 are replicated from John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV and discussed further in John Donohue, "The Swerve to 'Guns Everywhere:' A Legal and Empirical Analysis," *Law and Contemporary Problems*, (forthcoming, February 2020).  See also the earlier piece: John Donohue and Theodora Boulouta, "That Assault Weapon Ban? It Really Did Work," *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html.

[65] The Federal Assault Weapons Ban took effect September 13, 1994, and expired on September 13, 2004, due to a sunset provision that enabled the law to lapse after President George W. Bush reneged on his campaign promise to support retention of the federal ban.

[66] This downward trend in violent crime even as mass shootings rise after 2004 is important evidence of the harmful impact of ending the federal assault weapons ban.  Without that evidence one might mistakenly think that the overall violent crime drop of roughly 14 percent during the decade of the federal assault weapons ban was simply part of downward crime which itself explains the drop in mass shooting deaths. The experience after 2004 undermines that view.

[67] Note that the numbers of mass shootings would be substantially larger using alternative definitions, such as the Gun Violence Archive definition of *four individuals wounded by gunfire in a single incident*.  Using that more

74.     The evident effectiveness of the ten-year federal ban in reducing mass shooting deaths is exactly what we would expect, since during that decade mass killers could not simply enter a gun store and buy a weapon with a large capacity magazine, as they can do in most of the U.S. today.[68]

75.     Figure 8 illustrates the average number of fatalities in each mass shooting for the same four periods shown in Figure 7.  The pattern is the same:  fatalities per incident fell during the federal assault weapon ban and have risen sharply thereafter.  With the weaponry available to citizens getting increasingly more potent and plentiful, the average number of people who die in every incident has increased by 90 percent since the decade after elimination of the federal assault weapons ban.

76.     Assault weapons and/or high-capacity magazines were used in all 15 gun massacres since 2014 in which at least six were killed (other than the shooter) shown in Figure 7; all 272 people who died in these 15 gun massacres were killed by weaponry prohibited under the federal assault weapons ban (as well as the comparable Illinois  ban).[69]

---

capacious definition, there have been 366 mass shootings in the first 318 days of 2019, killing 408 and injuring 1477. https://www.insider.com/number-of-mass-shootings-in-america-this-year-2019-8.
[68] With the adoption of a new law in Illinois this week, 9 states and the District of Columbia ban assault weapons and all of those states plus Colorado and Vermont restrict the permissible size of ammunition magazines.
[69] After Figure 7 was created another victim of the Las Vegas shooting died after two horrendous and agonizing years as a quadriplegic, which elevates to 272 the number of deaths form public gun massacres in the last five years. The following article highlights some of the devastating injuries that result from being shot by an assault rifle, such as that used by the Las Vegas shooter. https://www.kptv.com/news/vancouver-woman-says-sister-injured-in-las-vegas-shooting-has/article_af9198c6-099c-11ea-87c1-37de7096726f.html.

**Figure 7**



Gun Massacres Were Less Frequent And Less Deadly During The Federal Assault Weapons Ban
(six or more killed, not including perpetrator)

Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place, except for the last column, which ends in 9/2/2019. Violent crime rate data from UCR; dots mark ten-year averages, except for the last dot, which ends in 6/2018.

**Figure 8**

77.    This instrumentality effect was further demonstrated in an article I authored with Phil Cook since my 2019 Report, demonstrating that the federal assault weapons ban—which banned both new semi-automatic assault rifles with certain features that made them attractive to mass shooters *and* new ammunition magazines that could hold more than ten rounds— suppressed deaths in public mass shootings.[70]  Figure 9 below shows that the deaths that occurred from these public mass shootings over the period from 1985-2019 in five year increments.  The Figure highlights that by the second half of the ten-year existence of the federal

---

[70] Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," *JAMA*. 2022; 328(12):1191-1192, https://jamanetwork.com/journals/jama/fullarticle/2796675.

assault weapons ban (1999-2004), fatalities from public mass shootings using banned weaponry had virtually been cut in half (falling from 30 down to 16). Conversely, there was no decline in public mass shooting deaths over this period with non-banned weaponry.

**Figure 9**



Victim Counts for Mass Public Shootings in the United States, 1985 - 2019
Using Assault Weapons and/or High-Capacity Magazines versus Other Firearms

in the last five year period, the 18 incidents with the more lethal weapons were far more deadly than the 14 incidents with the less lethal firearms.

78.     After the federal ban lapsed in 2004, the deaths from public mass shootings using the previously banned weaponry rose sharply: rising from 16 in the last five years of the federal ban to 271 in the five-year span from 2015-2019—with the latter figure 17 times as high as the former. Meanwhile, there was relatively little movement in public mass shooting deaths using the less-lethal weaponry (neither an assault weapon nor a high-capacity magazine). Indeed, as Figure 9 illustrates, there was roughly the same number of deaths from less lethal weaponry in the five-years prior to the federal assault weapons ban (1990-1994) as there was from 2015-2019—specifically 83 in the pre-ban period and 81 in the final period.

79.     Figure 9 also highlights that while there was a roughly comparable *number of incidents* of public mass shootings that used either the most lethal (previously federally banned) weaponry or less lethal firearms not subject to the federal ban, the incidents involving assault

weapons and/or high-capacity magazines were far more lethal. Specifically, the 18 public mass shootings conducted with the most lethal weapons killed 271 (roughly 15 deaths per episode), while the 14 public mass shootings with the less lethal firearms killed 81 (about 5.8 deaths per episode).

**Restrictions on Assault Weapons Reduce Mass Shooting Deaths and Casualties**

80.     Table 2 provides an original econometric analysis of Mother Jones mass shootings data from 1982-2019 to assess empirically whether assault weapons bans at the state and federal level have limited mass shootings deaths and overall casualties. This analysis reveals that such bans do generate statistically significant reductions in mass shooting deaths and casualties.

81.      This panel data analysis simultaneously examines data from all 50 states and the District of Columbia from 1982-2019 to ascertain what happens when federal or state bans on assault weapons and/or high-capacity magazines go into effect or are eliminated. The statistical model specifically controls for national influences on mass shootings that occur each year ("year effects") as well as the stable differences in mass shooting rates across states ("state effects").[71] This panel data model also controls for a variety of criminal justice, socio-economic, and demographic factors that could also influence violent crime.[72]

82.     Table 2 indicates that having an assault weapon ban (whether at the state or federal level) and/or high-capacity magazine ban in place in a given state is associated with a statistically significant decrease in per capita rates of deaths and casualties due to mass shootings.[73] Overall, this analysis serves to further reinforce and expand upon earlier findings that bans on assault weapons and high-capacity magazines save lives.

---

[71] This is a population-weighted, state-level two-way fixed effects regression.

[72] The controls include the lagged incarceration rate in each state for each year, the lagged police employee rate, real per capita personal income, the unemployment rate, poverty rate, beer consumption, the percentage of the population living in MSAs, and six demographic variables (based on different age-sex-race categories). This statistical model is described in greater details in Donohue, John, Abhay Aneja, and Kyle Weber, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

[73] The model also suggests that these gun safety restrictions suppress the rate of mass shooting incidents and injuries, although the evidence is statistically weaker for these dependent variables although the injury-alone effect is statistically significant at the .10 level.

**Table 2**

*The Effect of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings, 1982-2019*

| | Mass Shooting [a] *Incidents* per 10,000,000 Population | Mass Shooting *Deaths* per 1,000,000 Population | Mass Shooting *Injuries* per 1,000,000 Population | Mass Shooting *Casualties* [b] per 1,000,000 Population |
|---|---|---|---|---|
| Assault Weapon or High-Capacity Magazine Ban [c] | -.07 (0.05) | -.09** (0.04) | -.22* (0.12) | -.31** (0.15) |

Notes: Outcome variables are based on *Mother Jones*' database of mass shootings in the 50 states plus Washington DC from 1982 to 2019. The OLS regressions also included the socioeconomic control variables used in DAW 2019 as well as state and year fixed effects. The coefficients on these variables were omitted from this table to conserve space. Regressions are weighted by each state's 1999 population, and standard errors are clustered at the state level.

[a] Mass shootings are defined as attacks in public places in which four or more victims were killed.

[b] Casualties are defined as people who were either injured or killed during a mass shooting.

[c] The variable "Assault Weapon or High-Capacity Magazine Ban" is assigned a value of 1 for each state-year for which either an assault weapon ban or high-capacity magazine ban was active, and 0 for all other state-years.

* p<0.1; ** p<0.05; *** p<0.01

83.     One of the unfortunate consequences of the continuing advances in the lethality and power of modern firearms is that without appropriate government action the dangers posed

by civilian weaponry will continue to outpace any legitimate crime-reducing benefit that firearms might provide. The lesson of the November 2017 massacre at the Sutherland Springs Baptist Church in Texas highlights the growing dangers. The killer in that case used an AR-15 that was modified to include a laser scope and features that could allow large capacity magazines to be more quickly reloaded to maintain a relentless barrage. The killer stood outside the church and fired straight through the walls of the church as he strafed along at just above the top of the levels of the church pews, allowing him to shoot 254 shots from **outside** the church in a matter of minutes on his way to killing 26 men, women, and children. No portable weapon in civilian hands at the time of the adoption of the Second Amendment could possibly generate this degree of destruction so rapidly. The evident social harms will only grow as gun technology increases firearm lethality.

84. The tragedy that first brought mass shootings into the public consciousness is often thought to be the 1966 reign of death from the top of the University of Texas memorial tower when Charles Whitman used scoped hunting rifles to kill 14 and wound 32. Whitman was an expert Marine marksman, perched in a very protected space to continue his barrage, and it took him 90 minutes to produce this level of mayhem. Fast forward to November 5, 2009, and Nidal Hasan, an inexperienced shooter, was able to fire 214 times at Fort Hood in less than 10 minutes with a faster shooting handgun equipped with high-capacity magazines, killing 13 and also wounding 32.[74] The August 4, 2019 attack targeting a Dayton, Ohio bar district lasted only 32 seconds, yet armed with a 100 round drum magazine, the shooter was still able to kill nine and shoot 17 others.[75]

85. By 1981, as we saw with the Hinckley attempted assassination of Reagan, the US had not moved into the era of pervasive possession of modern weaponry, which was launched by both the increased advertising of assault rifles and the move towards modern pistols with high-capacity magazines that was catalyzed by the advent of the Glock 9 mm semiautomatic pistol, introduced into the U.S. market in 1986. These developments were accompanied by the U.S.

---

[74] Lee Hancock, The gun Nidal Hasan used to kill at Fort Hood, Jun 17, 2011, https://www.dallasnews.com/opinion/commentary/2011/06/17/lee-hancock-the-gun-nidal-hasan-used-to-kill-at-fort-hood/.

[75] Although the shooter had previously been suspended from high school for making hit lists of students he wanted to rape and kill, he met the gun industry definition of a responsible, law-abiding citizen who should be able to purchase the weaponry he employed to commit mass murder. Biesecker, Michael; Carr Smyth, Julie (August 5, 2019). "Classmates: Ohio shooter kept a 'hit list' and a 'rape list'". Associated Press.

gun market's fixation on ever bigger magazines and growing military-style appearance and enhanced lethality, turning mass shootings from once in a decade events in the 1960s and 1970s into the growing menace that they have become today. As the problem grew in the 1980s, government efforts at the state and federal level began, with the only serious national effort designed to address the problem coming in 1994 with the passage of the federal prohibition of new assault weapons and high-capacity magazines. While the ten years in which this federal ban was in place did restrict mass shootings, the lapsing of the federal ban and the continued expansion of these weapons has correlated tightly with the growing menace of mass shootings.

86. The dramatic increases in gun massacre incidents and fatalities closely tracks the growth in U.S. sales of previously federally banned weaponry that was ignited by the expiration of the federal assault-weapons ban in 2004, the removal of potential liability on the part of gun merchants, and intense advertising of the militarized upgrades, ranging from high-capacity magazines to flash suppressors, that stimulated the demand for this highly dangerous consumer product. Josh Sugarmann, executive director of the Violence Policy Center, notes that "The end of the assault-weapons ban allowed for the customization and modification of these weapons to make them look even more militaristic, even more grand in the eyes of their owners."[76]

87. Research published following the mass shootings in Buffalo, New York and Uvalde, Texas killing a total of 31 in May 2022 further confirms these findings.[77] Specifically, an analysis of mass shooting data by a group of injury epidemiologists and trauma surgeons reached the following conclusion:

> We calculated that the risk of a person in the U.S. dying in a mass shooting was 70% lower during the period in which the assault weapons ban was active. The proportion of overall gun homicides resulting from mass shootings was also down, with nine fewer mass-shooting-related fatalities per 10,000 shooting deaths.

88. Another empirical study that examined high-fatality mass shootings killing at least six victims between 1990 and 2017 similarly concluded that "LCM bans have been effective at

---

[76] Quoted in Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

[77] Klein, Michael, 2022. Did the assault weapons ban of 1994 bring down mass shootings? Here's what the data tells us, *The Conversation*, June 8, 2022, https://theconversation.com/did-the-assault-weapons-ban-of-1994-bring-down-mass-shootings-heres-what-the-data-tells-us-184430.

saving lives" by reducing the incidence of and deaths in these mass shootings.[78]  The authors found that:

89.    Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

**Industry Advertising Appeals to Potential Mass Shooters**

90.    A year after the lapsing of the federal assault weapons ban, the Protection of Lawful Commerce in Arms Act (PLCAA) was passed, which provided gun manufacturers with near-blanket immunity from suits based on the criminal misuse of their products.  This emboldened a torrent of consumer advertising designed to highlight the battlefield appeal of modern assault weapons, and sales soared in response.  The dramatic rises in gun massacres followed.

91.    These advertising campaigns reveal exactly how the gun industry sought to market assault weapons:  they are hawked with explicit depictions of combat and phrases like "The closest you can get without having to enlist."[79]

92.    Unsurprisingly, a growing number of mass killers turn to these assault rifles when they launch their deadly onslaughts. Moreover, an industry survey of civilian assault-rifle ownership "reveals that the average civilian assault-rifle owner keeps a small arsenal, owning three or more of the guns; 27 percent of owners have bought four or more. [Unfortunately,] many civilian assault-rifle owners fail to secure their arms; nearly one owner in five does not lock up his rifle, and more than 30 percent take no care to secure their ammunition."[80] In other words, a very substantial fraction of owners of assault rifles act irresponsibly, thereby exposing their weapons to loss or theft and resulting criminal misuse. For example, the weapons used by Adam Lanza to kill his mother, Nancy Lanza, and in the Newtown shooting were owned by his mother

---

[78] Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. *Am J Public Health*. 2019;109(12):1754-61. doi: 10.2105/ajph.2019.305311.
[79] *Id.*
[80] The NSSF periodically conducts research on civilian assault rifles intended for gun sellers, and these figures are from their latest survey. Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-weapon-of-choice-107819/

– a pattern that has repeated itself all too often as the *Wall Street Journal* noted (see footnote 39, above).

93.    The makers of the Bushmaster assault rifle Nancy Lanza owned and that her son Adam Lanza used to gun down first-graders and teachers in Newtown was sold under the slogan "Forces of opposition, bow down." While such weapons are designed for and appropriately used by trained military personnel and law enforcement, they are exceedingly dangerous when wielded by mentally unstable civilians.

94.    While the United States does not have a higher rate of mental illness than other advanced industrialized nations, it certainly has a higher rate of public mass shootings. This is in part because young men are saturated in a gun culture created by advertising designed to exploit their weaknesses.

95.    A common refrain among opponents to sensible efforts to reduce the lethality of mass shootings is the oft-repeated but clearly erroneous gun industry assertion that "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." Stenberg v. Carhart, 530 U.S. 914, 1001 (2000) at n. 16 (Thomas, J., dissenting). The truth is exactly the opposite.

96.    Throughout the 1980s the gun industry marketed AR-type rifles as "assault" weapons because this marketing promoted sales. The image below of a Guns & Ammo magazine cover highlighting assault rifles in July 1981 is just one of the numerous such advertisements and gun industry publications concerning assault weapons that one can find on the web throughout the 1980s.[81]  Only when the increase in civilian ownership of these weapons was followed by outrage over (and fears of potential tort liability for) prominent mass shootings did the industry shift away from that direct terminology in its advertisements (while continuing to market guns with appeals to their military character).

---

[81] See, https://www.democraticunderground.com/126210025.

**Figure 10**

Cover of the July 1981 Issue of Guns & Ammo[82]



97.     Consider the following Bushmaster advertisement for the gun that Adam Lanza used, and imagine the impact it could have on someone struggling with substantial mental health problems:

---

[82] Reproduced from the *New York Times*, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html.

**Figure 11**



98.     Notably, while Lanza used a Savage Mark II bolt-action .22-caliber rifle to kill his sleeping mother, he chose the much more dangerous Bushmaster assault weapon with 30-round magazines that enabled him to fire 154 bullets over the 264 seconds in his lethal rampage at Sandy Hook School.[83] We can surmise that if he had only a bolt action hunting rifle, he could not have fired as many bullets and many lives would have been spared.

99.     The impact of the gun industry's efforts to exploit messages about assault weapons directed at those with deep insecurities and even mental health issues showed up in another recent mass shooting.

---

[83] Coalition to Stop Gun Violence, "What Adam Lanza Took, and Didn't Take, to Sandy Hook Elementary," https://www.csgv.org/adam-lanza-took-didnt-take-sandy-hook-elementary/ (last visited on October 22, 2018).

**Figure 12**



100.    The nineteen-year old killer of 17 at Parkland High School (on February 14, 2018) was moved to post the above NRA image on his Instagram account.  He stated in a recording that he had had enough of being told what to do and was tired of being called "an idiot." "I am nothing. I am no one, my life is nothing and meaningless. With the power of the A.R., you will know who I am."

101.    Industry advertisements of guns "for the 'warrior' in you" undoubtedly enhance sales, but they convey an entirely inappropriate message to a civilian population.[84] The marketing strategy of gun sellers that exploits the fantasies of young men leads troubled individuals like the Sutherland Springs mass shooter to highlight their attachment to their weapons:  he posted a picture of his AR-15 with the heading "She's a bad bitch" shortly before he killed 26 in Texas in 2017.[85]

---

[84] E-mail advertisement by the U.S. Concealed Carry Association, September 8, 2022.
[85] Seventeen-year-old Kyle Rittenhouse was drawn to the illegal purchase of the AR-15-style rifle he used to kill two and maim one because it "looked cool." Donohue, "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," *The Conversation*, December 6, 2021, https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-

102.     Of course, banning assault weapons does not eliminate the threat from troubled individuals, but since these weapons are particularly attractive to troubled potential mass killers and specifically designed to facilitate the most rapid and effective annihilation of all intended targets, bans on assault weapons is not only prudent but indeed indispensable in any governmental effort designed to effectively address the mass shooting problem in America.  A brief discussion of how and why the AR-15 came to be chosen as the primary military combat weapon used by the U.S. in Vietnam explains why.

**The Army Adopts the AR-15 for Battlefield Use**

103.     In 1957, the Army invited Armalite's chief gun designer, Eugene Stoner, to produce a lightweight, high-velocity rifle, that could operate in both semi- and full-automatic modes with firepower capable "of penetrating a steel helmet or standard body armor at 500 yards." Stoner devised the AR-15 to meet these specifications. The Advanced Research Projects Agency (ARPA) –today known as DARPA – was so impressed with the AR-15's value as a combat weapon that it pushed to have 1,000 rifles shipped for use by South Vietnamese troops and their American special-forces trainers in 1961.

104.     The performance of this new assault weapon was assessed in a confidential ARPA report in July 1962, stating "The AR-15 Armalite rifle has been subjected to a comprehensive field evaluation under combat conditions in Vietnam."[86] The report noted that "The lethality of the AR-15 and its reliability record were particularly impressive."[87] The wounds generated by this weapon were prodigious: "At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic hitting one VC [(Viet Cong)] with 3 rounds [of Caliber .223] with the first burst. One round in the head-took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter. It cannot be determined which round killed the VC but it can be assumed that *any one of the three would have caused death*."[88]

105.     The report enumerated the wounds in a Ranger ambush of a Viet Cong position, including: a back wound that "caused the thoracic cavity to explode"; a buttock wound that

---

the-rittenhouse-verdict-172741.

[86] Advanced Research Projects Agency, Office of the Secretary of Defense, *Field Test Report, AR-15 Armalite Rifle*, at 4 (July 31,1962,). Retrieved October 12, 2018 from http://www.dtic.mil/dtic/tr/fulltext/u2/343778.pdf
[87] Id. at 15.
[88] Id. at 22 (emphasis added).

"destroyed all tissue of both buttocks"; and finally "a heel wound," where "the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip." All the deaths were "instantaneous," "except the buttock wound. He lived approximately five minutes."[89]

106.    The "phenomenal lethality" of the AR-15 described by ARPA led the Army in December 1963 to adopt the AR-15 – rebranding it the M16.

107.    Of course, the civilian AR-15 lacks the fully automatic (and burst) mode of the M16, but it still retains all the other aspects that made it such a valuable lethal weapon for deadly combat. In fact, the Army's own Field Manual states that semi-automatic fire is the "most important firing technique during fast-moving, modern combat," noting, "It is surprising how devastatingly accurate rapid semi-automatic fire can be."[90] In other words, saying that this semi-automatic assault weapon is not a weapon of war because it doesn't have fully automatic capacity is like saying that a conventional bomber is not a war plane because it isn't carrying a nuclear payload.  Indeed, the ability to convert a civilian AR-15 into a fully automatic weapon – or the near fully-automatic capacity that Stephen Paddock used in the Las Vegas shooting of a year ago – is yet an additional factor that renders it unusually dangerous.

108.    According to one of its designers, the AR-15 assault rifle was originally engineered to generate "maximum wound effect." "It's a perfect killing machine," says Dr. Peter Rhee, a trauma surgeon and retired Navy captain.[91]

109.    Rhee was the doctor who saved the life of Arizona Rep. Gabby Giffords after she was shot in the head with a handgun fired during a mass shooting in 2011. According to Rhee: "A handgun [wound] is simply a stabbing with a bullet. It goes in like a nail. [But with the AR-15,] it's as if you shot somebody with a Coke can."

110.    The identical message was conveyed by one of the emergency room doctors who treated some of the pulverized victims of AR-15 wounds inflicted during the catatostrophic Parkland shooting that killed 17 and wounded 17 others in a span of four minutes.[92]  The CBS show 60 Minutes also provided a dramatic experiment to illustrate the far more destructive

---

[89] Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

[90] Id.

[91] Id.

[92] Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic*, February 2018, https://www.theatlantic.com/amp/article/553937/

impact on human tissue of being shot with an AR-15 than a handgun, as seen in the referenced video "What Makes the AR-15 so Deadly?"[93]

**The Allure of and Value to Mass Shooters of Assault Weapons**

111.    It is not surprising that mass shooters employing these particularly lethal weapons are able to kill so many so quickly:  Adam Lanza was able to slaughter 26 in less than five minutes with his Bushmaster AR-15. James Holmes used a Smith & Wesson "Military & Police" (M&P) AR-15 fitted with a 100-round magazine to kill 12 and wound 58 in a Colorado movie theater. The ISIS-inspired San Bernardino, California, shooters used a pair of AR-15s to kill 14. Orlando shooter Omar Mateen unleashed Sig Sauer's concealable "next-generation AR" to leave 49 dead and dozens more injured at the Pulse nightclub.

112.    In July 2016, incensed by police shootings of unarmed black men, Gavin Long used a rifle with a 40-round magazine to shoot six police officers in Baton Rouge, Louisiana, killing three before he himself was killed by a police sniper. Long used a TAVOR assault rifle – which the manufacturer describes as "the ultimate weapon of the 21st century" employed by armed forces around the globe.  Israel Weapon Industries notes on its webpage that this particular weapon, developed in co-operation with the Israeli Defense Forces, was "especially created" in response to "dynamic changes in the modern battlefield, the threats of global terrorism and the demands of ever-changing combat situations."[94]

113.    Moreover, there is not the slightest evidence that the federal restrictions on assault weapons that was enacted in 1994 (and lapsed ten years later) compromised the safety of law-abiding citizens.  Since these weapons are useful for those bent on mass killing, further limiting their availability should have a beneficial effect on the active shooter and mass shooting problems that are serious and worsening in the United States.

114.    Hundreds of law-abiding citizens have been killed in mass shootings and the problem of mass shootings is getting worse.  Since the value of assault weapons over non-assault weapons for legitimate self-defense is virtually non-existent, the primary impact of removing such weapons from circulation will be to decrease the prospect that a law-abiding citizen will be confronted by a criminal with such weaponry.

[93] https://www.cbsnews.com/news/ar-15-used-mass-shootings-weapon-of-choice-60-minutes-2019-06-23/.
[94] James Gill, "Civilians carrying 'ultimate weapon' Gavin Long used in Baton Rouge would be regarded worldwide as insane," The New Orleans Advocate, August 10, 2016.

115.     "[L]aw-abiding citizens" whose guns are lost or stolen each year are one of the most important sources of weapons for criminals in the United States. The best current estimates are that roughly 400,000 guns move into the hands of criminals this way each year in the United States.[95]  In other words, it is orders of magnitudes more likely that a criminal will steal a gun of a law-abiding citizen than a law-abiding citizen will fire an assault weapon in lawful self-defense.  More assault weapons in the hands of law-abiding citizens like Nancy Lanza means more assault weapons in the hands of criminals such as Adam Lanza.

116.     Further, many of the most horrific mass shootings in America were perpetrated by previously law-abiding citizens.  The list, which is too long to recite, includes Stephen Paddock, who killed 59 in Las Vegas; Omar Mateen, who killed 49 in the Pulse nightclub in Orlando; Adam Lanza, who killed 26 in Newtown, Connecticut; and the Batman killer in Aurora, Colorado, who killed 12, as well as the Buffalo and Uvalde, Texas shootings in May 2022, where 10 and 21 died, respectively, after being shot with assault weapons equipped with high-capacity magazines.

117.     The empirical evidence supports the conclusion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, many of the gun tragedies of recent years would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States.  It is also my opinion that Illinois' and Cook County's bans on high-capacity magazines is one tool in the important governmental effort to reduce the likelihood that residents of the state will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip weapons with lethal accoutrements that are both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

---

[95]According to Larry Keane, senior vice president of the National Shooting Sports Foundation (a trade group that represents firearms manufacturers), "There are more guns stolen every year than there are violent crimes committed with firearms." More than 237,000 guns were reported stolen in the United States in 2016, according to the FBI's National Crime Information Center. The actual number of thefts is obviously much higher since many gun thefts are never reported to police, and "many gun owners who report thefts do not know the serial numbers on their firearms, data required to input weapons into the NCIC." The best survey estimated 380,000 guns were stolen annually in recent years, but given the upward trend in reports to police, that figure likely understates the current level of gun thefts. See, Freskos, Brian. 2017c. "These Gun Owners Are at the Highest Risk of Having Their Firearms Stolen." *The Trace*. 4/11/2017. https://www.thetrace.org/2017/04/gun-owners-high-risk-firearm-theft/ and Freskos, Brian. 2017b. "Missing Pieces." *The Trace*. 11/20/2017. https://www.thetrace.org/features/stolen-guns-violent-crime-america/.

**Gun Control Dramatically Reduced Mass Shootings in Australia**

118.    In this regard, consider what happened in Australia after a gunman shot and killed 35 people in Port Arthur, Tasmania in 1996.  The Australian federal government persuaded all states and territories to implement tough new gun control laws. Under the National Firearms Agreement (NFA), firearms legislation was tightened throughout the country, national registration of guns was imposed, and it became illegal to hold certain long guns that might be used in mass shootings. The effect was that both while there were 7 public mass shootings in Australia during the seventeen-year period 1979–96 (a per capita rate that was higher than in the U.S. at the time), there have been none in the 23 years since (in contrast to the bleak trend in public mass shootings in the United States[96]).  Adjusting for the relative populations of the two countries, it would be as though there were 103 separate mass shooting events in the 18 years prior to the massive Australian gun buyback and none in the 23 years since.[97]

119.    The important point of the Australian experience for present purposes is that by depriving disturbed individuals of the vehicle by which they imagined they would unleash their murderous impulses, Australia showed that strong gun control measures such as bans on semiautomatic rifles could dramatically reduce the number of mass shootings – even if guns are still widely available, as they remain in Australia.

120.    Although the ban was highly controversial when enacted in 1996, the results have been so unambiguously positive for the country that there is now overwhelming support for it throughout Australia, as repeatedly shown in public opinion polls.  For example, a survey by Essential Research in 2016 confirmed that 44 percent thought Australians gun restrictions were "about right" and 45 percent thought the laws were "not strong enough."[98]  Against this 89 percent in support of gun restrictions, only 6 percent thought the laws were "too strong." Significantly, the poll specifically noted that these views were now consistent regardless of political party voting tendency for Labor, Coalition, or Greens voters.

---

[96] Dan Diamond, "**Mass Shootings Are Rising. Here's How To Stop Them," *Forbes**, June 18, 2015 (depicting the accelerating trend in the U.S. versus the benign trend in Australia), https://www.forbes.com/sites/dandiamond/2015/06/18/charleston-deaths-are-an-american-tragedy-mass-shootings-are-rising/#12bd32ef787b.

[97] The population of Australia in 1996 was 18.3 million and the population of the US in the same year was 269.4 million, according to data from the World Bank.

[98] Essential Research, "Gun laws", 1 November 2016.

121.     New Zealand followed the Australian lead after a horrific mass murder with an assault rifle,[99] and Canada announced in May 2022 its plans for a similar gun buyback for its current stock of assault weapons after its own horrendous mass shooting prompted the enactment of a ban on assault weapons in 2020.[100] Tellingly, in announcing an array of stringent gun safety measures, Canadian Prime Minister Justin Trudeau showed that he has learned from the lamentable experience of mass killings in the United States: "We need only look south of the border to know that if we do not take action, firmly and rapidly, it gets worse and worse and more difficult to counter."

### High-Capacity Magazines Enhance The Danger from Firearms, Which Can be Curtailed by Regulation

122.     While defensive gun ownership is designed to prevent violence, the intent of the public mass shooter is to kill as many people as possible. Accordingly, the lethal capacity of the weapon will influence that toll of these homicidal events (as opposed to the defensive setting when brandishing typically achieves its goal).  As Klarevas, Koper, and courts have observed, assault weapons with large capacity magazines are disproportionately used in mass shootings.[101] When such weapons are deployed in mass shootings, they "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'"[102] Among the mass shootings identified in a 2016 study by Everytown for Gun Safety, use of a large capacity magazine, or assault weapon that likely included a large capacity magazine, was associated with more than twice as many people being shot and nearly 50 percent more people being killed.[103]

---

[99] Associated Press, "New Zealanders hand in 50,000 guns after assault weapon ban," Dec. 21, 2019, https://www.nbcnews.com/news/world/new-zealanders-hand-50-000-guns-after-assault-weapon-ban-n1106081 ("The government banned the most lethal types of semi-automatic weapons less than a month after a lone gunman in March [2019] killed 51 worshippers at two Christchurch mosques. The police then launched a six-month program to buy the newly banned weapons from owners.")

[100] The Prime Minister also announced that magazine size would be restricted to five rounds in long guns. Justin Trudeau, "Further strengthening our gun control laws,' (May 30, 2022), https://pm.gc.ca/en/news/news-releases/2022/05/30/further-strengthening-our-gun-control-laws. Amanda Coletta, "Canada vows to 'freeze' handgun sales, buy back assault-style weapons," The Washington Post (May 30, 2022)("[T]he government banned 1,500 makes and models of "military-style assault weapons" in 2020, after a gunman posing as a police officer charged across rural Nova Scotia, killing 22 people, including a Royal Canadian Mounted Police officer, in the country's deadliest mass shooting.")

[101] Christopher Ingraham, It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say, Washington Post, February 15, 2018, https://www.washingtonpost.com/news/wonk/wp/2018/02/15/its-time-to-bring-back-the-assault-weapons-ban-gun-violence-experts-say/;  Koper 2004 Assessment at 14, 18.

[102] N.Y.S. Rifle, 804 F.3d at 264 (quoting Heller v. District of Columbia, 670 F.3d 1244, 1263 (D.C. Cir. 2011)).

[103] Mass Shootings in the United States: 2009 – 2016,  Appendix of Shootings Profiled, https://everytownresearch.org/documents/2017/03/appendix-mass-shootings-united-states-2009-2016.pdf.

123.    The argument that the federal assault weapons ban could not be effective since it only limited acquisitions of newly acquired weapons, but did not by itself reduce the stock of assault weapons or high-capacity magazines turned out to be incorrect.  Figure 13 shows data from Chris Koper's investigation in six cities of the percent of guns recovered at crime scenes that were assault weapons, documenting how this percentage changed after the federal assault weapons ban went into effect. The figure clearly shows that the prevalence of assault weapons found at crime scenes fell in all six cities when the ban went into effect.

**Figure 13**



**Assault weapons as a share of guns recovered by police at crime scenes**

Time periods for data for each city vary based on when data was collected.

Source: Christopher Koper, 2004 National Institute of Justice study          THE WASHINGTON POST

124.    Subsequent research by Koper et al (2017: 319) further highlights both the increased danger from assault weapons (AWs) and firearms with large-capacity magazines (LCM firearms):

> LCM firearms, which include AWs as well as other high-capacity semiautomatics, appear to account for 22 to 36% of crime guns in most places, with some estimates

upwards of 40% for cases involving serious violence. These estimates are comparable to or higher than earlier estimates of LCM use. …

Consistent with prior research, this study also finds that AWs and LCM firearms are more heavily represented among guns used in murders of police and mass murders. AWs account for 13–16% of guns used in murders of police, while LCM weapons overall account for about 41% of these weapons. Estimates for firearm mass murders are very imprecise due to lack of data on the guns and magazines used in these cases, but available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of such incidents. Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts.

Importantly, trend analyses suggest that LCM firearms have grown substantially as a share of crime guns since the expiration of the federal ban on AWs and LCMs.[104]

125.    In other words, the use of banned firearms and magazines by criminals fell during the federal AWB and rose when it lapsed.  These weapons also account for a major share of murders of police and overall crime, as well as for firearm mass murder.

126.    As the Fourth Circuit held in upholding Maryland's assault weapons ban in 2017: "the issue is whether the banned assault weapons and large-capacity magazines possess an amalgam of features that render those weapons and magazines like M16s and most useful in military service. The uncontroverted evidence … is that they do.[105] Indeed, the industry is constantly striving to find new ways to increase the lethality of their merchandise, so the notion that some threshold of "common use" erects a constitutional impediment that can obstruct governmental initiatives to promote citizen safety is wholly misguided. The ability and right of citizens to enact safety promoting measures designed to deal with the serious and growing problem of public mass shootings should not be affected by how quickly gun manufacturers can sell their products before regulations can be put into place.

---

[104] Koper, Christopher et al. (2017), Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources, J Urban Health (2018) 95:313–321, DOI 10.1007/s11524-017-0205-7.  The authors summarized their findings based on crime data from Minneapolis from January - August 2014  as follows:This study has highlighted the potential value of LCM restrictions for reducing HVG cases, which pose clear public dangers (nearly all HVG cases in this study occurred in public or outdoor settings). The findings underscore the concern that criminal use of semiautomatic weapons with large ammunition magazines facilitates particularly dangerous and injurious HVG incidents that contribute to a notable share of gunshot victimisations. Koper, Christopher et al. (2018), "Gunshot victimisations resulting from high-volume gunfire incidents in Minneapolis: findings and policy implications,"
[105] *Kolbe v. Hogan*, (4th Circuit Court of Appeals, February 21, 2017), https://cases.justia.com/federal/appellate-courts/ca4/14-1945/14-1945-2017-02-21.pdf?ts=1487707284.

127.    In 2016, fourteen-year old Jesse Osborne of South Carolina wanted to top the death toll of Adam Lanza, and he made numerous attempts to get his father's assault weapon from a gun safe as he planned a school shooting at a nearby elementary school.  When that failed, he took his father's loaded handgun from his bed dresser and killed his father before heading to the school where he opened fire on the playground, killing a 6-year-old boy before his gun jammed.  As the *Wall Street Journal* study referenced above found, a sizeable proportion of students aged 12-18 had access to firearms without adult permission.  For students and others who harbor homicidal fantasies similar to Jesse Osborne, the most powerful and deadly weapons will be most helpful for their criminal designs.[106]

128.    As stated above, an enormous source of guns used by teens in school shootings come from the home and the ability to kill is greatly enhanced if the gun at home is an assault weapon with a high-capacity magazine (see footnote 39, above).  Adam Lanza could not have made this point any more powerfully when he used his mother's assault rifle to kill 26 (also killing himself as the police closed in).  Of course, this is part of the larger problem of the enormous rates of gun thefts in the United States each year – in the neighborhood of 400,000 stolen.  The more assault weapons lying around in the home of law-abiding citizens, the more will be made available to criminals via these enormous rates of theft.

129.    My empirical evaluation of data through 2019 has emphasized that restrictions on high-capacity magazines are essential if one wants to reduce the risk of Las Vegas style killings that enable hundreds of individuals to be shot.[107]  The evidence that the federal assault weapons bans reduced deaths from public mass shootings is powerful and unrefuted.

**Gun Ownership Is Becoming More Concentrated in a Declining Portion of the Population**

130. A discussion of the social science literature concerning gun ownership rates must begin with the General Social Science Survey (GSS), which is an annual survey conducted by the National Opinion Research Center, headquartered at the University of Chicago.  The GSS is widely regarded by social science researchers as the most reliable indicator of national social trends, in part because of its professional implementation of face-to-face interviews using a very large sample size (the latest GSS data comes from 2,867 respondents versus roughly 1000 in a

---

[106] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," *The Wall Street Journal*, https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600, April 5, 2018.
[107] John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV.

typical telephone survey) with a high response rate (always in excess of 70 percent versus telephone survey responses which have fallen below 10 percent in recent surveys). See Pew Research Center, "Assessing the Representativeness of Public Opinion Surveys," (May 15, 2012); http://www.people-press.org/2012/05/15/assessing-the-representativeness-of-public-opinion-surveys/.

131. GSS data from 2016, the most recent year that data is available, states that 30.8% of American households have at least one gun, and that 20.5% of adults personally own a gun. See Donohue & Rabbani, "Recent Trends in American Gun Prevalence," (attached as Exhibit B). A carefully executed 2015 national survey showed that 34% of households owned guns, and that ownership of private firearms is highly concentrated among a small percentage of gun owners.[108]

132. The evidence that gun ownership is concentrated is strong and uncontradicted. Researchers analyzing the results of a 2015 national survey found that 8% of individual gun owners reported owning ten or more firearms—collectively accounting for 39% of the American gun stock—and that 20% of gun owners, who owned the most guns collectively, possessed about 60% of the nation's guns.[109] A decade earlier, researchers found a similar pattern: a 2004 survey indicated that 48% of gun owners possessed four or more guns and that the top 20% of firearms owners possessed 65% of all firearms.[110]

133. While I am not aware of any current social science research providing an estimate for the number of American households that own large-capacity magazines or LCMs (defined as an ammunition feeding device with the capacity to hold more than 10 rounds of ammunition) or for the number of LCMs in private hands in America, many firearms owned by American households do not accommodate LCMs, including shotguns and many types of handguns and rifles.

134. Accordingly, the share of households containing a weapon with a large-capacity magazine will only be a subset of gun owners. This minority status of LCM ownership by

---

[108] Azrael et al., "The Stock and Flow of US Firearms: Results from the 2015 National Firearms Survey," (Russell Sage Foundation J. Soc. Sci., forthcoming (2018) (attached as Exhibit C).
[109] See Azrael et al., supra.
[110] Hepburn et al., "The US Gun Stock: Results from the 2004 National Firearms Survey," Injury Prevention 2007;13:15–19.

household both reflects the judgment of most Americans that LCMs are not important to their self-defense.

135. The minority status of LCM ownership is also consistent with numerous polls showing that two thirds or more of respondents favor limiting magazine size.[111] A January 2013 New York Times/CBS News poll of 1,110 adults nationwide found that nearly two-thirds of Americans overall favored a ban on large-capacity magazines.[112]

**Firing Capacity Restrictions Have Historically Corresponded with Increased Use and Criminal Abuse**

136. Restrictions on weaponry have historically followed growing criminal abuse and social harm, rather than at the time these weapons are first introduced. This makes sense because it is not always clear at the outset which inventions will lead to adverse impacts on public safety. Frequently, the dangers of products and practices fly below the radar until their proliferation generates sufficient social damage to enable the public and the scientific community to become aware of the full extent of their social harm.

137. The first group of state restrictions on the number of rounds that could be fired by a firearm without reloading were adopted in the 1920s and 1930s after weapons like the Tommy gun became a preferred weapon for gangsters.[113] More recently, after pistols replaced revolvers as the most commonly used handguns in the United States in the 1980s, a second round of restrictions addressing magazine capacity and assault weapons began to be adopted, including the now expired 10 year federal ban on large capacity magazines.[114] State restrictions continued to be adopted following the expiration of the federal ban, often in response to public mass shootings.

---

[111] VPR – Vermont PBS Poll (July 2018), http://projects.vpr.net/vpr-vermont-pbs-poll.; Castleton Poll Measures Vermonters' Support for Gun Control Measures, Complete Poll Results (Feb. 21, 2013), https://www.castleton.edu/academics/undergraduate-programs/political-science/poll-results/castleton-poll-measures-vermonters-support-for-gun-control-measures/complete-poll-results/

[112] Jennifer Steinhauer, "Pro–Gun Lawmakers Are Open to Limits on Size of Magazines," *N.Y. Times* (Feb. 18, 2013), http://www.nytimes.com/2013/02/19/us/politics/lawmakers-look-at-ban-on-high-capacity-gun-magazines.html?_r=1&.

[113] *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68 (2017).

[114] *See* 1990 N.J. Sess. Law Serv. 32 (West); Haw. Rev. Stat. Ann § 34–(8); Pub. L. 103–322, § 110103 (Sep. 13, 1994).

**Limiting the Size of Ammunition Magazines Should Save Lives and Reduce Injuries**

138. No single gun control measure is likely to be as effective in addressing the problem of public mass shootings as the limitation on the size of the ammunition magazine, and the evidence from the ten-year period when the federal assault weapons ban was in effect from 1994-2004 indicates that this federal law, which contained the limitation on the size of ammunition magazines to ten bullets saved lives and reduced the mayhem from mass shootings.

139. A review of the resolution of mass shootings and other public shootings unleashed with large-capacity magazines in the U.S. suggests that bans on large-capacity magazines can help save lives by forcing mass shooters to pause and reload ammunition. Citizens have frequently taken advantage of a perpetrator stopping to reload his weapon to tackle him or otherwise subdue him in at least 20 separate shootings in the United States since 1991, notably including the December 7th, 1993 shooting of passengers on a Long Island Railroad car,[115] the October 29th, 1994 shooting near the grounds of the White House,[116] the May 21, 1998 shooting at Thurston High School in Springfield, Oregon,[117] and the January 8th, 2011 shooting in Tucson, AZ that targeted U.S. Congresswoman Gabby Giffords.[118] In many other incidents, targeted victims were able to escape while a shooter reloaded. Perhaps the most vivid illustration of this benefit was seen when at least nine children at Sandy Hook Elementary School were able to escape while Adam Lanza reloaded his 30 round LCM.[119]

---

[115] "DEATH ON THE L.I.R.R.: The Rampage; Gunman in a Train Aisle Passes Out Death," *The New York Times*, December 9, 1993 - http://www.nytimes.com/1993/12/09/nyregion/death-on-the-lirr-the-rampage-gunman-in-a-train-aisle-passes-out-death.html (9-millimeter pistol, 15 round magazine).
[116] "Public Report of the White House Security Review," Department of the Treasury, 1995 - http://www.fas.org/irp/agency/ustreas/usss/t1pubrpt.html (Chinese-made SKS semiautomatic rifle, 30 round magazine).
[117] When an already wounded student realized the shooter's 50 round magazine was empty, the student ran 10 to 15 feet and tackled the shooter as he tried to reload his rifle. At that point, other boys helped subdue the gunman as he reached for a handgun in his belt. Jere Longman, "SHOOTINGS IN A SCHOOLHOUSE: THE HERO; Wounded Teen-Ager Is Called a Hero," *The New York Times*, May 23, 1998, https://www.nytimes.com/1998/05/23/us/shootings-in-a-schoolhouse-the-hero-wounded-teen-ager-is-called-a-hero.html.
[118] "Crowd members took gunman down," *Los Angeles Times*, January 9, 2011 - http://articles.latimes.com/2011/jan/09/nation/la-na-arizona-shooting-heroes-20110110 (9mm Glock handgun, 30-round extended magazine).
[119] "Legislative Leaders Say Bipartisan Agreement Could Yield Nation's Strongest Gun-Control Bill," *The Hartford Courant*, April 1, 2013. http://www.courant.com/news/politics/hc-gun-deal-newtown-0413-20130401,0,7341094.story (Bushmaster .223 caliber rifle, high-capacity 30 round magazine). While some contend that 11 children were saved in this fashion at Sandy Hook, Louis Klarevas puts the number at 9 in his book, Rampage Nation: Securing America from Mass Shootings (Amherst, NY: Prometheus 2016). p. 22.

140. On April 22, 2018, a man walked into a Nashville Waffle House and opened fire, killing four and wounding seven. The police credited a customer with ending the slaughter when he saw the shooter trying to reload his rifle. The 29-year-old customer "burst out from behind a swinging door where he had been hiding, wrested the weapon away and threw it over a countertop."[120] When shooters stop to reload, they are overtaken by citizens, shot by police, or provide opportunities for escape, all of which government policy should seek to facilitate. The lower the size of the magazine, the more reloading must take place in mass shooting situations.

141. Indeed, an effective ban on high-capacity magazines would likely have significantly reduced the number of deaths and non-fatal gun shot victims at the Las Vegas concert. The *New York Times* video of the 2017 Las Vegas shooting shows how the Las Vegas concert attendees would use the pauses in firing when the shooter's high-capacity magazines were spent to flee the deadly venue before more shots were fired.[121] If Stephen Paddock had been limited to using only 10-round magazines during his deadly rampage, potentially hundreds of victims at the concert could have been spared.

142. No one has a greater desire or use for a large-capacity magazine than a determined mass killer, and governments have a responsibility to thwart those desires and those uses. A ban on such magazines is an important tool in the effort to stop the most egregious homicidal rampages.

143. As noted above, Adam Lanza was able to kill more (a total of 20 children and six adults) because he was using lawfully purchased weapons equipped with a 30-round LCM. It may well be that Lanza would have criminally abused the guns that his mother had made available to him even if he had not had an LCM, but there is every reason to believe that he would have killed fewer individuals if he had to persistently reload during his murderous rampage. In other words, the LCM ban is designed precisely to save lives and by raising the costs for killers, the LCM ban would be expected to advance that goal.

144. Further, most mass killings by Americans involve the use of guns, and many of these killers – Adam Lanza (Newtown), James Holmes (the Batman movie killer in Aurora, Colorado

---

[120] Christopher Mele and Jacey Fortin, "Man Sought in Waffle House Shooting Had Been Arrested Near White House," *The New York Times*, April 22, 2018, https://www.nytimes.com/2018/04/22/us/waffle-house-shooting.html.
[121] Malachy Browne, et al., *10 Minutes. 12 Gunfire Bursts. 30 Videos. Mapping the Las Vegas Massacre*, N.Y. TimesVideo, Oct. 21, 2017, *available at* https://www.nytimes.com/video/us/100000005473328/las-vegas-shooting-timeline-12-bursts.html (last visited Nov. 1, 2017).

killed 12 and injured 70), Jared Loughner (shooting Congresswoman Gabby Giffords), Stephen Paddock (who killed 58 and wounded roughly 500 in Las Vegas in October 2017) to name just a few – were drawn to a vision of killing large number of individuals in a certain way that included the use of LCM's. On November 5, 2009, Nidal Hasan killed 13 and injured more than 30 others at Fort Hood, near Killeen, Texas. When Hasan purchased his killing arsenal, he asked for "the most technologically advanced weapon on the market and the one with the highest standard magazine capacity."[122] This is exactly what one would do if one wanted to simply kill as many people as possible in the shortest amount of time. If one is serious about stopping mass killings, a good first step is to deprive such killers of their preferred killing approaches.[123]

**Assault Weapons Bans are Critical to Reducing the Cost of Mass Shootings**

145. The response that bans on assault weapons will have a limited effect on overall gun crime, which is most commonly committed with a handgun, is misplaced because Illinois' assault weapons ban was not primarily enacted to address gun crime generally, but rather was adopted in response to the growing mass shooting problem in the United States. Indeed, the first assault weapons ban was enacted in California in the immediate aftermath of the 1989 mass shooting in the schoolyard of Cleveland Elementary School in Stockton, California by an individual armed with an AK-47 semiautomatic rifle (killing 5 schoolchildren and wounding 32 others).

146. The Stockton massacre was a pivotal moment when the public first began to appreciate that the proliferation of increasingly lethal weaponry was causing a significant threat to public safety. For example, shortly after the massacre in March 1989, Republican Vermont Congressman Peter Smith announced that he was cosponsoring "a bill to stop the spread of semiautomatic assault weapons in this country. … I cannot — and will not — defend … the proliferation of paramilitary assault weapons that were designed solely for one purpose: killing human beings. These are not hunting rifles. These are killing machines." Realizing this threat to

---

[122] Scott Huddleston, "Hasan Sought Gun with 'High Magazine Capacity,'" MySanAntonio.com, October 21, 2010, http://blog.mysanantonio.com/military/2010/10/hasan-sought-gun-with-high-magazine-capacity/.

[123] Anders Breivik, who committed mass murder in Norway, was aided in his efforts because of lax rules concerning LCM's in the United States. Breivik was very unhappy that he could not get the large-capacity magazines that he wanted to use since they were banned in Europe. In his manifesto, he wrote about his attempts to legally buy weapons, stating, "I envy our European American brothers as the gun laws in Europe sucks ass in comparison." Under the section titled, "December and January - Rifle/gun accessories purchased," Breivik wrote that he purchased ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him. Stephanie Condon, "**Norway Massacre Spurs Calls For New U.S. Gun Laws,**" CBS News, July 28, 2011, http://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/.

the lucrative new market in AR-15-style weapons, the NRA immediately targeted Congressman Smith, who in 1990 became the first incumbent member of Congress from Vermont to lose re-election in 30 years.[124] Illinois' assault weapons ban was implemented in the wake of \the horrific , again highlighting the importance of governmental responses to the heightened risk of mass shooting in order to promote public safety.

147. There is not the slightest evidence that the restrictions on assault weapons and large-capacity magazines exceeding 10 rounds compromised the safety of law-abiding citizens. Since assault weapons and large-capacity magazines are useful for those bent on mass killing, further limiting their availability will have a beneficial effect on a problem that is serious and growing in the United States.

148. The first line of defense to reducing mass shootings is clearly to try to keep guns out of the hands of those who may end up using them for criminal purposes, but this approach will never be fully effective since not all killers can be easily identified in advance. Therefore, a critical element in trying to stop the death and injury from the growing problem of mass shootings is to limit the killing power of the weaponry available to prospective mass shooters. The value of a ban on high-capacity magazines is that it is easily definable, hard to circumvent through cosmetic changes by gun merchants, and effective at reducing the lethality of mass shooters by limiting the number of bullets that can be fired without reloading.

149. It is my opinion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, tragedies like the one in Las Vegas would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States and perhaps the world.[125] It is also my opinion that Illinois' and Cook County's restrictions challenged in this litigation are effectively designed to reduce the likelihood that its citizens and visitors will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip themselves with weapons that are both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

---

[124] Paul Heintz, "Stickin' to His Guns? The NRA Helped Elect Bernie Sanders to Congress," Seven Days, June 26, 2019.

[125] The horrendous mass killing in Norway by Anders Breivik, endangered by the restrictive gun laws of Europe, was salvaged by his ability to procure ten 30-round, high-capacity magazines from the United States. Stephanie Condon, "Norway Massacre Spurs Call for New U.S. Gun Laws," CBS News, July 28, 2011, *available at* https://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/ (last visited Nov. 1, 2017).

**Uses of Assault Weapons and LCMs for Self-Defense are Extremely Rare**

150. In the face of the clear evidence from around the United States and the world, Plaintiff fail to acknowledge the threat posed by weapons accessories, and features that Illinois and Cook County restrict. First, it is worth noting that the vast majority of the time that an individual in the United States is confronted by violent crime, they do *not* use a gun for self-defense. Specifically, over the period from 2007-2011 when roughly 6 million violent crimes occurred each year, data from the National Crime Victimization Survey shows that the victim did not defend with a gun in 99.2 percent of these incidents – this in a country with 300 million or more guns in civilian hands.

151. Second, even if a gun were available for self-defense use, the need for an LCM is slight according to decades of statements by NRA-affiliated and pro-gun experts. For example, John Lott has repeatedly made the following claims:

- based on "about 15 national survey[s] … about 98 percent of [defensive gun uses] involve people brandishing a gun and not using them."[126]

- "When victims are attacked, 98 percent of the time merely brandishing a gun is enough to cause the criminal to stop his attack."[127]

- "Considerable evidence supports the notion that permitted handguns deter criminals. …. In 98% of the cases, people simply brandish weapons to stop attacks."[128]

152. Gary Kleck has similarly stated: "Of the … times citizens use their guns to defend themselves every year, the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers."[129]

153. In other words, a gun is used in defense less than 1 percent of the time when someone is attacked in the United States. In the "overwhelming majority" of the less than 1% of cases in which a gun *is* used, brandishing is all that is needed for defense. One would imagine

---

[126] Statements by John R. Lott, Jr. on Defensive Gun Brandishing Posted by Tim Lambert on October 17, 2002 http://scienceblogs.com/deltoid/2002/10/17/lottbrandish/. Page 41, State of Nebraska, Committee on Judiciary LB465, February 6, 1997, statement of John Lott, Transcript prepared by the Clerk of the Legislature, Transcriber's Office.
[127] John R. Lott, Jr., Packing Protection, Letters, *Chicago Sun-Times*, April 30, 1997, Pg. 52.
[128] John R. Lott Jr., "Unraveling Some Brady Law Falsehoods," *Los Angeles Times*, July 2, 1997.
[129] Gary Kleck and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun," 86(1) *Journal of Criminal Law and Criminology* 150-187 (Fall 1995). https://pdfs.semanticscholar.org/91da/afbf92d021f06426764e800a4e639a1c1116.pdf.

that the vast majority of the times that the gun is fired in this increasingly small subset, it will be fired no more than 10 times. All firearms that can accept high-capacity magazines can also accept magazines that hold fewer rounds. It cannot be seriously maintained that assault weapons and high-capacity magazines play any important role in furtherance of the Second Amendment goal of self-defense. Indeed, if they did, the industry would have marketed them as protection weapons instead of assault weapons – or in the more recent gun-marketing jargon "sporting" or "tactical" rifles.

154. Should there be a future case of a law-abiding citizen who 1) has a gun and 2) the need and opportunity to use it in self-defense, and 3) the desire to fire more than 10 rounds, the individual can either re-load the defensive weapon by inserting a new clip or by using a second weapon, which an increasingly large number of gun owners currently possess. This implies that the challenged Illinois and Cook County restrictions, which are designed to limit the mayhem caused by criminals engaging in the most dangerous forms of violent criminal behavior, are likely to have little or no impact on the defensive capabilities of law-abiding citizens.

155. Bullets fired by assault weapons or a modern weapon with an LCM will easily penetrate walls, threatening family members or occupants in attached dwellings. This point was dramatically underscored when a concealed carry permit holder attending a gun safety class inadvertently fired his weapon, which discharged a bullet that easily penetrated the classroom wall, striking and killing the owner of the gun store who was working in the next room.[130] Encouraging untrained, stressed individuals to spray bullets from a high-capacity magazine is a recipe for generating similar unwelcome outcomes that will put family members and neighbors at considerable risk.

---

[130] Peter Holley, *Ohio gun store owner accidentally killed by student during firearm-safety class*, *Washington Post*, June 19, 2016, *available at* https://www.washingtonpost.com/news/morning-mix/wp/2016/06/19/ohio-gun-store-owner-accidentally-killed-by-student-during-firearm-safety-class/?utm_term=.ed4c232d20ad (last visited Nov. 1, 2017).

      Another example of how doors and walls do not stop bullets from modern handguns occurred on September 13, 2015, when "39-year-old Mike Lee Dickey was babysitting an 8-year-old Casa Grande, Arizona boy. According to police, at about 2 a.m., Dickey was in the bathroom removing his .45-caliber handgun from the waistband of his pants when he unintentionally discharged the gun. The bullet passed through two doors and struck the 8-year-old in his arm while he lay sleeping in a nearby bedroom. The boy was flown to a hospital in Phoenix for treatment." *8-year-old boy unintentionally shot by babysitter*, Ohh Shoot, Sept. 13, 2016, *available at* http://ohhshoot.blogspot.com/2015/09/8-year-old-boy-unintentionally-shot-by.html (last visited Nov. 1, 2017).

**Law Enforcement and Military Support for Assault Weapon and LCM Bans**

155. The testimony of United States Attorney (District of Colorado) John Walsh before the Senate Judiciary Committee on February 27, 2013,[131] is worth quoting:

> From the point of view of most law enforcement professionals, a perspective I share as a long-time federal prosecutor and sitting United States Attorney, shutting off the flow of military-style assault weapons and high-capacity magazines is a top public safety priority. […]

Like military-style assault weapons, high-capacity magazines should be reserved for war, and for law enforcement officers protecting the public.[132]

156. Dean L. Winslow, a retired Air Force colonel, flight surgeon, and professor of medicine at Stanford University has particularly valuable insight into the wisdom of having assault weapons in civilian hands.

157. Dr. Winslow noted that "as commander of an Air Force hospital in Baghdad during the surge, I have seen what these weapons do to human beings. The injuries are devastating."[133] Moreover, unlike a shotgun filled with birdshot, which is far more likely to hit a target and less likely to penetrate walls than a bullet from an assault weapon, assault weapons are simply not well suited for defensive use in the home.  Based on his extensive military and medical experience, Dr. Winslow noted that it is "insane … that in the United States of America a civilian can go out and buy a semiautomatic weapon like an AR-15."

158. According to Maryland Police Superintendent Marcus Brown, "in many home defense situations assault weapons are likely to be less effective than handguns because they are less maneuverable in confined areas."[134] Experts consider handguns clearly more suitable than assault weapons for self-defense. Massachusetts Chief of Police Mark K. Leahy said that when

---

[131] Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).

[132] See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*, *Washington Post*, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).

[133] Dean L. Winslow, "I spoke my mind on guns. Then my Senate confirmation was put on hold," *The Washington Post*, December 20, 2017. See also, Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic Monthly*, February 22, 2018, https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/.

[134] Brown Decl. ¶ 20, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).

"asked to recommend a weapon for home defense or concealed carry, I always recommend a handgun."[135]

159. Since AR-15's were selected by the Defense Department as a weapon of choice for the battlefield in Vietnam because the destructive force of the gun made it especially lethal to even outer extremity wounds, the point could not be clearer: keeping these weapons out of civilian hands will reduce the death toll and seriousness of injuries in cases of mass shootings or other criminal or accidental uses of these weapons.

160. A wise December 2016 editorial in the *Las Vegas Sun* noted the danger presented— and the lack of practical use for—LCMs:

> By overwhelmingly supporting universal background checks for firearms purchases, Clark County voters made it abundantly clear last month that they were concerned about gun violence.
>
> Now, it's time for Las Vegas-area lawmakers to go a step further to protect Nevadans and push to ban the sale of high-capacity magazines in the state. Eight states and the District of Columbia already have imposed such prohibitions, and with good reason. There's simply no legitimate civilian use for magazines that hold dozens upon dozens of rounds of ammunition.
>
> Don't believe us? Fine, then listen to Clark County Sheriff Joe Lombardo. "I'm a very avid hunter, I was in the military myself, and there's no need to have a high-capacity magazine for any practical reason," Lombardo said during a recent interview with the Sun.
>
> To the contrary, the dangers posed by such magazines are obvious. Lombardo says the time it takes for suspects to change magazines gives potential victims an opportunity to escape and law enforcement officials an opportunity to safely fire back. That being the case, the fewer times a shooter has to switch out magazines, the fewer chances for people to get away and authorities to get a protected shot.[136]

The prescience of the editorial was powerfully underscored ten months later when On October 1, 2017, the deadliest mass shooting in U.S. history occurred in Las Vegas (60 killed and hundreds wounded) – only possible because of the use of high- capacity magazines.

---

[135] Leahy Decl. ¶ 22, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).
[136] *High-capacity magazine ban a must for Nevadans' safety*, Las Vegas Sun, Dec. 11, 2016, *available at* https://lasvegassun.com/news/2016/dec/11/high-capacity-magazine-ban-a-must-for-nevadans-saf/(last visited Nov. 1, 2017).

161.     One of the most disturbing aspects of the recent mass shootings our Nation has endured is the ability of a shooter to inflict massive numbers of fatalities in a matter of minutes due to the use of high-capacity magazines.  High-capacity magazines were defined in the 1994 ban as magazines capable of holding more than 10 rounds, and this is a definition the Department endorses.  The devastating impact of such magazines is not limited to their use in military-style assault rifles; they have also been used with horrific results in recent mass shootings involving handguns.  The 2007 mass shooting at Virginia Tech involved a shooter using handguns with high-capacity magazines.  Similarly, recent mass shootings in Tucson, Arizona; Oak Creek, Wisconsin; and Fort Hood, Texas all involved handguns with magazines holding more than 10 rounds.  As evidenced by these events, a high-capacity magazine can turn any weapon into a tool of mass violence.  Forcing an individual bent on inflicting large numbers of casualties to stop and reload creates the opportunity to reduce the possible death toll in two ways: first, by affording a chance for law enforcement or bystanders to intervene during a pause to reload; and second, by giving bystanders and potential victims an opportunity to seek cover or escape when there is an interruption in the firing.  This is not just theoretical:  In the mass shooting in Tucson, for example, 9-year old Christina-Taylor Green was killed by the 13th shot from a 30-round high-capacity magazine.  The shooter was later subdued as he was trying to reload his handgun after those 30 shots.  The outcome might have been different if the perpetrator had been forced to reload after firing only 10 times.

162.     Furthermore, high-capacity magazines are not required for defending one's home or deterring further action by a criminal.  The majority of shootings in self-defense occur at close range, within a distance of three yards.  In such a scenario, and at such close ranges, a 10-round magazine is sufficient to subdue a criminal or potential assailant.  Nor are high-capacity magazines required for hunting or sport shooting.  Like military-style assault weapons, high-capacity magazines should be reserved for war, and for law enforcement officers protecting the public.  The continued commercial sale of high-capacity magazines serves only to provide those determined to produce a high body count with the opportunity and the means to inflict maximum damage.  Indeed, there is evidence suggesting that when the previous ban was in effect, it

reduced the number of high-capacity magazines seized by the police, as well as the lethality of incidents.[137] [The citation is from Walsh's statement.][138]

**Threats to Civil Peace and to Democracy Itself**

163.    There is also a larger issue at stake with the proliferation of assault weapons: their capacity to facilitate political violence and threaten American democracy.  The concern is heightened by the sharp rise in the percentage of Americans who think that violence against the government could be appropriate, which doubled from 16 percent in 2010 to 34 percent in 2021 (over 40 percent of Republicans and independents and 23 percent of Democrats agreed).[139]

164.    The extent and severity of these concerns have been clarified by the events of January 6, 2021, which I have written elsewhere has provided new insight into the dangers of such weaponry and the utter folly of many of the claims of the gun lobby:

> Consider the gun lobby protestation that "Gun control simply doesn't work." Imagine for a moment what that rally would have looked like in Houston, Texas, or some other "gun-friendly" jurisdiction. Without Washington, DC's profoundly wise firearm restrictions [including its assault weapons ban], a very large number of the rioters would have been marching on the U.S. Capitol armed with assault rifles equipped with high-capacity magazines and other highly lethal weapons. When the mob storming the Capitol spun out of control, guns would have been flashing everywhere, and it is not hard to imagine that bullets would have been cutting down scores or even hundreds of victims. Those who remember the 1970 Kent State massacre understand that once the bullets start flying in a riotous atmosphere, the consequences quickly turn lethal and dire….
>
> The pernicious Proud Boys leader Enrique Tarrio [currently being tried for seditious conspiracy],[140] who had planned to address the crowd before the U.S. Capitol riot, was thankfully taken off the streets two days earlier when he was arrested for tearing down a Black Lives Matter banner on a Washington, DC, church and lighting it on fire. At the time of his arrest, Tarrio was carrying two high-capacity magazines festooned with the Proud Boys logo. Washington, DC's wise prohibition on such unnecessary accoutrements to lethal weaponry managed to keep one conspiring criminal away from the U.S. Capitol on January 6, and

---

[137] See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*, Washington Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).

[138] Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).

[139] Meryl Kornfield and Mariana Alfaro, "1 in 3 Americans say violence against government can be justified, citing fears of political schism, pandemic," *Washington Post*, January 1, 2022, https://www.washingtonpost.com/politics/2022/01/01/1-3-americans-say-violence-against-government-can-be-justified-citing-fears-political-schism-pandemic/.

[140] Alan Feuer and Zach Montague (Jan. 12, 2023). "Prosecutors Open Arguments Against Proud Boys in Sedition Trial," *The New York Times.*

thousands of others, knowing of Washington, DC's strict gun laws, were dissuaded from carrying weapons because of these laws. [Moreover, the claim that weapons equipped with high-capacity magazines could protect American democracy is fanciful.] First, the thought that private gun owners could stand up to the modern U.S. military if it backed a tyrannical federal government is absurd. There is no circumstance in which private citizens in modern America could promote democracy by using assault weapons to kill government employees to show their disapproval of what they perceive to be a "tyrannical" government. Second, the idea that gun owners can be expected to *oppose* rather than support the tyrant was dealt a fatal blow by the violence at the U.S. Capitol.[141]

## Comments on Some of The Errors in The Plaintiff's Allegations

165. Any discussion of assault weapons must address the tragic problem of public mass shootings. The Plaintiff marches down the misguided path of trying to diminish the importance of governmental action to address this problem by making an array of misguided, erroneous, and misleading claims.

166. The Plaintiff seems to believe that because automatic weapons are potentially more dangerous than semiautomatic assault weapons, this should disempower the ability of the state to address the worsening problem of mass shootings.

167. The Plaintiff's claim is misguided in two respects. First, the current and worsening problem of mass shootings is not a problem of automatic weapons, which have been effectively been addressed by government action. Since the evidence from the United States and the world indicates that restrictions on assault weapons and large-capacity magazines reduces the harm from mass shootings, this is the area where protective government action is needed.

168. The second problem is that the Plaintiffs' misguided claim is entirely undercut by the Army Field Manual, which states in two sections that the Plaintiff fails to reference that:

> 7-12. The most important firing technique during fast-moving, modern combat is rapid semiautomatic fire. It is the most accurate technique of placing a large volume of fire on poorly defined targets or target areas, such as short exposure, multiple, or moving targets.

> 7-14. While Soldiers sacrifice some degree of accuracy to deliver a greater volume of fire, it is surprising how devastatingly accurate rapid semiautomatic fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to

---

[141] John Donohue, "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf.

automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit. Proper training and repeated practice increases the degree of accuracy.

169. It is for this reason that all knowledgeable commentators on the lethality of the AR-15 understand that it fully enables – in the words of the Army's own Field Manual -- the "most important firing technique during fast-moving, modern combat" that in the typical circumstances of an attempted mass shooting "is superior to automatic fire in all measures."

170. The nature of the misleading character of the Plaintiffs' claims is confirmed by the comments of Retired Army Maj. Gen. Paul D. Eaton:

> "As the former Commanding General of the Infantry Center at Fort Benning and Chief of Infantry, I know a bit about weapons. **Let me state unequivocally — For all intents and purposes, the AR-15 and rifles like it are weapons of war….It is a very deadly weapon with the same basic functionality that our troops use to kill the enemy.** Don't take the bait when anti-gun-safety folks argue about it. They know it's true. Now you do too."[142]

171. At the same time that the Plaintiffs is inaccurately trying to obscure the lethality of the type of weaponry covered by the Illinois Assault Weapons Ban (Ill. Pub. Act 102-1116) and the Cook County Blair Holt Assault Weapons Ban (Cook County Ordinance 54-210), the complaint also implicitly recognizes that nothing remotely as lethal as this restricted weaponry was available at the time of the founding of our nation. It should be immediately obvious to all that if there was any weapon remotely as available, lethal, effective, and portable as a modern assault weapon, the soldiers commanded by George Washington would have been using them. Instead, the soldiers were using muskets utterly incapable of inflicting the mass mayhem in a matter of seconds that modern Americans have to fear.

172. It is widely recognized that "Early firearms were expensive. They were complicated. They required extensive training to use, and they were very slow to load."[143] Moreover, "The flintlock musket was the most important weapon of the Revolutionary War. It represented the most advanced technological weapon of the 18th century. Muskets were smooth-bored, single-shot, muzzle-loading weapons. The standard rate of fire for infantrymen was three shots per minute." With this type of weaponry, there would be absolutely no concern about a lone gunman blasting away at unsuspecting crowds with the lethal and tragic effect that

---

[142] Paul Eaton, June 2, 2022 (emphasis supplied).
[143] "Learn about American Revolutionary War usage of muskets, bayonets, and gunpowder," Britannica https://www.britannica.com/video/195113/gunpowder-muskets-American-Revolution.

even teenage mass shooters increasingly inflict in seconds or minutes in modern America.  Any suggestion that 18th Century weaponry in civilian hands could impose anywhere near the risk to the public of the modern assault weapon is simply absurd on its face.

**Figure 14**



A musket from the 18th century, when the Second Amendment was written, and an assault rifle of today.
Top, MPI, via Getty Images, bottom, Joe Raedle/Getty Images .

173. The Complaint also tries to minimize the risk of the weaponry restricted by Illinois by arguing that the deaths from mass shootings and by assault weapons are only a relatively small portion of the total homicides in the United States (they don't even try to make that claim for weapons with high-capacity magazines).  The misleading table that appears in the Complaint tells us that in 2019 there were 364 killings with rifles.  The Complaint doesn't reveal, though, this 364 figure is clearly an understatement of the number of rifle killings because in a substantial number of the allegedly 10,258 firearm murders that year, the FBI doesn't know or report what type of firearm was used. The Complaint concedes in the fourth line of their table that there were also 45 murders with "other guns" but then fails to disclose that the FBI data source used to create the table indicates that there were *3281 murders* with "firearms, type not stated" in 2019. In other words, even for the 10,258 firearm murders counted for 2019 in Plaintiff's UCR data source, there is simply no information about what gun was

used in 3326 of these murders, which severely undermines the value of this FBI data as shown in Table 3 below.

179.But pretending that 3326 firearm murders about which the FBI provides no information about the firearm contain no murders with rifles is not the only massive error in the Plaintiffs' misguided effort to minimize the social burden of mass shootings. We also know that total number of firearm homicides listed in the Plaintiffs' FBI source for 2019 – the 10,258 figure shown in my Table 3 below -- is itself severely inadequate since it fails to capture more than 4000 other firearm homicides in 2019. The problem lies in the fact that police departments are not required to report data to the FBI, so the FBI data the Plaintiff references are not only inadequate in not identifying the type of lethal firearm in a very large number of the murder cases it knows about, but the table in the Complaint also completely ignores an even larger number of firearm homicides that did occur in 2019. We know this because the CDC data on homicide is based on mandatory reporting requirements for all death certificates, which indicate if the homicide was caused by a firearm.[144] As Table 4 reveals, many thousands of firearm homicides occurred but are not even captured in the "full" FBI data. When one compares in the table below the CDC total of 14,414 firearm homicides to the 6932 homicides that the Plaintiffs based their numbers on, one sees that their data is grossly deficient and should not be relied upon. A more relevant, and sobering statistic is that the percentage of firearm homicides committed with long guns has grown steadily since 1993, doubling from 17.9 percent in that year to 35.6 percent in 2018.[145]

---

[144] The superiority of the CDC data on firearm homicide over the data that the Plaintiffs provide is well known by researchers of gun violence, as described in this Bureau of Justice Statistics report: "Homicide data in this report are primarily from the Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports developed from the National Vital Statistics System (NVSS) of the National Center for Health Statistics (NCHS), a part of the Centers for Disease Control and Prevention. NVSS mortality data are produced from standardized death certificates and include causes of death reported by attending physicians, medical examiners, and coroners…. Generally, the NVSS produces more accurate information than the SHR on annual homicide rates at the national level …." Grace Kena and Jennifer L. Truman, "Trends and Patterns in Firearm Violence, 1993–2018," Bureau of Justice Statistics Special Report (April 2022), https://bjs.ojp.gov/content/pub/pdf/tpfv9318.pdf.
[145] Id.



Source: U.S. Dept. of Just., <u>Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019,</u> Crime in the United States, 2019, FBI.

**Table 4**



180.     As a final exclamation point on the inadequacy of Plaintiffs' 2019 data, one should note that firearm homicides spiked 35 percent between 2019 and 2020, rendering their flawed 2019 accounting even less meaningful.  It is also worth noting that in 2020 firearms were used in 79 percent of homicides, which was the greatest proportion ever, up from 74 percent in 2019.[146] Moreover, the Plaintiff would have you forget the considerable number of victims of assault weapons who do not show up in the homicide count because they survive – often with crushingly damaging and life-altering injuries.

---

[146] Jennifer Mascia, "It's Official: Gun Deaths Hit an All-Time High in 2020," *The Trace*, Jan. 7, 2022.

181.     Not only is the general ploy to minimize the number of deaths caused by assault weapons and firearms equipped with high-capacity magazines based in this case on Plaintiffs' wholly inadequate data, but the entire enterprise is misguided for three additional reasons:  1) the deaths and injuries caused by mass shootings are increasing at an alarming pace, 2) the social harm from these traumatic events is far larger than the mere numerical casualty counts, and 3) the incessant efforts to enhance the deadliness of firearms to increase gun sales means that, if this deadly arms race is not restrained, mass shootings with deaths of many hundreds of individuals may well be our fate.  This growing menace cannot be effectively addressed without concerted and effective governmental action, including bans on assault weapons and high-capacity magazines.

## CONCLUSION

182.     The problem of mass shootings in the United States is socially damaging, growing worse, and will be exacerbated if appropriate limitations on the lethality of weaponry, such as the restrictions on assault weapons and high-capacity magazines enacted first by the federal government and then by the state of Illinois and Cook County as this dire social harm first emerged, are not sustained as constitutionally permissible measures.

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States.

Executed on February 27, 2023

_____

John J. Donohue