**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| **JAVIER HERRERA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 23-cv-532** |
| **v.** | ) | |
| | ) | |
| **KWAME RAOUL, in his official capacity as Attorney General for the State of Illinois, *et al*.,** | ) | **Hon. Lindsay C. Jenkins** |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS CITY OF CHICAGO AND DAVID BROWN'S RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


**INTRODUCTION** ........ 1

**BACKGROUND** ........ 5

**ARGUMENT** ........ 6

I. Plaintiff Does Not Have A Likelihood Of Success On The Merits. ........ 7

1. Assault weapons and high capacity magazines are not arms covered by the Second Amendment. ........ 8

a. Assault weapons are not covered arms. ........ 8

b. High capacity magazines are not covered arms. ........ 13

2. Assault weapon and high capacity magazine restrictions are consistent with history and tradition. ........ 14

II. Plaintiff Has Not Established Irreparable Harm. ........ 18

III. The Public Interest And The Balance Of Hardships Weigh In Favor Of The City. ........ 21

**CONCLUSION** ........ 25

# TABLE OF AUTHORITIES

## CASES

*American Civil Liberties Union v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) .................................. 24

*Baird v. Bonta*, No. 19-cv-617, 2022 WL 17542432 (E.D. Cal. Dec. 8, 2022) ........................ 7, 25

*Bevis v. City of Naperville*, No. 1:22-cv-4475, 2023 WL 2077392
(N.D. Ill. Feb. 17, 2023) ........................................................................... 14, 15, 16, 19

*Bolton v. Bryant*, 71 F. Supp. 3d 802, 819 (N.D. Ill. 2014) .......................................................... 25

*Culp v. Madigan*, No. 14-cv-3320, 2015 WL 13037427 (C.D. Ill. Dec. 7, 2015) ........................ 25

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................................... passim

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............................................... 7, 19, 20, 24

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ............................................... 3

*Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) ........................................... 24

*Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ....................................... 12

*Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ..................................................... 6

*Joelner v. Village of Washington Park*, 378 F.3d 613 (7th Cir. 2004) ......................................... 24

*Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2407 (2022) ......................................................... 7

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) ............................................................................. 12

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ........................................................................ 9, 12

*MacDonald v. Chicago Park Dist.*, 132 F.3d 355 (7th Cir. 1997) ............................................... 24

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................................... 2, 10

*Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765 (7th Cir. 2011) ......................................... 7

*Miller v. Downey*, 915 F.3d 460, 463 (7th Cir. 2019) ..................................................................... 8

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .................................. passim

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2nd Cir. 2015) ........................... 12

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................ 6

*Staples v. United States*, 511 U.S. 600 (1994) ...................................................................... 8, 12

*Tully v. Okeson*, 977 F.3d 608 (7th Cir. 2020) ..................................................................... 6

*United States v. Miller*, 307 U.S. 174 (1939)......................................................................... 9

*United States v. Morrison*, 529 U.S. 598 (2000) ................................................................. 21

*United States v. Salerno*, 481 U.S. 739 (1987) ..................................................................... 8

*Wilson v. Cook Cnty.*, 937 F.3d 1028, 1036 (7th Cir. 2019)................................................. 19

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................. 6, 7

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ................................................................. 12

**STATUTES**

Municipal Code of Chicago, section 8-20-010 ..................................................................... 5, 6

Municipal Code of Chicago, section 8-20-075 ..................................................................... 2, 5

Municipal Code of Chicago, section 8-20-085 ..................................................................... 3, 6

## INTRODUCTION

In response to last year's deadly mass shooting with an assault weapon during a Fourth of July parade in a Chicago suburb (Highland Park), Illinois enacted a state-wide restriction on assault weapons and large capacity magazines. The carnage that day confirms what experts have long known: a bullet fired by an assault weapon travels three times faster than one from a regular gun, and the resulting force tears large holes on the outside of the body and rips internal tissue and organs to shreds. Assault weapons, moreover, enable novices to do all this with deadly accuracy, extreme rapidity, and little or no training. The military minds who developed the AR-15 – the assault weapon that Plaintiff wants to own and use in Chicago – knew this too: developed as a military rifle, the AR-15 was tested on Vietnam War battlefields and adopted by the United States military because of how efficiently it killed the enemy. *See generally* Dkt. 52, Response Brief of Illinois Attorney General and ISP Director to Plaintiff's Motion for TRO and Preliminary Injunction ("Ill. Resp."), at 26-32.

Chicago welcomes the new Illinois legislation. It is a critical policy tool that will stem the flow into Chicago of the deadliest types of firearms and magazines – the tools of choice for domestic terrorists to kill children in schools (as in Uvalde, Texas, in 2022), tourists at music festivals (as in Las Vegas, Nevada in 2017), and adults in nightclubs (as in Orlando, Florida, in 2016). Dkt. 52-9 (Yurgealitis Dec.) ¶ 5. Chicago abounds in venues like these. And Chicago itself is no stranger to the mayhem of assault weapons. Just last October, 14 people at a neighborhood vigil in Garfield Park were shot by assault weapons. Ex. A hereto (Snelling Dec.) ¶ 10. The year before, 10 people were shot at an outdoor street party, even though police officers already happened to be there, on patrol. *Id.* ¶ 30. As any Chicagoan knows, Chicago has faced a gun violence epidemic for decades, much due to illegal guns infiltrating the City from

neighboring jurisdictions or elsewhere in the State. So a state-wide restriction – joined with those of the City and Cook County – is essential.

Chicago's ordinances prohibiting assault weapons and high capacity magazines have stood for decades. Now, though, Plaintiff suddenly wants them struck down, along with the State's and Cook County's laws. The Second Amendment requires no such folly. The Supreme Court has recognized two particular rights under the Second Amendment – the right to keep and carry a handgun for self-defense in the home (*District of Columbia v. Heller*), and the right to do so outside the home (*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*). Each time, however, the Supreme Court went no further, nor did it indicate that other firearms restrictions are in peril – especially those that restrict particular types of firearms or firearm accessories, like assault weapons and high capacity magazines, that are objectively and intolerably dangerous.

Just the opposite: the Supreme Court made clear that legislatures retain a wide berth to regulate particular firearms to protect public safety. In *Heller*, for example, the Court instructed that the Second Amendment is not a right to keep and carry "any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. 570, 626 (2008). Then, when the Court ruled in *McDonald v. Chicago* that the Second Amendment is incorporated against state and local governments, the Court "repeat[ed] those assurances" from *Heller*. 561 U.S. 742, 786 (2010) (plurality opinion). And it added more: the Court decreed that the Second Amendment "by no means eliminates" the ability of state and local governments "to devise solutions to social problems that suit local needs and values," and that "state and local experimentation with reasonable firearms regulations will continue." *Id.* at 785.

It was in the wake of these assurances that the City enacted the current versions of the laws challenged here – a ban on assault weapons, in section 8-20-075 of the Municipal Code of

Chicago ("MCC"), and on high capacity magazines, in section 8-20-085. Also in this wake, the Seventh Circuit twice upheld similar laws enacted by Highland Park, *Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015), and Cook County, *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019).

Plaintiff claims that none of this is allowed anymore after *Bruen*. He is wrong. *Bruen* held that the Second Amendment does not tolerate a categorical restriction on carrying handguns in public. But like the Court's earlier Second Amendment decisions, it did not presume to venture further and suggest that other laws are invalid. *Bruen*, 142 S. Ct. 2111, 2159 (2022) (Alito, J., concurring) ("reiterat[ing]" that "[a]ll we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self defense" and that New York law violated that right). Indeed, as if foreseeing this case, the Court said that the Second Amendment does not foreclose legislative responses to "unprecedented societal concerns or dramatic technological changes" in firearms violence. *Id.* at 2132. Justice Kavanaugh (joined by the Chief Justice) wrote that the Second Amendment allows a "'variety' of gun regulations," including "prohibiting the carrying of dangerous and unusual weapons." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*) (citations omitted).

To be sure, *Bruen* clarified the analytical framework for analyzing Second Amendment claims: First, a plaintiff must show that a firearm or accessory falls within the coverage of the Second Amendment's text. If not, then the regulation is lawful. But even if covered by the Second Amendment's text, the regulation is still upheld if the government can show that the regulation is consistent with the Nation's history and tradition of firearms regulation.

This clarification of the framework, however, does not suggest that banning assault weapons and high capacity magazines is now suddenly unconstitutional. Indeed, Plaintiff falls

far short of satisfying his injunctive burden to show that he is likely to succeed on the merits under the *Bruen* framework. And he cannot succeed in any event. As shown below, and more fully in the briefs of the State Defendants and County Defendants, the AR-15 assault weapon and the high capacity magazines that Plaintiff wishes to use fail step one of the *Bruen* analysis because they do not constitute arms covered by the Second Amendment. The AR-15 is not covered because it is just the semi-automatic, civilian version of the military's M-16 machine gun—a weapon type that *Heller* has already said falls outside the Second Amendment's protection. 554 U.S. at 627. Separately, it is not commonly owed for self-defense, thus failing to qualify for Second Amendment protection. Nor is a high capacity magazine a protected "arm." It is just an accessory, and is not necessary for a firearm to function. Plaintiff's claims, moreover, fail *Bruen* step two because the City's restrictions fall comfortably within the Nation's tradition – from its earliest days – of restricting dangerous and unusual weapons.

Plaintiff's failure on the merits is reason alone to deny his motion. But he does not have any claim under the equities, either. He suffers no tangible harm from the City's ordinances. Being unable to use an AR-15 or a 17-round magazine for his handgun does not compromise his self-defense, because the City's laws allow him to use any number of lawful semiautomatic handguns and rifles, as well as magazines up to 15 rounds – the same number that Chicago police officers use when patrolling some of the most dangerous streets in the State. Ill. Resp. at 17-18 & n. 8. These more than suffice for Plaintiff, too. Nor is he harmed if his inability to keep his AR-15 in the City means it takes longer for him to get to SWAT trainings where he wishes to join in shooting sessions. He has no interest under the Second Amendment in shooting AR-15s with SWAT teams – he is a volunteer medic, not a trained SWAT law enforcement officer, and

he does not even carry, much less shoot, AR-15s on SWAT deployments. The City's ordinance poses no impairment to his actual role with a SWAT team.

In contrast, enjoining the City's ordinances (and the State's and County's laws too) will cause severe harm to the City's residents, visitors, and police officers. It would remove an important and proven legislative tool that reduces mass injury and death by restricting access to the weapons favored by mass shooters. Every corner of the City – whether neighborhood schools and parks, or downtown offices and attractions – will become less safe if assault weapons and high capacity magazines are suddenly allowed. And the lives of Chicago's police officers would be in greater jeopardy than they already are, raising the risk that they will be outgunned by criminals with assault weapons. For these and other reasons discussed more fully below, Plaintiff's motion should be denied.

## BACKGROUND

Chicago's assault weapons ban is found at MCC section 8-20-075. Subsection (a) states that "[i]t shall be unlawful for a person to import, sell, manufacture, transfer, or possess an assault weapon." Section 8-20-010 defines "assault weapon" in a way similar the State's statute and Cook County's ordinance. It has a list of specific firearms listed by type and/or maker that are classified as assault weapons. This list includes the AR-15. The definition also has lists of certain features or functionalities that, if present on a firearm, make the firearm an assault weapon. For instance, section (a)(1) of the definition states that an assault weapon is a "semiautomatic rifle that has the ability to accept a detachable magazine and has one or more of the following: (A) a folding, telescoping or detachable stock; (B) a handgun grip; (C) a forward grip; (D) a threaded barrel; (E) a grenade, flare or rocket launcher; or (F) a barrel shroud." Similarly, section (a)(2) states that a "semiautomatic rifle that has a fixed magazine with the

capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition" is an assault weapon.

Chicago's restriction on high-capacity magazines is codified at MCC section 8-20-085. Subsection (a) states in relevant part that "[i]t is unlawful for any person to carry, possess, sell, offer or display for sale, or otherwise transfer any high capacity magazine or tubular magazine extension for a shotgun." Section 8-20-010 defines "high capacity magazine" as "a magazine, belt, drum, feed strip, or similar device, including any such device joined or coupled with another in any manner, that has an overall capacity of more than 15 rounds of ammunition." The definition excludes "an attached tubular device to accept, and capable of operating only with, .22 caliber rimfire ammunition."

**ARGUMENT**

A preliminary injunction "is an extraordinary remedy" that is "never awarded as of right" but "only upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23-24 (2008). Plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Where, as here, the defendants are governmental bodies, the last two factors merge, and the harm to the defendants and the public are considered as one. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff's burden under all the factors is "significant." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). As to the likelihood of success on the merits, Plaintiff must make a "strong" showing that he is likely to succeed; "a mere possibility" is not enough. *Id.* at 762. Failure to make this showing warrants denial of the preliminary injunction. *Tully v. Okeson*, 977 F.3d 608, 612-13 (7th Cir. 2020). Plaintiff must also show that harm to him is "likely" in the absence of an injunction, *Winter*, 555 U.S. at 22, rather than a "possibility of some

remote future injury," *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). And even then, a court should deny the injunction if the harm to the defendant and to the public outweighs the benefit to the plaintiff. *Id.* at 789. Indeed, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation omitted). Plaintiff cannot satisfy any of the requirements for a preliminary injunction.

## I. Plaintiff Does Not Have A Likelihood Of Success On The Merits.

The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Under *Bruen*'s two-step approach, a court evaluating a Second Amendment claim first considers whether the amendment's text covers the conduct at issue: "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126; *see also id.* at 2129-30.[1] The inquiry then moves to the second step: "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. This second step, though, is triggered only if, at the first step, the conduct is covered by the amendment's text. If the conduct

[1] Plaintiff bears the burden of making the showing at step one. *Bruen* was clear that it is at step two that the burden shifts to the government: "[*t]he government must then* justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129-30 (emphasis added). *See also Baird v. Bonta*, No. 19-cv-617, 2022 WL 17542432, at *6 (E.D. Cal. Dec. 8, 2022) (holding that a plaintiff bears the burden on *Bruen* step one). Plaintiff points to *Bruen*'s statement "that the Government bears the burden of proving the constitutionality of its actions." Pl. Br. at 14 n. 3 (quoting 142 S. Ct. at 2130). This statement does not help him because it was in the portion of *Bruen* discussing the importance of the historical inquiry at step two; the Court was not discussing step one. *See also Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2407, 2421-22 (2022) (explaining that a plaintiff in a First Amendment free exercise challenge has an initial burden to show that the government has burdened protected religious exercise, and if that showing is made, the burden shifts to the government to justify the regulation). Nor does *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), decided a decade before *Bruen*, indicate that Defendants bear the burden on step one of the analysis announced by *Bruen*.

is not covered, then the inquiry ends, and the law is upheld; the government need not show that a regulation is consistent with a historical regulatory tradition. *Id.* at 2129-30 (explaining that presumptive constitutional protection and the ensuing historical tradition inquiry comes into play "[w]hen" the conduct is covered by the amendment's text). Plaintiff's claims do not have a likelihood of success at either step.

**1. Assault weapons and high capacity magazines are not arms covered by the Second Amendment.**

**a. Assault weapons are not covered arms.**

*Heller* made clear that the Second Amendment's coverage does not extend to any weapon, but "only to certain types of weapons." *Heller*, 554 U.S. at 623. *Heller* further indicated that one of the weapon types that is not covered is "M-16 rifles and the like;" they "may be banned." *Id.* at 627. That is dispositive here because the weapon Plaintiff seeks to use – an AR-15 – is "like" an M-16.[2] Indeed, "M-16" is just the name for the military version of the AR-15. The AR-15 was first developed in the late 1950s, and after observing its devastating accuracy and lethality during test trials on Vietnam War battlefields, the United States military adopted it and rebranded it as the "M-16." Dkt. 52-6 (Andrew Dec.) ¶¶ 25-28 & Exhibit B; Dkt. 52-9 (Yurgealitis Dec.) ¶¶ 57-59. *See also Staples v. United States*, 511 U.S. 600, 603 (1994)

[2] Plaintiff argues that the challenged laws are unconstitutional as "applied" to him because they they prevent him from keeping, acquiring, or training with one particular type of assault weapon – an AR-15 – and keeping a particular high capacity magazine – a 17-round detachable magazine of his Glock 45 handgun. Pl. Br. at 12-13, 22. We therefore focus on whether the Second Amendment means that Defendants must permit these firearms and accessories, specifically. *See also Miller v. Downey*, 915 F.3d 460, 463 (7th Cir. 2019) ("federal courts, as courts of limited jurisdiction, should strive to decide constitutional cases narrowly and refrain from answering questions broader than necessary to resolve the case or controversy before them"). While Plaintiff briefly nods to bringing a facial challenge to Defendants' laws, Pl. Br. at 12, 22, he makes no attempt to show he has a likelihood of success on a facial claim. Indeed, to prevail on facial challenge, Plaintiff would need to show that each of the different types of assault weapons listed in those laws are protected by the Second Amendment, because a facial challenge requires the plaintiff to show that a law is unconstitutional in all of its applications. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiff makes no effort to do this.

("[t]he AR-15 is the civilian version of the military's M-16 rifle"); Dkt. 60, Opposition of Cook County Defendants to Plaintiff's Motion for TRO and Preliminary Injunction ("County Resp."), at 6-9. Plaintiff's AR-15 falls outside the scope of the Second Amendment's textual coverage, and he is therefore unlikely to succeed for this reason alone. *See Kolbe v. Hogan*, 849 F.3d 114, 135 (4th Cir. 2017) ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles' – 'weapons that are most useful in military service' – they are among those arms that the Second Amendment does not shield.") (quoting *Heller*, 554 U.S. at 627)).[3]

Additionally, an AR-15 is not a firearm covered by the text of the Second Amendment because it is not in common use for self-defense. When the Second Amendment was adopted, it was understood to protect weapons that were in "common use at the time." *United States v. Miller*, 307 U.S. 174, 179 (1939). *See also Heller*, 554 U.S. at 627 (discussing *Miller*). Plaintiff, however, makes no argument about common use in 1791 (or even in 1868, the year that the Fourteenth Amendment, which incorporated the Second Amendment against state and local governments, was ratified). Indeed, as explained by the State Defendants, assault weapons were not in common use in either era. Ill. Resp. at 20-24. Plaintiff, rather, stakes his case entirely on the idea that AR-15s are in common use, today.

He is not likely to succeed on this claim. While the arms covered by the Second Amendment's text are not limited to those in existence in 1791 or 1868, modern arms are

[3] This holding from *Kolbe* is still good law after *Bruen*. It was an independent basis for the court's decision, 849 F.3d at 137, and mirrors the first step of the *Bruen* analysis, and thus is fully applicable here. *See Bruen*, 142 S. Ct. at 2126-27 (explaining that "[s]tep one of the predominant framework" used by lower courts prior to *Bruen*, which considered whether a regulation falls within the "historical meaning" and "original scope" of the Second Amendment, "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history"). While *Kolbe* also went on to examine the AR-15 restriction under means-end scrutiny as an alternative basis for sustaining the law – the mode of analysis that *Bruen* rejected – the resolution in *Kolbe* did not depend on that analysis.

covered if they are in common use for self-defense. *Bruen* held that New York's carry law implicated protected arms because "handguns are weapons 'in common use' today for self-defense." 142 S. Ct. at 2134 (internal citation omitted). *See also id.* at 2125 ("In *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense."); *id.* at 2132 (explaining that while the term "arms" in the Second Amendment "is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense"); *id.* at 2161 (Kavanaugh, J., concurring) (describing Second Amendment right as the "right to possess and carry guns for self-defense"). As the Supreme Court has explained, self-defense is "core" to, *Heller*, 554 U.S. at 630, and the "central component" of, *McDonald*, 561 U.S. at 767, the Second Amendment right.

Plaintiff fails his burden to show that AR-15s are in common use today for self-defense. The Supreme Court has not defined what constitutes "common use," and Plaintiff does not offer a definition himself. But a useful metric is what constituted common use at the time of the Second Amendment's adoption, for *Heller* instructs that the Second Amendment's "common use" test is rooted in the fact that, during the Founding Era, people were expected to serve in the militia "bearing arms supplied by themselves and of the kind in common use at the time." *Heller*, 524 U.S. at 624 (quoting *Miller*, 307 U.S. at 179). And the historical evidence shows that, at that time, approximately 50% to 60% of American households owned a firearm, usually a musket or fowling piece. Dkt. 52-11 (Roth Dec.) ¶ 15.

Plaintiff offers nothing showing that AR-15 ownership is anywhere near this 50%-60% benchmark rooted in *Heller*. Indeed, data shows that only 2% of Americans today own a "modern sporting rifle," the industry term for assault rifle. Dkt 52-4 (Klarevas Decl.) ¶ 27. And AR-15 owners would be just a subset of that paltry 2%. This evidence shows that AR-15s are

not in common use today at all, much less for self-defense. *Cf. Bruen*, 142 S. Ct. at 2155 (explaining that historic laws in the Western Territories are not informative of American practice because they covered a population that was less than 1% of the population of the United States). *See also* Ill. Resp. at 34-35.

Plaintiff offers no other pathway to establishing common use. He mainly points to statistics about the aggregate number of assault weapons owned or purchased. For instance, he contends that over a 30-year period ending in 2020, 24.5 million AR- and AK- type assault weapons were added to the U.S. gun stock. Pl. Br. at 16. He also posits that 30.2% of gun owners purportedly owned an assault rifle at some point in their lives. *Id.* at 16-17. These figures are a flawed metric for common use, as explained at length in the State Defendants' briefing. Ill. Resp. at 33-36. But they fail for a few core reasons: they are not tied to any numerical standard rooted in *Heller*; they do not speak to how widespread ownership is among *all* Americans (rather than just the self-selecting subset of gun owners); and as to those few people who may own an AR-15, the statistics do not answer whether they own them for self-defense. Indeed, Plaintiff points to nothing showing that AR-15s are usually used for self-defense. In fact, AR-15s were neither designed for self-defense, nor are they a wise or effective tool for self-defense. *See* Dkt. 52-6 (Andrew Dec.) ¶¶ 25-26; Dkt. 52-7 (Busse Dec.) ¶¶ 12-13, 32; Dkt. 52-9 (Yurgealitis Dec.) ¶ 96, 98-101, 109-110; County Resp. at 14-15, 49-50. And the firearms industry markets assault weapons by appealing to their use as offensive military weapons that can be used in urban warfare scenarios and the like, and not as self-defense arms. Dkt. 52-9 (Busse Dec.) ¶¶ 43-48; County Resp. at 10.

For these same reasons, Plaintiff cannot rely on the pre-*Bruen* Second Amendment cases from other circuits that he cites. *See* Pl. Br. at 15-16. Those cases likewise did not assess

common use against the *Heller* benchmark, nor did they address whether assault weapons are in common use for self-defense.[4] Nor does appeal to *Staples v. United States*, 511 U.S. 600, satisfy Plaintiff's burden. *Staples* was not a Second Amendment case. *See id*. at 602. Indeed, it predated *Heller* and modern Second Amendment jurisprudence by nearly 15 years. And it did not opine on whether AR-15s specifically, or semiautomatic rifles as a class, are in common use for self-defense. Instead, it addressed a statutory question: whether a possessor of an AR-15 that had been altered to allow it to fire in automatic mode could be convicted for possessing a machine gun in violation of federal law if he did not know of the alteration. *Id*. at 604-05.

Plaintiff argues that 34% of semiautomatic rifle purchasers bought them for self-defense, Pl. Br. at 17, as if this statistic helps him. It does not. It shows that the vast majority – two thirds – bought them for a reason *other than* self-defense. And, regardless, statistics for why people buy semiautomatic rifles as a class are irrelevant, because assault weapons, and AR-15s even more specifically, are just a subset of semiautomatic rifles. *See Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) (upholding an assault weapons ban because it "proscribe[d] only a set of specifically enumerated semi-automatic assault weapons . . . and semiautomatic assault weapons that have certain combat-style features"), *abrogated on other grounds by Bruen*. Plaintiff's statistic says nothing about the reasons people buy AR-15s.

Last, Plaintiff is incorrect that AR-15s achieve Second Amendment coverage simply because, by his telling, most people who own them do so "for lawful purposes." *See* Pl. Br. at

---

[4] *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255-57 (2nd Cir. 2015) (concluding that assault weapons are in common use simply because millions of them are owned, and simply assuming for sake of argument that they are owed for lawful purposes, but then resolving case in favor of government on other grounds); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (similar analysis regarding semiautomatic rifles). The panel decision in *Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), likewise did not find that assault weapons are in common use for self-defense, *see id.* at 174-77, and, in any event, was later vacated by the Fourth Circuit *en banc* in a decision that upheld Maryland's assault weapon and LCM restrictions, *see Kolbe v. Hogan*, 849 F.3d 114, 135 (4th Cir. 2017).

14-15. As explained, common use for self-defense, and not just any "lawful" purpose, is what would qualify an AR-15 for coverage. Further, common use (for whatever purpose) is not established by isolating the very group (no matter how small) that possesses a weapon and then asking why they possess it. Even if every owner of a particular firearm possesses it for self-defense (or some other lawful purpose) that says nothing about how common the weapon is in the population, much less how frequently they are actually used for self-defense. Plaintiff's mode of analysis would lead to protection for hand grenades simply if most who owned them said they had them for self-defense.[5]

For all these reasons, Plaintiff does not satisfy *Heller*'s common use requirement. This is an alternative reason why he fails to establish that AR-15s are protected under *Bruen*'s step one.

**b. High capacity magazines are not covered arms.**

Plaintiff also lacks a likelihood of success on his challenge to the City's restriction of high capacity magazines. As explained by the State Defendants, high capacity magazines (also known as "large capacity magazines") are not "arms" under the meaning of that word in the Second Amendment's text. Ill. Resp. at 15-20. Rather, they are accessories that can be inserted into and removed from a firearm. Nor are they necessary for a firearm to function, as any number of smaller, compliant magazine sizes can be used instead to supply ammunition to the firearm and still allow it to effectively be used for self-defense. Ill. Resp. at 15-20; Ex. B hereto (Supplemental Busse Dec.) ¶¶ 55-57, 61-67; Ex. C hereto (Supplemental Yurgealitis Dec.)

---

[5] Plaintiff is not helped by *Bruen*'s statement that the Second Amendment "extends . . . to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding[.]" Pl. Br. at 13 (quoting *Bruen*, 142 S. Ct. at 2132). The Court was simply making the point that the text of a constitutional provision can apply to modern circumstances. *See Bruen*, 142 S.Ct. at 2132 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense"). As we otherwise show, an AR-15 is not an arm that satisfies the Second Amendment's text.

¶¶ 136-143. Separately, high capacity magazines are not protected because they were not in common use in earlier eras or today for self-defense. Ill. Resp. at 20-36.

**2. Assault weapon and high capacity magazine restrictions are consistent with history and tradition.**

Plaintiff lacks a likelihood of success for another, independent reason: Step two of the *Bruen* analysis – should the Court choose to reach it – is likely to be resolved in Defendants' favor. This is because the Supreme Court has already recognized the existence of a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *see also Bruen*, 142 S. Ct. at 2128, 2143. And because the Supreme Court has already said this tradition exists, it is not something that Defendants need to prove. As another judge of this District concluded last month, "[t]he history of firearm regulation . . . establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)." *Bevis v. City of Naperville*, No. 1:22-cv-4475, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023). Indeed, even Plaintiff agrees that Defendants "may restrict arms that are both unusual and dangerous." Pl. Br. at 18. The tradition of regulating dangerous and unusual weapons is not merely consistent with the Second Amendment – it is an "important limitation on the right to keep and carry arms." *Heller*, 554 U.S. at 627.

Assault weapons and high capacity magazines are dangerous and unusual, and so the City's restrictions fall comfortably within recognized historical tradition. As *Bevis* concluded in rejecting a preliminary injunction against the State's and Naperville's assault weapons and LCM restrictions, "[a]ssault weapons pose an exceptional danger, more so than standard self-defense weapons such as handguns." 2023 WL 2077392, *14. This exceptional danger arises due to their rates of fire, muzzle velocity, wound size, evisceration of internal organs, and disproportionate use in mass shootings. *See id.* at *14-15. Shootings committed with assault

weapons are therefore more likely to be fatal or inflict grave bodily injury as compared to other firearms. Ex. A hereto (Snelling Dec.), ¶¶ 12, 14; Dkt. 52-14 (Hargarten Dec.) ¶¶ 14, 31-35; Dkt. 52-4 (Klarevas Dec.) ¶¶ 13-14; Dkt. 52-10 (Schreiber Dec.) ¶ 24. And because bullets fired by assault weapons travel at comparatively longer distances and at greater speeds, assault weapons can be used to inflict greater harm on individuals from greater distances. Ex. A hereto (Snelling Dec.) ¶ 14; Dkt 52-10 (Schreiber Dec.) ¶ 26. All of these facts are documented by firearms and medical experts, as the State Defendants and County Defendants address at length. Ill. Resp. at 26-30; County Resp. at 12, 23-24, 27-37.

High capacity magazines, too, are dangerous and unusual, because they make a firearm dramatically more lethal by allowing gunmen to fire off a barrage of shots in just seconds without having to reload. *See Bevis*, 2023 WL 2077392, *15 (discussing studies showing higher fatality rates when LCMs are used in a shooting or mass shooting). When high-capacity magazines are used, shootings result in more fatalities and injuries. Dkt. 52-4 (Klarevas Dec.) ¶¶ 16-17. *See also* County Resp. at 12 (discussing expert evidence on lethality of high capacity magazines). "Because assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition." *Bevis,* 2023 WL 2077392, at *16.

Plaintiff's only argument for why AR-15s are not dangerous is that semiautomatic handguns are "more dangerous" than semiautomatic rifles, based on how often each type of weapon is used in a homicide. Pl. Br. at 18. Again, however, Plaintiff improperly lumps AR-15s in with all semiautomatic rifles. He does not make any argument about the non-dangerousness of AR-15s, specifically. More importantly, the comparison between handguns and rifles is inapt because there are vastly more handguns in circulation than rifles, Dkt. 52-4

(Klarevas Dec.), ¶¶ 28-29, which would naturally lead to handguns being used more frequently in crime incidents overall. But on a weapon-to-weapon comparison, assault weapons remain far more dangerous and lethal than handguns, because they can kill scores of people in just seconds. *See also* Ill. Resp. at 23 n.18. They therefore may be restricted consistent with the Second Amendment. *See Bevis*, 2023 WL 2077392, at *16.

The established tradition of regulating dangerous weapons satisfies Defendants' burden under *Bruen*'s step two. If anything more were needed on historic tradition, however, the historical analysis conducted by the State Defendants and County Defendants confirms that banning assault weapons and high capacity magazines is consistent with the long arc of regulatory tradition, from the Founding Era through today.

The historical laws discussed by the State Defendants and County Defendants are rightly considered here, even though those laws did not address assault weapons or high capacity magazines specifically. Indeed, they couldn't have, because such technology – and the mass shootings they enable due to their extremely rapid and accurate fire of high-velocity bullets – did not exist in any meaningful sense until the 20th century. Ill. Resp. at 43-45. In a situation like this – one "implicating unprecedented societal concerns or dramatic technological changes" – a court's treatment of history must be "nuanced" enough to appreciate these dynamics. *Bruen*, 142 S. Ct. at 2132. Indeed, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id*. For this reason, *Bruen* instructs that a historical law need not be a "twin" or "dead ringer" for the City's current laws. *Bruen*, 142 S. Ct. at 2133. Being an "analogue" is enough. *Id.*

A historic law is sufficiently analogous if it "impose[s] a comparable burden" on self-defense, and is "comparably justified," as the modern law. *Bruen*, 142 S. Ct. at 2133. Both of

these vectors are met here. As to burden on self-defense, historic regulations of dangerous firearms and other weapons did not burden the right of self-defense, because many alternative arms remained available for that purpose. Ill. Resp. at 55-58. The City's ordinances work the same way, and are therefore sufficiently analogous: they leave Plaintiff free to use a wide variety of handguns or long guns for self-defense, including his preferred Glock 45 with a compliant magazine. Firearm experts, moreover, hold that conventional handguns, such as revolvers, and shotguns are actually better for self-defense than assault weapons. Dkt. 52-6 (Andrew Dec.) ¶¶ 58-59, 61; Dkt. 52-9 (Yurgealitis Dec.) ¶¶ 105-108; Dkt. 52-7 (Busse Dec.) ¶¶ 13, 17, 23. Plaintiff, for his part, makes no effort to show that the myriad firearms and magazines available to him under the City's law are insufficient for self-defense – and they are not. Dkt. 52-6 (Andrew Dec.) ¶ 61; Dkt. 52-9 (Yurgealitis Dec.) ¶¶ 96-110; Dkt. 52-7 (Busse Dec.) ¶¶ 12, 25-29; Ex. B hereto (Supplemental Busse Dec.) ¶¶ 55-60; Ex. C hereto (Supplemental Yurgealitis Dec.) ¶¶ 134, 138-144.

As to the second vector, the historical laws and the City's laws also share a comparable justification. The prior laws – whether bans on pistols and fighting knives in the early days of the Republic, revolvers in the latter 1800s, or machine guns in the 1930s – were all enacted to curtail the particular weapons that – at those particular times – were responsible for outbreaks of extreme or mass violence. Ill. Resp. at 45-52. The same purpose is served by banning assault weapons and high capacity magazines, today. The City's laws are not an effort to "address a general societal problem that has persisted since the 18th century" but that earlier generations believed to be out of bounds under the Second Amendment. *Bruen*, 142 S. Ct. at 2131. Rather, they respond to the very same problem that Americans have always been free to address, as it arose under the particular circumstances of each era. Today's scourge is assault weapons and

high capacity magazines, but the City is pursuing the same end – restricting the most dangerous and destructive weapons – that has always been the objective of state and local legislatures.

There is no indication that had AR-15s and high capacity magazines existed in earlier generations, our forebears would have viewed the Second Amendment as requiring them to stand aside while classrooms of children died within seconds. To the contrary – the evidence shows that every time an especially dangerous weapon entered the scene, legislatures answered the call to protect the lives of their residents. The City's laws are therefore wholly "consistent with" historical understandings of legislatures' authority to restrict firearms under the Second Amendment. *Bruen*, 142 S. Ct. at 2131. Plaintiff therefore lacks a likelihood of success on *Bruen*'s step two, providing yet another reason to deny his motion.

## II. Plaintiff Has Not Established Irreparable Harm.

Plaintiff's motion fails for the separate reason that he has failed his burden to show irreparable harm. Plaintiff argues that the City's ordinances harm his interest in self-defense because they prevent him from keeping an AR-15, or handgun with a 17-round magazine. This does not impair his ability to use firearms for self-defense. As explained above, Plaintiff remains free to use any number of handguns, rifles, and shotguns under the City's ordinances, and he may use magazines with up to 15 rounds.[6] Plaintiff says he prefers an AR-15 because he values being able to place his non-firing hand "toward the rifle's muzzle" and to "stabilize the rifle against [his] body." Dkt. 5-1 (Herrera Dec.) ¶ 5. But he does not explain why he can't do this

[6] An AR-15 is actually a poor choice as a self-defense weapon. Due to their velocity, rounds from an AR-15 are more likely to penetrate standard home construction materials; shooting an AR-15 in self-defense therefore risks the lives of other people in the house, even those in other rooms, or bystanders outside, particularly in a dense city like Chicago where residents live in apartment buildings or homes separated from each other by just a few feet. Dkt. 52-9 (Yurgealitis Dec.) ¶ 98; *see* Ex. D hereto (Andrew Supplemental Dec.) ¶ 78. Other long guns, such as 12-guage shotguns loaded with buckshot, do not have the same risk of over-penetration. Dkt. 52-9 (Yurgealitis Dec.) ¶ 106.

with any number of other rifles and long guns that are permitted under the City's ordinance, and, of course, he can. As *Bevis* held, there is no irreparable harm from an assault weapons restriction because people "retain other effective weapons for self-defense," such as shotguns and handguns. 2023 WL 2077392, at *16.

For these same reasons, Plaintiff suffers no irreparable harm from the City's ban on high-capacity magazines. Even if his Glock 45 would somehow be compromised by using a 10 or 15 round magazine – a claim that he does not support, and that is affirmatively refuted by experts[7] – he can choose any number of handguns that use magazines that hold fifteen or fewer rounds. Firearms with these magazines are carried by most police officers, including Chicago police, and are plainly suitable for self-defense. Ill. Resp. at 17-18 & n.8, 9. Because the City's ordinances allow Plaintiff to choose among a wide variety of options for self-defense in the home, they place no burden on his right to self-defense.

Plaintiff argues that *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) entitles him to a presumption of irreparable harm. But the *Ezell* presumption applies only to *some* cases, as dictated by "the form of the claim and the substance of the Second Amendment right" at issue. *Id.* at 700. *See also Wilson v. Cook Cnty.*, 937 F.3d 1028, 1036 (7th Cir. 2019); *Bevis*, 2023 WL 2077392, at *16. A presumption applied in *Ezell* because of the way the laws in that case infringed the Second Amendment right's "central component" – namely, "the right to possess

---

[7] Plaintiff posits – without any basis – that magazines with smaller capacities than the Glock 45's "standard" 17-round magazine could cause the firearm to malfunction and might void the warranty. Dkt. 5-1 (Herrera Dec.) ¶ 5. But experts confirm that the Glock 45 can be used with smaller magazines without issue; indeed, Glock, like most manufacturers, makes smaller magazines for use in its guns, including the Glock 45. Ex. B hereto (Busse Supplemental Dec.) ¶¶ 61-67; Ex. C hereto (Yurgealitis Supplemental Dec.) ¶ 143. Plaintiff's concern about the voiding of a manufacturer's warranty, moreover, does not constitute irreparable harm because it is a purely monetary harm (if the warranty becomes void, he would have to pay for repairs out of pocket) and is therefore compensable with monetary damages.

firearms for protection." *Ezell*, 651 F.3d at 699. The laws imposed a blanket, threshold impediment to a person lawfully possessing *any* firearm for self-defense because they barred *all* firearm possession unless the owner was trained, while simultaneously barring within city limits all ranges where training could occur. *Id.* at 691. The City's ordinances here do nothing like that. They freely permit residents to acquire myriad firearms for self-defense, without any encumbrance whatever, and simply restrict particular firearms and magazines that are especially dangerous. For that reason, there is no basis for applying a presumption of harm here.

Plaintiff's other claim of harm is that he has to forgo attending shooting sessions with a suburban SWAT team. His theory is that, because the City's ordinance prevents him from keeping his AR-15 in his Chicago home, he must store it in the suburbs, but that makes it too difficult to take the AR-15 to the SWAT sessions because it takes too long to retrieve it from his storage site.[8] As before, Plaintiff cannot establish irreparable harm by appeal to *Ezell*, because the City's ordinance does not bar his use of firearms for self-defense under this scenario, either. Indeed, Plaintiff does not claim that he would ever carry or use an AR-15 – or is even legally authorized to do so – on a SWAT deployment. Rather, he deploys with SWAT teams as a medic to provide medical care, a role that is distinct from that of the "operators," the actual law enforcement officers on the SWAT team who carry and use AR-15s. Dkt. 1 (Compl.) ¶¶ 27-28. The only time Plaintiff would even *touch* an AR-15 is if a SWAT member was injured or needed to free up their hands for something else, in which case Plaintiff would receive the member's AR-15 and *unload* it – not *shoot* it. *Id.* ¶ 30; Dkt. 5-1 (Herrera Dec.) ¶ 8. But even that is a stretch – Plaintiff does not claim that this has ever happened, and SWAT protocols are designed

[8] Plaintiff acknowledges that he has been able to participate in these drills two to three times a month in the past, notwithstanding having to first pick up his AR-15 from a location outside the City. Dkt. 5-1 (Herrera Dec.) ¶¶ 7-10; Dkt. 1 (Compl.) ¶¶ 29-30. He does not explain why this is now suddenly prohibitive.

to shield the medic from ever needing to touch a weapon. Dkt. 52-16 (Chiappini Dec.) ¶¶ 8-11.[9] There is no Second Amendment interest in being able to attend SWAT shooting sessions when Plaintiff is not a SWAT operator and his role involves no use of weapons. Plaintiff suffers no irreparable harm if he is somehow hindered in his ability to attend those sessions.

For these reasons, as well as those discussed by the State Defendants and County Defendants, Plaintiff fails to establish irreparable harm.

## III. The Public Interest And The Balance Of Hardships Weigh In Favor Of The City.

Because Plaintiff fails to show a likelihood of success on the merits or irreparable harm, his motion fails and the Court need not address the balance of the hardships or the public interest factors. Even so, those factors weigh decidedly against an injunction.

To begin, an injunction would harm the public interest by negating policy tools chosen by Chicagoans, through their elected representatives, to help keep themselves safe. Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). And the threat that these laws address is grave. Assault weapons and high capacity magazines are disproportionately used in mass shootings, "with increased frequency." Dkt. 52-4 (Klarevas Dec.) ¶¶ 13-14. And they are used in locations where people congregate—such as concert halls, houses of worship, schools, and public parade routes—to maximize the deaths and injuries that they inflict. Dkt. 52-6 (Andrew Dec.) ¶¶ 41-42, 46; Ex. D hereto (Supplement Andrew Dec.) ¶ 71. *See also* Dkt. 52-4 (Klarevas

---

[9] Plaintiff's allegations fail for additional reasons. He says that he already is a "skilled AR-15 user," Dkt. 1 (Compl.) ¶ 36. Nor does he explain why he needs to bring his *own* AR-15 when shooting alongside SWAT members. If anything, he would want to use someone else's AR-15, because the scenario he contemplates is that he may need to handle and render an operator's AR-15 during a SWAT mission. *Id*. ¶ 30. Nothing in the City's ordinance prevents him from practicing with someone else's AR-15 in the suburbs, which is where the trainings are held.

Dec.) ¶ 13. Chicago is rife with these preferred targets. And many of Chicago's other traits—including its population density, robust public transit systems, active downtown, and prominent attractions—also pose vulnerabilities. Ex. D hereto (Supplemental Andrew Dec.) ¶¶ 61, 78.

The City's laws, moreover, are an effective tool for responding to this threat because they reduce the injury and death from mass shootings. Research confirms that prohibitions on assault weapons and high capacity magazines hinder access to the instruments that would-be perpetrators need to commit mass shootings. Dkt. 52-4 (Klarevas Dec.) ¶¶ 30-31. This can deter potential offenders from committing shootings altogether, or at least hamper their ability to inflict maximum harm by forcing them to use less-deadly or less-effective instruments. *Id.* ¶¶ 31-39. Epidemiological studies and anecdotal evidence have found that when bans on assault-weapons and high capacity magazines are in effect, there are fewer high-fatality mass shootings and fewer deaths as a result of those shootings. *Id.* ¶¶ 45-47; *see also id*. ¶ 21.

Removal of these tools would therefore raise the risk of mass shootings and the horror they entail. The City's residents and organizations would struggle to try to prevent mass shootings in a world where the tools of mass murder cannot be restricted. Even now, policing large public events in the City, such as Lollapalooza, calls for untold personnel and logistical resources. Ex. A hereto (Snelling Dec.) ¶¶ 33-35. And designing and implementing response protocols for an active shooter scenario is time consuming and costly, often prohibitively so for public and private organizations. Ex. D hereto (Supplemental Andrew Dec.) ¶¶ 69-72; *see also* Dkt. 52-6 (Andrew Dec.) ¶¶ 46-47. The creation and implementation of additional security and screening procedures, moreover, could force harmful changes to organizations' culture and openness. Ex. D hereto (Supplemental Andrew Dec.) ¶¶ 70-72. And the effectiveness of these

protocols is often limited, particularly amid the immense stress and terror unleashed when a shooter is spraying bullets *en masse*. *Id.* ¶¶ 69, 71, 73-74.

Another harm from an injunction is that it will become easier for gang members and criminals to obtain assault weapons and high capacity magazines. Ex. A hereto (Snelling Dec.) ¶ 31. Larry Snelling, CPD's Chief of the Bureau of Counterterrorism, explains that these weapons and magazines are preferred by gang members because of their firepower and ability to fire quickly without needing to reload. *Id.* ¶¶ 7-8, 14. Gangs use assault weapons to intimidate rival gangs or to respond to shootings using similar firepower. *Id.* ¶ 14. And these gang shootings risk the lives of bystanders. In some cases, bullets shot from assault weapons have hit people nearby after passing through walls or cars. *Id.* ¶ 9. Last October, 14 people—including three children—were shot in a drive-by shooting committed using assault weapons. *Id.* ¶ 10.

Last, in a world where mass violence is more likely because assault weapons are easier to acquire, Chicago police officers would bear a unique and grave risk. Most of them do not carry assault weapons as a matter of course, meaning that officers encountering a shooter with an assault weapon are outgunned. Ex. A hereto (Snelling Dec.) ¶ 16. And CPD's standard bullet-proof vests do not protect against bullets fired from assault weapons. *Id.* ¶¶ 9, 17. *See also* Dkt. 52-6 (Andrew Dec.) ¶ 49; Dkt. 52-9 (Yergealitis Dec.) ¶¶ 113-115. The increased likelihood of a deadly encounter would only add to police officers' already stressful and dangerous jobs. Ex. A hereto (Snelling Dec.) ¶ 21, 27-28.[10]

---

[10] Outfitting rank-and-file officers with higher-rated protective gear is not a panacea. The heavy and bulky equipment would impede officers' mobility. Ex. A hereto (Snelling Dec.) ¶¶ 17-19. It also requires significant ongoing training to use effectively, which would leave officers with less time to devote to their normal, routine neighborhood policing roles. *Id.* ¶¶ 20-22. And the military-style equipment would undermine police-community relations; neighborhood officers would suddenly look like members of an occupying force. *Id.* ¶ 23.

Plaintiff ignores the enormous public safety implications of his motion and fails to acknowledge any harm that would flow if the City's bans were enjoined. His lone argument for why the equities are in his favor is that it is against the public interest to enforce an unconstitutional law. Pl. Br. at 29. But Plaintiff has not shown that the City's laws are unconstitutional, and, regardless, that does not obviate the need to weigh the myriad harms to the public that would result from an injunction. *See Ezell*, 651 F.2d at 710 (considering the relative harms to the plaintiff and public even after finding a likely Second Amendment violation and irreparable harm to plaintiff); *Joelner v. Village of Washington Park*, 378 F.3d 613, 627-29 (7th Cir. 2004) (affirming denial of preliminary injunction in First Amendment case even where the challenged law had "serious constitutional problems," as an injunction "may nevertheless be inappropriate if the relative harms strongly disfavor such relief").

In that calculus, moreover, the Court would be free to consider that Plaintiff suffers no actual harm from the City's laws, even if they were unconstitutional. *See MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357-58 (7th Cir. 1997) (per curiam) ("any harm to MacDonald [from an alleged First Amendment violation] appears to be minimal and seems to us insufficient to justify a broad injunction against the general application and enforcement of the challenged sections of the Code"); *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (holding that it is appropriate to consider the "specific character" of the harm claimed in a First Amendment case where irreparable harm is otherwise presumed, and denying injunctive relief because the actual harm was "minimal").[11]

[11] *American Civil Liberties Union v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), does not hold differently. In that case, the governmental defendant did not address the balancing or public-interest factors. *See Brief of Defendant-Appellee Alvarez*, No. 11-1286, Dkt. 29 (July 26, 2011). Accordingly, the court's assessment of the equities was driven only by the plaintiff's likelihood of success on the merits.

In accord with this precedent, courts repeatedly have refused to enjoin firearms regulations because of the public's strong interest in those laws, even where a plaintiff may experience irreparable harm from a likely Second Amendment violation. *E.g.*, *Bolton v. Bryant*, 71 F. Supp. 3d 802, 819 (N.D. Ill. 2014); *Culp v. Madigan*, No. 14-cv-3320, 2015 WL 13037427, *17 (C.D. Ill. Dec. 7, 2015); *see also Baird*, 2022 WL 17542432, at *6-7 (denying preliminary injunction of concealed-carry law, without addressing the merits or irreparable harm factors, because the plaintiff had "not shown the balance of harms and public interest favor a preliminary injunction" in view regulation's enhancement of public safety). Here, the grave public safety threats and other harms that would result from an injunction decisively outweigh any harm (and there is none) to Plaintiff.

## CONCLUSION

For the foregoing reasons, and those set forth in the oppositions filed by the State Defendants and Cook County Defendants, Plaintiff's motion for temporary restraining order and preliminary injunction should be denied.

Dated: March 10, 2023

Respectfully submitted,

/s/ Andrew Worseck

Deputy Corporation Counsel

ANDREW W. WORSECK
andrew.worseck@cityofchicago.org
WHITNEY G. WOODWARD
whitney.woodward@cityofchicago.org
DAVID B. SMITH
david.smith4@cityofchicago.org
City of Chicago Department of Law
Constitutional and Commercial
Litigation Division
2 North LaSalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7129 / 0260 / 7220

*Attorneys for the City of Chicago and David Brown*

# EXHIBIT

# A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAVIER HERRERA,<br><br>Plaintiff,<br><br>v.<br><br>KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois; BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police; COOK COUNTY, a body politic and corporate; TONI PRECKWINKLE, in her official capacity as County Board of Commissioners President; KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney; THOMAS J. DART, in his official capacity as Sheriff of Cook County; CITY OF CHICAGO, a body politic and corporate; DAVID O'NEAL BROWN, in his official capacity as Superintendent of Police for the Chicago Police Department,<br><br>Defendants. | ) | No. 1:23-cv-00532 |

**<u>DECLARATION OF CHICAGO POLICE DEPARTMENT CHIEF LARRY SNELLING</u>**

I, LARRY SNELLING, declare under penalty of perjury as follows:

1. I am the Chief of the Bureau of Counterterrorism for the Chicago Police Department ("CPD"). I submit this sworn declaration in support of Defendants in the above-referenced case. The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

**A. Background.**

2. I graduated from DePaul University with a degree in adult education.

3. I was hired as a police officer with CPD in 1992. I have been promoted regularly during my career, achieving the ranks of Sergeant, Lieutenant, Commander, Deputy Chief, and Chief. I was promoted to Chief of the Bureau of Counterterrorism in October of 2022. The position of Chief is the third-highest sworn rank in the Chicago Police Department, serving under the Superintendent and First Deputy Superintendent.

4. In my current role as Chief of the Bureau of Counterterrorism, I am responsible for more than 20 units and teams, including the Intelligence Section, Special Weapons and Tactics (SWAT), Firearms Investigation Team, Canine Unit, Public Transportation Unit, Airport Operations Unit, Marine Operations Unit, Mounted Unit, Gang Investigations Division, and Bomb Squad. There are over 1,000 sworn officers comprising these units. In addition, I serve as the Incident Commander for all major events, such as protests, festivals, and concerts. On a day-to-day basis, I supervise the operations of these units, manage administrative duties, and help plan and coordinate Chicago's safety plans and responses to large-scale special events. I also continue to perform work in the field often.

5. Due to my career with CPD, I possess decades of experience with firearms, including assault weapons and high capacity magazines. Over the course of my career with the Department, I have been present at crime scenes where individuals were shot and killed or injured by shooters using assault weapons and high capacity magazines. Further, in my various roles with the Department, including my current position, I have regularly received and reviewed reports and other information about crime in the City, including shootings involving assault weapons and high capacity magazines, and the recovery of firearms.

**B. Impact of Assault Weapons and High Capacity Magazines on Public Safety.**

6. In this declaration, when I refer to "assault weapons," I am referring to the types of firearms that are prohibited by the City's ordinance, Municipal Code of Chicago section 8-20-075. Similarly, when I refer to "high capacity magazines," I am referring to the magazines that are prohibited by the City's ordinance, Municipal Code of Chicago section 8-20-085. These sometimes are referred to as "extended magazines" or "large capacity magazines."

7. It is my opinion that there is no need for members of the public to possess assault weapons or high capacity magazines in Chicago or other areas, even for self-defense. Compared to other types of firearms, assault weapons do not provide an advantage with respect to self-defense. The purpose of assault weapons is not self-defense, but to kill multiple people with extreme speed and efficiency, as in a battlefield scenario. For this reason, they are exponentially more dangerous than other types of handguns and rifles.

8. It is my opinion that the purpose of high capacity magazines is to enable a shooter to kill multiple people with extreme speed and efficiency, by increasing the number of bullets that can be fired in a short period of time, without needing to reload. It is my opinion that high capacity magazines are not needed for self-protection, as smaller magazines still contain enough bullets for a firearm to be used effectively for personal self-defense.

9. Assault weapons cause more extreme physical damage to victims and can hit a greater number of victims than other firearms. Assault weapons shoot with a higher velocity than other types of handguns and rifles. Because of this velocity, ammunition fired from assault weapons travels easily through many objects, including most bulletproof vests, walls, vehicles, and the human body. I have personally witnessed the destruction assault weapons cause, including witnessing crime scenes where an assault weapon has been used to shoot innocent bystanders through barriers such as cars or building walls. Also, compared to other weapons, assault weapons require little or no training for a shooter to reach a large area and maximize death and destruction. Because assault weapons allow a shooter to hit targets within a very large area and at a higher velocity, they result either in intentional mass shootings or the unintentional shooting of many victims who are not the intended targets but innocent bystanders within the field of fire.

10. For example, on October 31, 2022, 14 people were shot in a drive-by shooting in Garfield Park, Chicago, using assault weapons. Three of the victims were children. The shooting occurred during a vigil at which a large group of people were gathered. Even though the shooter or shooters were targeting a specific person in that group, the use of an assault weapon risked the lives of the bystanders nearby.

11. Further, through the use of a switch or other modification to the firearm, assault weapons can become fully automatic, meaning that a single pull of the trigger will cause the firearm to fire continuously. My teams have recovered modified assault weapons, or automatic-capable assault weapons, on hundreds of occasions.

12. For example, on December 16, 2022, four teenagers were shot outside Benito Juarez High School in Chicago. Two of them died. In February of this year, CPD arrested the suspected shooter, who is a teenager. CPD recovered four semiautomatic weapons with high-capacity magazines from the suspect. Three of those weapons had switches that allowed the weapon to be fully automatic, which means they are prohibited under Chicago's assault weapons ordinance.

13. Demand for assault weapons seems to have risen in recent years. My opinion about this increased demand is based in significant part on my knowledge of crime data and crime trends in the City, including information about shootings, the weapons that Chicago police officers recover, and the information gathered from officers who work in specialized units, including those investigating gangs and narcotics. The increase is particularly acute in the areas of the City which generally experience more violence—specifically, Areas 1, 2 and 4, which encompass the majority of the south side and the far west sides of the City. Over the last five years, the Chicago Police Department has recovered more than 3,500 firearms that constitute assault weapons under the ordinance. The number weapons that CPD recovers each year has trended upward in recent years. In 2022 alone, CPD recovered more 1,713 assault weapons—more than five times the amount recovered in 2018.

14. Gangs, in particular, seem to be in a race to procure assault weapons. They use these weapons to intimidate other gangs or to respond in kind to shootings involving assault weapons. Not possessing assault weapons or an inability to respond to shootings using assault weapons are perceived as signs of weakness, and gangs want to avoid being seen as weak. There has also been an increase over the last several years of social media posts depicting individuals brandishing assault weapons. The posts are used to intimidate others and/or glamorize violence with assault weapons, particularly gang violence. This further bolsters their desirability, which leads to them be acquired, and ultimately used in shootings.

### C. Impact of Assault Weapons and High Capacity Magazines on Law Enforcement.

15. Prior to 2008, CPD did not assign assault rifles to police officers. Because of the prevalence of assault weapons on the streets of Chicago, however, CPD now maintains a small amount of them so that it has some officers, such as those on SWAT teams, who can respond to emergency incidents with appropriate firepower.

16. Most Chicago police officers, however, do not carry assault weapons in the course of performing their job duties, nor do they train with them. This means that most of the time, the officers first responding to an active shooter incident involving an assault weapon will usually have weaker firepower than the assailant.

17. Due to the high velocity of bullets fired by assault weapons (along with the shape of the bullets that are commonly fired from assault weapons), assault weapons are able to defeat standard protective equipment used by law enforcement personnel, including that commonly worn by CPD officers. The highest level of protective equipment is therefore necessary.

18. This protective equipment includes the highest level of bullet-proof vest outfitted with trauma plates, and ballistic helmets. Trauma plates are heavy, metal or ceramic plates worn in conjunction with a vest to provide additional protection from bullets and other blunt force trauma. Vests only cover the chest and upper back area of the wearer, and the trauma plates only cover the area over the heart.

19. Partly because of the weight and expense of this equipment, as well as the fact that this equipment is bulky and limits mobility, it is not practical for all officers to wear such equipment prophylactically on their beats day-to-day. Moreover, this equipment can be extremely expensive and is purchased by officers out of their own pockets unless they are assigned to certain specialized units.

20. Only the SWAT team ordinarily wears this type of protective gear. Officers on the SWAT team are specially trained to handle particularly dangerous situations, including responding to calls involving assault weapons. SWAT officers train with their team every day while wearing this equipment and, because of this, become proficient in how to move about while wearing, carrying, and operating the equipment. Most police officers do not have this training, and thus would not be skilled at maneuvering with the equipment even if it were available to them.

21. Even if the City were to outfit all of its officers with this enhanced protective equipment, that would not ensure that officers are protected from a shooting from an assault weapon. This equipment still leaves some parts of the body vulnerable, and hits from assault weapons have a much higher likelihood of causing death or serious injury as compared to other types of firearms. And even if assault weapon ammunition is stopped by the vest or plate, major trauma to the body can still occur because of the high velocity of the bullet.

22. Because most officers are not trained to wear this equipment, they also would need to regularly train while wearing this equipment, in teams, like SWAT officers. I expect that training would require at least 15 hours of work each week to ensure its efficacy. Implementing that amount of training each week to most, if not all, CPD officers would be a huge logistical and financial undertaking for CPD, and would reduce the time that officers otherwise have available for protecting public safety through their normal policing routines in the community.

23. Having Chicago police officers routinely wear this equipment on their daily beats also would negatively impact the community because it would make officers appear to look more like members of an occupying military rather than persons who wish to protect and serve. Police officers are trained to de-escalate situations if we can, and that will be difficult to do if officers are routinely in neighborhoods wearing gear that makes them look like they are prepared for war.

24. Assault rifles are the weapon of choice for mass shootings in public spaces. Designed as killing machines, they allow a person to kill or injure as many people as possible in a short time, much more than with a handgun or non-semi-automatic rifle. CPD has thus adjusted its large-event and domestic terrorism preparations to address assault weapons and mass shootings. The rise in mass shootings and the increased prevalence of assault weapons has required CPD to dedicate increasingly large amounts of resources and time to securing public events and the general safety of the public.

25. For example, the 2022 Lollapalooza festival took place just weeks after the Fourth of July mass shooting in Highland Park, Illinois, in which the shooter used an assault weapon and high capacity magazine. CPD asked residents to stay off of the rooftops of buildings surrounding Grant Park and instituted other safety precautions designed specifically to address the safety concerns posed by a shooter using an assault weapon, both if located within the festival or outside the festival perimeter. If assault weapons became even more prevalent in the population, CPD would have to engage in efforts like this, which require a great deal of planning and personnel resources, much more often, thus depleting the resources available for other activities, including routine policing in neighborhoods.

26. Situations like this also present difficult operational decisions for law enforcement. For example, last year a threat was reported at Lollapalooza. This threat caused CPD to evaluate whether to evacuate everyone in the festival. But an evacuation itself could have risked a mass shooting because an individual armed with an assault weapon could have been waiting outside the secure perimeter.

27. Also, if assault weapons became more prevalent in the population, police officers' jobs would be more stressful. The job is already stressful. In any situation—whether responding to a battery or a traffic stop—an officer cannot know ahead of time if the individual has a weapon. This uncertainty creates even more stress when assault weapons may be in the picture, because if the individual has an assault weapon, the officer will be outgunned and effective cover will be harder to find. Encountering individuals armed with assault weapons is one of the most stressful situations that a Chicago police officer may encounter.

28. I understand from my conversations with officers and people outside CPD that many people hold the perception that being a police officer is less safe today than in earlier years. I believe this perception hurts CPD's recruiting ability. The increased prevalence of assault weapons will only further this perception.

29. No matter how prepared or well-equipped CPD is, it is virtually impossible to guarantee that a shooting with an assault weapon can be stopped. Officers may also often decide that they cannot respond to an assailant using an assault weapon by firing their own weapons at the assailant because doing so could jeopardize the safety of bystanders.

30. For example, in June 2021, two shooters armed with assault weapons hit 10 people during an outdoor community party along 75th Street in Chicago. Officers already were patrolling the scene before the shooting occurred, and they initially believed they were being targeted. In that situation, shooting back to try to stop the offenders would have risked hitting bystanders because of the crowd of people present.

31. If Chicago's ordinances were enjoined, even temporarily, I expect that the number of assault weapons and high capacity magazines in the City would significantly increase, particularly among persons who would use them to commit crimes.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 02 MARCH 2023 in Chicago, Illinois

[signature]

# EXHIBIT

# B

**SUPPLEMENTAL DECLARATION OF RYAN BUSSE**

I, Ryan Busse, declare that the following is a true and correct supplement to my declaration dated February 24, 2023, that I prepared for Defendants Kwame Raoul and Brendan F. Kelly ("State Defendants") in *Herrera v. Raoul*, *et al.*, Case No. 1:23-cv-523 (N.D. Ill.), filed at Dkt. 52-7 (the "Prior Declaration"). For the sake of continuity and clarity, I begin this supplemental declaration at Paragraph 51, as my Prior Declaration ended at Paragraph 50.

51. I am a former senior executive in the firearms industry and the author of *Gunfight: My Battle Against the Industry that Radicalized America* (New York: PublicAffairs, 2021).

52. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

53. My background and qualifications are described in the Prior Declaration. My CV is attached to that document as Exhibit A.

54. I have been retained by the Office of the Corporation Counsel for the City of Chicago to provide expert testimony in *Herrera v. Raoul*, *et al.*, Case No. 1:23-cv-523 (N.D. Ill.), which challenges the City's assault weapons ordinance and high capacity magazine (also known as "large capacity magazine" or "LCM") ordinance. As of the date of this declaration, the scope of this engagement is to provide expert testimony on behalf of Defendants City of Chicago and David O'Neal Brown. I have reviewed the provisions of the Chicago Municipal Code, Chapter 8-20, which are being challenged in this case. I am being compensated at a rate of $200 per hour for my work on this declaration, and $350 per hour for any travel or testimony connected with this matter.

## A. LACK OF NECESSITY OF ASSAULT WEAPONS AND LCMS FOR SELF DEFENSE

55. In my opinion neither assault weapons nor LCMs are necessary for self-defense. While there is a competitive firearms industry marketing trend towards selling guns with increased ammunition capacity, this does not equate to necessity for self-defense. There are also many recently introduced handgun models that utilize or offer magazines which are not LCMs, including many with 10-round magazines, that are considered excellent self-defense options by notable industry experts and trade journalists.

56. The following is a review for a 10-round version of one of the best-selling handguns in the industry, the Springfield Hellcat, offered by notable industry website TheArmoryLife.com: "10 rounds of 9mm in a micro-compact is still a formidable defense. Springfield Armory recently announced the addition of a 10-round version of the Hellcat pistol for shooters in states that require restricted magazine capacities. The new 10-round variant of the Hellcat offers a great self-defense option for owners that live in areas with these restrictions."[1]

57. There are many handguns that are designed to function with a magazine capacity of 10 rounds including, for example, the Sig 365, which is one of the most popular modern handguns in the United States and is also consistently ranked among the top choices for self-defense by firearms trainers. In addition, there are other proven similar choices with standard capacities of 10 or fewer rounds, such as the 1911 mentioned in the Prior Declaration.

[1] Review of Springfield Hellcat 10 round version: https://www.thearmorylife.com/going-10-rounds-with-the-springfield-hellcat/ (last viewed Feb 8, 2023).

58. Revolvers, which almost always have 5- or 6- round capacities, are also considered to be extremely effective self-defense guns. Even the most respected industry experts openly agree on this point.

59. Revolvers have always been considered a top choice of firearm for self-defense because of their reliability and ease of use. For many decades, law enforcement officers have preferred revolvers as a "backup" self-defense guns to their standard-issue semiautomatic handguns, and many are still carried for that purpose today. Likewise, many civilians prefer revolvers for the same reasons law enforcement officers carry them. These firearms are relatively simple compared to a semiautomatic pistol, their mechanisms are visible and easy to see, they very rarely malfunction, and their controls are very intuitive. Revolvers are considered to be a top choice for new shooters or gun owners who do not practice often, and experienced shooters also prefer them because of their reliability. Importantly for this case, revolvers almost always have a 5 or 6 round capacity and yet are still considered a top self-defense choice.

60. Many shotguns are also designed with capacities of 5 or 6 rounds. For nearly a century, many shotguns, including pump-action shotguns, have been widely considered a top choice for self-defense. For example, in my more than 25 years in the industry, I never met anyone who debated that the Remington 870 pump shotgun was one of the most effective home defense guns of all time.[2]

## B. AVAILABILITY AND RELIABILITY OF NON-LCM MAGAZINES

61. Magazines that hold 10 or 15 rounds are not unreliable, uncommon, expensive or difficult to obtain.

---

[2] Gun Digest Review of Self-Defense Shotguns: https://gundigest.com/gun-reviews/shotguns/top-four-remington-870-tactical-shotgun-options (last viewed Feb. 18, 2023).

62. There are hundreds of examples from the industry which demonstrate this. A notable example is the Beretta 92FS pistol, which has been the military's preferred self-defense pistol for decades and is one of the most common commercially available pistols in the United States. (This pistol's military designation is the M9 and its civilian model is 92FS.)

63. Beretta designed the 92FS pistol to hold specifically-shaped magazines, and those magazines have a maximum capacity of is 15 rounds. But the shape of the magazine, not its capacity, is what is critical to the magazine's ability to properly function in a firearm. As proof of this fact, Beretta sells three versions of this pistol commercially. One is sold with a 15 round magazine and two are sold with 10 round magazines and the shape of all of these magazines is identical.

64. The two 10-round options are built to comply with various state magazine capacity regulations. Nowhere does Beretta, or any other reputable authority, claim the 10 or 15 round versions of this pistol are unreliable or defective in any way. Neither is there any issue with increased price or decreased availability. The following is the Beretta website page advertising the three models of this pistol. Note that the only difference in the models is the magazine capacity offered with each model. Obviously switching this accessory between pistols

is an easy and common change. Even the pistol image is the same for all three.[3]




| Model Code | J92F300CA | JS92F300 | JS92F300M |
|---|---|---|---|
| Model Name | 92FS | 92FS | 92FS |
| MSRP | $ 709.00 | $ 709.00 | $ 709.00 |
| Action | Dbl/Sngl | Dbl/Sngl | Dbl/Sngl |
| Caliber | 9 mm | 9 mm | 9 mm |
| Rounds | 10 Rounds | 10 Rounds | 15 Rounds |

65. Another pertinent example is FN's 5-SeveN pistol, which it markets to "commercial, law enforcement and military" customers.[4] According to the FN website, this pistol is offered with either 10 or 20 round magazines. There is no functional difference between these options, and FN makes no claim regarding the 10 round option being more difficult to obtain, more expensive or less reliable. In fact, FN markets both the 10 and 20 round versions as "the ultimate precision pistol."

[3] Beretta Website 92FS pistol: https://www.beretta.com/en-us/beretta-92fs/ (Last viewed Feb 24, 2023).
[4] FN Handgun Website: https://fnamerica.com/products/pistols/fn-five-seven-mrd-fde/ (last viewed Feb. 22, 2023).

Pistols > FN Five-seveN® Series > FN Five-seveN® MRD FDE

**FN Five-seveN® MRD FDE**

Available for commercial, law enforcement, and military.

**MSRP: $1,509.00**

**Buy Now ▾**




**SPECS**

**CALIBER:** 5.7x28mm
**OPERATION:** Delayed blowback, Single-action only
**MAG CAPACITY:** 10 or 20 Rd.
**WEIGHT:** 25.2 oz. (without mag)
**BARREL LENGTH:** 4.8"
**OVERALL LENGTH:** 8.2"
**TWIST RATE:** 1:9" RH
**HEIGHT:** 5.6"
**WIDTH:** 1.35"
**TRIGGER PULL:** 4.4 - 7.87 lb.
**SIGHT RADIUS:** 7.0"

**PRIMARY FEATURES**

Slide cut to mount most optics

Minimal recoil from the FN 5.7x28mm cartridge

Enhanced grip with stippled texture

Adjustable iron sights co-witness with most MRDs

**SLIDE**

Add most MRDs in minutes, without a gunsmith

Machined steel slide with polymer cover

Enhanced slide cover improves cocking control

Photo-luminescent front sight with adjustable rear

66. Glock pistols are among the most popular in America, one of which—the Glock 45—is owned by the Plaintiff in this case. In my opinion, non-LCM magazines, including those with 10 or 15 round capacities, are widely available for Glock handguns and are just as reliable as any LCM. Glock itself markets non-LCM magazines that are compatible with the Glock 45. I am not aware of a single warning from Glock or other resellers to the contrary and have only ever encountered industry marketing and advertisements which attest to their reliability, such as this statement from the very popular online firearms store GunMagWarehouse for a magazine that is compatable with the Glock 45: "The Glock® Gen 5 G17 9mm 10-Round Magazine is a genuine Glock Gen 5 pistol magazine, designed to deliver superior reliability at an affordable price. . . . Featuring durable polymer construction with reinforcing steel inserts and numbered witness holes, Glock magazines are known for their rock-solid reliability and consistent performance in any climate. These 10-round magazines come equipped with high-strength steel

wire springs and hi-vis polymer followers for consistent feeding performance, ideal for target practice, tactical drills, or training."[5]

67. The examples of the non-LCM magazines being widely available and functional in the Beretta, Glock and FN guns above are generally applicable to all handguns sold in the United States market.

**C. ASSAULT WEAPON FEATURES**

68. I address below terms used in Chicago's assault weapons ordinance that are not otherwise specifically addressed in the Prior Declaration.

69. **Handgun grip.** This term is interchangeable with "Pistol Grip," which is discussed in my Prior Declaration.

70. **Grenade, Flare or Rocket Launcher**. These terms are generally interchangeable and differ only in the type of projectile fired. This feature can be added or attached to a rifle in a manner that often appears as if it were a second or lower barrel below the main barrel of an assault rifle. While these features are of use in war, to my knowledge no credible authority has ever claimed that they are useful or appropriate for civilian self-defense.

71. **Second or Forward Handgun Grip on Pistols.** This is a feature added to semiautomatic pistols to help stabilize the gun during fast rates of fire. The feature is very similar to a vertical forward grip discussed in my Prior Declaration which, if on a handgun, makes the handgun an illegal handgun. This feature is not necessary for any reasonable or likely self-defense scenario.

---

[5] GunMagWarehouse Glock Mags: https://gunmagwarehouse.com/glock-gen-5-glock-17-9mm-10-round-factory-magazine.html (last viewed Mar. 8, 2023)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 9, 2023 at Kalispell, MT.

/s/

# EXHIBIT

# C

**SUPPLEMENTAL DECLARATION OF JAMES E. YURGEALITIS**

I, James E. Yurgealitis, declare that the that the following is a true and correct supplement to a declaration dated February 27, 2023, that I prepared for defendants Kwame Raoul and Brendan F. Kelly ("State Defendants") in *Herrera v Raoul*, *et al.*, Case No. 1:23-cv-523 (N.D. Ill.), filed at Dkt. 52-9 (the "Prior Declaration"). For the sake of continuity and clarity, I begin this supplemental declaration at Paragraph 118, as my Prior Declaration ended at Paragraph 117.

118. I am currently self employed as a Legal and Forensic Consultant providing firearms related technical and public policy consulting, forensic case reviews and testing and training services to corporations, legal counsel, and the public sector. During my previous 26-year career as a Federal Law Enforcement Officer, I have been recognized, and testified, as an expert witness in numerous local, state and federal courts.

119. My background and qualifications are described in my Prior Declaration. My curriculum vitae is attached to that document as Exhibit A, and my qualifications and expert witness experience are detailed in my Statement of Qualifications, which is attached to the Prior Declaration as Exhibit B.

120. I have been engaged by the Office of the Corporation Counsel of the City of Chicago to provide expert testimony in litigation challenging the City's assault weapons and high capacity magazine laws. As of the date of this declaration, the scope of this engagement is to provide expert testimony on behalf of Defendants City of Chicago and David O'Neal Brown. I have reviewed the provisions of the City of Chicago Municipal Code, Chapter 8-20 ("the Code") which are being challenged in this case. I am being compensated at a rate of $400 per hour for my work on this declaration, and $1600 per travel and work day.

121. I have been provided with, and have reviewed, the following documents:

a.) Plaintiff's Complaint, Case No. 1:23-cv-00532, Dkt. 1;

b.) City of Chicago Municipal Code, Chapter 8-20; and

c.) Plaintiff's Declaration, Dkt. 5-1.

122. My statements and opinions in the Prior Declaration are incorporated here and, unless otherwise specified, apply equally to "assault weapons" and "high capacity magazines," as defined by the City of Chicago Municipal Code, and the City's prohibitions of those weapons and accessories.

## OPINIONS

123. As explained in my Prior Declaration, many of the firearms covered by the Code can directly trace their origins to weapons developed for use in combat, and they were not initially intended for general distribution and sale to the public. Furthermore, I am of the opinion that they are also ill suited for home- and self-defense use and, additionally, pose a general threat to public safety.

## DISCUSSION

### A. Prohibited Firearms And Features Under the Code.

124. Definitions of general firearms terms used in this section are set forth in the Prior Declaration.

#### i. Prohibited Firearms

125. The Code does not ban all firearms, all semiautomatic firearms, or even all firearms chambered in .223 / 556 (AR) or 7.62x39mm (AK) calibers.

126. Instead, the Code bans firearms with obvious military heritage, using an enumerated list of the prohibited weapons.

127. To offer one example not discussed in the Prior Declaration, the Code bans ".50 caliber rifles." This refers to a firearm chambered to accept the .50 BMG (Browning Machine

Gun) cartridge. Initially designed as the ammunition for a belt-fed .50 caliber heavy machine gun by John Browning in the waning years of WWI, .50 BMG cartridges have been repurposed for use in long range sniper rifles manufactured since the late 1990's – early 2000's. Browning originally designed the cartridge for the Model 1921A1 and further development resulted in the M2 heavy machine gun (AKA the "Ma Deuce") which has seen combat in every American Conflict since WWII. The modern sniper rifles capable of firing the round (the US Barrett M82A1 and McMillan TAC-50) can hit targets with precision from distances exceeding two miles. For example, in 2017 a Canadian Special Forces Soldier killed an Iraqi combatant at a distance of 2.2 miles with a McMillan .50 caliber rifle.[1]

128. The Code also bans certain semiautomatic rifles, handguns, and shotguns with particular features. As I explain below, each of the features, whether incorporated into the firearm by the manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing the firearm's effectiveness in a combat scenario.

**ii. Prohibited Features**

129. Included in the Code's definition of "assault weapon" are a number of enumerated features which, when included on certain firearms, bring those weapons under the statutory definition of "assault weapons." These include a rifle or handgun that has the capacity to accept a detachable magazine (or can be readily modified to do so), or a semi-automatic shotgun, are considered an assault weapon if the firearm also includes one of the features delineated in the Code.

[1] https://gunandsurvival.com/2021/08/05/longest-sniper-shot-6-rifles-that-went-the-distance

130. For reference, a detachable magazine is an ammunition feeding device which can be readily detached and replaced with another of the same kind for reloading. Detachable magazines have varying capacities up to and including 100 rounds. Without question a firearm which utilizes a detachable magazine facilitates reloading more rapidly than a firearm with an internal or tubular magazine. Until the mid 1950's the main "battle rifle" of the U.S. military was the M-1 "Garand" rifle with an internal eight round (non detachable or "fixed") magazine. The M-14 rifle adopted in the mid – late 1950's was the first rifle with a detachable magazine approved by the U.S. military for standard issue to front line combatants.

131. Both the State of Illinois and the City of Chicago list similar features under their respective legislation. As I have previously addressed those also prohibited under State Legislation in the Prior Declaration, I will address here those unique to the Code.

132. The features prohibited under the Code and not previously addressed are:

i. **Forward Grip:** Same as "Protruding Foregrip" addressed previously.

ii. **Grenade, flare or rocket launcher:** Without question, a grenade, flare or rocket launcher has no practical self-defense application on a civilian firearm. Flare guns (AKA: "Very Pistols") are available for signaling and emergency use and are not restricted under the Code. Obviously, a grenade is an offensive military weapon which could result in mass casualties if deployed during a civilian event or in a public space. Depending on the size (caliber) and chemical composition of the propellant a rocket can also be utilized as an offensive weapon.

iii. **Handgun Grip:** Substantially equivalent to, and addressed in the Prior Declaration, under "pistol grip."

iv. **Second Handgun Grip on Pistols:** A second handgun grip on a pistol allows the operator to more easily control recoil and subsequent muzzle climb during rapid fire. The resultant effect is the ability to place more aimed shots on target in a shorter period of time. A pistol with a second foregrip is also considered "Any Other Weapon" under the National Firearms Act and subject to more stringent controls to include registration in a National Database.

133. The Code also prohibits "belt-fed semiautomatic firearms," which refers to those designed to utilize a belt of ammunition (either linked or web) to continuously feed ammunition to the firearm. As opposed to detachable or fixed magazines, the belt can be of infinite capacity as there are no dimensional physical limitations (as with fixed & detachable magazines) to limit their capacity. Ammunition belts were initially designed early in the 20th Century, and continue to be used by military entities, as an ammunition feeding system for a fully automatic firearms (machine guns).

**B. Prohibited "High Capacity Magazines" Under The Code.**

134. Magazine capacity plays a role in defining Assault Weapons under the Code. The Code also restricts possession and sale of high capacity magazines themselves and limits magazine capacity to 15 rounds or less.

135. Generally speaking, modern semi-automatic rifles that are designed, manufactured and marketed as "hunting rifles" traditionally have an internal magazine capacity of less than 10 rounds depending on caliber. For example, the Browning BAR in .30-06 caliber as currently manufactured has an internal magazine capacity of four (4) rounds.

136. Semi-automatic pistols from numerous manufacturers are sold with detachable magazines that would be permitted under the Ordinance.

137. As stated previously, detachable magazines are available with varying capacities from 5 to 100 rounds. Generally speaking, any firearm designed for a detachable magazine with a capacity exceeding 15 rounds will function as designed with a magazine of lesser capacity, including magazine capacities permitted under the Code.

138. Home defense and/or street/commercial robbery situations are rarely lengthy protracted shootouts with extensive exchanges of gunfire. The National Rifle Association Institute for Legislative Action (NRA ILA) regularly publishes newsclips on their "Armed Citizen" webpage highlighting examples of defensive use of firearms by citizens.[2]

139. Claude Werner, a firearm instructor and writer, conducted a detailed statistical analysis of 482 self-defense incidents provided by the NRA ILA on their website from 1997 to 2001. He determined, from the information provided by the NRA, that the defending individual reportedly fired their weapon in only 72 percent of the disclosed incidents and, in those incidents, fired an average of 2.2 rounds.[3]

140. Lucy Allen conducted a similar statistical analysis of the NRA's "Armed Citizen" newsclips for the period January 2011 – May 2017. Her analysis revealed that the average number of shots fired in a self defense scenario was identical to that determined by Werner: 2.2 shots.[4]

141. These two independent analyses of information provided by the NRA, itself an organization which advocates and promotes use and availability of firearms for self-defense,

[2] https://www.nraila.org/gun-laws/armed-citizen/
[3] https://www.defensivecarry.com/attachments/tac-5-year-w-tables-pdf.107045
[4] Declaration of Lucy P. Allen, Delaware State Sportsmen's Assn. v. Delaware Department of Homeland Security, U.S. District Court for the District of Delaware, Case No. 1:22-cv-00951-RGA, p.5

showed that the average shots fired per self-defense incident had not changed over a 20 year period.

142. As stated in the Prior Declaration, repeated practice and shooting with your chosen firearm will make you a more effective deterrent should deadly force be required. An abundance of ammunition is not a substitute for a lack of marksmanship.

143. The Plaintiff contends that he does not use his Glock Model 45 because the Code prevents him from using the 17-round magazine originally supplied with it. He states that using Glock handguns with non-standard magazines causes them to malfunction, and further states that using non-standard magazine can impede the firearm's safety, reliability and warranty. The Glock Model 45 is a 9mm caliber pistol, and is a 'hybrid' of sorts as it utilizes the frame of the Glock Model 17 and a more compact slide assembly from the Glock Model 19. Accordingly, any magazine manufactured for the Glock Model 17 will fit and function in the Glock 45. Glock itself manufactures magazines for the Glock 17 (which fit the Model 45) with a capacity compliant with the Code. (See below image.) To the best of my knowledge, those magazines are as reliable as any other produced by the company. Additionally, to the best of my knowledge, use of smaller capacity magazines manufactured by Glock themselves do not render any factory warranty on their own pistols null and void.




Source: https://gunmagwarehouse.com/glock-gen-4-glock-17-9mm-10-round-factory-magazine.html

144. The Plaintiff also states he currently utilizes a Glock Model 43x for various purposes to include potential use in self-defense.[5] The Model 43x comes with a standard 10 round magazine. As this pistol can be safely carried with a round in the chamber, the effective capacity is 11 rounds.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 03/10/2023 at MANCHESTER, MD.

[signature]

James E. Yurgealitis

[5] Complaint, Dkt. 1, ¶ 23.

# EXHIBIT

# D

# SUPPLEMENTAL DECLARATION OF PHIL ANDREW

I, Phil Andrew, declare that the following is a true and correct supplement to my declaration dated February 2, 2023, that I prepared for defendants Kwame Raoul and Brendan F. Kelly ("State Defendants") in *Herrera v. Raoul, et al.*, Case No. 1-23-cv-523 (N.D. Ill.), filed at Dkt. 52-6 (the "Prior Declaration"). For the sake of continuity and clarity, I begin this supplemental declaration at Paragraph 62, as my Prior Declaration ended at Paragraph 61.

62. This supplemental declaration is based on my personal knowledge and experience, and if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

63. My background and qualifications are described in the Prior Declaration. My CV is attached to that document as Exhibit A.

64. All opinions contained herein are made pursuant to a reasonable degree of professional certainty.

65. I have been retained by the Office of the Corporation Counsel for the City of Chicago to provide expert testimony in *Herrera v. Raoul, et al.*, Case No. 1:23-cv-532 (N.D. Ill.), which challenges the City's assault weapons and high capacity magazine (also known as "large capacity magazine" or "LCM") ordinances. As of the date of this declaration, the scope of this engagement is to provide expert testimony on behalf of Defendants City of Chicago and David O'Neal Brown. I have reviewed the provisions of City of Chicago Municipal Code, Chapter 8-20 ("the Code"), which are being challenged in this case. I am being compensated at a rate of $450 per hour.

66. I explained in my Prior Declaration that "assault weapons" and "large-capacity magazines," as defined under the Protect Illinois Communities Act, have a highly

disproportionate impact on public safety and present a unique modern public safety threat. Further, I explained that restricting access to those weapons and accessories helps prevent killings and injuries, advances public safety, and does not interfere with law-abiding citizens' ability to protect themselves. My statements and opinions in my Prior Declaration are incorporated here and apply equally to "assault weapons" and "high capacity magazines" as defined in the Code, and the City's prohibitions of those weapons and accessories.

## I. ASSAULT WEAPONS AND HIGH CAPACITY MAGAZINES PRESENT A CRITICAL PUBLIC SAFETY CHALLENGE TO THE CITY OF CHICAGO.

68. Specific areas of the City, such as those on Chicago's south and west sides, already experience a relatively higher level of firearm violence compared to other areas. Many of the neighborhoods which have higher levels of firearm violence also are experiencing a variety of economic challenges, such as poverty, chronic unemployment, and reduced economic and business development.

69. Based on my professional experience—including working with various organizations in the City to develop and implement safety programs, and my experience serving as the Director of Violence Prevention for the Archdiocese of Chicago—it is my opinion that organizations cannot eliminate the possibility of a mass shooting committed using an assault weapon and/or high capacity magazine through the adoption of safety measures. Those measures can only hope to reduce the impact of such an attack. Countering any firearm attack is challenging, and assault weapons and firearms that utilize high capacity magazines only exacerbate that challenge by limiting the time and space for escape or defense. This is because assault weapons and large capacity magazines allow shooters to fire rapidly and accurately across a broad area with great force.

70. The most rigorous safety plans and countermeasures for this type of violence require specially-trained, armed, and tactically-equipped counter-threat units—measures that are only available to a handful of entities with substantial resources, such as the White House. The vast majority of organizations lack the resources those measures require, and in general are not well-positioned or equipped to plan and defend against the threat of an attack using assault weapons and/or high capacity magazine shootings.

71. Facilities and venues with a mission, function, or purpose of hosting large groups of people—such as schools, houses of worship, theaters, music venues, public buildings, public transit, public parks, and transportation hubs—have an increased vulnerability to mass shootings using assault weapons and/or high capacity magazines. Chicago has a high concentration of these locations. Common countermeasures have proven insufficient to prevent assault weapons attacks in spaces like these. In addition, the public or private organizations that manage these spaces generally do not have the means or ability to provide the most effectual pre-crisis planning and prevention and active threat response.

72. As explained in my Prior Declaration, the threat posed by assault weapon attacks requires organizations to plan and implement a wealth of safety measures to lower the likelihood of one occurring. Doing so requires time and significant resources, which is beyond the means of many organizations. Further, many of the more effective safety measures, such as intelligence gathering and restricting access to the location by blocking roadways and access points, are impossible or impracticable for most organizations, including those whose missions or functions involve hosting gatherings of people, such as religious organizations and music venues.

73. In my work as a crisis planning professional, I conceptualize every crisis as having a “before,” “during,” and “after” for purposes of developing and implementing threat

mitigation and response measures. Because of the grave physical impact that shootings using assault weapons and high capacity magazines pose to victims, I consider decreasing the likelihood of assault weapon and high capacity magazine uses in an attack, to the greatest extent possible, to be a critical part of the "before" phase of crisis planning. This is because the ability to respond to assault weapon and high capacity magazine use "during" a shooting—such as by implementing protocols like "Run, Hide, and Fight"—are extremely limited and usually unsuccessful at completely preventing injuries or fatalities. Moreover, the mere presence of assault weapons can create stress, panic, and prompt emergency response.[1]

74. Current crisis planning best practices for workplaces, schools, and churches include some version of the widely-endorsed "Run, Hide, and Fight" protocol as an active threat response. While it is important to provide planning and confidence for personal action in active threat situations, assault weapons and high capacity magazines can render "Run, Hide, Fight" nearly impossible or largely ineffective in the area exposed to the attack. For example, if an attacker is firing a high capacity assault weapon at a crowd from an elevated or protected position, there is no way to fight back. And if the exits to venues are bottlenecked—which commonly occurs, even without the panic that ensues during an attack—people cannot run or hide because they cannot rapidly evacuate. This limited effectiveness of "Run, Hide, and Fight" in response to a mass shooting is especially true for the countless public spaces in Chicago, from bars and restaurants to crowded tourist attractions. The same is true for schools, churches, and recreational and sporting venues, which have purposeful flows that draw large groups into specific areas.

[1] Richard Fausset, *A Heavily Armed Man Caused Panic at a Supermarket. But Did He Break the Law?*, *New York Times* (Jan. 5, 2023), available at https://www.nytimes.com/2023/01/02/us/atlanta-gun-laws.html.

75. These challenges to mitigating the threat and harm of shootings committed with assault weapons and large capacity magazines underscore the need for the government to address this public safety risk. I believe the City of Chicago's prohibition of assault weapons and high capacity magazines is part of an appropriate public safety function and strategy while allowing other firearms to be available for legal, responsible, and effective civilian self-defense.

## II. ASSAULT WEAPONS ARE NOT PRACTICAL OR NECESSARY FOR RESPONSIBLE, LAW ABIDING CITIZEN SELF DEFENSE.

76. Based on my experience as a federal agent, a public safety professional, and my longtime familiarity with the City of Chicago, the City's assault weapons and high capacity magazine laws do not interfere with law-abiding citizens' ability to defend themselves.

77. Firearms can be an effective (though not necessary) tool for self-defense, both for trained law enforcement and trained civilian use. But as stated in my Prior Declaration, effective self-defense relies more heavily on factors unrelated to having an assault weapon. These include factors related to the individual facing the threat and the environment in which the situation occurs. Further, the types of firearms that I believe are most suitable for self-defense—shotguns and 9 mm pistols—remain legal under the City of Chicago ordinance.

78. An assault weapon is unnecessary and impractical and inappropriate for self-defense. Most self-defense shootings are in close quarters, in places such as rooms, hallways, parking lots, and common areas in buildings. Because the rounds fired by assault weapons can penetrate walls and bodies, they pose a particularly high threat of hitting innocent people or causing unintended damage. That risk only increases in areas with high population and housing densities, such as Chicago.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 9, 2023, at Kenilworth, Illinois.

/s/ Phil Andrew