**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAVIER HERRERA,<br><br>       *Plaintiff*,<br><br>     v.<br><br>KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity County Board of Commissioners President, KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney, THOMAS J. DART, in his official capacity as Sheriff of Cook County, CITY OF CHICAGO, a body politic and corporate, DAVID O'NEAL BROWN, in his official capacity as Superintendent of Police for the Chicago Police Department,<br><br>       *Defendants*. | Case No. 1:23-cv-00532<br><br>Hon. Lindsay C. Jenkins<br><br><br>**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION**<br><br>**EXPEDITED ORAL ARGUMENT REQUESTED** |

**REPLY IN SUPPORT OF EMERGENCY MOTION**
**FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

ARGUMENT ...................................................................................................................... 4

I.      *Bruen* abrogates Seventh Circuit precedent. ............................................................ 4

II.     The challenged laws prohibit conduct that is covered by the plain text of the Second
Amendment. .................................................................................................................. 5

       A.      Defendants' interest-balancing arguments and 20-plus declarations are
improper. .............................................................................................................. 5

       B.      Modern semiautomatic rifles are "Arms" in the Second Amendment. ................. 9

       C.      Protection of standard magazines is inherent in the Second Amendment's
protection of "Arms." ....................................................................................... 13

       D.      The Second Amendment's plain text covers the State's registration
requirement. ...................................................................................................... 18

III.    Defendants offer no historical tradition that could justify the challenged laws ............. 20

       A.      AR-15 rifles cannot be banned in the home as "dangerous and unusual"
weapons. ............................................................................................................. 21

       B.      AR-15 semiautomatic rifles and standard magazines are "in common use." ....... 25

       C.      Defendants' historical evidence is not analogous. .............................................. 31

       D.      Defendants ignore the most apt analogy to colonial-era militia acts. ................... 38

       E.      There is no historical analogue for the challenged magazine bans ....................... 40

       F.      There is no historical analogue for the challenged registration requirement ........ 41

IV.    Harm is irreparable. ..................................................................................................... 43

V.     The public interest and the balance of the equities favor a preliminary injunction. ......... 47

CONCLUSION ................................................................................................................. 48

# TABLE OF AUTHORITIES

## Cases

*Am. C.L. Union of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ................................................................................................ 48

*Andrews v. State,*
  50 Tenn. 165 (1871) ............................................................................................... passim

*ANJRPC v. Att'y Gen.,*
  910 F.3d 106 (3d Cir. 2018) .......................................................................................2, 13

*Antonyuk v. Bruen,*
  2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) .................................................................. 43

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Bruck,*
  142 S. Ct. 2894 (2022) ........................................................................................................ 5

*Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen.,*
  974 F.3d 237 (3d Cir. 2020) ............................................................................................. 28

*Aymette v. State,*
  21 Tenn. 154 (1840) .................................................................................11, 12, 32, 34

*Bevis v. City of Naperville,*
  2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) .......................................................... passim

*Bianchi v. Frosh,*
  142 S. Ct. 2898 (2022) ........................................................................................................ 5

*Bliss v. Commonwealth,*
  12 Ky. 90 (1822) ................................................................................................................ 34

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ................................................................................................. passim

*Christian v. Nigrelli,*
  2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) .............................................................. 43

*Cockrum v. State,*
  24 Tex. 394 (1859) ............................................................................................................ 34

*Commonwealth v. Caetano,*
  26 N.E. 3d 688 (Mass. 2015) ........................................................................................... 28

*Connection Distrib. Co. v. Reno,*
  154 F.3d 281 (6th Cir. 1998) ........................................................................................... 47

*Covalt v. Carey Canada, Inc.,*
  860 F.2d 1434 (7th Cir. 1988) ........................................................................................... 7

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................................................. passim

*Duncan v. Becerra,*
  970 F.3d 1133 (9th Cir. 2020) ......................................................................................... 40

*Duncan v. Bonta,*
  142 S. Ct. 2895 (2022) ................................................................................................ 5

*Duncan v. Bonta,*
  19 F.4th 1087 (9th Cir. 2021) ............................................................................ 38, 40

*English v. State,*
  35 Tex. 473 (1871) .................................................................................... 12, 32, 34

*Ezell v. City of Chicago,*
  2010 WL 3998104 (N.D. Ill. Oct. 12, 2010) ............................................................ 18

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ............................................................................ 43, 45

*Ezell v. City of Chicago,*
  678 Fed. App'x 430 (7th Cir. 2017) ........................................................................ 18

*Ezell v. City of Chicago,*
  70 F. Supp. 3d 871 (N.D. Ill. Sept. 29, 2014) ........................................................ 18

*Ezell v. City of Chicago,*
  846 F.3d 888 (7th Cir. 2017) .................................................................................. 18

*Fife v. State,*
  31 Ark. 455 (1876) ................................................................................................ 34

*Friedman v. City of Highland Park,*
  136 S. Ct. 447 (2015) .............................................................................................. 4

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ........................................................................ 4, 25, 44

*Fyock v. City of Sunnyvale,*
  25 F. Supp. 3d 1267 (N.D. Cal. 2014) .................................................................... 31

*Fyock v. Sunnyvale,*
  779 F.3d 991 (9th Cir. 2015) .................................................................................. 13

*Good Shepherd Manor Found., Inc. v. City of Momence,*
  323 F.3d 557 (7th Cir. 2003) .................................................................................... 7

*Gordon v. Holder,*
  721 F.3d 638 (D.C. Cir. 2013) ................................................................................ 48

*Grace v. District of Columbia,*
  187 F. Supp. 3d 124 (D.D.C. 2016) .............................................................. 43, 46, 48

*Hardaway v. Nigrelli,*
  2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) .......................................................... 43

*Hardy v. Fischer,*
  701 F. Supp. 2d 614 (S.D.N.Y. Mar. 31, 2010) ...................................................... 44

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ...................................................................... passim

*In re Ocean Bank,*
    481 F. Supp. 2d 892 (N.D. Ill. 2007) ........................................................................... 7

*Indiana ex rel. Naylor v. Ind. State Teachers Ass'n,*
    950 F. Supp. 2d 993 (S.D. Ind. Mar. 26, 2013) ...................................................... 7

*Jackson v. City & Cty. of S.F.,*
    746 F.3d 953 (9th Cir. 2014) ..................................................................................... 13

*Joelner v. Vill. of Washington Park,*
    378 F.3d 613 (7th Cir. 2004) ..................................................................................... 48

*Kolbe v. Hogan,*
    813 F.3d 160 (4th Cir. 2016) ..................................................................................... 25

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) ..................................................................................... 25

*Koons v. Reynolds,*
    2023 WL 128882 (D.N.J. Jan. 9, 2023) ................................................................. 43

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ........................................................................................... 6, 23, 30

*McDonald v. State,*
    102 S.W. 703 (Ark. 1907) .................................................................................... 36, 37

*Midwest Title Loans, Inc. v. Ripley,*
    616 F. Supp. 2d 897 (S.D. Ind. 2009) .................................................................... 47

*Miller v. Bonta,*
    542 F. Supp. 3d 1009 (S.D. Cal. June 4, 2021) ............................................ 23, 25, 28

*Morin v. Lyver,*
    143 S. Ct. 69 (2022) ...................................................................................................... 5

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ...................................................................................... 25

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) .................................................................................... passim

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................................... 47

*Nunn v. State,*
    1 Ga. 243 (1846) .................................................................................................... 33, 34

*O'Neil v. State,*
    16 Ala. 65 (1849) ........................................................................................................ 21

*Ocean State Tactical, LLC v. Rhode Island,*
    2022 WL 17721175 (D.R.I. Dec. 14, 2022) .......................................................... 13

*Preston v. Thompson,*
    589 F.2d 300 (7th Cir. 1978) ..................................................................................... 47

*Redbox Automated Retail, LLC v. Xpress Retail LLC,*
    310 F. Supp. 3d 949 (N.D. Ill. 2018) ................................................................ 44

*Rhode v. Becerra,*
    445 F. Supp. 3d 902 (S.D. Cal. 2020) ............................................................... 43

*RLJCS Enters., Inc. v. Prof'l Benefit Tr.,*
    487 F.3d 494 (7th Cir. 2007) ........................................................................... 7, 8

*Rupp v. Bonta,*
    2022 WL 2382319 (9th Cir. June 28, 2022) ....................................................... 5

*Staples v. United States,*
    511 U.S. 600 (1994) .......................................................................................... 25

*State v. Huntly,*
    25 N.C. 418 (1843) ............................................................................................ 21

*State v. Kerner,*
    107 S.E. 222 (N.C. 1921) .................................................................................. 12

*State v. Reid,*
    1 Ala. 612 (1840) .............................................................................................. 14

*State v. Workman,*
    14 S.E. 9 (W. Va. 1891) .................................................................................... 12

*Thomas v. Collins,*
    323 U.S. 516 (1945) .......................................................................................... 19

*United States v. Cox,*
    906 F.3d 1170 (10th Cir. 2018) ........................................................................ 17

*United States v. Hasson,*
    2019 WL 4573424 (D. Md. Sept. 20, 2019) ..................................................... 17

*United States v. Miller,*
    307 U.S. 174 (1939) ................................................................................... passim

*Wilson v. Cook County,*
    937 F.3d 1028 (7th Cir. 2019) ...................................................................... 4, 45

*Wilson v. State,*
    33 Ark. 557 (1878) ...................................................................................... 12, 24

*Young v. Hawaii,*
    142 S. Ct. 2895 (2022) ........................................................................................ 5

## Statutes

2 Edw. III c. 3 (1328) ........................................................................................... 21

720 ILCS 5/24-1.10 .......................................................................................... 2, 43

720 ILCS 5/24-1.9 ................................................................................. 2, 18, 43, 44

1 William Charles White, *A Compendium and Digest of the Laws of Massachusetts* (1809) ........................... 16

2 Henry St. George Tucker, *Commentaries on the Laws of Virginia* (1837) ................................. 16

*The Public Statute Laws of the State of Connecticut, As Revised and Enacted by the General Assembly, in May, 1821* (Hartford: H. Huntington 1821) ...................................................................................16

**Rules**

Fed. R. Civ. P. 26(a)(2)(B)(vi) ...........................................................................................................8

**Treatises**

1 William Hawkins, *A Treatise of the Pleas of the Crown* (1777) ...........................................1, 21

3 Wood, *An Institute of the Laws of England* (1754) ...............................................................1, 21

4 William Blackstone, *Commentaries on the Laws of England* (1769) .................................1, 14, 21

**Other Authorities**

1 Noah Webster, *An American Dictionary of the English Language* (1828) ......................14, 15, 16

1 Richard Burn, *Justice of Peace and Parish Officer* (1st ed. 1762) ......................................22, 35

1 T. Cunningham, *A New and Complete Law Dictionary* (1764) ....................................15, 21, 35

87 Fed. Reg. 24652, 24655 (Apr. 26, 2022) ..................................................................................26

John Adams Argument for the Defense (December 3-4, 1770), National Archives Founders Online, https://bit.ly/2U5iy8b .........................................14

Campbell et al., *Tactical Medicine Essentials* (2d ed. 2020) ...................................................3, 46

Carissa Byrne Hessick, *Corpus Linguistics and the Criminal Law*, 2017 B.Y.U. L. Rev. 1503 (2017) ...............................................................15

Cong. Rsch. Svc., *House-Passed Assault Weapons Ban of 2022* (H.R. 1808) (Aug. 4, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12174 ................................................26

David B. Kopel, *Knives and the Second Amendment*, 47 U. Mich. J. L. Reform 167 (2013) .................................................................33

Giles Jacob, *A New Law Dictionary* (1750) ................................................................................15

Kevin Tobia, *Testing Ordinary Meaning*, 134 Harv. L. Rev. 726 (2020) ......................................15

Osgood, *The American Colonies in the Seventeenth Century* (MacMillan 1904) ......................38, 39

Robert Leider, *Deciphering the "Armed Forces of the United States,"* 57 Wake Forest L. Rev. 1195 (2022) .........................................................12

Robert Leider, *Federalism and the Military Power of the United States*, 73 Vand. L. Rev. 989 (2020) ..........................................................11

Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L. J. 1587 (2014) .........................................................11

Stephen P. Halbrook & David B. Kopel, *Tench Coxe and the Right to Keep and Bear Arms, 1787-1823*, 7 Will. & M. Bill of Rights J. 347 (1999) ..........................................16

Thomas Potts, *A Compendious Law Dictionary* (1803) ..................................................................15

**REPLY**

The question before the Court is whether the government may ban arms in the home—arms that are so commonly owned that there are millions in circulation.[1] In response, Defendants offer historical statutes that prohibited the carrying of certain arms *in public*. They offer arguments about dangerousness, which likewise traces back to the common-law offense of "going armed" *in public* with dangerous and unusual arms in menacing fashion.[2] Defendants' public carry arguments are no response at all to Dr. Herrera's particular claims and requested relief. Dr. Herrera is not asking to carry a Tommy gun to the playground. He is not asserting a right to terrorize others with Bowie knives at the farmers' market. Dr. Herrera is instead asking to keep America's most common semiautomatic rifle in his home with the 30-round magazine that came with it. He is asking to keep a popular handgun operable in his home with the 17-round magazine that came with it. Defendants concede that there are lawful uses of these banned arms, and Defendants concede that there are millions of lawful users. But they have disarmed Dr. Herrera, with the effect of prohibiting him from participating in critical firearms training with his SWAT team—a team that deploys to *police* that dangerousness, not to create it, in a city overwhelmed with crime.

---

[1] There is a pending motion to reassign this case to be heard alongside related cases under Local Rule 40.4. *See* Notice, Dkt. 41. The State and County Defendants agree that reassignment would further judicial economy and have filed notices explaining to whom they believe reassignment would be most proper. *See* Notice, Dkt. 58 (State Defendants); Notice, Dkt. 56 (County Defendants). As explained in Plaintiff's reply in support of reassignment (Dkt. 59), reassignment is all the more appropriate now that Judge Virginia M. Kendall has issued a reasoned opinion discussing the Second Amendment issues in these related cases. *See Bevis v. City of Naperville*, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023).

[2] 3 Wood, *An Institute of the Laws of England* 453 (1754) (emphasis omitted) ("Riding or going armed with dangerous and unusual weapons to the terror of the people, is an offense at common law, and prohibited by statute."); 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1769) ("The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."); *see also* 1 William Hawkins, *A Treatise of the Pleas of the Crown* 266 (1777) ("as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people").

*Bruen* could not be clearer: the Second Amendment protects firearms commonly owned today for lawful purposes. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2143 (2022). And the Second Amendment protects those firearms' components, which are necessary to their proper function. *See ANJRPC v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022). Defendants' bans flout both principles. But now before this Court, Defendants play a game of semantics, contending that the commonly owned rifles and handguns that Dr. Herrera and millions of others own are not "arms." That is implausible. Defendants' laws, prohibiting Dr. Herrera from purchasing, keeping, and using these common arms for lawful purposes in his home, necessarily implicate Dr. Herrera's fundamental rights. *Bruen*, 142 S. Ct. at 2135.

Defendants' laws are unconstitutional. The County and City categorically ban semiautomatic rifles and magazines in the home. Opening Br. 6-8. The recently enacted state law compounds that unconstitutional state of affairs. *Id.* at 8. It bans purchasing new rifles, replacement magazines, and other rifle components. It permits preexisting owners of rifles and magazines to keep their firearms in their homes only if bought before this year and only if they are willing to register them, down to the serial number, with the state police. 720 ILCS 5/24-1.9, 24-1.10. And beginning in April, those preexisting owners may only "possess" the rifles and magazines; it does not indicate whether anyone may "use" them for self-defense, except at a "a properly licensed firing range or sport shooting competition venue." *Id.* §§24-1.9(d), 24-1.10(d) (distinguishing between "possess" and "use").

The Court will not find any historical equivalent to Defendants' laws. There is no historical tradition of banning entire classes of arms in the home. The historical tradition points in exactly the opposite direction: *requiring* arms in the home. Colonial-era militia acts expected the citizenry to be armed with muskets or carbines or rifles. Uniformly, the colonies required men to keep and become

proficient with arms and ammunition suitable for individual and collective self-defense.[3] Fail to do so, and colonists would face fines or other punishments.[4] Modern versions of those commonly owned arms cannot be banned today.

After *Bruen*, it is legal error to ignore those historical analogues and instead defer to Defendants' interest-balancing. But here, that is what Defendants ask the Court to do. They merely shift pre-*Bruen* "step 2" means-ends scrutiny arguments to their so-called "*Bruen* step 1" arguments, accompanied by hundreds of pages of expert declarations with policy justifications. Whatever the label, it's still "one step too many." *Bruen*, 142 S. Ct. at 2127. Defendants ignore what *Bruen* says matters: whether there is a broad historical tradition of banning citizens from purchasing, keeping, and using classes of commonly owned weapons for their homes. There is not. There is an uninterrupted history of permitting commonly owned arms in homes. There is an uninterrupted history of permitting them to be kept in such a way that they may be *used* for self-defense, not merely kept inoperable. And there is an uninterrupted history of permitting such things without requiring gun owners to register lawfully acquired rifles. After *Bruen*, bans flouting that history must be declared unconstitutional.

The harm from these ongoing constitutional violations is irreparable and a preliminary injunction is warranted. The harm is particularly egregious in Dr. Herrera's case. Together, Defendants' laws prevent Dr. Herrera from participating in weapons training with his SWAT team—the "most valuable education" for a medic to become proficient with his team's weapons and tactics. Campbell et al., *Tactical Medicine Essentials* 12, 14 (2d ed. 2020).[5] For a medic like Dr. Herrera, "[a]t a minimum, [he] should be familiar with how to make these weapons 'safe' by manipulating the safety and magazine

---

[3] These militia acts and other historical statutes are included in Exhibit 1 of this reply. Exhibit 1 also includes copies of statutes cited by Defendants, nearly all of which regulate public carry and have nothing to do with keeping arms inside one's home. *See* Part III.C, *infra*.

[4] *See, e.g.*, Ex. 1 at pp. 2-3, 9, 12 (Nos. 2, 4, 16, 22).

[5] Quoted pages from this tactical medicine textbook are attached to Exhibit 3, a supplemental declaration by Dr. Herrera.

release, and ideally know how to fire these weapons under duress should the need arise. This is espe-cially true if [he] [is] not a law enforcement officer and [has] no formal law enforcement education." *Id.* at 30; Ex. 3, Herrera Supp. Dec. ¶¶7-11. Defendants' laws put Dr. Herrera and others at risk be-cause he may not train with his rifle with his SWAT team. *Id.* ¶¶12-15. Dr. Herrera satisfies every requirement for a temporary restraining order and preliminary injunction, his request for that prelim-inary relief has been pending for 45 days, and he respectfully requests expeditious relief.

## ARGUMENT

**I.** ***Bruen*** **abrogates Seventh Circuit precedent.**

Contrary to the County Defendants' arguments (at 50-52) and the City Defendants' arguments (at 3-4), the merits of this case are not controlled by pre-*Bruen* decisions in *Wilson* and *Friedman*. Those decisions are "no longer good law." *Bevis*, 2023 WL 2077392 at *8 & n.6. In *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), the Seventh Circuit applied what could have been called a "sub-stantial benefit" test. *Id.* at 412; *see Friedman v. City of Highland Park*, 136 S. Ct. 447, 447-49 (2015) (Thomas, J., dissenting from denial of cert.) (criticizing Seventh Circuit's framework). In application, it was no different from means-ends scrutiny. *Friedman* reasoned that "[i]f criminals can find substitutes for banned assault weapons, then so can law-abiding homeowners." *Friedman*, 784 F.3d at 411. *But see Bruen*, 142 S. Ct. at 2127, 2129-30. According to *Friedman*, there was enough of a "substantial benefit" for the government to justify the law: "If a ban on semiautomatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit." *Friedman*, 784 F.3d at 412. *Friedman* concluded that "[w]hen there is no definitive constitutional rule," such "matters are left to the legislative process." *Id.*; *accord Wilson v. Cook County*, 937 F.3d 1028, 1035 (7th Cir. 2019). *But see Friedman*, 136 S. Ct. at 448 (Thomas, J., dissenting from denial of cert.) (rejecting that the Second Amendment or the Court's precedents "leave matters open").

*Bruen* requires the opposite presumption. *Bruen* does not permit the government to advert to "perceived risk[s]" or "feel[ing] safer." *Friedman*, 784 F.3d at 412. The government instead must identify some historical laws analogous to its firearms ban, otherwise the government cannot impose the ban. *See Bruen*, 142 S. Ct. at 2127, 2129-30. That was a sea-change from *Friedman* and *Wilson*'s approach, as well as the approach of many other courts across the country. It is thus no surprise that, after *Bruen*, the Supreme Court granted, vacated, and remanded many such decisions, including those about the constitutionality of bans analogous to those at issue here.[6]

## II. The challenged laws prohibit conduct that is covered by the plain text of the Second Amendment.

With *Friedman* no longer good law, *Bruen* is the proper starting place. The first question is whether the Second Amendment's plain text covers the conduct that Defendants' laws would forbid, including (1) purchasing and keeping and, if necessary, using a semiautomatic rifle in the home; (2) purchasing and keeping and, if necessary, using standard magazines—which are an essential component of modern rifles and semiautomatic handguns—in the home; and (3) keeping lawfully acquired arms in the home without having to register them with the state police. The Second Amendment's plain text covers this conduct.

### A. Defendants' interest-balancing arguments and 20-plus declarations are improper.

Rather than engage the Second Amendment's text as *Bruen* requires, Defendants spend their briefs making policy arguments about why semiautomatic rifles and their magazines ought not be considered "Arms." *See* State Resp. 15-19; Cnty. Resp. 5-21; City Resp. 14-16. They rely on 28 declarations, including 24 redundant expert declarations offering opinions on the meaning and relevance

---

[6] *See, e.g.*, *Duncan v. Bonta*, 142 S. Ct. 2895 (2022) (magazines); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (2022) (magazines); *Bianchi v. Frosh*, 142 S. Ct. 2898 (2022) (semiautomatic rifles); *Young v. Hawaii*, 142 S. Ct. 2895 (2022) (public carry); *Morin v. Lyver*, 143 S. Ct. 69 (2022) (permit-to-purchase law). Courts of appeals have similarly vacated other decisions and remanded for further consideration in light of *Bruen*. *See, e.g.*, *Rupp v. Bonta*, 2022 WL 2382319 (9th Cir. June 28, 2022) (semiautomatic rifles).

of gun laws past and present, mass shootings, crime prevention, unreliable self-defense statistics, fire-arms advertising—all touting the government's interest in regulating firearms. The State argues (at 17), for example, that citizens should not be permitted to own magazines with a greater capacity than handguns used by the Chicago Police Department. The County criticizes (at 10) how some have marketed the AR-15. All describe the horrific aftermath of mass killings, including in places such as Highland Park where such arms were already banned. State Resp. 36; Cnty. Resp. 12-13; City Resp. 1-2. In short, Defendants and their experts' overarching contention is that the banned arms are too dangerous to be permitted anywhere, including in Dr. Herrera's own home.

Defendants' voluminous declarations are improper. For starters, *Heller* makes clear that inter-est-balancing has no place in the Second Amendment analysis, which "is the very *product* of an interest balancing by the people." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("We would not apply an 'interest-balancing' approach to the prohibition of a peaceful neo-Nazi march through Skokie.… The Second Amendment is no different."). But Defendants' Klarevas, Andrew, Busse, Colwell, Donohue, Hargarten, Morgan, Palmer, Peterson, Roth, Schreiber, Snelling, and Yurgealitis Declara-tions are offered for that purpose. Their arguments are policy judgments, not legal ones. Courts are not positioned to resolve which expert has the better policy arguments about causes of crime and crime prevention, preventing psychological trauma, and the like. *Compare, e.g.*, Klaveras Dec. (Dkt. 52-4, 52-5), *with* Ex. 4, Kleck Dec. (debating causes and nature of mass shootings).[7] Defendants' policy declarations cannot rewrite the Second Amendment's "bare text." *Bruen*, 142 S. Ct. at 2141 n.11. "[T]he Second Amendment does not permit—let alone require—'judges to assess the costs and benefits of

---

[7] Plaintiff submits an expert declaration from renowned criminology professor Dr. Gary Kleck (Exhibit 4) for purposes of preserving Plaintiff's disagreement with Defendants' experts' opinions on the frequency of mass killings, crime prevention, and crime policy should the Court deem those opin-ions relevant. That would be error, for *Bruen*'s rejection of means-ends scrutiny confirms that Plain-tiff's Second Amendment claims do not turn on these policy debates. Dr. Kleck's declaration responds directly to State and County experts; his opinions apply equally to the City's later-filed brief and over-lapping experts.

firearms restrictions.'" *Id.* at 2129 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010)). Nor are Defendants' declarations—largely about public mass shootings—applicable to the question before the Court, regarding the historical tradition of firearms bans *in homes*. They are improper and cannot substitute for *Bruen*'s required legal analysis. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (expert testimony on legal conclusions, including irrelevant ones, is inadmissible).

With respect to Defendants' Baron, Cornell, DeLay, Roth, and Spitzer Declarations, these opinions from professors of history, linguistics, and political science purport to interpret historical statutes and the Constitution's meaning of "Arms" for the Court. Interpreting legal provisions is the job of lawyers and courts; an expert witness (let alone five of them) has no role. *In re Ocean Bank*, 481 F. Supp. 2d 892, 898-99 (N.D. Ill. 2007) (collecting Seventh Circuit cases for principle "that expert testimony on both legal conclusions and on the meaning of the statutory provisions (or 'legislative history') is improper" and striking opinions). Likewise, portions of State Defendants' declaration from State Representative Bob Morgan are unreliable post-enactment legislative history that cannot substitute for the text of the firearms bans at issue. *See Covalt v. Carey Canada, Inc.*, 860 F.2d 1434, 1438-39 (7th Cir. 1988) ("Legislative history generated in the course of litigation has even less utility, for it may be designed to mislead, to put an advocate's slant on things."). Plaintiff will respond to these arguments about the relevant history, statutory interpretation, and constitutional interpretation with legal arguments in this brief, supported by the attached copies of historical statutes (Exhibits 1 & 2), not with similarly improper expert opinions purporting to dictate what the law means and how historical statutes do or do not decide the constitutional question. *See RLJCS Enters., Inc. v. Prof'l Benefit Tr.*, 487 F.3d 494, 498 (7th Cir. 2007) (rejecting experts as necessary for "specialized knowledge" about law); *Indiana ex rel. Naylor v. Ind. State Teachers Ass'n*, 950 F. Supp. 2d 993, 1002 (S.D. Ind. Mar. 26, 2013)

(excluding professor's expert testimony that "duplicate[ed] legal arguments" and "improperly suggest[ed] that federal courts could turn to him for legal guidance"); *see also Bruen*, 142 S. Ct. at 2130 n.6.

The sheer volume and redundancy of these declarations—at the preliminary injunction stage no less—illustrates how Defendants overcomplicate the *Bruen* inquiry and resist its obvious answer. Plaintiff finds himself responding to at least five declarations from the State alone offering opinions about the dangerousness of the banned weapons, and at least three declarations from the State alone touching on the nature of the firearm. An individual's constitutional rights do not depend on his ability to respond to a parade of experts, in addition to Defendants' roughly 150 pages of preliminary injunction briefing. "Legal arguments are costly enough without being the subjects of 'experts….'" *RLJCS Enters.*, 487 F.3d at 498. The opinions offered by Defendants' experts are not what *Bruen* requires. After all, the Supreme Court decided *Bruen* itself in a motion-to-dismiss posture. *See* 142 S. Ct. at 2125. And here, it doesn't take more than a dozen experts to understand that keeping semiautomatic rifles and standard magazines in millions of Americans' homes is conduct plainly covered by the Second Amendment's text. Defendants' highly paid experts have no say in whether that right "is *really worth* insisting upon." *Heller*, 554 U.S. at 634.[8]

---

[8] The County and State Defendants are compensating their primary historical experts $750 per hour and $500 per hour respectively for their declarations, plus more per hour for any testimony. *See* Cornell Dec. (Dkt. 52-14); Spitzer Dec. (Dkt. 52-12). Both the County and State Defendants are paying the same criminology expert, presumably twice, at a rate of $480 per hour for his two reports, plus more per hour for any testimony. Klarevas State Dec. (Dkt. 52-4); Klarevas Cnty. Dec. (Dkt. 54-3). County Defendants are paying a psychologist $500 per hour for her declaration, plus $4,000 per day for any testimony. Palmer Dec. (Dkt. 54-15). Other declarations from the County fail to disclose compensation, in violation of Federal Rule of Civil Procedure 26(a)(2)(B)(vi). *See* Donohue Dec. (Dkt. 54-4); Andrew Dec. (Dkt. 54-9). One such declaration is from a law professor who devotes his declaration to a legal critique of (in his words) "Plaintiff's tenditious [*sic*] Complaint" with a whole section titled "The Complaint Reflects a Complete Ignorance of the Problem of Guns and Crime." Donohue Dec. (Dkt. 54-4) ¶25 & p. 8.

**B. Modern semiautomatic rifles are "Arms" in the Second Amendment.**

Defendants cannot sensibly argue that AR-15 semiautomatic rifles are not "Arms" under the Second Amendment's plain text. The term "Arms" broadly includes "weapons of offence" and "armour of defence." *Heller*, 554 U.S. at 581 (cleaned up). That includes weapons that an individual "takes into his hands, or use[s] in wrath to cast at or strike another"—in other words, weapons that an individual can "bear." *Id.* Founding-era sources included "all firearms" in the definition of "Arms." *Id.*; *see also Andrews v. State*, 50 Tenn. 165, 179 (1871) (explaining that "arms" includes "rifle[s] of all descriptions").

Today, AR-15 semiautomatic rifles are plainly within that definition of "Arms." *See* Ex. 5, Newton Dec. ¶¶19-20 ("An AR-15 is a semiautomatic rifle … designed to be held with two hands and fired from the shoulder."). Rifles as a general category are "Arms." *See, e.g.*, *United States v. Miller*, 307 U.S. 174, 182 (1939) (discussing Virginia's 1785 militia statute allowing citizens to bring "good rifles with proper accoutrements, in lieu [of muskets]"). And while Founding-era rifles were not semiautomatic, neither were Founding-era pistols. But it is "bordering on the frivolous" to argue, as Defendants do, that modern rifles and handguns are something other than "Arms." *Heller*, 554 U.S. at 582; *see, e.g.*, State Resp. at 20-24; *see also Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("There is no basis in *Heller* for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles."). Technological improvements over 18th-century weapons do not move otherwise covered arms outside the Second Amendment's presumptive scope. *See, e.g.*, *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (holding stun guns to be protected arms).

**Arms for self-defense versus other lawful purposes:** Defendants assert that Dr. Herrera must do more—convincing the Court with statistical arguments about self-defense encounters for his rifles to be considered "Arms." The State Defendants (at 20-25) and City Defendants (at 12) argue

9

that, for modern rifles not common during the Founding or Reconstruction, Dr. Herrera must quantify the degree to which those rifles are in "in common use" specifically for "self-defense" today.[9] And the County argues (at 5) that he must show that AR-15 rifles are common to "facilitate armed self-defense." That is incorrect as far as the meaning of "Arms" goes. "'[T]he Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms,'" including modern ones. *Bruen*, 142 S. Ct. at 2132 (emphasis added). None of the Defendants' glosses on "Arms"—in particular the notion that the Second Amendment protects only firearms sufficiently popular for self-defense specifically—appears in the Second Amendment's text. Instead, these arguments about the uses of firearms, including how they may be permissibly used or whether they are unusually dangerous, are relevant to Defendants' burden under *Bruen. See id.* at 2129-30. Accordingly, Dr. Herrera addresses those arguments in Part III, *infra*. For purposes of what "Arms" qualify for Second Amendment protection, no plaintiff is required to conduct a cross-country empirical study to determine whether certain firearms are sufficiently popular for self-defense or for other lawful purposes, leaving only the first class protected and the latter class not. It suffices here that there are millions of the now-banned rifles in circulation for various lawful purposes. *See* Opening Br. 15-17; Ex. 5, Newton Dec. ¶¶74-77.

**Arms for militia use:** Defendants also wrongly claim that AR-15 rifles are not "Arms" under the Second Amendment because they share certain features with military weapons. State Resp. 25-33; Cnty. Resp. 6-10; City Resp. 8-9. As an initial matter, with respect to Defendants' misplaced arguments about *Heller*'s dicta that "M-16 rifles and the like" "may be banned," 554 U.S. at 627, the civilian AR-15-style weapons banned by Defendants differ from the M16 in a critical respect: M16s are military-

---

[9] Defendants also spend pages attempting to convince the Court that multi-shot firearms and large-capacity magazines—proto-AR-15s—were uncommon curiosities in the Founding era. *E.g.,* State Resp. 23-24. Even if multi-shot firearms were uncommon then, Defendants' expert concedes that they existed, *see* Delay Dec. (Dkt. 52-13) ¶¶8-31, and were recognized as "'Small Armes,'" *e.g., id.* ¶21. What matters is that these small arms have since "unquestionably" become "common … today," which is what *Bruen* requires. 142 S. Ct. at 2143.

issued "machineguns," capable of fully automatic fire, while AR-15s are semiautomatic rifles, which fire a single shot with each trigger pull. *See* Ex. 5, Newton Dec. ¶¶79, 81. Beyond that critical distinction, the similarities between AR-15s and generally issued military weapons only *confirms* that civilian AR-15 rifles are indeed "Arms."[10] The term "Militia" in the prefatory clause clarifies that "Arms" must *at least* include weapons useful as "ordinary military equipment" for individual use. *See Heller*, 554 U.S. at 577-78, 624-25 (discussing "clarifying function" of the prefatory clause and explaining that the Second Amendment protects *more* than "only … weapons useful in warfare"); *see also* Robert Leider, *Federalism and the Military Power of the United States*, 73 Vand. L. Rev. 989, 1008-09 (2020) (Framers' use of "the militia" referred "to the entire national able-bodied population subject to military service"). For that reason in *Miller*, the Supreme Court held that short-barreled shotguns were *not* protected precisely because they had no "reasonable relationship to the preservation or efficiency of a well regulated militia." 307 U.S. at 178 (citing *Aymette v. State*, 21 Tenn. 154, 158 (1840) (defining "arms" as those "usually employed in civilized warfare, and that constitute the ordinary military equipment")).

To be sure, the Second Amendment would presumably tolerate bans on civilians' use of some military-issued weapons. But consider the rationale, which only confirms Dr. Herrera's likelihood of success here. Such tolerable laws would ban civilians' use of weapons that are either not bearable arms for "individual" use or otherwise not part of the "ordinary military equipment" and "highly unusual in society at large." *Heller*, 554 U.S. at 624, 627. For example, squad-level machineguns such as the M249 or non-bearable arms such as the M240B requiring three people to operate, Ex. 5, Newton Dec. ¶80, and "bombers and tanks" could presumably be banned for civilian use. *Heller*, 554 U.S. at 627; *see also* Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L. J. 1587, 1595, 1638-39, 1649 (2014)

---

[10] Nor does the dicta in *Heller* say that military-issued M16 rifles are not "Arms." The discussion of whether M16s could be banned instead followed *Heller*'s identification of the "*historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons,'" 554 U.S. at 627 (emphasis added), which is relevant to Defendants' burden of proving a historical tradition of banning classes of arms under *Bruen*, 142 S. Ct. at 2128, 2142-44.

(noting the differences between ordinary military equipment versus other weapons not commonly issued to each individual soldier). But those squad-level automatic weapons or other non-bearable arms are not at issue here. What is at issue are widely popular semiautomatic rifles, which in times of unexpected conflict and arms shortages could be used by civilian forces for the common defense of the country, Ex. 5, Newton Dec. ¶83, just as muskets and carbines were kept and used by colonists, Ex. 1 at 2-13. Civilians' proficiency with such arms, moreover, would carry over to wartime military-issued weapons, Ex. 5, Newton Dec. ¶82, just as colonists regularly trained with their own arms to prepare for wartime and other armed conflict, Ex. 1 at 2-13. *See also* Robert Leider, *Deciphering the "Armed Forces of the United States,"* 57 Wake Forest L. Rev. 1195, 1279 (2022) (explaining how the right to keep and bear arms ensures that non-active duty citizens "can stay proficient with arms in peacetime so that they can use them effectively in wartime," including any "wartime emergencies that require an immediate expansion of the Armed Forces without time to retool civilian industry for wartime arms production"). These characteristics of the banned arms put them at the very heart of the Second Amendment's protections. *See Miller*, 307 U.S. at 178; *Wilson v. State*, 33 Ark. 557, 560 (1878) (cannot "prohibit the citizen from wearing or carrying a war arm"); *Aymette*, 21 Tenn. at 158 ("arms … usually employed in civilized warfare"); *State v. Kerner*, 107 S.E. 222, 224-25 (N.C. 1921) ("arms" are those "whose use was necessary for their protection against the usurpation of illegal power—such as rifles, muskets, shotguns, swords, and pistols"); *English v. State*, 35 Tex. 473, 474 (1871) ("Arms of what kind? Certainly such as are useful and proper to an armed militia."); *State v. Workman*, 14 S.E. 9, 10 (W. Va. 1891) ("in regard to the kind of arms…it must be held to refer to the weapons of warfare to be used by the militia"); *see also Heller*, 554 U.S. at 636 (Stevens, J., dissenting) ("it is equally clear that [Second Amendment] *does* encompass the right to use weapons for certain military purposes").

**C. Protection of standard magazines is inherent in the Second Amendment's protection of "Arms."**

The Second Amendment protects magazines because they are necessary for protected firearms to be operable. Relevant here, "[a]ll semiautomatic firearms require a magazine to function," including both the semiautomatic handguns protected in *Heller* and the semiautomatic rifles at issue here. Ex. 5, Newton Dec. ¶27. They are necessary to feed ammunition into the firearm. *Id.* They are a technological advancement with indisputable benefits for gun safety and ready self-defense. *Id.* ¶¶31-32. Without a magazine, the firearms are inoperable, incongruous with the Second Amendment's protection of "Arms." That protection is specific to keeping weapons "for the purpose of offensive or defensive action," *not* ornamental display. *Heller*, 554 U.S. at 584 (cleaned up). Thus, just as the term "automobile" includes a vehicle's gas tank, the term "Arms" includes components essential to proper function. *See ANJRPC*, 910 F.3d at 116 ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."), *abrogated in other part by Bruen*, 142 S. Ct. 2111; *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014). A requirement that firearms be "rendered and kept inoperable … makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Heller*, 554 U.S. at 630.

In response, State Defendants argue (at 15) that the Second Amendment "excludes related *accessories* like ammunition and magazines,"[11] while County Defendants concede (at 41) that the Second

---

[11] State Resp. 15-16 (emphasis added). Referring to magazines as "accessories" is erroneous. A district court recently made the same error in *Ocean State Tactical, LLC v. Rhode Island*, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022), contrary to the critical fact that a magazine is a necessary component for a semiautomatic firearm to operate. *See* Ex. 5, Newton Dec. ¶27; *ANJRPC*, 910 F.3d at 116. An "accessory," by comparison, is "an object or device that is not essential in itself but adds to the beauty, convenience, or effectiveness of something else." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/accessory.

Amendment necessarily covers "items 'necessary to use' those firearms." On State Defendants' view, the Second Amendment originally protected mere paperweights—the firearms themselves, but not those parts necessary to properly function. State Resp. at 15-17. By Defendants' logic, a state could ban triggers without even *implicating* the Second Amendment's presumptive protections. That argument is meritless. *See Heller*, 554 U.S. at 630 (invalidating regulation that "ma[de] it impossible for citizens to use" firearms "for the core lawful purpose of self-defense").

The Second Amendment's right to keep and bear arms has always been understood to include "the right of … *using* arms for self-preservation and defence." *See* 1 William Blackstone, *Commentaries on the Laws of England* 143-44 (1768) (emphasis added); *Heller*, 554 U.S. at 618 ("'[A] militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons.'" (quoting J. Pomeroy, *An Introduction to the Constitutional Law of the United States* §239, pp. 152-53 (1868))). John Adams famously argued that "every private person is authorized to arm himself." Argument for the Defense (December 3-4, 1770), National Archives Founders Online, https://bit.ly/2U5iy8b (citing 1 William Hawkins, *A Treatise on the Pleas of the Crown* 71, §14 (1824)). Arming oneself implied then as it does now not only "'[t]he possession of arms,'" but also "'the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former.'" *Miller*, 307 U.S. at 180.[12] Defendants' narrow focus on the meaning of "Arms" forgets that the right to keep and bear arms encompasses the right to keep the standard components necessary for their proper function. *See State v. Reid*, 1 Ala. 612, 616-17 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."); *Andrews*, 50 Tenn. at 178 ("The right to

---

[12] *See* "Arm," 1 Noah Webster, *An American Dictionary of the English Language* (1828) (hereafter Webster) ("To furnish or equip with weapons of offense, or defense; as, to *arm* the militia. … To provide with arms, weapons, or means of attack or resistance.").

keep arms, necessarily involves the right … to keep them in a state of efficiency for use, and to pur-chase and provide ammunition suitable for such arms, and to keep them in repair.").

For that reason, State Defendants' *corpus linguistics* expert's discussion about "arms and accou-trements" misses its target. *See* State Resp. 15-16; Baron Dec. (Dkt. 52-8). On the merits, Baron admits (¶37) that even his methodology shows that some usages of "arms" did include "cartridge-boxes," analogous to today's magazines necessary to hold ammunition, but he concludes that those uses were relatively infrequent.[13] But as to his methodology—in particular, his reliance on word-counting in databases of Founding texts written or read mostly by elites versus words spoken by the People— *Heller* rejected such word-counting, and it remains controversial among his peers. *See Heller*, 554 U.S. at 588-89; Baron Dec. ¶8 (admitting that his method was relied upon by the dissent in *Bruen*).[14] That methodology also ignores that "arms" had a broad legal sense that is not likely captured by counting words in non-legal sources.[15] For example, "[i]n English statutes, armor is used for the whole apparatus

---

[13] Baron's other discussion (¶¶64-66) about "magazine guns" at the Founding is the very sort of error that *Heller* called "bordering on the frivolous," 554 U.S. at 582. The question is whether, then and now, the protection of arms would be understood to include the components necessary for them to function, even if those components have advanced technologically over time.

[14] Carissa Byrne Hessick, *Corpus Linguistics and the Criminal Law*, 2017 B.Y.U. L. Rev. 1503, 1509 (2017) ("the frequency with which a word appears in print is separate from how an ordinary citizen would understand that word"); Kevin Tobia, *Testing Ordinary Meaning*, 134 Harv. L. Rev. 726, 796 (2020) ("Insofar as legal corpus linguistics data may not adequately reflect nonprototypical uses, one cannot conclude that the rarity of use implies that such a use is not part of the term's ordinary mean-ing.").

[15] Founding-era law dictionaries confirm the broad sense of "arms" used in law. "Armour or Arms," 1 T. Cunningham, *A New and Complete Law Dictionary* (1764) ("In the understanding of law, are extended to any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."); "Armour and Arms," Giles Jacob, *A New Law Dictionary* (1750) ("In the Understanding of Law, are extended to any Thing that a Man wears for his Defence, or takes into his Hands, or useth in Anger to strike or cast at another."); Thomas Potts, *A Compendious Law Dictionary* 29 (1803) ("ARMS, in the law, are extended to any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at, or strike another."). That broad sense encompasses parts of weapons essential to their offensive or defensive use. *See, e.g.*, "Armour or Arms," 1 Cunningham, *supra* ("Servants and labourers shall use bows *and* arrows … and not bear other *arms*." (emphases added)); *Heller*, 554 U.S. at 581.

of war; including offensive as well as defensive arms."[16] "Armor," 1 Webster, *supra*. The same was true of "Arms" in American statutes.[17] And lexicographers recognized the close relationship between "arms" and "military accoutrements" in the relevant context. *See* "Accoutrements," *id.* ("[M]ilitary dress *and arms*; equipage for military service." (emphasis added)).

In any event, even if "Arms" and "accoutrements" were distinct concepts, that fact says nothing about whether the protection of the former also protects parts integral to their operation.[18] Tench Coxe, the "leading interpreter of the meaning of the right to keep and bear arms in the first four decades of the republic," explained that "Congress have no power to disarm the militia" because "[t]heir swords, and *every other terrible implement of the soldier*, are the birthright of an American."[19] Indeed, Baron's finding that "arms" and "accoutrements" were commonly used together is evidence that the right to keep arms was understood to extend to those accoutrements. *See, e.g.*, Militia Act, 1 Stat. 271, §1 (May 8, 1792) (requiring possession of both arms and necessary parts, such as "two spare flints," "not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder," etc.); *see also Miller*, 307 U.S. at 180-82 (discussing 1785 militia

---

[16] To illustrate the unreliability and irrelevance of Baron's conclusions, he asserts (¶80) that "armor" is not within the meaning of "arms," while *Heller* rejected that position based on the lexicography of the day, 554 U.S. at 581.

[17] Exhibit 1 identifies militia acts from 1639 to 1803 that use "Arms" broadly to cover necessary components. *See, e.g.*, Ex. 1 at pp. 3, 6, 9, 10-11, 13 (Nos. 4 (1639), 9 (1668), 16 (1740), 17 (1741), 18 (1741), 20 (1775), 25 (1803)). For example, a 1741 Delaware Act required that all persons keep the "following Arms and Ammunition, *viz*: One well fixed Musket or Firelock, one Cartouch-Box, with *Twelve* Charges of Gun-powder and Ball therein, and *Three* good Flints." *Id.* at 10 (No. 18).

[18] For example, a piece of flint is, by itself, a piece of stone, but when attached to certain firearms, it becomes a part of the firearm necessary for it to operate as such. *See* Flint, 1 Webster ("A piece of the above described stone used in firearms to strike fire."); *accord* Roth Dec. (Dkt. 52-11) ¶16 ("The firing mechanism also had to be readied, often with a fresh flint."). The notion that the right to keep arms at the Founding would not have included the right to keep flint for flintlock firearms is frivolous. *But see* Baron Dec. ¶11 (stating that "flints" were "accoutrements" and not "arms"). Magazines, like flints, are detachable and necessary for the firearm to fire.

[19] Stephen P. Halbrook & David B. Kopel, *Tench Coxe and the Right to Keep and Bear Arms, 1787-1823*, 7 Will. & M. Bill of Rights J. 347, 363, 398 (1999) (emphasis added); *id.* at 367 (Tench Coxe explaining that the Second Amendment protects the "right to keep and bear … private arms").

statute expecting citizens would be "'properly armed'" with "good rifles with proper accoutrements'"). And the law generally protected both Arms and accoutrements from judgments and taxation.[20]

State Defendants' fallback argument fares no better. They contend (at 17) that magazines with a greater capacity than their laws permit are not "necessary" for the operation of firearms. Detailed above, that assertion is wrong as a factual matter. Semiautomatic firearms are designed to operate with magazines, and many firearms—including Dr. Herrera's firearms at issue here—come standard with 17- or 30-round magazines. *See* Ex. 5, Newton Dec. ¶28.[21] To the extent that governments may regulate the design of firearms for civilian use, including by banning components that came with them to make them operable, nothing in the Second Amendment's text sets forth that power. It is the *government* that must justify any such restrictions on capacity under *Bruen*'s framework, by showing that they comport with the historical tradition of firearm regulation. *See* 142 S. Ct. at 2126, 2129-30.

The cases that State Defendants cite confirm this distinction between magazines and, in those cases, restrictions on "silencers"—devices affixed to the end of a firearm to reduce its sound. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *United States v. Hasson*, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019). In *Hasson*, the court expressly distinguished components that "contain, feed, or project ammunition" from silencers "not necessary" to a firearm's operation. 2019 WL

---

[20] *See* 1 William Charles White, *A Compendium and Digest of the Laws of Massachusetts* 195 (1809) ("Every citizen enrolled, and providing himself with the arms, ammunition, and accoutrements required by law, shall hold the same exempted from all suits, distresses, executions, or sales for debt, or for payment of taxes."); *The Public Statute Laws of the State of Connecticut, As Revised and Enacted by the General Assembly, in May, 1821*, at 328-29 (Hartford: H. Huntington 1821) (similar); 2 Henry St. George Tucker, *Commentaries on the Laws of Virginia* 360-61 (1837) ("Arms, ammunition, and equipments of militia are privileged.").

[21] State Defendants criticize Dr. Herrera for "re-brand[ing] [30-round magazines] as 'standard.'" State Resp. 17. No rebranding is necessary. Dr. Herrera's firearms came from the factory with magazines that are now banned. Defendants admit that AR-15 rifles "are often sold with a 30-round magazine." State Resp. 18. And with respect to Dr. Herrera's Glock 45 handgun, Defendants have not identified any magazine that would have come standard with that particular firearm that is not now banned. *See, e.g.*, Yurgealitis Cnty. Dec. pp. 5-6 (identifying magazine alternatives marketed for the Glock 17 paired with the assumption that they fit the Model 45).

4573424, at *4-5. And in *Cox*, the court considered arguments about a silencer's convenience but held that the Second Amendment's plain text did not cover "firearm accessor[ies]." 906 F.3d at 1186. Neither says that essential components like magazines are not included within "Arms." In fact, *Hasson* held the opposite.

### D. The Second Amendment's plain text covers the State's registration requirement.

Dr. Herrera cannot possess his rifles within the State unless he registers them when registration goes live between October 2023 and January 2024. *See* 720 ILCS 5/24-1.9(d). Dr. Herrera has no present intent to submit to that unconstitutional requirement. Herrera Dec. (Dkt. 5-1) ¶14; Ex. 3, Herrera Supp. Dec. ¶18. As a law-abiding citizen, he also has no present intent to violate the state law. Herrera Dec. (Dkt. 5-1) ¶3. Accordingly, unless the registration requirement is preliminarily enjoined, Dr. Herrera must begin taking steps *now* to accommodate Illinois' rifle ban, contrary to the State Defendants' contention (at 37) that challenging the registration requirement is premature.[22] Dr. Herrera now must plan to move his lawfully acquired firearms out of State, including identifying an out-of-state custodian who could safely keep them and making any financial arrangements, or else face severe criminal sanctions come January 2024. Ex. 3, Herrera Supp. Dec. ¶18.

On the merits, State Defendants confuse their *gun registration* requirement for keeping lawfully acquired arms *at home* with the *personal licensing* requirements for carrying arms *in public* at issue in *Bruen*.[23]

---

[22] It also stands to reason that the time to judgment absent preliminary relief will be after the registration requirements begin, and thus leaves Dr. Herrera with no way to lawfully avoid those requirements absent preliminary relief or moving his firearms out of the State. In *Ezell v. City of Chicago*, for example, the plaintiffs first sought preliminary relief in August 2010 but did not receive a final judgment in their favor until September 2014. *See* 2010 WL 3998104, *2 (N.D. Ill. Oct. 12, 2010); 70 F. Supp. 3d 871 (N.D. Ill. Sept. 29, 2014). Even then, after the Seventh Circuit affirmed the judgment in 2017, the plaintiffs had to seek a writ of mandamus to enforce the mandate. *See* 846 F.3d 888 (7th Cir. 2017) (affirming judgment); 678 Fed. App'x 430, 431 (7th Cir. 2017) (denying mandamus as premature but noting "legal duty to comply with the mandate").

[23] The distinction matters with respect to Defendants' burden and the relevant history. As then-Judge Kavanaugh explained in *Heller II*, there is no history of requiring gun owners to register

Compounding that error, the State Defendants claim (at 39) that *Bruen* decided the issue by holding "that most licensing requirements do not implicate Second Amendment rights whatsoever." That misstatement of *Bruen* is egregious. *Bruen* did not say that licensing does not "implicate" the Second Amendment. Any licensing scheme implicates the protected conduct of "carrying handguns publicly for self-defense," *Bruen*, 142 S. Ct. at 2134, just as a registration scheme implicates keeping arms for self-defense. What *Bruen* actually said, in footnoted dicta, was that the Court's analysis should not "be interpreted to suggest the unconstitutionality" of shall-issue licensing regimes while not "rul[ing] out constitutional challenges to shall-issue regimes" operating in ways that "deny ordinary citizens their right to public carry." *Id.* at 2138 n.9; *accord id.* at 2162 (Kavanaugh, J., concurring) ("shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge").

Both here and in *Bruen*, the plaintiffs' "proposed course of conduct" implicates the Second Amendment. *Id.* at 2134 (majority op.). The registration requirement here implicates Dr. Herrera's right to "keep" arms at home, just as New York's may-issue licensing requirement implicated the *Bruen* plaintiffs' right to "bear" arms in public. *See id.* Such laws preconditioning the exercise of a constitutional right can themselves infringe the right. For instance, "a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment." *Thomas v. Collins*, 323 U.S. 516, 540 (1945). As such, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Defendants have failed to make that showing.

---

lawfully acquired long guns, *see* Part III.F, *infra* while there is some history of licensing requirements for publicly carrying weapons, *see, e.g.*, *Bruen*, 142 S. Ct. at 2148-49 (discussing history of surety statutes requiring some individuals to post bond before carrying weapons in public).

### III. Defendants offer no historical tradition that could justify the challenged laws.

Because the Second Amendment's plain text covers the conduct proscribed by the challenged laws, Defendants must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. But here, Defendants have identified no historical tradition of banning arms or standard magazines for those arms in law-abiding citizens' homes, nor any historical tradition of requiring gun owners to register their lawfully acquired arms for the purpose of keeping them in their homes. As Part III.A explains, Defendants' primary argument that AR-15-style rifles and certain magazines are too dangerous is not an argument that can justify Defendants' bans on purchasing, keeping, and using those rifles and magazines in one's home. The historical origins for regulation of "dangerous and unusual weapons" relates to the crime of affray and carrying weapons *outside* the home. As Part III.B explains, that the weapons and magazines at issue are in common use for lawful purposes further confirms that they cannot be banned in homes as "dangerous and unusual weapons." As Part III.C explains, Defendants have spent untold sums on experts whose analysis of historical statutes proves irrelevant, even if those expert opinions were proper. Nearly every historical firearms regulation cited by Defendants and their experts prohibits or limits the *public carry* of certain arms, such as Bowie knives; those laws are no support for banning firearms inside homes. Worse, as Part III.D explains, Defendants have ignored the most analogous history— that militia acts preceding ratification of the Second Amendment uniformly *required* colonists to keep arms in their home that would be suitable for both individual and collective self-defense. As Part III.E explains, Defendants proffer no historically analogous regulation of magazines, nor as discussed in Part III.F, do they identify any historically analogous registration requirements. For these reasons, Dr. Herrera is likely to succeed on the merits of his claims.

20

**A. AR-15 rifles cannot be banned in the home as "dangerous and unusual" weapons.**

Defendants begin and end their defense with arguments about dangerousness. They offer hundreds of pages of expert opinion on mass shootings and point toward a historical tradition of laws regulating "dangerous and unusual weapons." State Resp. 41; Cnty. Resp. 21-34; City Resp. 14-18. For three reasons, these responses do not address the particular constitutional challenge here—that Defendants' bans that together prohibit Dr. Herrera from purchasing, keeping, and using AR-15 rifles in his home.

*First,* regulating "dangerous and unusual" arms can be traced back to a historical tradition of regulating certain weapons *outside the home*, not banning commonly owned firearms *inside the home*. *See Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2143. Citing Blackstone and other Founding-era sources, *Heller* identified a "historical tradition of prohibiting *the carrying* of 'dangerous and unusual weapons.'" 554 U.S. at 627 (emphasis added). Blackstone and others were describing the common-law offense of affray—*i.e.*, "[t]he offense of *riding* or *going armed*, with dangerous or unusual weapons" or "dangerous and unusual weapons,"[24] which "is a crime against the *public peace*, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1769) (hereinafter Blackstone) (second emphasis added). The common-law tradition of prohibiting menaces from going into public

---

[24] Both "dangerous *and* unusual weapons" and "dangerous *or* unusual weapons" appear in other 18th-century legal treatises summarizing English law. *See, e.g.*, 1 Hawkins, *A Treatise of the Pleas of the Crown* 266 (1777); 4 Blackstone 148–149; 3 Wood, *An Institute of the Laws of England* 430 (1754). Different treatises use different conjunctions. *Compare* 1 Hawkins 266 *and* 3 Wood 453 ("and"), *with* 4 Blackstone 149 ("or"). Read in context, the phrase refers to a unified concept, akin to a term of art, to describe a class of weapons that would implicate the common-law offense of affray. *See* Cnty. Resp. 39-40 (providing detailed description of affray without likening it to banning arms in the home). "[C]ommon weapons" would not implicate that common-law offense. *See* "Affray," 1 Cunningham, *supra*; *accord Caetano*, 577 U.S. at 417 (Alito, J., concurring) (weapons must be not just "dangerous" but also "unusual"). The treatises' authors use the phrase to describe the Statute of Northampton, a 14th-century law that codified a special application of that common-law offense of affray. *See* 2 Edw. III c. 3 (1328); *see also Bruen*, 142 S. Ct. 2139-42. The Statute of Northampton and other similar statutes proscribed certain conduct in public, not a class of arms at home. *See, e.g.*, *State v. Huntly*, 25 N.C. 418, 422-23 (1843) (carrying with "wicked purpose"); *O'Neil v. State*, 16 Ala. 65, 67 (1849) (similar).

("riding or going armed") with uncommon weapons to "terrify[]" the public is inapposite to the particular question here: what rights does Dr. Herrera have *inside his home*. Discussed further in Part III.C, the common-law offense of affray and later public-carry restrictions do not permit bans of widely owned arms in law-abiding citizen's homes, including Dr. Herrera's.

**Second,** arms that are commonly owned are, by definition, not dangerous and unusual. At common law, the class of "dangerous and unusual" or "dangerous or unusual" weapons, depending on the treatise, was distinct from "common weapons." As to the latter, there was no common-law proscription of "wearing *common weapons*, or having their usual number of attendants with them, for their ornament or defence." 1 Richard Burn, *Justice of Peace and Parish Officer* 15-16 (1st ed. 1762) (emphasis added); Ex. 1 at 14-15 (No. 4). *Heller* and *Bruen* confirmed this common-law understanding. *See Bruen*, 142 S. Ct. at 2143 ("[*Heller* explained] that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' *as opposed to* those that 'are highly unusual in society at large.'" (emphasis added)); *Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."). And it is consistent with the distinction drawn in *Miller*, in which the Supreme Court distinguished short-barreled shotguns from weapons "in common use" and observed that colonial-era men "were expected to appear" for militia musters with arms in the latter category—that is, "bearing arms supplied by themselves and of the kind in common use at the time." 307 U.S. at 178-79. Historical laws that prohibited weapons that "were considered 'dangerous and unusual weapons,'" such as Bowie knives discussed *infra*, pp. 32-35, therefore "provide no justification for laws restricting … weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143. Explained in Part III.B, the now-banned semiautomatic rifles are "unquestionably in common use today," *id.*, making Defendants' arguments appealing to laws regulating the public carry of "dangerousness and unusual  weapons" doubly irrelevant.

22

**Third,** dangerousness alone is not enough to ban a class of arms. Because all firearms have the potential to be lethal, Ex. 5, Newton Dec. ¶64, "virtually every covered arm would qualify as 'dangerous'" and nothing would be protected if dangerousness alone could ban an arm. *Caetano*, 577 U.S. at 418 (Alito, J., concurring). It is thus incorrect that "particularly 'dangerous' weapons are unprotected." *Bevis*, 2023 WL 2077392, at *9.[25] Just the opposite—as Justice Alito explained in his *Caetano* concurrence, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." 577 U.S. at 418.

Defendants' dangerousness arguments are also irreconcilable with *Heller*. Over Justice Breyer's dissent about gun crime and the particular dangerousness of handguns, *Heller* concluded that banning handguns in homes was unconstitutional. 554 U.S. at 634; *id.* at 694-95 (Breyer, J., dissenting) (pistols were "7 times more likely to be lethal than a crime committed with any other weapon" (quotation marks omitted)). So too here: where the banned firearms are commonly owned for lawful purposes, *infra*, pp. 26-31, Defendants' dangerousness arguments cannot justify a complete ban on such arms in the home.

Allowing Defendants' dangerousness arguments would also "amount to something like a disfavored 'heckler's veto'" in the First Amendment context. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1039 (S.D. Cal. June 4, 2021), *vac'd and rem. in light of Bruen*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). *But see McDonald*, 561 U.S. at 780 (Second Amendment is not "a second-class right, subject to an entirely different body of rules"). Specifically, Defendants zero in on what is statistically a relatively small number of murderers who misuse AR-15s in "'mass shootings, police killings, and gang activity.'" *E.g.*,

---

[25] County Defendants, for example, invite the Court to err by considering "factors like whether the weapons have features that make them particularly deadly or harmful compared to other firearms, whether the weapons have an unusually apt application to illegal activity, and whether the weapons pose a unique threat." Cnty. Resp. 23. That test will not do. Handguns have features that make them particularly deadly compared to certain rifles: they are semiautomatic and concealable and are a "favorite" of criminals. *Heller*, 554 U.S. at 682, 694-95 (Breyer, J., dissenting). But handguns are protected. *See id.* at 635-36.

State Resp. 57 (quoting *Bevis*, 2023 WL 2077392, at *15). Mass shootings are horrific events. They are also exceedingly rare.[26] Defendants have no answer to the fact that, even with millions of AR-15 rifles in circulation, there are not millions of instances of those arms being used for unlawful purposes. The Second Amendment thus forbids states from banning these commonly owned firearms that law-abiding citizens "prefer," *Heller*, 554 U.S. at 629, even if those firearms are also "the overwhelmingly favorite weapon of armed criminals" intent on doing harm, *id.* at 682 (Breyer, J., dissenting). As has been true for more than a century, the "general deprivation of a constitutional privilege" of law-abiding citizens cannot be justified by the acts of "cowardly and dishonorable men" who "shoot unarmed men with army pistols or guns" and whose "evil[s] must be prevented by the penitentiary and gallows," *Wilson v. State*, 33 Ark. 557, 560 (1878), not disarming whole cities, counties, or States.

Finally, Defendants' dangerousness arguments depend on a number of factual errors or misapplication by their experts. These errors are immaterial to the legal question before this Court, *see supra* pp. 5-8, but they are raised here so that they are preserved in the event dangerousness alone is deemed a relevant consideration for Dr. Herrera's right to keep certain firearms inside his home.

- Defendants' reliance on muzzle velocity to characterize AR-15 rifles as dangerous is factually inaccurate and, in all events, has more to do with ammunition than the characteristics of the banned firearm itself. *E.g.*, State Resp. 28-29; Cnty. Resp. 17-18; *but see* Ex. 5, Newton Dec. ¶47. Greater muzzle velocity does not mean greater lethality. *See* Ex. 4, Kleck Dec. ¶97 ("[H]igher muzzle velocities such as the c. 3000 fps cited by Roth cause bullets to pass through the victim's body too fast for the bullets to expand."); Ex. 5, Newton Dec. ¶41.

- Defendants rely on various expert opinions about ammunition and its effect on the human body. State Resp. 26-29; *see also Bevis*, 2023 WL 2077392, at *14 (similar). That is a fact about ammunition, not the banned firearm, and is as or more true of ammunition for weapons that are not banned. Hargarten Dec. (Dkt. 52-14) ¶27 & Ex. B (showing common handgun ammunition also causes significant cavitation); Ex. 5, Newton Dec. ¶¶47 & Figure 1, ¶¶39-40 (showing comparison of ammunition standard for banned and not banned firearms). Defendants' expert concedes that a ".30-06 round from the Remington hunting rifle"—still lawful— causes substantially greater cavitation than "the 5.56 NATO round" fired from an AR-15.

---

[26] *See* Ex. 4, Kleck Dec. ¶¶12-65. Of homicide deaths, only one-tenth of one percent are killed in "gun massacres." *Id.* ¶14. Put another way, the probability of dying in a gun massacre is about 1 in 9 million, or 1/8th the risk of being killed by a bolt of lightning. *Id.* ¶15.

Hargarten Dec. (Dkt. 52-14) ¶28 & Ex. B at 65-72; *see* Ex. 4, Kleck Dec. ¶62 (assault weapon ammunition "tend[s] to make narrower wound cavities"); *id.* ¶83 (similar).

- Defendants' arguments that large-capacity magazines "allow a shooter to fire more bullets" and "inflict more injuries" per shooting, Cnty. Resp. 15, is irrelevant to the claim about what weapons should be allowed in law-abiding citizens' homes and ignores the safety advantages for detachable magazines used by law-abiding citizens in their homes. *See* Ex. 5, Newton Dec. ¶¶32, 56. A shooter intent on killing in public, moreover, can do the same with spare magazines, which can be changed in a matter of seconds. *Id.* at ¶66; Ex. 4, Kleck Dec. ¶115 (seconds to change magazine is shorter than the typical interval between shots in mass shootings).

- Defendants' arguments about the rate of fire ignore that semiautomatic rifles (and handguns) fire at whatever rate the user pulls the trigger, and even a proficient marksman at a shooting range would achieve a rate of fire (roughly 45 rounds per minute) that comes nowhere near the rate of fire for automatic weapons (up to 800 rounds per minute for an M16 and 970 rounds per minute for an M4). *See* Ex. 5, Newton Dec. ¶¶21, 65, 81.[27]

**B. AR-15 semiautomatic rifles and standard magazines are "in common use."**

Tellingly, before *Bruen* it was seemingly beyond dispute that AR-15-style semiautomatic rifles were in common use. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255-56 (2d Cir. 2015) ("This much is clear: Americans own millions of the firearms that the challenged legislation prohibits" and "[t]he same is true of large-capacity magazines."); *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (collecting cases and concluding "it is beyond dispute from the record before us, which contains much of the same evidence cited in the aforementioned decisions, that law-abiding citizens commonly possess semi-automatic rifles such as the AR-15."), *on reh'g en banc* 849 F.3d 114, 141 (4th Cir. 2017) (not disagreeing that arms were "sufficiently popular" but concluding they were still too "violent or dangerous"), *en banc opinion abrogated by Bruen*, 142 S. Ct. 2111; *Miller*, 542 F. Supp. 3d at 1022 & n.32; *see also Staples v. United States*, 511 U.S. 600, 603, 611-12 (1994) ("widely accepted as lawful possessions"). Before *Bruen*, the question was whether the undisputed popularity of these arms could be overcome by Defendants' policy justifications for banning them or arguments that rifles had to be

---

[27] Research also shows that "mass shooters typically fire at slow rates, well below the rates of fire of which their weapons are capable." Ex. 4, Kleck Dec. ¶78; *id.* ¶96 ("Mass shootings instead typically involve slow, deliberate fire.").

popular specifically for self-defense. *See, e.g.*, *Heller II*, 670 F.3d at 1261 (finding it "clear enough" that "semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use'" but then stating uncertainty about "whether these weapons are commonly used or are useful specifically for self-defense or hunting" and whether "prohibitions … meaningfully affect the right to keep and bear arms"); *Cuomo*, 804 F.3d at 257 (similar); *Friedman*, 784 F.3d at 412 (describing crime justifications and "substantial benefit" increased "sense of safety" derived from AR-15 ban). Then came "clearer guidance from the Supreme Court," *Cuomo*, 804 F.3d at 257, which should have resolved any confusion on this score.

*Bruen*, combined with *Heller*, clarifies that the Second Amendment protects keeping in one's home firearms that are in common use today for lawful purposes, including but not limited to self-defense. *See Bruen*, 142 S. Ct. at 2129-30, 2143; *Heller*, 554 U.S. at 624-25 ("'in common use' for lawful purposes like self-defense"). Applied here, it is sufficient to show that there are millions of semiautomatic rifles in circulation with various lawful purposes including individual self-defense, collective defense, hunting, and sport shooting.[28]

**Common use:** Between 1990 to 2018, nearly 20 million semiautomatic rifles were sold in the United States, with almost 2 million sold in the 2018 alone.[29] Their popularity has only grown. Updated numbers from the Congressional Research Service show that in 2020 alone, "2.8 million … AR- or AK-type rifles" "were introduced into the U.S. civilian gun stock." *See* Cong. Rsch. Svc., *House-Passed*

---

[28] To the extent the debate between criminology experts is relevant to the constitutional claims here, it is that both would agree that, while there are millions of semiautomatic weapons in circulation, there are not millions of murderers using those weapons to perpetrate mass killings. As explained by Professor Kleck, every one of those events is tragic but statistically speaking they are "freakishly rare." Ex. 4, Kleck Dec. ¶¶15, 30.

[29] *See* Ex. 6, National Shooting Sports Foundation, *Firearm Production In The United States* (2020), at 7, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (hereafter NSSF Report); Ex. 5, Newton Dec. ¶¶49-51, 56-58, 74, 82-83 (describing various lawful uses, discussing self-defense advantages, discussing cross-over benefits of training for military conflicts); Herrera Dec. (Dkt. 5-1) ¶4 ("self-defense, training for work, hunting, and sport shooting").

*Assault Weapons Ban of 2022* (H.R. 1808), at 2 (Aug. 4, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12174. In 2022, the Bureau of Alcohol, Tobacco, Firearms, and Explosives acknowledged that "the AR-15-type rifle" is "one of the most popular firearms in the United States," including "for civilian use." 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022).[30] With respect to magazines, those with a capacity of 11 or more rounds are also commonly owned: about 71 million pistol magazines and about 90 million rifle magazines. *See* Ex. 6, NSSF Report at 7; Opening Br. 23-24.

Against that overwhelming consensus, Defendants argue that semiautomatic rifles like the AR-15 are *not* commonly owned. State Resp. 34-35; Cnty. Resp. 26; City Resp. 10. State Defendants concede (at 35 & n.22) that at least "6.4 million" gun owners own semiautomatic rifles but then say that "raw numerosity" is not enough. Similarly, County Defendants concede (at 26) that semiautomatic rifles "make up approximately 5.3% of all firearms in circulation" but then deem that percentage "negligible." Beyond their say-so, Defendants offer no standard by which to measure their conclusion that millions of weapons in circulation is not sufficiently "common." They simply declare millions are not enough. *See* State Resp. 35; Cnty. Resp. 26.[31] Defendants resist *Heller*'s simplicity, where it was

---

[30] While the experts debate the overall proportion of handguns and long guns among civilian gun owners, the point remains that the proportions are a plurality of gun owners. The accumulated civilian firearm stock is in the tens of millions. Ex. 4, Kleck Dec. ¶29 & Table 1. Professor Kleck estimates roughly half of the accumulated civilian gun stock are long guns. *Id.* Defendants' expert estimates that the percentage of handgun ownership is greater. *See* Klarevas Dec. Figure 14 & accompanying text (Dkt. 52-4); Klarevas Dec. Figure 11 & accompanying text (Dkt. 54-3). But those estimates do not account for firearms owned before 2000. Ex. 4, Kleck Dec. ¶28. Either way, the millions of firearms in circulation brings them comfortably within the ambit of the Second Amendment. *Compare Caetano*, 577 U.S. at 420 (Alito, J., concurring) (stun guns, even though owned by only 200,000 civilians and thus "less popular than handguns," still covered by the Second Amendment).

[31] Defendants' arguments also depend entirely on defining the relevant category as *semiautomatic rifles* specifically, rather than *rifles* generally. But *Heller*, assessing the commonality of *handguns* generally, suggests that the relevant category for assessing commonality is *rifles* generally. 554 U.S. at 628-29; *see also Heller II*, 670 F.3d at 1269 (Kavanaugh, J., dissenting) (finding "no meaningful or persuasive constitutional distinction" between semiautomatic handguns in *Heller* and semiautomatic rifles). Defendants concede that "rifles account for 33%" "of the civilian stock of firearms," Klarevas Dec. (Dkt. 52-4) ¶28, which is likely an undercount, Ex. 4, Kleck Dec. ¶28. So even if the commonality of semiautomatic rifles were not beyond dispute, the commonality of rifles in general surely is.

sufficient that modern gun owners widely owned handguns for self-defense without any further statistical handwringing. *Heller*, 554 U.S. at 629. And Defendants altogether abandon common-sense understandings of "common." Americans who own semiautomatic rifles—6.4 million according to Defendants' expert, Klarevas Dec. (Dkt. 52-4) ¶27 & n.23—are more common than estimates of lawyers (1.3 million),[32] teachers (4 million),[33] Jewish Americans (5.8 million),[34] Chicagoans (2.7 million),[35] and Ford F-150s.[36] It defies the English language to deem these persons and things "uncommon." The same is true of semiautomatic rifles.

*Caetano* illustrates the point. Preceding the Supreme Court's summary reversal, the Supreme Judicial Court of Massachusetts declared that stun guns were "unusual" because they are "'dwarfed by the number of firearms.'" *Commonwealth v. Caetano*, 26 N.E. 3d 688, 693-94 (Mass. 2015). About "'200,000 civilians owned stun guns' as of 2009." *Caetano*, 577 U.S. at 420 (Alito, J., concurring). The Supreme Court summarily reversed. *Id.* at 411-12. As Justice Alito's concurring opinion acknowledged, "[w]hile less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." *Id.* at 420 (Alito, J., concurring). If stun guns are not uncommon, neither is "'[t]he most popular rifle in American history.'" *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen.*, 974 F.3d 237, 256 (3d Cir. 2020) (Matey, J., dissenting) (quoting David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015)), *vac'd* 142 S. Ct. 2894 (2022). But the State Defendants (35 n.22) again resist the obvious conclusion that millions of such

---

[32] American Bar Association, *ABA Profile of the Legal Profession*, at 22 (2022), www.americanbar.org/content/dam/aba/administrative/news/2022/07/profile-report-2022.pdf.

[33] National Center for Education Statistics, *Teacher Characteristics and Trends*, https://nces.ed.gov/fastfacts/display.asp?id=28.

[34] Pew Research Center, *Jewish Americans in 2020* (May, 11, 2021), https://www.pewresearch.org/religion/2021/05/11/the-size-of-the-u-s-jewish-population/.

[35] U.S. Census Bureau, QuickFacts: *Chicago City, Illinois; United States*, https://www.census.gov/quickfacts/fact/table/chicagocityillinois,US/PST045221.

[36] *Miller*, 542 F. Supp. 3d at 1022-23 & n.32.

rifles are common and cannot be banned in homes. Defendants pivot to their next overarching argument that the banned arms are not common for self-defense specifically versus for "lawful purposes" generally, including but not limited to self-defense as *Heller* says. 554 U.S. at 625.

    **Lawful purposes:** Plaintiffs do not need to prove empirically that a weapon is "commonly used *for self-defense*." State Resp. 33, 35.[37] Defendants (and their experts) are not answering the right question. *See* State Resp. 35; Cnty. Resp. 26. *Heller* asks whether the banned arms are "typically *possessed* by law-abiding citizens *for lawful purposes*." 554 U.S. at 625 (emphases added). That more general question does not require an empirical assessment of whether particular firearms are most often used for self-defense, as compared to hunting or some other lawful use. *See, e.g., id.* at 599; *see also id.* at 636 (Stevens, J., dissenting) (describing various lawful uses including "hunting" and "sporting activities," in addition to "self-defense" and "military duties"). *Heller* recognized that the pre-existing individual right in the Second Amendment "was important to Americans not only to maintain the militia, but also for self-defense *and hunting.*" *Heller II*, 670 F.3d at 1252 (emphasis added). *Heller*—understanding that gun owners can own firearms for multiple lawful purposes—does not require plaintiffs to dis-aggregate those lawful purposes. Applied here, it is sufficient that even Defendants agree that Americans buy semiautomatic rifles for a variety of lawful purposes. *See* State Resp. 35-36 (self-defense, hunting, target shooting); *see* Ex. 5, Newton Dec. ¶¶32, 74 (listing various uses including "self-defense" given advantages). The vast majority (67.2%) of first-time gun buyers who purchase semiautomatic rifles did so for personal protection, and another substantial proportion did so for target shooting (24.3%) and hunting (8.5%).[38]

---

[37] County Defendants concede that "all lawful uses of a particular weapon may be considered when assessing the commonness of its lawful use," but then add that "the commonness of a weapon's use for self-defense bears the most weight." Cnty. Resp. 24.

[38] Exhibit 7, NSSF, *First-Time Gun Buyers*, www.nssf.org/wp-content/uploads/2020/06/FirstTimeResearch.pdf.

With respect to self-defense in particular, an AR-15 can be easier to control than other firearms. Newton Dec ¶49. Their detachable magazines can be safer to keep in homes than fixed magazines. *Id.* ¶¶31-32, 58. Defendants' experts discuss other options for self-defense, which they say they prefer. *See, e.g.*, Yurgealitis Dec. (Dkt. 52-9) ¶¶102-10. But Defendants' experts' preferences cannot be supplanted with the preferences of the people, nor should they. The cited concerns about bullet penetration (*e.g.*, *id.* ¶¶99-100), are a concern for every gun user, not just AR-15 users (*see* Ex. 5, Newton Dec. ¶54). And the suggestion by Defendants' expert that a homeowner should engage in one-handed shooting while doing other things during a life-or-death encounter is reckless and incredible. Yurgealitis Dec. (Dkt. 52-9) ¶104; Ex. 5, Newton Dec. ¶57.

Similarly, the experts dispute how frequently AR-15s and magazines exceeding 10 or 15 rounds are actually used in armed self-defense encounters,[39] but that too is legally irrelevant. If "infrequency of … use for self-defense" were the test, Cnty. Resp. 26, then *no firearms would be protected.* According to one of Defendants' experts, violent-crime victims "did not defend with a gun [*of any kind*] in 99.2 percent" of incidents.[40] Donahue Dec. ¶150 (Dkt. 54-4); Cnty. Resp. 26. But *Heller* confirms that handguns are protected, even if they are used to defend against less than 1 percent of incidents by Defendants' count. *Heller* "struck down the … handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose." *McDonald*, 561 U.S. at 890

---

[39] *Compare, e.g.*, Yurgealitis Dec. (Dkt. 54-5) pp. 7-8 (contending "the average number of shots fired in a self defense scenario" is "2.2 shots"), *with* Ex. 4, Kleck Dec. ¶¶125-26 ("number of defensive uses of guns in which over 10 rounds were fired is far larger than the number of mass shootings in which it could be credibly argued that LCM use increased the number of casualties"); Ex. 5, Newton Dec. ¶52 (explaining there is no "'average' self-defense situation" and that "an individual must be prepared to shoot until the threat is eliminated" and for "situations with multiple assailants").

[40] In fact, if there are "about 2.2 million" defensive gun uses every year, of which thousands involve firing more than 10 rounds, then the number of defensive uses "with many rounds fired … is many times larger than the number of mass shootings" using large-capacity magazines. Ex. 4, Kleck Dec. ¶¶125-26.

n.33 (Stevens, J., dissenting). So the relevant inquiry is whether Americans commonly *choose* semiauto-matic rifles like the AR-15 for self-defense and other lawful purposes, *Heller*, 554 U.S. at 629, not the number of times per year those rifles are actually used for armed self-defense in homes. *See McDonald*, 561 U.S. at 767-68 (what matters is whether the people commonly "preferred" a weapon). In short, "the standard is whether the prohibited [arms] are 'typically *possessed* by law-abiding citizens for lawful purposes,' not whether they are often *used* for self-defense." *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014) (quoting *Heller*, 554 U.S. at 625), *aff'd* 779 F.3d 991 (9th Cir. 2015); *see* Opening Br. 15 n.4.

### C. Defendants' historical evidence is not analogous.

Defendants must justify their laws with history. *Bruen*, 142 S. Ct. at 2126. In evaluating that history, courts cannot "stake [their] interpretation of the Second Amendment upon a single law," *Heller*, 554 U.S. at 632, and "when it comes to interpreting the Constitution, not all history is created equal," *Bruen*, 142 S. Ct. at 2136. In *Bruen*, for example, the Court identified "serious flaws" with the State's reliance on 19th-century laws principally from the western territories. *Id.* at 2154-55 (noting their "exceptional nature," "the miniscule territorial populations," and that they were "rarely subject to judicial scrutiny"). Here, as County Defendants acknowledge (at 41), there is no "direct regulatory analogy." Instead, Defendants' analogies are to two overlapping groups of laws—19th-century re-strictions on Bowie knives (and similar "dangerous and unusual" arms) and restrictions on the public carry of certain arms (often Bowie knives)—plus a third group of 20th-century laws.[41] Defendants' historical analogues do not justify their outright bans of purchasing, keeping, and using commonly

---

[41] County Defendants also rely on gunpowder-storage laws to support their position. *E.g.*, Cnty Resp. 41-43, 45. *Heller* already dismissed such laws as disanalogous "fire-safety laws" that do not sup-port an "absolute ban" in the home. 554 U.S. at 632. It is difficult to see how a tradition in the United States of "limit[ing] the amount of gunpowder a person could possess" to "twenty to thirty pounds," Cnty. Resp. 42, supports an outright ban in the home of commonly owned rifles and the standard magazines that come with them (versus other much larger non-standard magazines, *see* Ex. 5, Newton Dec. ¶34 (describing non-standard 50- or 100-round magazines)).

owned rifles and their standard magazines in the home. And all Defendants' cited laws come far too late to establish the requisite tradition.

**Bowie knives and similar arms:** Defendants, their experts, and the recent *Bevis* decision point to laws restricting Bowie knives and similar weapons. State Resp. 42; *Bevis*, 2023 WL 2077392, at *10-11. They identify 44 laws enacted from 1835 to 1913. State Resp. 47-48; State Ex. 14 (Dkt. 52-15) 8-24. To begin, these laws are too recent to show a historical tradition necessary carry Defendants' burden. *See Bruen*, 142 S. Ct. at 2136-2137 (courts may not give "postenactment history more weight than it can rightly bear" and stating that "19th-century evidence [is] 'treated as mere confirmation of what'" earlier evidence "'already … establish[es]'"); *id.* at 2147 n.22 (rejecting "statute enacted … nearly 70 years after the ratification of the Bill of Rights"); *id.* at 2154 (rejecting "late-19th century" evidence).

But even if these laws were of the correct vintage, they are not "relevantly similar" to the Defendants' laws that ban the possession of AR-15s in the home for two reasons. *Bruen*, 142 S. Ct. at 2132-33. *First*, Bowie knives were of a class of weapons considered "useless in war" and instead "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." *Aymette*, 21 Tenn. at 158; *see English*, 35 Tex. at 476-77 ("arms" in the U.S. Constitution "refers to the arms of a militiaman," such as the "musket and bayonet" or "holster pistols and carbine" but "bowie knives[] belong to no military vocabulary" and soldiers found with them "would be punished for an offense against discipline"); *Andrews*, 50 Tenn. at 179, 186-87 (holding that "the rifle of all descriptions" is protected and expressly distinguishing rifles and "the repeater" from "a dirk, sword cane," etc.). By comparison, semiautomatic rifles have multiple lawful uses, including accessorizing them for possible military uses in times of unexpected conflict if there were weapons shortages, and proficiency with those civilian weapons will translate to proficiency for military-issued weapons. Ex. 5, Newton Dec. ¶¶82, 83. *Second*—as is obvious from the text of each of the statutes

included in full in Plaintiff's Exhibit 1—the restrictions on Bowie knives largely regulated the concealed carry of those weapons *outside* the home, and thus cannot be used to justify a modern law that bans certain weapons in all places including inside the home. Of the 44 regulations State Defendants identify, 39 regulate carrying,[42] 2 are surety statutes,[43] 3 prohibit selling certain arms,[44] 1 prohibits dueling,[45] and 3 increase the penalty of using a Bowie knife in an assault or homicide.[46] Importantly, even the statutes regulating carrying have exceptions or limitations, for example prohibiting carrying only *with intent to injure*[47] or only during election day for specified hours.[48] Only a handful of laws prohibited all forms of carry.[49]

These statutes cannot satisfy Defendants' burden. Of the handful that prohibited all carry, none was enacted before 1858. Of the handful that regulated selling, just two were enacted before 1880.[50] These statutes are too temporally distant from 1791 and represent too few States to establish a "tradition of *broadly* prohibiting the [keeping] of commonly used firearms." *Bruen*, 142 S. Ct. at 2138 (emphasis added); *id.* at 2153 (rejecting as "outliers" two state regulations because courts must not "give disproportionate weight to a single state statute and a pair of state-court decisions"). Nor do these public-carry laws do anything to show law-abiding citizens were prohibited from keeping or using such knives in their homes; many expressly did *not* extend to the home, *infra* pp. 35-37.

---

[42] A few of the statutes do more than prohibit manners of carrying. *E.g.*, State Ex. 14 (Dkt. 52-15) 9-10 (Table 2, No. 4, 5) (manner of carrying and selling).

[43] State Ex. 14 (Dkt. 52-15) 8, 10-11 (Table 2, Nos. 2, 7).

[44] State Ex. 14 (Dkt. 52-15) 9-10, 16 (Table 2, Nos. 4, 5, 23).

[45] State Ex. 14 (Dkt. 52-15) 14 (Table 2, No. 19).

[46] State Ex. 14 (Dkt. 52-15) 11-12 (Table 2, Nos. 3, 8, 9).

[47] State Ex. 14 (Dkt. 52-15) 12, 17-18, 21 (Table 2, Nos. 11, 28, 30, 34).

[48] State Ex. 14 (Dkt. 52-15) 13-14 (Table 2, No. 16).

[49] State Ex. 14 (Dkt. 52-15) 8-9, 11-12, 19-20, 23-24 (Table 2, Nos. 10, 31, 32, 43, 44). Georgia's prohibition of 1837 appears to have an exception for those who "openly wear, externally, Bowie Knives," though not for pistols. *Id.* at 9-10 (Table 2, No. 4). "There is great vagueness in the wording of this statute" because pistols were "omitted in" the section exempting Bowie knives. *Nunn v. State*, 1 Ga. 243, 246 (1846). *See infra*, p. 34, for discussion of the constitutionality of this statute.

[50] State Ex. 14 (Dkt. 52-15) 9-10 (Table 2, Nos. 4, 5).

Finally, even setting aside these differences, it is questionable whether these Bowie knife restrictions were "perceived" to be "legal[]." *Bruen*, 142 S. Ct. at 2155; *see* David B. Kopel, *Knives and the Second Amendment*, 47 U. Mich. J. L. Reform 167, 186-190 (2013). A recent opinion states that such laws were "uniformly upheld," *Bevis*, 2023 WL 2077392, at *11, but they were not. The Court of Appeals of Kentucky invalidated an act proscribing the concealed carry of "a pocket pistol, dirk, large knife, or sword in a cane." *Bliss v. Commonwealth*, 12 Ky. 90, 90, 93-94 (1822). Likewise, as State Defendants acknowledge (at 49 n.26), the Supreme Court of Georgia explained that prohibitions "against bearing arms *openly*" are unconstitutional and "*void*." *Nunn*, 1 Ga. at 251. Texas and Tennessee decisions also undermine the conclusion that these laws were perceived to be legal. In *Cockrum v. State*, the state supreme court affirmed that the "right to carry a bowie-knife for lawful defense is secured," despite being "an exceeding[ly] destructive weapon." 24 Tex. 394, 402 (1859).[51] In *Aymette*, the court abided by the same distinction between Bowie knives and rifles that Plaintiff offers here. *Aymette* held that the "Legislature … have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, *and which are not usual in civilized warfare*, or would not conduce to the common defence." *Aymette*, 21 Tenn. at 159 (emphasis added). The Court stated that "citizens have the *unqualified* right to *keep* [a] weapon" that is "usual in civilized warfare," but that "the right to *bear* arms is not of that unqualified character." *Id.* at 159-160 (emphasis added). Applied here, a century later, *Aymette* confirms Dr. Herrera's right to keep semiautomatic rifles and standard magazines in his home. *E.g.*, State Resp. 26 (pressing the argument that semiautomatic rifles are of a military nature); Ex. 5, Newton Dec. ¶¶78-79, 81-82 (explaining military differences and similarities). In short, the decisions that upheld restrictions of arms like "bowie knives" simultaneously held that those arms are

---

[51] In *English v. State*, the Supreme Court of Texas later restricted protection only to standard arms for militiamen and not more broadly to arms including pistols. 35 Tex. at 476. *Heller* and *Bruen* abrogate *English*'s unduly narrow conception of arms. *See Bruen*, 142 S. Ct. at 2153.

*not* analogous to "the arms of a militiaman or soldier." *English*, 35 Tex. at 476-77; *Aymette*, 21 Tenn. at 159-60; *Andrews*, 50 Tenn. at 186-87; *Fife v. State*, 31 Ark. 455, 461 (1876).

**Public Carry Laws:** Defendants and their experts cite a host of statutes that ban publicly carrying certain arms outside the home. Some such statutes are clearly inspired by the common-law offense of affray, discussed above.[52] The common-law offense of affray carried over to the colonies and then States, which punished the offense: "Colonial Massachusetts and New Hampshire both authorized justices of the peace to arrest 'all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively ... by Night or by Day, in Fear or Affray of Their Majesties Liege People." *Bruen*, 142 S. Ct. at 2142-43 (quoting 1692 Mass. Acts and Laws no. 6, pp. 11-12; see 1699 N. H. Acts and Laws ch. 1). And Virginia law prohibited going armed "in fairs or markets, or in other places, in terror of the Country." *Id.* at 2144 (quoting Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794)). As discussed, these statutes are irrelevant to the constitutional question here. Dr. Herrera is not asking to go armed in public, let alone to go armed in public with "dangerous and unusual weapons." Instead, he is asking to purchase and keep "common weapons" (AR-15 and Glock 45) and "their usual number of attendants" (magazines) in his home should the need arise to use them, which is conduct not covered by this common-law tradition of regulation. "Affray," 1 Cunningham, *supra*; *accord* 1 Burn, *supra*, at 15-16; Ex. 1 at pp. 14-15.

Later statutes that State Defendants rely upon regulate certain pistols[53] and revolvers,[54] which also regulate the *public carry* of such arms, not keeping and using such arms in one's home. *See* State Resp. 49-50. These statutes fail just as Defendants' reliance on overlapping regulations prohibiting

---

[52] *E.g.* State Ex. 14 (Dkt. 25-15) 21 (Table 2, No. 34) (citing 1892 Vermont law prohibiting carrying "dangerous or deadly weapon … with the intent or avowed purpose of injuring a fellow man").

[53] State Ex. 14 (Dkt. 52-15) 2 (Table 1).

[54] State Ex. 14 (Dkt. 52-15) 25 (Table 3).

carrying Bowie knives fail. The earliest regulations, between 1813 and 1838, prohibited "carrying cer-tain *concealable* weapons, including pistols."[55] State Resp. 49 (emphasis added). The prohibitions against carrying concealed pistols were extended to revolvers, beginning in 1870. State Resp. 50 & n.30. But those statutes were upheld by courts only if "they exempted [open carry of] army revolvers" or by courts "operat[ing] under a fundamental misunderstanding of the right to bear arms" as only a collec-tive right. *Bruen*, 142 S. Ct. at 2146-47, 2155 & n.30 (collecting decisions). And "long guns" were treated more favorably than handguns. *See Bruen*, 142 S. Ct. at 2144, 2154. In short, *Bruen* already addressed this history and held that "American governments simply have not broadly prohibited the public carry of commonly used firearms." 142 S. Ct. at 2156. It necessarily follows that there is no history of broadly prohibiting keeping and using such firearms in one's home.

Even if *Bruen* had not settled that score, Defendants' proffered statutes are striking in their uniformity and inapplicability as to the relevant constitutional question here: whether the government may ban purchasing, keeping, and using a class of arms for the home. All are either silent on that question or expressly *affirm* that right to keep firearms in homes even if they could not be carried publicly. *See* Ex. 1 at pp. 20-55. Consider the following statutes with express exceptions for defending one's home with arms that otherwise could not be carried (or carried concealed) in public:

- An 1881 Arkansas law prohibited carrying bowie knives, swords, or other weapons but ex-pressly permitted carrying such weapons while "on a journey, and on his premises." State Ex. 14 (Dkt. 52-15) p. 5 (Table 1, No. 11); *see also McDonald v. State*, 102 S.W. 703, 703 (Ark. 1907).

---

[55] In Table 1 of State's Exhibit 14, 11 out of 12 statutes regulated *carrying*, the other prohibited selling non-military pistols. State Ex. 14 (Dkt. 52-15) 2-7. The seven earliest all permitted open carry. *Id.* (Table 1, No. 1-7). State Defendants point to an 1870 Tennessee statute that "prohibited pistol carrying" generally, State Resp. 49, but that statute was invalidated as applied to "the pistol known as the repeater" because it "is a soldier's weapon—skill in the use of which will add to the efficiency of the soldier." *Andrews*, 50 Tenn. at 186-87. Only one other statute prohibited all carry, but it was enacted in 1891. State Ex. 14 (Dkt. 52-15) 6-7 (Table 1, No. 12). And even that statute provided an affirmative defense for those with good cause to believe that carrying a restricted weapon was necessary for self-defense. *Id.* Two other statutes permitted the open carry of military-style pistols. *Id.* at 5 (Table 1, Nos. 9, 11).

- An 1881 Nebraska law prohibited "carry[ing]" certain weapons "concealed" with an express exception "for the defense of his person, property or family." Ex. 14 (Dkt. 52-15) 16 (Table 2, No. 25).

- An 1882 West Virginia law prohibited "carry about his person" of certain arms but added "nothing herein contained shall be so construed as to prevent any person from keeping or carrying" such weapons "about his dwelling house or premises," or "from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done…." *Id.* at 28 (Table 3, No. 9).

As these laws confirm, the government did not ban classes of arms in American homes even by that point.[56] Contrary to Defendants' arguments, there is a historical tradition of permitting "weapon[s] when upon a journey or upon his own premises" as Dr. Herrera seeks to do. *McDonald*, 102 S.W. at 703.

**20th-century laws:** Defendants' remaining statutes are 20th-century laws regulating machine guns or other weapons. Contrary to Defendants' arguments, this Court need not consider "any of the 20th-century historical evidence brought to bear by" Defendants, or Defendants' reliance "on a handful of temporary territorial laws … enacted nearly a century after the Second Amendment's adoption" and other laws covering very few people. *Bruen*, 142. S. Ct. at 2154-55 & n.28. Even if their 20th-century evidence were not too late, the evidence marshalled here would be insufficient. State Defendants identify (at 51-52 & n.31) a handful of statutes that they say banned semiautomatic rifles, with the earliest being in 1927.[57] These statutes substantially postdating the Second Amendment's ratification do not constitute a longstanding tradition of regulating semiautomatic rifles. *See Heller II*, 670 F.3d at 1260 & n.*; *see also id.* at 1287-88 (Kavanaugh, J., dissenting). Meanwhile, Defendants omit other

---

[56] The historical examples of arms restrictions extending to inside the home were unconstitutionally discriminatory statutes perpetuating the unlawful disarmament of Native Americans, Black Americans, and others based on race or religion. *See* Ex. 1 at pp. 16-19 (examples of unconstitutional statutes disarming groups of individuals by race or religion).

[57] State Defendants' expert acknowledges that Illinois, Louisiana, and South Carolina have ambiguous statutes. Spitzer Dec. (Dkt. 52-12) Ex. B, at 2-3 & n.†. Those statutes could be fairly read not to encompass Dr. Herrera's semiautomatic rifles. They prohibit firearms "capable of *automatically* discharging more than eight cartridges successively without reloading." *Id.* Ex. D, at 9, 12, 26 (IL, LA, SC) (emphasis added).

statutes following the Uniform Machine Gun Act, which would have permitted the banned conduct here. Those laws excluded semiautomatic-only rifles, which Defendants' laws ban; the uniform act also did not extend into the home even for certain machine guns under .30 caliber. *See* Ex. 1 at 66-68.

Moreover, related technology and related societal problems existed decades before Defendants' 20th-century analogues. For example, in 1855, Daniel Wesson and Oliver Winchester "introduce[d] the lever action rifle, which contained a 30-round magazine that could be emptied in less than one minute." *Duncan v. Bonta*, 19 F.4th 1087, 1154-55 (9th Cir. 2021) (Bumatay, J., dissenting), *vac'd* 142 S. Ct. 2895 (2022). That rifle and the later Winchester Model 1866 were "commercially successful," selling in the tens of thousands. *Id.* Yet the first outright bans of rifles to which Defendants can point come more than a half century later to address a longstanding societal problem that "has persisted since the 18th century"—"firearm violence in densely populated communities." *Bruen*, 142 S. Ct. at 2131-32; *see also* Ex. 4, Kleck Dec. ¶24 ("[T]he relevant historical reality is that Americans were able to carry out hundreds of mass shootings before the late 20th century without benefit of [assault weapons] or LCMs," particularly against Native Americans). According to Defendants, that concern about public violence was addressed in earlier times: by banning the *carrying* of *uncommon* weapons like sword canes in public. So the "lack of a distinctly similar historical regulation addressing" violence applied to common weapons like rifles "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

### D. Defendants ignore the most apt analogy to colonial-era militia acts.

Missing from Defendants' historical analogues are colonial-era militia acts. Those militia acts are the best evidence that the challenged laws here are unconstitutional. "In all the colonies, as in England, the militia system was based on the principle of the assize of arms," where—instead of a large standing army—there was a "general obligation of all adult male inhabitants to possess arms,

and, with certain exceptions, to cooperate in the work of defence."[58] Examples of colonial militia laws are catalogued in the attached Exhibit 1 (pp. 2-12). Those laws *required* "the possession of arms and ammunition by all who were subject to military service" and "appear in all the important enactments concerning military affairs. Fines were the penalty for delinquency, whether of towns or individuals."[59] In general, men between the ages of 16 and 60 were required to furnish themselves with muskets and ammunition.[60] The typical infantry soldier was outfitted with a matchlock musket, his bandoleer ("a belt two inches wide, to which were attached twelve small cylindrical boxes, each holding one charge of powder," and hanging from it "a priming wire, a bullet bag, and a case containing several yards of match"), and "a short sword."[61] As the colonies neared the 18th century, technology advanced. Flint-locks or firelocks, carbines, and pistols became more common and remained required of colonial men.[62]

There is no way to reconcile that history with Defendants' disarmament regime. Semiauto-matic rifles are owned by millions. And while they are not military-issued weapons, they would be suitable for individual use for the collective defense if the need arose, Ex. 5, Newton Dec. ¶¶82-83, just as the colonial-era muskets and carbines kept in colonists' homes would have been centuries ago.

Defendants' response that an AR-15 is like a weapon of war thus only raises more questions. Such weapons, so long as for individual use and not unusually rare, were required to be kept in homes before the Founding. Ordinary male citizens of eligible age who failed to arm themselves with com-mon weapons and standard ammunition faced fines and punishment. *See, e.g.*, Ex. 1 at pp. 2-12 (Nos. 2-4, 6, 8-9, 12-20, 22). History, especially the history forgotten by Defendants, establishes that banning

---

[58] Osgood, *The American Colonies in the Seventeenth Century* 499 (MacMillan 1904), digitally ar-chived at https://archive.org/details/americancolonies01osgouoft/page/n5/mode/2up.

[59] *Id.* at 500.

[60] *See* Ex. 1 at pp. 4-11 (Nos. 6, 8, 9, 10, 12, 15, 19).

[61] Osgood, *supra*, 501-02.

[62] *Id.*

from the home common weapons suitable for both individual and collective defense is ahistorical. Only those weapons so "highly unusual in society at large" may be banned, *Heller*, 554 U.S. at 627-28. Defendants have no response to the highly *usual* nature of the weapons banned here. Had such civilian weapons existed centuries ago, based on this history, they presumably would have been required— not banned—in every household.

### E. There is no historical analogue for the challenged magazine bans.

Defendants' expert's evidence of magazine bans is not as billed. *See* State Resp. 56-57. By his own admission, the laws banned particular firearms—mostly machine guns—not detachable magazines themselves. Spitzer Dec. (Dkt. 52-12) ¶¶31-32; *see also* Ex. 1 at 469-559 (copies of the cited statutes). Spitzer's earliest example is from 1917, which is too late to establish a broad historical tradition of regulating ammunition capacity. *Bruen*, 142. S. Ct. at 2136-37, 2147 n.22, 2154 & n.28.

Early regulations of ammunition, including in militia acts, establish a tradition pointing in the opposite direction: the Founding era *mandated* that common arms be kept with the requisite ammunition and accoutrements. *See* Part III.D, *supra*; *Duncan*, 19th F.4th at 1154-55 (Bumatay, J., dissenting) (second emphasis added) ("Ironically, the closest Founding-era analogues to ammunition regulations appear to be laws *requiring* that citizens arm themselves with particular arms and a specific *minimum* amount of ammunition."). Nineteenth-century evidence "'confirm[s]'" what has "'already been established'" by that evidence. *Bruen*, 142 S. Ct. at 2137. "[R]ifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified." Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, *supra*, at 851, 854-57; *see also Duncan*, 19 F.4th at 1154-55 (Bumatay, J., dissenting) (reviewing the history); Opening Br. 24-26. Yet the first regulations Defendants can muster were enacted more than half a century later, in the 20th century, State Resp. 56-57, virtually all of which were later repealed, and are distinguishable here. *See Duncan v. Becerra*, 970 F.3d 1133, 1150-51 (9th Cir. 2020), *on reh'g en banc* 19 F.4th 1087, *vac'd* 142 S. Ct. 2895 (2022); *supra*, pp. 37-

38. Such "short lived" and "passing regulatory efforts" cannot demonstrate "an enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2155.

### F. There is no historical analogue for the challenged registration requirement.

State Defendants cannot satisfy their burden to show a tradition of broadly requiring registration of commonly owned firearms by gun owners. *See Bruen*, 142 S. Ct. at 2138. Copies of registration statutes are included in Exhibit 2, including statutes that confirm the ahistorical nature of the State's new registration requirement. State Defendants identify just eight such statutes in seven States. State Ex. 14 (Dkt. 52-15) 69-71. State Defendants mostly rely on five statutes in four States—enacted between 1848 and 1867—that "imposed taxes on specific firearms." State Resp. 40 n.24; State Ex. 14 (Dkt. 52-15) 69-71. But the identified statutes mostly targeted certain kinds of pistols and arms like the Bowie knife; they did not generally target rifles, and there were express exceptions for arms with military utility in the earlier ones.[63] So the analogy fails. *See Bruen*, 142 S. Ct. at 2144 (rejecting a historical analogy to a regulation that "prohibited the public carry of pistols" because "it did not prohibit planters from carrying long guns for self-defense—including the popular musket and carbine"). But even if the law at issue here were a tax and the historical statutes concerned common rifles, the analogy would still fail: if "*three* colonial regulations" cannot "suffice to show a tradition of public-carry regulation," *id.* at 2142, then four States' regulations more than half a century after ratification likewise cannot establish the requisite tradition.

---

[63] The 1848 Mississippi statute applied only to "dueling or pocket pistol[s]," and excepted those "kept for use by military companies." State Ex. 14 (Dkt. 52-15) 69 (Table 5, No. 2). North Carolina's 1856 statute taxed pistols, except those "used exclusively for mustering," and arms like the Bowie knife. *Id.* (Table 5, No. 3). North Carolina's 1858 statute taxed similarly unusual arms and stated "[a]rms used for mustering shall be exempt from taxation." *Id.* (Table 5, No. 4). Georgia's 1866 statute taxed all firearms "over the number of three kept or owned on any plantation in [certain] counties." *Id.* at 69-70 (Table 5, No. 5). And Alabama's 1867 statute targeted pistols, revolvers, and arms like the Bowie knife, but not rifles. *Id.* at 70 (Table 5, No. 6).

State Defendants also rely (at 40 n.24) on a single Virginia statute from 1631 that required "commanders" to "take a muster of their men" and "also of arms and munitions." State Ex. 14 (Dkt. 52-15) 69 (Table 5, No. 1). As then-Judge Kavanaugh explained in his *Heller II* dissent, these "militia requirements were a far cry from a registration requirement for all firearms." 670 F.3d at 1293 (Kavanaugh, J., dissenting). Even if they were, this Court "cannot put meaningful weight on this solitary statute." *Bruen*, 142 S. Ct. at 2144. It was enacted in a single colony decades before the Bill of Rights 1689, "the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. It is therefore at once too early and unrepresentative of the colonies generally. *See Bruen*, 142 S. Ct. at 2136 (admonishing courts not to "'go too far back'" in history).

Finally, State Defendants point to two later statutes: an 1885 Illinois statute and a 1918 Montana statute. State Ex. 14 (Dkt. 52-15) 70-71 (Table 5, Nos. 7, 8). Once again, two statutes enacted so long after the Second Amendment was ratified cannot establish the requisite tradition. *Bruen*, 142 S. Ct. at 2136-37, 2147 n.22, 2154 & n.28. The earlier Illinois statute requires that *sellers* "keep a register," State Ex. 14 (Dkt. 52-15) 70-71 (Table 5, No. 7), not gun *owners*, and required a register of pistol sales, not rifles or long guns, *see* Ex. 2 at pp. 2-15 (showing examples of registration by gun sellers, not gun owners). Once the Court ignores the irrelevant "20th-century historical evidence," *Bruen*, 142 S. Ct. at 2154 n.28, State Defendants have *zero* examples of laws requiring registration of common firearms unconnected to a military purpose. A more comprehensive list of historical registration requirements is included in Exhibit 2. That list confirms Justice Kavanaugh's observation that there are analogous registration requirements of *gun sellers*, but not of *gun owners* and not of long guns. *Heller II*, 670 F.3d at 1291-92 (Kavanaugh, J., dissenting). Without any historical pedigree, the registration requirement is unconstitutional. *Bruen*, 142 S. Ct. at 2129-30.

\* \* \*

42

For the foregoing reasons, Dr. Herrera is likely to succeed on the merits of his constitutional claim. The challenged laws implicated protected Second Amendment conduct—namely the right to keep and use common rifles in one's home for self-defense. Defendants can offer no historical justification for those laws. They are unconstitutional.

## IV. Harm is irreparable.

The ongoing Second Amendment violations here are the sort of ongoing constitutional violations where irreparable harm must be presumed.[64] The Second Amendment, like the First Amendment, "protects …intangible and unquantifiable interests." *Ezell*, 651 F.3d at 699. Dr. Herrera cannot know when the need for armed self-defense might arise in his home, nor will any amount of damages compensate the lost opportunity to defend himself and the lost opportunity to train to defend himself and others. Dr. Herrera suffers the unique irreparable harm of not training with his rifle with the SWAT team. His ability to safely handle an AR-15 on missions is critical, those missions are ongoing, and his skills degrade with each missed monthly opportunity to participate in the team's shooting drills. Herrera Dec. (Dkt. 5-1) ¶¶10, 12; Ex. 3, Herrera Supp. Dec. ¶¶3, 6, 15, 16. But the challenged laws have made it a practical impossibility for Dr. Herrera to participate in that critical training with his SWAT team with his rifle. Dr. Herrera thus cannot bring his AR-15 to the SWAT team's training, in addition to being without his preferred self-defense weapon at home. Ex. 3, Supp. Herrera Dec. ¶¶3-16. The newly enacted state law has compounded the constitutional harm, leaving it uncertain

---

[64] To be sure, recently in *Bevis*, the district court declined to apply *Ezell*'s presumption of irreparable harm to gun sellers. 2023 WL 2077392, at *16. But the case here involves claims about "the right to possess firearms for protection," and *Ezell* established the presumption for Second Amendment claims implicating just that. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). Other district courts have likewise found irreparable injury for Second Amendment claims before and after *Bruen*. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 149-50 (D.D.C. 2016); *Koons v. Reynolds*, 2023 WL 128882, at *22-24 (D.N.J. Jan. 9, 2023); *Hardaway v. Nigrelli*, 2022 WL 16646220, at *17 (W.D.N.Y. Nov. 3, 2022); *Christian v. Nigrelli*, 2022 WL 17100631, at *10 (W.D.N.Y. Nov. 22, 2022); *Antonyuk v. Bruen*, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022); *Rhode v. Becerra*, 445 F. Supp. 3d 902, 954 (S.D. Cal. 2020), *vac'd and rem. on other grounds Rhode v. Bonta*, 2022 WL 17099119 (9th Cir. 2022).

when, where, and how firearms may be lawfully used anywhere within the State's border. Beginning April 10, state law permits some to continue only to "possess" arms at specified locations; it does not indicate whether anyone may "use" arms at those locations, beyond "a properly licensed firing range or sport shooting competition venue." 720 ILCS 5/24-1.9(d), 24-1.10(d).

The Court should reject Defendants' arguments that Dr. Herrera's "years-long delay in seeking preliminary injunctive relief" defeats his "allegations of irreparable harm." State Resp. 63; Cnty. Resp. at 56. To support that contention, Defendants mischaracterize the relevant timeline as beginning in 2006, State Resp. 63, before *Heller* clarified the individual (versus collective) nature of the Second Amendment right and more than decade before Dr. Herrera "was recruited to serve as a medic on a Chicagoland SWAT team" in 2018. Herrera Dec. (Dkt. 5-1) ¶8. By the time Dr. Herrera joined the SWAT team, the Seventh Circuit had already decided that the Second Amendment did not protect semiautomatic rifles, *Friedman*, 784 F.3d at 412, and the Supreme Court denied certiorari, 577 U.S. 1039. Dr. Herrera was familiar with the fact that, between 2015 and 2022, any challenge would have failed in this Circuit. Ex. 3, Herrera Supp. Dec. ¶19. All of that changed with *Bruen*, and Dr. Herrera filed his complaint within a reasonable time and sought preliminary relief on the same day. *Id.* (explaining he could not file "right away for various reasons including because my time was relatively scarce given my hours at the hospital and my academic responsibilities"). The State then enacted its law in January 2023, and Dr. Herrera filed his complaint the very same month. *Id.* ¶20.[65] Dr. Herrera's filing time is reasonable in the light of his commitments, including as a physician, a professor, and a

---

[65] The addition of the state law is particularly problematic because it creates uncertainty about when lawfully owned rifles and magazines can be "used," *infra*. And the State's law immediately prohibited Dr. Herrera from purchasing semiautomatic rifles and magazines anywhere in the State, 720 Ill. Comp. Stat. Ann. 5/24-1.9(b), where previously Dr. Herrera could purchase and keep them outside of Cook County, *e.g.*, Herrera Dec. (Dkt. 5-1) ¶¶6-7. Among other reasons, because Dr. Herrera intended to purchase a new rifle, Dr. Herrera's timely filed his lawsuit the very same month the State enacted its new unconstitutional law.

medic on the SWAT team. Dr. Herrera did not unreasonably delay in seeking relief for the ongoing violation of his constitutional rights.[66]

This Court remains bound by *Ezell* despite Defendants' suggestion that *Ezell* was undermined by later precedent. State Resp. 69. Defendants suggest that *Wilson*, 937 F.3d 1028, abrogated *Ezell*'s presumption of irreparable harm "for Second Amendment violations." State Resp. 64. But *Wilson* involved an appeal from the district court's grant of a motion to dismiss and thus had nothing to say about *Ezell*'s discussion of irreparable injury for preliminary injunctions. 937 F.3d at 1031, 1036. The quote on which Defendants rely (State Resp. 64; City Resp. 19)—setting "forth the 'threshold' inquiries that would govern in '*some* Second Amendment cases'"—is from *Ezell*'s likelihood-of-success analysis. *See Wilson*, 937 F.3d at 1036 (quoting *Ezell*, 651 F.3d at 701).

Defendants' attempt to confine *Ezell* to its facts similarly fails. State Resp. 64-65; City Resp. 19-20. The Court's discussion of irreparable harm was not so confined. The Court first analogized Second Amendment injuries to First Amendment injuries: "The loss of a First Amendment right is frequently presumed to cause irreparable harm based on 'the intangible nature of the benefits flowing from the exercise of those rights.'" *Ezell*, 651 F.3d at 699; *accord* Cnty. Resp. 53. The Court then affirmed that "[t]he Second Amendment protects similarly intangible and unquantifiable interests" that "cannot be compensated by damages." *Ezell*, 651 F.3d at 699. Those "intangible and unquantifiable interests" are "the Amendment's central component": "the right to possess firearms for protection." *Id.* And the right to possess firearms for protection is squarely presented by Dr. Herrera's claims. *E.g.*, Herrera Dec. ¶5 (stating that the laws prevent him from keeping an operable handgun in his home); *id.* ¶7 (stating that he is unable to keep a rifle at home); *id.* ¶14 (stating that he cannot continue to

---

[66] State Defendants' reliance (at 63) on the effect of delays in seeking interim relief in the trademark-infringement context is inapplicable to the *constitutional* harm here. *Compare, e.g.*, *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018), *with Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. Mar. 31, 2010) ("delay in filing [a] lawsuit" does not "justif[y] the denial of interim relief from an ongoing alleged constitutional violation").

possess rifles without registration); Ex. 3, Herrera Supp. Dec. ¶14 ("Not training with my own rifle jeopardizes my ability to render aid in a tactical environment. Not training with my own rifle alongside the team makes me less prepared to perform my role."). As *Ezell* holds, when regulations implicate that right, the "harm is properly regarded as irreparable and having no adequate remedy at law." *Id.* at 699-700. This Court is bound by that holding. Defendants' attempt to evade it fail.[67]

Defendants' attempt to minimize Dr. Herrera's irreparable harm of not being able to adequately train for SWAT duties also flies in the face of textbook standards of tactical medicine. State Resp. 66; Cnty. Resp. 55. State Defendants rely on the declaration of Dominic Chiappini[68] to show that Dr. Herrera does not require training with an AR-15. State Resp. 66. Chiappini asserts that medics are "kept out of the 'hot zone,'" Chiappini Dec. (Dkt. 52-16) ¶8, but Dr. Herrera's training requires preparation for the worst-case scenario: entering "the 'hot zone'" to render "aid if the situation demands." Ex. 3, Herrera Supp. Dec. ¶7. Chiappini does not account for these or other American College of Emergency Physicians (ACEP) guidelines for tactical medicine, as outlined in its textbook. *See id.* at ¶¶8-12. Chiappini's assertions that Dr. Herrera does not need to train with an AR-15, Chiappini Dec. (Dkt. 52-16) ¶¶8-11, conflict with ACEP's guidelines that medics "must be competent with firearms" and must "be able to safely disarm downed officers and suspects when necessary" and should "ideally know how to fire these weapons under duress should the need arise," Ex. 3, Herrera Supp. Dec. ¶11 (quoting and excerpting Campbell et al., *Tactical Medicine Essentials*, *supra*, at 30, 61). And Chiappini's assertions conflict with Dr. Herrera's experience where an officer "had to switch to a less-

---

[67] The weakness of Defendants' arguments on irreparable harm is evident from Defendants' nearly complete reliance on their merits analysis. *See* State Resp. 65; Cnty. Resp. 54. Many of these arguments have already been rejected. For example, courts have already rejected Defendants' argument that a plaintiff must identify "a single instance in which he was unable to defend himself," State Resp. 65, because the Second Amendment right "can be infringed upon whether or not plaintiffs are ever actually called upon to use their weapons." *Grace*, 187 F. Supp. 3d at 150.

[68] Chiappini is not a tactical medical provider and does not purport to be an expert in tactical medicine. Chiappini Dec. (Dkt. 52-16) ¶¶1-6. Dr. Herrera is a tactical medical provider and teaches tactical medicine at a university. Ex. 3, Herrera Supp. Dec. ¶¶ 2, 7-11.

lethal firearm" and "handed [Dr. Herrera] his AR-15 to secure." Herrera Supp. Dec. ¶13. As a direct result of the bans at issue here, Dr. Herrera cannot train for potentially lethal missions based on accepted practices of the field. *Id.* at ¶¶5, 14-16.

### V.   The public interest and the balance of the equities favor a preliminary injunction.

Defendants' arguments about the remaining preliminary injunction factors are the same: the laws further the government interest of public safety. State Resp. 66-68; Cnty. Resp. 55-59; City Resp. 21. Defendants conclude from their public safety interest in preventing gun violence that the public interest and the balance of the equities favors denying injunctive relief. State Resp. 66-68; Cnty. Resp. 55-59. The recent *Bevis* decision reasoned along similar lines. *See* 2023 WL 2077392, at *17 ("The protection of public safety is also unmistakably a 'public interest,' one both laws further."). But however strong the public interest in protecting public safety, the public has no interest in doing so by unconstitutional means.

"Balancing harm to the parties and considering the public interest 'largely overlap' when a Plaintiff sues a government entity to enjoin enforcement of a statute." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd sub nom. Midwest Title Loans v. Mills*, 593 F.3d 660 (7th Cir. 2010); *accord Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party."). "The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). "While the public has an interest in enforcing laws that promote safety or welfare, the public has *no cognizable interest* in enforcing laws that are unconstitutional. Indeed, the public interest is best served by preventing an unconstitutional enforcement." *Ripley*, 616 F. Supp. 2d at 908 (emphasis added; cleaned up) (citing *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)). So even if this Court were to accept Defendants' policy arguments, Defendants would be "substantially harmed" only if enjoined from enforcing "a *constitutional* law aimed at fighting" gun

violence because "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Because the balance of the equities and the public interest overlap here, they will favor Dr. Herrera if he is likely to succeed on the merits. *See Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012) ("[I]f the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.").

Defendants largely ignore the weight of authority on these factors in the context of constitutional violations. State Defendants' only response (at 67 n.44) is that "the Act does not violate a constitutional right," which is a tacit concession that preliminary injunctive relief depends on the merits. County Defendants (at 58) attempt to confine those authorities to the First Amendment context.[69] But the principle applies to the entire Constitution, "the ultimate expression of the public interest," and not just preferred rights. *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."). The Constitution supersedes Defendants' policy views. *Id.* Because Dr. Herrera is "likely to prevail in showing that [his] Second Amendment rights are being violated, the public interest weighs heavily in favor of granting [his] requested injunction." *Grace*, 187 F. Supp. 3d at 150-51.

## CONCLUSION

For the foregoing reasons and those in the memorandum of law in support of the motion for a temporary restraining order and preliminary injunction, this Court should grant Dr. Herrera's motion and preliminarily enjoin the unconstitutional laws.

---

[69] County Defendants argue (at 58) that *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004), engaged in interest balancing, but the Court explained that doing so was permissible "when the challenged statute regulates the adult entertainment industry" for reasons specific to First Amendment law. *Id.* at 620.

Dated: March 14, 2023

Gene P. Hamilton*
Reed D. Rubinstein*
Michael Ding (IL ARDC 6312671)
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue SE
Washington, DC 20003
Tel: (202) 964-3721
gene.hamilton@aflegal.org
reed.rubinstein@aflegal.org
michael.ding@aflegal.org

Gregory Abbott Bedell
33 North Dearborn Street, 10th Floor
Chicago, IL 60602
(312) 977-9119
gbedell@kkbchicago.com

*   *Admitted pro hac vice*

Respectfully submitted,

 */s/ Taylor A.R. Meehan*
Thomas R. McCarthy*
Jeffrey M. Harris*
Taylor A.R. Meehan (IL ARDC 6313481)
C'Zar D. Bernstein*
Matthew R. Pociask*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
jeff@consovoymccarthy.com
taylor@consovoymccarthy.com
czar@consovoymccarthy.com
matt@consovoymccarthy.com

*Counsel for Plaintiff*

49

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to counsel of record.

Dated: March 14, 2023                           */s/ Taylor A.R. Meehan*
                                                Taylor A.R. Meehan

50