## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JAVIER HERRERA,

*Plaintiff*,

v.

KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity County Board of Commissioners President, KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney, THOMAS J. DART, in his official capacity as Sheriff of Cook County, CITY OF CHICAGO, a body politic and corporate, LARRY B. SNELLING, in his official capacity as Superintendent of Police for the Chicago Police Department,

*Defendants*.

Case No. 1:23-cv-532

Hon. Hon. Lindsay C. Jenkins

## AMENDED COMPLAINT

Dr. Javier Herrera brings this complaint for declaratory and injunctive relief against Kwame Raoul, the Attorney General of Illinois; Brendan F. Kelly, the Director of the Illinois State Police; Cook County (aka County of Cook); Toni Preckwinkle, President of the County Board of Commissioners; Kimberly M. Foxx, Cook County State's Attorney; Thomas J. Dart, the Sheriff of Cook County; the City of Chicago; and Larry B. Snelling, Superintendent of Police for the Chicago Police Department ("Defendants"). Dr. Herrera alleges as follows:

### INTRODUCTION

1. The Second Amendment protects an individual's right to keep and bear arms, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022), especially in "the home." *D.C. v. Heller*, 554 U.S. 570, 629 (2008). That right "is not 'a second-class right, subject to an entirely

1

different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156. It is not subject to a "freestanding 'interest-balancing'" test that asks "whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. Nor may the government "simply posit that [gun] regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126. The government must instead "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government cannot do that when it bans arms commonly kept by law-abiding citizens for lawful purposes. *See Heller*, 554 U.S. at 625, 629; *Bruen*, 142 S. Ct. at 2128, 2156. Such laws violate "the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36 50 n.10 (1961)).

2.      This constitutional command binds Illinois. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). But in January 2023, Illinois enacted a law that flouts it.  *See* Ill. Pub. Act 102-1116. The Act bans the purchase and possession of America's most commonly owned semiautomatic rifle, the AR-15. It bans the purchase and possession of the standard magazine for that rifle and other standard magazines for some of America's most commonly owned handguns. That constitutionally protected conduct is criminal in Illinois. The Act makes no distinction between keeping at home versus keeping or carrying elsewhere—it is an outright ban. The Act flouts the Second Amendment's unqualified command that the "right of the people to keep … Arms, shall not be infringed." U.S. Const. amend. II.

3.      Cook County and the City of Chicago are likewise flouting this constitutional command. These jurisdictions ban the purchase and possession of the same commonly owned rifles. They ban the purchase and possession of standard magazines for that rifle and some of America's most commonly owned handguns. Those bans extend even to commonly owned rifles that the State allows citizens to possess because of a grandfathering provision. It is therefore illegal in Cook County

and the City of Chicago to keep rifles that are legal under State law—even at home. Constitutionally protected conduct is now criminal.

4.     These bans have real-world consequences for ordinary citizens like the plaintiff here, Dr. Javier Herrera. He is a law-abiding Chicago resident who is an emergency medical physician. Like millions of Americans, he owns two AR-15 rifles for lawful purposes including self-defense. He also serves the community as a medic on a SWAT team that trains with AR-15 rifles to remain proficient. But because of the bans, he cannot keep those commonly owned rifles at his Chicago home. Dr. Herrera must instead keep them far away, too far to allow him to train with them alongside his SWAT team, let alone possess them in his home for self-defense.

5.     The State and local laws contravene the Second Amendment and what the Supreme Court has said about it. While States may regulate "dangerous *and* unusual weapons," *Heller*, 554 U.S. at 627 (emphasis added), those "in common use" are beyond the State's power to ban in the home, *id.* "The Second Amendment as construed in *Heller* protects weapons that have not traditionally been banned and are in common use by law-abiding citizens. Semi-automatic rifles have not traditionally been banned and are in common use today, and are thus protected under *Heller*." *D.C v. Heller*, 670 F.3d 1244, 1286-87 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). In adopting the Second Amendment, the American people chose to protect "the right of law-abiding, responsible citizens to use arms." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). That choice "demands our unqualified deference." *Id.*

6.     "American governments simply have not broadly prohibited" keeping "commonly used firearms for personal defense" in the home. *Bruen*, 142 S. Ct. at 2156. On the contrary, there is a long tradition of allowing civilians to keep at home common civilian rifles that are useful for the common and personal defense. *See, e.g.*, Militia Act, 1 Stat. 271 (May 8, 1792). Dr. Herrera's AR-15

rifles are within that tradition: they are civilian rifles, not military ones, millions of Americans own them, and they are useful for both personal and common defense.

## PARTIES

7.      Plaintiff, Dr. Javier Herrera, is a resident of Chicago, Illinois. He is an emergency medicine doctor and has taught tactical medicine at a public university. Dr. Herrera is also a law-abiding gun owner with a valid firearm owner's identification card and concealed-carry license. He owns firearms for various lawful purposes—among them, self-defense, hunting, and sport shooting. Local ordinances prohibit Dr. Herrera from keeping some of those firearms and their standard magazines in his home and using them for self-defense. Instead, he must keep them more than an hour away. And state law imposes even more burdens—banning purchases of replacement components or magazines and precluding Dr. Herrera's use of those most common arms for self-defense.

8.      Defendant Kwame Raoul is the Attorney General of Illinois. As Attorney General, he has the duty to "institute and prosecute all actions and proceedings in favor of or for the use of the State, which may be necessary in the execution of the duties of any State officer" and to "investigate alleged violations of the statutes which the Attorney General has a duty to enforce." 15 Ill. Comp. Stat. Ann. 205/4. He also has the duty to "defend all actions and proceedings against any State officer, in his official capacity, in any of the courts of this State or the United States." *Id.* He must "consult with and advise the Several State's Attorneys in matters relating to their duties," *id.*, and has publicly advised officers to enforce the Illinois Act. Defendant Raoul maintains a Chicago Main Office, a principal place of business, in 100 West Randolph Street, Chicago, IL 60601. At all relevant times, Defendant Raoul is and will act under color of state law to enforce the Act. Defendant Raoul is sued in his official capacity.

9.     Defendant Brendan F. Kelly is the Director of the Illinois State Police and a resident of Illinois. "The Director shall be responsible for the management and control of the Illinois State Police. The Director shall make and adopt rules and regulations for the direction, control, discipline and conduct of the members of the Illinois State Police and such other rules for the government and operation of the Illinois State Police as he may deem necessary." 20 Ill. Comp. Stat. Ann. 2610/2. Upon information and belief, Defendant Kelly and his subordinates are enforcing and will continue to enforce the Illinois Act. At all relevant times, Defendant Kelly is and will act under color of state law. Defendant Kelly is sued in his official capacity.

10.     Defendant Cook County is a "county which has been … established in" Illinois. *See* 55 Ill. Comp. Stat. Ann. 5/5-1001. It is "a body politic and corporate," and it may "be sued." *Id.* Under Illinois law, the County "with [its] chief executive officer elected by the electors of the county may (1) exercise any power and perform any function pertaining to its government and affairs, or (2) exercise those powers within traditional areas of county activity, except as limited by the Illinois Constitution or a proper limiting statute, notwithstanding effects on competition." *Id.* §2-5016. The County has used this power to enact the unconstitutional ordinances at issue here.

11.     Toni Preckwinkle is the President of Cook County's Board of Commissioners. As President, she is the Chief Executive Officer of Cook County. In that capacity, she has the power to sign and approve, or veto, ordinances passed by the Board. 55 Ill. Comp. Stat. Ann. 5/2-5010. She also has the duty to "see that all of the orders, resolutions and regulations of the board are faithfully executed." *Id.* §2-5009(a). Upon information and belief, she approved the unconstitutional ordinances at issue here, and she and her subordinates are enforcing and will continue to enforce them. At all relevant times, Defendant Preckwinkle is and will act under color of state law. Defendant Preckwinkle is sued in her official capacity.

12.     Kimberly M. Foxx is Cook County's State's Attorney. As State's Attorney, Defendant Foxx has the duty to enforce State statutes and the County's ordinances, including those at issue here. *See id.* §3-9005. The enforcement duties include prosecuting those who violate the State's statutes and County's ordinances. Upon information and belief, Defendant Foxx is enforcing and will continue to enforce rifle and magazine bans at issue here. At all relevant times, Defendant Foxx is and will act under color of state law. Defendant Foxx is sued in her official capacity.

13.     Defendant Thomas J. Dart is the Sheriff of Cook County. As Sheriff, he enforces the County's ordinances. *See id.* §3-6019. He has authority to enforce the bans at issue here. *See, e.g.*, Cook Co. Ord. §§54-212, 54-213. Upon information and belief, Defendant Dart is enforcing and will continue to enforce rifle and magazine bans at issue here. At all relevant times, Defendant Dart is and will act under color of state law. Defendant Dart is sued in his official capacity.

14.     Defendant City of Chicago is a municipal entity organized under the constitution and laws of the State of Illinois.

15.     Defendant Larry B. Snelling is the Superintendent of Police for the Chicago Police Department. As Superintendent, he is "the chief executive officer of the Police Department" and is "responsible for the general management and control of the Police Department and shall have full and complete authority to administer the Department, except for those matters under the jurisdiction of the Office of Public Safety Administration, in a manner consistent with the ordinances of the City, the laws of the state, and the rules and regulations of the Police Board." Chi. Mun. Code, §2-84-040; *see also id.* §2-84-050. The superintendent is responsible for enforcing the City's gun ordinances. *See, e.g., id.* §§2-84-070, 2-84-070, 2-84-075. For example, the "superintendent has the authority to seize any firearm, assault weapon, ammunition, laser sight accessories, or firearm silencer or muffler carried or possessed in violation of this chapter or any applicable state or federal law. Such items are hereby declared contraband and shall be seized by and forfeited to the city." *Id.* §8-20-250. The

"superintendent has the authority to promulgate rules and regulations for the implementation of" the City's rifle and magazine bans. *Id.* §8-20-260. Upon information and belief, Defendant Snelling is enforcing and will continue to enforce rifle and magazine bans at issue here. At all relevant times, Defendant Snelling is and will act under color of state law. Defendant Snelling is sued in his official capacity.

## JURISDICTION AND VENUE

16.     This action arises under the United States Constitution and 42 U.S.C. §1983. This Court therefore has subject-matter jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1343.

17.     Venue is proper under 28 U.S.C. §1391. At least one defendant is located in the Northern District of Illinois, all defendants perform official duties there, and all defendants reside in Illinois. Venue is also proper because a substantial part of the events giving rise to the claims occurred within this district.

## BACKGROUND AND FACTUAL ALLEGATIONS

**A.      State and local law infringe Dr. Javier Herrera's lawful exercise of his Second Amendment rights.**

18.     Dr. Javier Herrera is a doctor of emergency medicine, including in a Chicago area public hospital. He was born and raised in Chicagoland and completed his medical training here.

19.     Dr. Herrera currently resides in Chicago, one of the most dangerous cities in the country. In 2019 alone, there were nearly 500 reported murders, more than 1,500 reported rapes, nearly 8,000 reported robberies, nearly 10,000 reported burglaries, and more than 15,000 reported aggravated assaults. *See 2019 Crime in the United States*, FBI, Table 8: Illinois, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-8/table-8-state-cuts/illinois.xls.   Crime   since then has soared.

20.     In 2023, the City of Chicago reported more than 35,000 violent crimes, including more than 600 homicides, more than 2,000 criminal sexual assaults, nearly 12,000 robberies, and nearly 9,800

aggravated assaults. *See Violence and Victimization Trends*, City of Chicago, https://www.chicago.gov/city/en/sites/vrd/home/violence-victimization.html.

21. Dr. Herrera is no stranger to Chicago violence and the acute need for self-defense. During his medical residency, an armed attacker killed the attending physician on duty and two others at the hospital where he was working. He rendered aid at the scene.

22. Dr. Herrera has a valid firearm owner's identification card and concealed carry permit. He has lawfully kept firearms for self-defense in his home, and used them for hunting and sport shooting.

23. Dr. Herrera owns a Glock 45, a common handgun. But state and local law prohibit the standard 17-round magazines that come with it. *See* 720 ILCS 5/24-1.10; Cook Co. Code of Ord. §§54-211, 212, 214; Chi. Mun. Code §§8-20-010, 8-20-085, 8-20-300.

24. Firearms are designed to function with standard components, and the use of non-standard magazines can impede the firearms' safety, reliability, and warranty. Dr. Herrera has experienced malfunctions with a firearm when used with non-standard magazines.

25. Because of the ban on the 17-round standard magazine for the Glock 45, Dr. Herrera keeps his Glock 45 inoperable in his home.

26. Dr. Herrera owns a Glock 43x, a common handgun, that he keeps for self-defense outside his home.. That firearm comes standard with a 10-round magazine. But for the state and local bans, he would keep a different firearm for self-defense inside his home..

27. Dr. Herrera owns two AR-15 rifles, the most common semiautomatic rifle in the United States. But local ordinances prohibit him from keeping an AR-15 at home. Cook Co. Code of Ord. §54-212; Chi. Mun. Code §8-20-075. Those ordinances also prohibit the standard 30-round magazines he uses with the AR-15. Cook Co. Code of Ord. §§54-211, 212, 214; Chi. Mun. Code §§8-20-010, 8-20-085, 8-20-300. Because of the ordinances, Dr. Herrera must store his AR-15 rifles, along

with the standard magazines for them, more than an hour away, beyond county lines. That has consequences for myriad aspects of Dr. Herrera's life and his fundamental rights.

28.     During Dr. Herrera's residency in 2018, he was recruited to serve as a medic on a Chicagoland SWAT team. He accepted the call and began additional training in tactical medicine—rendering medical aid in high-risk missions conducted by local law enforcement.

29.     Dr. Herrera continues to serve as a medic on the SWAT team. He is currently on a brief medical leave and will return to full participation in fall 2024. He also gives presentations on tactical medicine and has taught tactical medicine to medical students and residents as an assistant professor at a public university.

30.     The SWAT team conducts missions in notoriously dangerous neighborhoods. They respond to high-risk situations, including search-and-arrest warrants on subjects that are known or suspected to carry firearms, hostage situations, and active shooters. The team deploys with operators (area law enforcement officers who carry AR-15 rifles) and a medic.

31.     As the medic, Dr. Herrera is trained to give medical aid to officers, bystanders, perpetrators, or anyone else who may be injured at the scene. He does not carry a firearm on missions, but he trains with them to ensure he could quickly secure, unload, and make safe an injured officer's AR-15 in the field. His inability to do so would threaten his own life, as well as the lives of other officers and bystanders. In addition, because Dr. Herrera is stationed inside the command vehicle until called upon to render aid, the team's operators often hand him their AR-15 when they need to use a breaching tool or other specialized weapon. If Dr. Herrera were not confident with handling his personal AR-15—and if his teammates didn't trust him—that task would fall to another operator, reducing the number of available officers to complete the mission.

32.     As part of the team, Dr. Herrera attends training two to three days per month. He also completed SWAT school to familiarize himself with the tactical aspects of the team's mission set. This

cross-training ensures that Dr. Herrera is familiar with the team's maneuvers in the field for his own safety and the safe and effective operation of the team.

33.    Monthly team trainings include shooting and other tactical drills. The team trains with the AR-15, the rifle all operators use in the field. Dr. Herrera can and has participated in these drills using his personal AR-15 as part of his training to ensure he could secure, unload, and render safe another team member's rifle if necessary.

34.    It is not unusual for a medic like Dr. Herrera to participate in shooting and tactical drills. As the team medic, Dr. Herrera attempts to adhere to the best practices for tactical medical providers such as those approved by the American College of Emergency Physicians (ACEP), as outlined in its textbook on tactical emergency medicine. *See* Campbell, et al., *Tactical Medicine Essentials* (2nd ed. 2020).

35.    Consistent with his own SWAT team and teaching experience, ACEP instructs that SWAT medics must be comfortable handling SWAT officers' weapons and that the "most valuable education" comes from participating in regular monthly training with the team. *Tactical Medicine Essentials* at 14. According to ACEP's best practices:

- "There is a consensus among SWAT unit leaders … about major areas that should be learned and practiced by TMPs [tactical medical providers]. These include specific SWAT unit tactics, weapons training, and immediate action drills." *Tactical Medicine Essentials* at 12.

- "Regardless of whether or not the medical personnel are armed, at a minimum all TMPs should learn and maintain skills in safe weapons handling and unloading, as well as techniques for rendering weapons safe. Participation in routine marksmanship training is desirable, and medical personnel should be familiar with all types of weapons used by the SWAT unit." *Tactical Medicine Essentials* at 14.

- "Weapons training for TMPs must stress that, in the tactical environment, weapons should not be 'fired and forgotten.' TMPs should maintain weapons-handling skills and always seek to improve on their education." *Tactical Medicine Essentials* at 14.

- "At a minimum, [a TMP] should be familiar with how to make these weapons 'safe' by manipulating the safety and magazine release, and ideally know how to fire these weapons under duress should the need arise. This is especially true if [a TMP is] not a law

enforcement officer and ha[s] no formal law enforcement education." *Tactical Medicine Essentials* at 30.

- "Tactical medical providers (TMPs) must be competent with firearms….[A]s a TMP you must retain safe practices in weapons handling in order to be able to safely disarm downed officers and suspects when necessary." *Tactical Medicine Essentials* at 61.

- "[A] critically injured SWAT officer should allow a well-trusted and known SWAT officer or TMP to remove and secure his or her weapons. … [A TMP] must be knowledgeable and skilled in handling and making safe each type of weapon carried by the SWAT unit … includ[ing] the SWAT unit's long rifles." *Tactical Medicine Essentials* at 70-71.

- "The bottom line is that [a TMP] must have a baseline understanding of law enforcement and the operational aspects of the SWAT unit. In every unit, the primary role of the TMP is medical support, but, as in any uncontrolled environment, the unexpected sometimes occurs. You must be prepared to make a split-second decision when faced with an armed and high-threat criminal suspect. There will be times when a SWAT officer may not be immediately present to assist in resolving the situation. [A TMP] should learn and know use of force, self-defense laws, arrest and control techniques, and combat skills. Additional skills necessary in the tactical environment might include crowd control, weapon retention, and use of less-lethal weapons." *Tactical Medicine Essentials* at 13.

36.     Dr. Herrera had to handle an AR-15 on a real-world mission. In 2021, the team responded to an armed and barricaded murder suspect. One of the operators had to switch to a less-lethal firearm. The officer handed Dr. Herrera his AR-15 to secure in the back of his command vehicle. Dr. Herrera checked to verify that the weapon was safe, and he placed the weapon in the interior of the vehicle where he knew it could remain safe and under his watch. Dr. Herrera felt comfortable handling the officer's AR-15 because he had recent training with that firearm.

37.     Current law makes Dr. Herrera's participation in these monthly training drills with his AR-15 a practical impossibility.

38.     Because Dr. Herrera cannot keep his AR-15 rifles or necessary magazines in his home, he instead keeps them secured at a location more than an hour away from his Chicago residence.

39.     To attend team training with his AR-15, Dr. Herrera would have to make an hour-plus drive outside of Cook County to retrieve his rifle. From there, he would have to make an hour-plus drive south to the teams' training sites. After training, Dr. Herrera would have to make the reverse

trip to return his AR-15 to that location beyond county lines, and then drive another hour to return to his Chicago home. Including because training locations change, it is not feasible for Dr. Herrera to store his rifle at training sites.

40.     In practice—due to his working hours as an emergency medicine doctor and the hours of required travel—Dr. Herrera cannot attend training sessions with his AR-15. His inability to do so compromises his safety in the field. He cannot train with the team to ensure that he is familiar with the operators' movements and to ensure that he could swiftly secure, unload, and make safe an injured team members' rifle. Dr. Herrera believes that this training is essential to his safety and to building trust with his teammates.

41.     If Dr. Herrera could keep his AR-15 and required magazines in his home, he could participate in the team's training drills with his AR-15, improving his team's readiness and his ability to protect himself and others when the team is in the field.

42.     Dr. Herrera is a skilled AR-15 user—skilled enough to know that his confidence with a rifle depends on routine training and practice. The in-home bans for commonly owned rifles preclude him from maintaining that proficiency.

43.     Beyond his duties as a SWAT medic, Dr. Herrera uses or would use his AR-15 rifles for self-defense, hunting, and sport shooting. Given his personal experience with a workplace shooting, Dr. Herrera knows first-hand the stress of an active shooter situation. That is one reason he would prefer to use an AR-15 to defend himself from a violent intruder at home. Based on his own experience, it would be easier to use an AR-15 safely and accurately under stress compared to a handgun. The AR-15's design features, including the foregrip, pistol grip, and buttstock, give him more control over the firearm, reducing the risk of injury to himself or a bystander.

44.     Dr. Herrera also uses an AR-15 for recreational purposes. As a hobby, he visits indoor and outdoor ranges for target shooting. And he uses an AR-15 to hunt small game in neighboring

Indiana. But Dr. Herrera's ability to do so is hampered by state and local laws that require him to store his AR-15 rifles far from home.

45.     Dr. Herrera has an individual right to keep and bear arms in Illinois just as he would if he were a resident of any other State. But state and local laws have erected serious barriers to Dr. Herrera's exercise of that fundamental right.

**B.     Illinois bans on the sale, purchase, and possession of rifles and magazines.**

46.     On January 10, 2023, Governor Pritzker signed into law the "Protect Illinois Communities Act." Ill. Pub. Act 102-1116, §1. The "Act takes effect upon becoming law." *Id.* §99. The Act's effective date was therefore January 10, 2023, unless otherwise specified, and it is in effect now.

47.     The Act creates two new sections to the Illinois Compiled Statutes: 720 ILCS 5/24-1.9 (the rifle ban) and 720 ILCS 5/24-1.10 (the magazine ban). *Id.* §25. It also amends section 24-1 of the Criminal Code of 2012. *Id.*

48.     Under the Act's amendments to the criminal code, a "person commits the offense of unlawful use of weapons when he knowingly … possesses any assault weapon … in violation of Section 24-1.9," 720 ILCS 5/24-1(a)(15), or "knowingly … purchases any assault weapon … in violation of Section 24-1.9," 720 ILCS 5/24-1(a)(16). The Act punishes the knowing purchase of an "assault weapon" as a Class A misdemeanor and the knowing possession of an "assault weapon" as a Class C felony. 720 ILCS 5/24-1(b).

49.     Section 24-1.9, in turn, contains the Act's rifle ban. It defines "assault weapon" to include, *inter alia*, "[a] semiautomatic rifle that has the capacity to accept a detachable magazine … if the firearm has … a pistol grip." 720 ILCS 5/24-1.9(a)(1)(A)(i). The Act expressly names "[a]ll AR types, including" the "AR-15." *Id.* §24-1.9(a)(1)(J)(ii)(II).

50.     Section 24-1.9 declares that selling, purchasing, or possessing so-called assault weapons is unlawful. First, it declares that as of January 10, 2023, "it is unlawful for any person within this State to knowingly … sell or purchase … an assault weapon." *Id.* §24-1.9(b). Second, it declares that as of January 1, 2024, "it is unlawful for any person within this State to knowingly possess an assault weapon." *Id.* §24-1.9(c).

51.     Section 24-1.9 contains a grandfather provision requiring registration of rifles that the state deems as "assault weapons." It applies only to those who possessed an "assault weapon" before January 10, 2023, or "inherited" one from someone who did. *Id.* §24-1.9(d). To be eligible, the grandfather provision requires the detailed registration of such firearms with the Illinois State Police, including "the make, model, caliber, and serial number of the … assault weapon." *Id.*

52.     In addition to the registration requirement, the text of the grandfather provision covers "possession" only and only in certain places. *Id.* §24-1.9(d). It does not indicate whether any grandfathered arms may actually be used for self-defense. The grandfather provision says that those eligible may "possess" rifles on his own "private property"; on "private property that is not open to the public with the express permission of the person who owns or immediately controls such property"; on "the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair"; "at a properly licensed firing range or sport shooting competition venue"; or "while traveling to or from these locations, provided that the assault weapon … is unloaded and the assault weapon … is enclosed in a case … or other container." *Id.*

53.     The Act also includes a magazine ban in section 24-1.10.

54.     Section 24-1.10 defines "'[l]arge capacity ammunition feeding device'" to mean "a magazine … that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns." 720 ILCS 5/24-1.10(a)(1).

55.     Section 24-1.10 bans both the purchase and possession of those magazines. The Act prohibits the "knowing[] … purchase … [of] a large capacity ammunition feeding device." *Id.* §24-1.10(b). Second, it makes it "unlawful to knowingly possess a large capacity ammunition feeding device." *Id.* §24-1.10(c).

56.     There is a narrow grandfather provision. The possession ban "does not apply … if the person lawfully possessed" them before January 10, 2023, but it again limits the places and circumstances where a person may "possess" the magazines and does not say expressly whether they may actually be used for self-defense. *Id.* §24-1.10(d). A "person shall possess such device only" on his own "private property"; or "on private property that is not open to the public with the express permission of the person who owns or immediately controls such property"; "while on the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair"; "while engaged in the legal use of the large capacity ammunition feeding device at a properly licensed firing range or sport shooting competition venue"; or "while traveling to or from these locations, provided that the large capacity ammunition feeding device is stored unloaded and enclosed in a case … or other container." *Id.* §24-1.10(d)(1)-(5). The grandfather provision does not permit the purchase of new magazines by lawful gun owners.

57.     Section 24-1.10 criminalizes the purchase and possession of magazines. It declares that a "person who knowingly purchases" or "possesses …in violation of this Section a large capacity ammunition feeding device capable of holding more than 10 rounds of ammunition for long guns or more than 15 rounds of ammunition for handguns commits a petty offense with a fine of $1,000 for each violation." *Id.* §24-1.10(g).

58.     After signing the Act, Governor Pritzker stated, "This legislation will stop the spread of assault weapons [and] high-capacity magazines." As for enforcement, he said "that the State Police is responsible for enforcement … and they will, in fact, do their job or they won't be in their job."

15

Governor Pritzker also promised that the "state police and law enforcement across the state … will, in fact, enforce this law." He promised to defend the Act in court. And he threatened ordinary citizens: "anybody who doesn't comply, there are consequences for that." "You don't get to choose which laws you comply with in the State of Illinois, let's be clear," Governor Pritzker stated.

59.     In a Tweet, Governor Pritzker stated that the Act "immediately bans the sale and distribution of assault weapons" and "high-capacity magazines." He described the Act as "one of the strongest assault weapons bans in the nation." The Governor promised "to end the sale of" the targeted rifles "as soon as possible."

60.     Defendant Raoul has publicly said that law enforcement agencies of the State will enforce the law.

61.     Defendant Dart, as Sheriff of Cook County, testified in support of the State ban during a House Committee hearing. "There is no sane person who's going to sit there and say in our society we should have these," he stated.

62.     The State Defendants are enforcing the Act and will continue to do so.

**C.     Cook County bans possession of rifles and magazines.**

63.     Cook County bans both commonly owned rifles and magazines.

64.     The County ordinance declares that "[i]t shall be unlawful for any person to … acquire, carry or possess any assault weapon or large capacity magazine in Cook County." Cook Co. Code of Ord. §54-212(a). "Any assault weapon or large capacity magazine possessed, carried, sold or transferred in violation of Subsection (a) of this section is hereby declared to be contraband and shall be seized and disposed of." *Id.* §54-212(b).

65.     The ordinance defines "assault weapon" to mean "[a] semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise" and expressly includes the "AR-

15" and similar rifles. *Id.* §54-211(1), (7)(A)(iii). "*Large-capacity magazine* means any ammunition feeding device with the capacity to accept more than ten rounds." *Id.* §54-211.

66.　　If a person violates the County's ban, he "shall be fined not less than $5,000.00 and not more than $10,000.00 and may be sentenced for a term not to exceed more than six months imprisonment." *Id.* §54-214(a).

67.　　The County therefore prohibits residents of the County from acquiring, carrying, or possessing AR-15s and so-called large-capacity magazines when in the County.

68.　　The County Defendants are enforcing these bans and will continue to do so.

**D.　　The City of Chicago bans the possession of rifles and magazines.**

69.　　The Municipal Code of Chicago contains an outright rifle ban. The Code declares that "[i]t shall be unlawful for a person to import, sell, manufacture, transfer, or possess an assault weapon." Chi. Mun. Code §8-20-075(a). "Any assault weapon carried, possessed, displayed, sold or otherwise transferred in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city." *Id.* §§8-20-075(d).

70.　　The Code defines an "assault weapon" to mean "[a] semiautomatic rifle that has the ability to accept a detachable magazine and has … a handgun grip." *Id.* §8-20-010. The Code expressly includes the "AR-15" rifle and ones like it. *See id.*

71.　　"[A]ny person who violates section 8-20-075 … shall be fined not less than $1,000.00 nor more than $5,000.00 and be incarcerated for a term of not less than 90 days nor more than 180 days." *Id.* §8-20-300(a). Penalties increase with subsequent offenses. *Id.* §8-20-300(b). The Code states that the "superintendent has the authority to seize any … assault weapon … carried or possessed in violation of this chapter" and that such "items are declared contraband" that "shall be destroyed at the direction of the superintendent." *Id.* §8-20-250.

72.     The Code also bans so-called high-capacity magazines. *See id.* §8-20-085. The Code defines "high capacity magazines" to mean any "magazine … that has an overall capacity of more than 15 rounds of ammunition." *Id.* §8-20-010. "It is unlawful for any person to carry, possess, sell, offer or display for sale, or otherwise transfer any high capacity magazine." *Id.* §8-20-085(a). "Any high capacity magazine … carried, possessed, displayed, sold or otherwise transferred in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city." *Id.* §8-20-085(b).

73.     "[A]ny person who violates section … 8-20-085 … shall be fined not less than $1,000.00 nor more than $5,000.00 and be incarcerated for a term of not less than 90 days nor more than 180 days." *Id.* §8-20-300(a). Penalties increase for subsequent violations. *Id.* §8-20-300(b).

74.     The City Defendants are enforcing these bans and will continue to do so.

**E.     The rifles and magazines that Illinois, Cook County, and the City of Chicago target are civilian arms in common use for lawful purposes.**

75.     An AR-15 is a semiautomatic rifle.

76.     "Semiautomatic firearms, which require shooters to reengage the trigger for every shot, are not machineguns." *Garland v. Cargill*, 602 U.S. 406, 410 (2024).

77.     "A semi-automatic gun 'fires only one shot with each pull of the trigger' and 'requires no manual manipulation by the operator to place another round in the chamber after each round is fired.'" *Heller*, 670 F.3d at 1285 (Kavanaugh, J., dissenting) (quoting *Staples v. U.S.*, 511 U.S. 600, 602 n.1 (1994)). "That is in contrast to an automatic gun—also known as a machine gun—which 'fires repeatedly with a single pull of the trigger.'" *Id.*

78.     The United States military does not use AR-15s.

79.     Standard rifles issued by the United States military must be capable of fully or partially automatic fire. Fully or partially automatic fire is needed for certain battlefield tactics, including providing cover. Military-issued weapons include the M16 and the M4, rifles that have the capability

to shoot fully automatically or in three-round bursts. The general public generally cannot own these weapons; they are reserved for military use.

80. AR-15s, by contrast, are civilian rifles. *Staples v. United States*, 511 U.S. 600, 603, 611-12 (1994). They are not reserved for military use.

81. AR-15s are not functionally the same as M16s or M4s. An M16 in automatic mode can fire up to 800 rounds per minute, and an M4 in automatic mode can fire up to 970 rounds per minute.

82. A proficient AR-15 user can accurately fire 45 rounds per minute. A proficient user of a semiautomatic handgun can accurately fire at about the same rate.

83. Although the AR-15 is not a military rifle, they are the kinds of rifles that are "typically possessed" by civilians and that "could contribute to the common defense" if the need were to arise. *United States v. Miller*, 307 U.S. 174, 178-79 (1939). Gaining proficiency with an AR-15 develops skills that could carry over to military-issued weapons or for military or militia use. A civilian who obtains proficiency with the civilian AR-15 would not have to undergo extensive training to transition from using his rifle to a military-issued weapon if called to serve in the militia or armed forces.

84. Relatedly, if there were a shortage of military-issued weapons, components could be added to an AR-15 so that it could be used as a civilian substitute. Because of the platform's standardized parts, detachable magazine, low cost, and adaptability, individuals called to militia service could add certain military-issued components to equip their rifle for military use if there were shortages.

85. The AR-15s standardized ammunition also makes it a civilian rifle that can be useful for personal defense and the common defense. It is a .22-caliber rifle. A standard AR-15 fires common .223 Remington ammunition, which has a bullet with roughly a 0.223-inch diameter.

86.     Common AR-15 ammunition is not significantly larger or more lethal than standard ammunition commonly used by civilians for hunting game. In fact, it is significantly smaller and less powerful than many common firearms used for hunting.

87.     For example, many rifles used for deer hunting fall within the class of .30-caliber rifles (pronounced "thirty"). These rifles are more powerful than a .22-caliber rifle and fire a bullet between 0.3 and 0.399-inch in diameter. Common .30-caliber deer hunting rifles use .30-06, .308 Winchester, and .300 Winchester Magnum ammunition. Figure 1 shows a side-by-side comparison of the .223 Remington cartridge that is typical of AR-15 rifles, and the .30-06 cartridge that is typical of deer hunting rifles.



Figure 1 – Comparison of .30-06 (left) and .223 Remington (right).

88.     All semiautomatic rifles require magazines to function.

89.     Magazines are not optional because they are integral to the operating cycle of a semiautomatic firearm. The magazine holds the ammunition for the firearm. A semiautomatic firearm is not designed to allow the user to bypass the magazine and directly insert a round into the chamber.

90.     AR-15 rifles are designed to use detachable 30-round magazines. They come standard with such magazines.

91.     Aftermarket magazines with a different capacity (whether less or more) may cause the firearm to malfunction.  As a consequence, these magazines may not reliably feed ammunition into the AR-15.

92.     "Semi-automatic rifles [are] in common use," *Heller*, 670 F.3d at 1287-88 (Kavanaugh, J., dissenting), and are "commonly available," *Cargill*, 602 U.S. at 430 (Sotomayor, J., dissenting). "[A]bout 40 percent of rifles sold in 2010 were semi-automatic." *Id.* And "the Supreme Court already stated that semi-automatic weapons 'traditionally have been widely accepted as lawful possessions.'" *Id.* (quoting *Staples*, 511 U.S. at 612).

93.     Americans purchase semiautomatic rifles for lawful purposes. In 2018, about "34% of buyers purchased" a semiautomatic rifle "for personal protection, while 36% purchased for target practice or informal shooting, and 29% purchased for hunting." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (2021), *vac'd and rem.*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). "In contrast, only 5% of traditional rifles were bought for personal protection." *Id.* "During 2018, approximately 18,327,314 people participated nationally in target and sport shooting specifically with" semiautomatic rifles. *Id.*

94.     Among semiautomatic rifles, the AR-15 is by far the most popular for civilian use.

95.     The Supreme Court recognized that AR-15s were "widely accepted as lawful possessions" nearly three decades ago in *Staples v. United States*, 511 U.S. 600, 612 (1994)); *see also Heller*, 670 F.3d at 1288 (Kavanaugh, J., dissenting).

96.     "[T]he AR-15 semiautomatic rifle appeared in 1963 and sold with a standard twenty-round magazine. … Since that time it has become '[t]he most popular rifle in American history.'" *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey (ANJRPC II)*, 974 F.3d 237, 256 (3d Cir.

2020) (Matey, J., dissenting), *cert. granted, judgment vac'd sub nom.* 142 S. Ct. 2894 (2022) (quoting David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859-60 (2015)).

97.     At least "1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market." *Id.*

98.     The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) recognized the ubiquity of AR-15s in a recent rulemaking. There, the agency described the AR-15 as "one of the most popular firearms in the United States," including "for civilian use." *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022).

99.     According to data based in part on reports and data by the ATF and the U.S. International Trade Commission, about 24.5 *million* modern semiautomatic rifles like the AR-15 have been in circulation in the United States since 1990. About 2.8 million were produced in 2020 alone. "There are more [such rifles] in circulation today than there are Ford F-Series trucks on the road." *See* National Shooting Sports Foundation, *Commonly Owned: NSSF Announces over 24 million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/.

100.     Another report states that "30.2% of gun owners—about 24.6 million individuals—have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total)." William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 2, 20 (May 18, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

101.     A Washington Post-Ipsos survey demonstrates that Americans who own AR-15s do so for lawful purposes like self-defense. *See* Emily Guskin et al., *Why do Americans own AR-15s?*, Wash. Post (Mar. 27, 2023), https://perma.cc/T56T-4SXZ. The survey "is one of the most detailed

nationally representative surveys to date on the opinion of AR-15 owners." *Id.* The survey was conducted "among a random national sample of 2,104 gun owners." Wash. Post (Mar. 27, 2023), https://perma.cc/UB8J-Y4KN. The survey found that 20% of gun owners own an AR-15-style rifle. *Id.* at 1. Of those, 91% reported defense as a reason for owning an AR-15-style rifle, with 65% saying it is a "major reason." *Id.* Another 48% identified hunting as a reason for owning AR-15-style rifles. *Id.*

102.    Millions of law-abiding Americans own AR-15-style rifles for lawful purposes.

103.    The standard magazines for AR-15s, which hold 30 rounds, are likewise "in 'common use.'" *Heller*, 670 F.3d at 1261. Similarly, standard magazines for handguns as common as the Glock 45 exceed ten rounds.

104.    "[F]ully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000." *Heller*, 670 F.3d at 1261. At least 79 million rifle magazines with 30+ round capacities are in civilian possession.

105.    About half of gun owners—about 39 million people—own magazines that hold more than ten rounds, and "542 million such magazines have been owned." *See* English, *supra.*, at 1-2, 20.

106.    These magazines, and the firearms that use them, are used for lawful purposes like self-defense and hunting. *See Ass'n of New Jersey Rifle & Pistol Clubs, Inc. (ANJRPC I) v. Att'y Gen.*, 910 F.3d 106, 116-17 (3d Cir. 2018), *abrogated by Bruen*, 142 S. Ct. 2111 (2022) ("The record shows that millions of magazines are owned, often come factory standard with many semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense.").

107.    Unsurprising in light of the ubiquity of these rifles and magazines, rifle and magazine bans have no historical pedigree.

108.     Firearms with magazines that hold over 15 rounds date back at least to the mid-nineteenth century. By 1855, Volcanic Repeating Arms Company sold carbine rifles with an integrated magazine holding between 20 and 30 rounds, depending on the model. Shortly after, in 1860, the New Haven Arms Company sold the Henry Repeating Rifle with a 16 round integrated magazine.

109.     There is no "evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding." *Heller*, 670 F.3d at 1260. The earliest examples of semiautomatic rifle and magazine regulation come from the last century: two isolated bans passed in 1927 and 1932. *See Heller*, 670 F.3d at 1260 & n.*.

110.     There is a long lineage of similar magazines sold for civilian use in the United States, but "there is no longstanding history of [large-capacity magazine] regulation." *ANJRPC*, 910 F.3d at 116-17. And while some jurisdictions passed similar bans in later decades, "most of those laws were invalided by the 1970s." *ANJRPC*, 910 F.3d at 117 n.18. And none of those regulations imposed magazine restrictions with "as low as [a] 10-round limit." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1152-53 (S.D. Cal. 2019).

111.     Regulation of modern magazines—which detach from the firearm to facilitate reloading—is even more recent. "The oldest statute limiting the permissible size of a detachable firearm magazine" was introduced in 1990 by New Jersey. *Duncan*, 366 F. Supp. 3d at 1149. A federal statute from 1994 "addressed magazines holding more than 10 rounds" but that statute "lapsed in 2004 and has not been replaced." *Id.*

112.     The bans in Illinois, Cook County, and the City of Chicago are ahistorical and unconstitutional.

**F. AR-15s are far less likely to be used in crime than firearms that Illinois, Cook County, and Chicago permit.**

113.     Dangerousness alone is not grounds for banning firearms. *See Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (describing unusual *and* dangerous conjunctive test); *id.* at 417-18 (Alito, J., concurring) ("virtually every covered arm would qualify as dangerous").

114.     Semiautomatic rifles like the AR-15 are no more dangerous to society at large than handguns. *See Heller*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) ("[S]emi-automatic handguns are more dangerous as a class than semi-automatic rifles because handguns can be concealed.").

115.     Handguns are more frequently used to commit violent crimes like murder than rifles of any kind, including semiautomatic rifles such as the AR-15. *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) (explaining that although "handguns comprise only about one-third of the nation's firearms, by some estimates they account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes").

116.     The Federal Bureau of Investigations publishes crime statistics. The data are broken down by weapon used to commit the offense.

117.     The following table includes some of the FBI's data relating to murder victims and the identifiable arms used to kill them in the United States between 2015-2019:

| Weapons | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Handguns | 6,194 | 6,778 | 7,052 | 6,683 | 6,368 |
| Rifles | 215 | 300 | 389 | 305 | 364 |
| Shotguns | 248 | 247 | 263 | 237 | 200 |
| Other guns | 152 | 172 | 178 | 164 | 45 |
| Knives | 1,533 | 1,562 | 1,608 | 1,542 | 1,476 |
| Personal weapons (hands, fists, etc.) | 651 | 668 | 715 | 712 | 600 |
| Blunt objects | 438 | 466 | 474 | 455 | 397 |

Source: FBI, "2019 Crime in the United States: Murder Victims by Weapon, 2015-2019," https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls

118.    As these statistics show, a victim is multiple times more likely to be killed by a knife than a rifle of any kind, and nearly twice as likely to be killed by an attacker's hands or fists.

119.    Criminals, moreover, are responsible for the danger that these statistics represent, not the firearms they sometimes use. The existence of gun crime cannot erase the fact that the AR-15, Glock 45, and other similar firearms are commonly—and overwhelmingly—used by Americans for lawful purposes.

G.    **Illinois, Cook County, and the City of Chicago laws unconstitutionally infringe fundamental self-defense rights.**

120.    Dr. Herrera has a fundamental right to defend himself, including against gun crime, and to otherwise keep and bear arms for lawful purposes.

121.    State and local laws infringe that fundamental Second Amendment right in several ways.

122.    Foremost, the County and City ordinances mean that Dr. Herrera cannot possess his AR-15 rifles or standard magazines at his Chicago home for self-defense.

123.    The County and City ordinances mean that Dr. Herrera cannot keep his Glock 45 operable at home for self-defense, because the Glock 45 comes standard with 17-round magazines.

124.    The County and City ordinances mean that Dr. Herrera cannot as a practical matter bring his rifle to monthly training with the SWAT team.

125.    The County and City ordinances deny Dr. Herrera easy access to his rifles for hunting and sport shooting in his off time. As a result, Dr. Herrera engages in these hobbies less than he otherwise would.

126.    The State, County, and City magazine bans prohibit Dr. Herrera from purchasing new magazines of standard size for his Glock 45 and AR-15 rifles, and thus ban Dr. Herrera from replacing

those essential components as they wear out. But for the state and local bans, Dr. Herrera would purchase new standard magazines.

127.     The State, County, and City rifle bans prohibits Dr. Herrera from purchasing new AR-15 components or a new AR-15 rifle. But for the bans, Dr. Herrera would purchase another AR-15 and AR-15 components to accommodate his multiple uses for that style of firearm. As a result of the bans, he cannot.

128.     The State ban prohibits Dr. Herrera from purchasing new rifles, new components, or new magazines. Dr. Herrera could merely "possess" what he has at specified locations—locations that would not include his own home as a result of the County and City bans.

**CLAIMS FOR RELIEF**

**COUNT I**
**Second and Fourteenth Amendments**
**(Illinois Magazine Ban—State Defendants)**
**42 U.S.C. §1983**

129.     Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

130.     Dr. Herrera has been deprived of his Second and Fourteenth Amendment rights by Defendants, acting under color of law.

131.     The Second Amendment secures the right to possess and purchase "arms" that are in "common use" for lawful purposes. *See Heller* 554 U.S. at 627; *see also McDonald v. City of Chicago*, 561 U.S. 742 (2010) (applying the Second Amendment to the City of Chicago and all other States and government subdivisions).

132.     Government officials cannot ban commonly owned arms. Those bans are ahistorical. Firearm restrictions are permissible only if "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135.

133. "[M]agazines are 'arms' within the meaning of the Second Amendment." *ANJRPC*, 910 F.3d at 116; *see also United States v. Miller*, 307 U.S. 174, 180 (1939) (The right to arms "implie[s] the possession of ammunition."). At the very least, the Second Amendment protects components of arms that are necessary for them to function as intended.

134. The Second Amendment thus forbids enforcement of the laws banning the possession and purchase of magazines.

135. Section 24-1.10 unconstitutionally bans the possession and purchase of rifle and handgun magazines with capacities of greater than 10 and 15 rounds, respectively.

136. Magazines with these capacities are in common use for lawful purposes, including self-defense.

137. Section 24-1.10 also infringes the right to use firearms that use these standard magazines to function. Those firearms include the AR-15 rifle and the Glock 45 handgun.

138. The Second Amendment thus forbids enforcement of section 24-1.10.

139. Dr. Herrera owns firearms designed to use magazines that exceed the capacity limits imposed by section 24-1.10. But for section 24-1.10's ban, Dr. Herrera would purchase new magazines, including to replace his existing magazines as they wear out.

140. State actors who deprive individuals of these federal constitutional rights under color state law violate federal law. *See* 42 U.S.C. § 1983.

141. Defendants, under color of state law, will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the magazine ban.

142. For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

**COUNT II**
**Second and Fourteenth Amendments**
**(Illinois Rifle Sale and Purchase Ban—State Defendants)**
**42 U.S.C. §1983**

143.     Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

144.     Semiautomatic rifles such as the AR-15 are "arms" within the meaning of the Second Amendment. Semiautomatic rifles are in common use for lawful purposes. Indeed, the AR-15 is "one of the most popular firearms in the United States," including "for civilian use." 87 Fed. Reg. at 24655; *see also Heller*, 670 F.3d at 1288 (Kavanaugh, J., dissenting) ("[A]s the Supreme Court noted in *Staples* [*v. U.S.*], the AR-15 is in common use by law-abiding citizens and has traditionally been lawful to possess.").

145.     AR-15 rifles are not military rifles. No branch of the armed forces uses them. They are civilian rifles intended for civilian use.

146.     The Second Amendment thus forbids enforcement of state laws that ban the possession and purchase of semiautomatic rifles such as AR-15s. Restrictions on the possession and purchase of these rifles are permitted by the Second Amendment only if they are consistent with a historical tradition of firearm regulation in the United States.

147.     Section 24-1.9 bans the possession and purchase of modern semiautomatic rifles, including the AR-15. The ban prohibits possession, anywhere in the State, if AR-15s are acquired after January 10, 2023, and it allows possession of previously acquired AR-15s only in a narrow set of locations and only if compliant with registration requirements.

148.     The Second Amendment thus forbids enforcement of section 24-1.9.

149.     Dr. Herrera owns AR-15s that he acquired before section 24-1.9 was enacted. To continue possessing those rifles, he had to comply with the registration requirement. Even now, he may only possess those arms in limited locations. But for section 24-1.9's ban, Dr. Herrera would use

them for self-defense if a need for armed self-defense arose. He would also purchase a new AR-15 and AR-15 components for lawful purposes, including self-defense and hunting.

150. State actors who deprive individuals of these federal constitutional rights under color state law violate federal law. *See* 42 U.S.C. § 1983.

151. Defendants, under color of state law, will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the rifle ban.

152. For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

## COUNT III
### Second and Fourteenth Amendments
### (Cook County Rifle Ban—Cook County and Defendants Preckwinkle, Foxx, and Dart)
### 42 U.S.C. §1983

153. Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

154. Defendants are "person[s]" acting under color of law within the meaning of 42 U.S.C. §1983.

155. The Cook County rifle ban is an official policy for purposes of 42 U.S.C. §1983.

156. The County bans the acquisition, carriage, or possession of rifles that are commonly owned for lawful purposes such as the AR-15. *See* Cook Co. Code of Ord. §§54-211, 54-211(a)(7)(iii), 54-212(a)-(c), 54-214. The County rifle ban prohibits residents from keeping rifles like the AR-15 in their homes. They also prohibit them from acquiring AR-15s.

157. The Second Amendment forbids the County from banning the purchase or possession of commonly owned rifles.

158. Dr. Herrera owns AR-15 rifles that he must keep outside Cook County. But for the County rifle ban, he would also purchase a new AR-15 and AR-15 components for lawful purposes.

159.     State actors who deprive individuals of these federal constitutional rights under color law violate federal law. *See* 42 U.S.C. § 1983.

160.     Defendants, under color of law, are depriving and will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the County rifle ban.

161.     For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

**COUNT IV**
**Second and Fourteenth Amendments**
**(Cook County Magazine Ban— Cook County and Defendants Preckwinkle, Foxx, and Dart)**
**42 U.S.C. §1983**

162.     Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

163.     Defendants are "person[s]" acting under color of law within the meaning of 42 U.S.C. §1983.

164.     The Cook County magazine ban is an official policy for purposes of 42 U.S.C. §1983.

165.     Cook County's ordinances ban the acquisition, carriage, and possession of magazines that are common and come standard in commonly owned rifles such as the AR-15 or commonly owned handguns such as the Glock 45. *See* Cook Co. Code of Ord. §§54-211, 54-211(a)(7)(iii), 54-212(a)-(c), 54-214.

166.     The County magazine ban also effectively bans the acquisition and possession of firearms that use these standard magazines to function.

167.     The Second Amendment forbids the County from banning magazines in this way.

168.     Dr. Herrera owns firearms designed to use magazines that exceed the capacity limits imposed by the County magazine ban. But for the ban, Dr. Herrera would keep these magazines in his Cook County residence and use them for self-defense if a need for armed self-defense arose. But

31

for the ban, he would keep his Glock 45 operable with its standard 17-round magazine. He would also purchase new magazines, including to replace his existing magazines as they wear out.

169.     State actors who deprive individuals of these federal constitutional rights under color law violate federal law. *See* 42 U.S.C. § 1983.

170.     Defendants, under color of law, are depriving and will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the County magazine ban.

171.     For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

**COUNT V**
**Second and Fourteenth Amendments**
**(Chicago Rifle Ban—City of Chicago and Defendant Snelling)**
**42 U.S.C. §1983**

172.     Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

173.     Defendants are "person[s]" within the meaning of 42 U.S.C. §1983.

174.     The Chicago rifle ban constitutes an official policy for purposes of 42 U.S.C. §1983.

175.     Chicago's Municipal Code bans the possession and carriage of commonly owned semiautomatic rifles such as the AR-15. *See* Chi. Mun. Code §§8-20-010, 8-20-075, 8-20-300. The Chicago rifle ban prohibits Chicagoans from keeping rifles such as the AR-15 in their homes. It also prohibits them from acquiring AR-15s.

176.     The Second Amendment forbids enforcement of the Municipal Rifle Ban.

177.     Dr. Herrera owns AR-15 rifles that he that he must keep outside the City of Chicago. But for the Chicago rifle ban, Dr. Herrera would possess his rifles in his Chicago residence for lawful purposes. He would also purchase a new AR-15 and AR-15 components for these lawful purposes.

178.     State actors who deprive individuals of these federal constitutional rights under color law violate federal law. *See* 42 U.S.C. § 1983.

179.    Defendants, under color of law, are depriving and will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the Chicago rifle ban.

180.    For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

## COUNT VI
### Second Amendment
### (Chicago Magazine Ban—City of Chicago and Defendant Snelling)
### 42 U.S.C. §1983

181.    Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

182.    Defendants are "person[s]" within the meaning of 42 U.S.C. §1983.

183.    The Chicago magazine ban constitutes an official policy for purposes of 42 U.S.C. §1983.

184.    Chicago's Municipal Code bans the possession and carriage of magazines that are common and standard in commonly owned rifles such as the AR-15 or commonly owned handguns such as the Glock 45. *See* Chi. Mun. Code §§8-20-010, 8-20-085, 8-20-300.

185.    The Chicago magazine ban also effectively bans the possession of firearms that require these magazines to function.

186.    The Second Amendment forbids enforcement of the Chicago magazine ban.

187.    Dr. Herrera owns firearms designed to use magazines that exceed the capacity limits imposed by the Chicago magazine ban. But for the ban, Dr. Herrera would keep these magazines in his Chicago home and use them for self-defense if a need for armed self-defense arose. But for the ban, he would keep his Glock 45 operable with its standard 17-round magazine. He would also purchase new magazines, including to replace his existing magazines as they wear out.

188.    State actors who deprive individuals of these federal constitutional rights under color law violate federal law. *See* 42 U.S.C. § 1983.

189.    Defendants, under color of law, are depriving and will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the Chicago magazine ban.

190.    For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants and provide the following relief:

A.    a declaratory judgment that the Illinois Act is unconstitutional;

B.    a declaratory judgment that the Cook County ordinance is unconstitutional;

C.    a declaratory judgment that the City of Chicago ordinance is unconstitutional;

D.    a permanent injunction barring Defendants from enforcing the Illinois Act;

E.    a permanent injunction barring Defendants from enforcing the Cook County ordinance;

F.    a permanent injunction barring Defendants from enforcing the City of Chicago ordinances;

G.    reasonable costs and expenses of this action, including attorneys' fees under 42 U.S.C. §1988 and any other applicable laws; and

H.    all other relief that Plaintiff is entitled to, as the Court deems just and proper.

Dated: August 14, 2024

Respectfully submitted,

*/s/ Taylor A.R. Meehan*

Gene P. Hamilton*
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

Gregory Abbott Bedell
GREGORY A. BEDELL, CHARTERED
33 North Dearborn Street, 10th Floor
Chicago, IL 60602
(312) 307-7558
gbedell@gabchartered.com

* Pro hac vice

Thomas R. McCarthy*
Jeffrey M. Harris*
Taylor A.R. Meehan (IL ARDC 6313481)
Gilbert Dickey*
C'Zar D. Bernstein*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
jeff@consovoymccarthy.com
taylor@consovoymccarthy.com
gilbert@consovoymccarthy.com
czar@consovoymccarthy.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2024, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to counsel of record.

Dated: August 14, 2024

*/s/ Taylor A.R. Meehan*
Taylor A.R. Meehan

35